**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **THE ESTATE OF MALCOLM J. BRYANT** * | |
| Lamar Estep & Malique Bryant | |
| Co-Personal Representatives * | |
| 5438 Shanning Road | |
| Baltimore, MD 21229 * | |
| | |
| Plaintiff, * | |
| | |
| v. * | Civil No. _____ |
| | |
| **BALTIMORE POLICE DEPARTMENT** * | **JURY DEMAND** |
| | |
| <u>**Serve on:**</u> * | |
| Interim Commissioner Gary Tuggle | |
| 601 E. Fayette Street * | |
| Baltimore, Maryland 21201 | |
| * | |
| **WILLIAM F. RITZ** | |
| 164 Carina Drive * | |
| Jupiter, FL 33478 | |
| * | |
| **BARRY VERGER** | |
| 7808 Reston Lane * | |
| Rosedale, MD 21237 | |
| * | |
| **UNKNOWN EMPLOYEES OF THE** | |
| **BALTIMORE POLICE DEPARTMENT** * | |
| 601 E. Fayette Street | |
| Baltimore, MD 21201 * | |
| | |
| Defendants. * | |
| | |
| * | |
| _____ * | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff the Estate of Malcolm J. Bryant, through its personal representatives Lamar

Estep and Malique Bryant, and by its undersigned attorneys, Nick Brustin, Anna Benvenutti

Hoffmann, Meghna Philip, and Rakim Brooks, and Neufeld, Scheck & Brustin, LLP, and Joshua

Treem, Jean M. Zachariasiewicz, Chelsea J. Crawford, and Brown, Goldstein & Levy, LLP,

alleges as follows:

## INTRODUCTION

1.      Before he was exonerated by DNA evidence, Malcolm J. Bryant was sentenced to

life in prison and spent more than 17 years incarcerated for a brutal crime he did not commit—

the 1998 assault and murder of 16-year-old Toni Bullock.

2.      Mr. Bryant was completely innocent of this crime and had no knowledge of the

true perpetrator.

3.      Mr. Bryant's wrongful conviction was no accident. It was the result of serious

misconduct by the Baltimore Police Department (BPD) officers investigating Ms. Bullock's

murder. BPD lead investigator William F. Ritz intentionally, or with deliberate indifference,

obtained a misidentification of Mr. Bryant from Tyeisha Powell, the single eyewitness presented

at trial. Detective Ritz failed to disclose evidence about a second eyewitness whose account

contradicted and undermined Tyeisha Powell's. He also failed to disclose incriminating evidence

pointing to the likely true perpetrator, John Doe[1], including a witness statement incriminating

Doe and undermining his denials of culpability, and a composite sketch that more closely

resembled Doe than Mr. Bryant.

4.      No physical or forensic evidence ever inculpated Mr. Bryant. Mr. Bryant

truthfully maintained his innocence throughout his prosecution, conviction, and incarceration.

5.      In 2016, testing of male DNA found on the victim's fingernail clippings, as well

as male DNA found near a stab wound on her t-shirt, revealed a full DNA profile of the true

---

[1] Because the likely true perpetrator has not been criminally charged for Ms. Bullock's murder,
Plaintiff refers to him in this Complaint as "John Doe" rather than by his true name.

perpetrator, and excluded Mr. Bryant as a potential source.

6.     After an independent reinvestigation by the Baltimore City State's Attorney's Office (BCSAO), the State of Maryland agreed that Mr. Bryant was factually innocent of the murder and, along with Mr. Bryant's post-conviction counsel, jointly requested that the court vacate his convictions.

7.     On May 11, 2016, Mr. Bryant's convictions were vacated. After spending more than 17 years incarcerated for a crime he did not commit, Mr. Bryant was released from prison. At the time of his wrongful arrest, Mr. Bryant was a young father of two young sons. As a result of his wrongful imprisonment, he was torn away from his family and robbed of the most basic freedoms.

8.     In November 2018, the Baltimore Event Review Team (BERT), a voluntary collaboration between the BCSAO, the BPD, the Maryland Office of the Public Defender in Baltimore City, and the University of Baltimore Innocence Project, released a consensus report on the investigation into Malcolm Bryant, to put forth recommendations for systemic improvement based on his wrongful conviction. The findings of the report were endorsed by the BPD and the BCSAO. BERT's review acknowledged apparent deviations from proper police practices that occurred during the investigation, including failures to adequately document Powell's descriptions of the perpetrator, and failures to adequately document the procedures used to create the photo array shown to Powell. The report also acknowledged that the investigation into John Doe, as well as the lack of investigation into Mr. Bryant's alibi, raised serious concerns. Even BERT's review, which was not geared toward finding misconduct that occurred during the investigation, revealed clear problems on the face of the investigative files.

9.      Mr. Bryant passed away in 2017 at the age of 42, less than a year after his exoneration and release. This complaint is brought on behalf of his estate, which is represented by his sons, Lamar Estep and Malique Bryant.

## JURISDICTION AND VENUE

10.      This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Mr. Bryant's rights as secured by the United States Constitution.

11.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367. Venue is proper under 28 U.S.C. § 1391(b) because the events giving rise to this Complaint occurred in this judicial district.

12.      On May 10, 2017, Plaintiff provided notice of his claims to Nancy K. Kopp, Treasurer of the State of Maryland, and David Ralph, then-Interim City Solicitor of Baltimore.

## PARTIES

13.      Plaintiff is the Estate of Malcolm J. Bryant, with his sons, Lamar Estep and Malique Bryant, as co-personal representatives.

14.      Defendant Baltimore Police Department ("BPD," "Police Department," or "Department") is or was the employer of each of the Officer Defendants. The BPD is a person within the meaning of 42 U.S.C. § 1983.

15.      At all relevant times, Defendant William F. Ritz (at times referred to herein as "Detective Ritz") was a detective in the Baltimore Police Department during the investigation of Ms. Bullock's murder and during Mr. Bryant's criminal trial. Mr. Bryant sues Detective Ritz in his individual capacity, acting under color of law and within the scope of his employment.

16.      Defendant Barry Verger was a forensic analyst/investigator in the Baltimore Police Department during the investigation of Ms. Bullock's murder and during Mr. Bryant's

criminal trial. Mr. Bryant sues Barry Verger in his individual capacity, acting under color of law and within the scope of his employment.

## FACTUAL ALLEGATIONS

### A.    Toni Bullock's Murder.

17.    On November 20, 1998, at approximately 8:30 p.m., 16-year-old Toni Bullock was stabbed to death by an individual male assailant in the 1300 Block of Harford Road in Baltimore City. The assailant stabbed her in multiple places, including her arms, legs, and abdomen.

18.    During the attack, the assailant's skin made contact with Ms. Bullock's body and clothing, and the assailant bled on her clothing, leading to the assailant's DNA on her t-shirt. Ms. Bullock also scratched him in her attempts to defend herself, leading to his DNA under her fingernails.

19.    Malcolm Bryant was not responsible for the stabbing of Ms. Bullock. He was not present during the attack and had no contemporaneous knowledge of it or the true perpetrator. Mr. Bryant had no connection to the likely true perpetrator, referred to in this Complaint as John Doe.

### B.    Detective Ritz Assigned to Case, Obtains Initial Description of Incident.

20.    Detective Ritz, a veteran detective with the Homicide Unit of the Baltimore Police Department, was tasked with the investigation of Ms. Bullock's homicide at 8:58 p.m. on November 20, 1998, and arrived at the scene of the murder shortly after 9:15 p.m.

21.    Tyeisha Powell, Ms. Bullock's friend, who was also 16 years old at the time, was present with Ms. Bullock when the assailant approached them.

22.     Detective Ritz conducted his first unrecorded interview with Ms. Powell shortly after he arrived on the scene, during which she gave him an initial description of the attack.

23.     According to Detective Ritz's incident report created within 24 hours of the attack, Ms. Powell reported that after 8 p.m. that evening, she and Ms. Bullock were walking south in the 1300 Block of Harford Road.

24.     As they were walking, a man approached them and demanded that they follow him. When they refused, he grabbed their arms and forced them across the street to a dark grassy area.

25.     There, the perpetrator asked whether Ms. Bullock and Ms. Powell had any money and threatened them. Ms. Powell managed to break free from the man's grasp. Ms. Bullock, however, was unable to escape.

26.     Detective Ritz's report does not indicate any further details about Ms. Powell's activities after she escaped. Ms. Powell eventually returned to the scene, by which time emergency personnel were already present.

**C.     Detective Ritz Unreasonably Identifies Malcolm Bryant as a Suspect.**

27.     At the time of Ms. Bullock's murder, it was rainy and dark outside, and the crime occurred in a dimly lit area. At the scene of the crime, Ms. Powell had given an initial, vague description of the suspect as a black male in his mid-20s. The main distinctive details in Ms. Powell's description concerned the perpetrator's attire: a black jacket, red shirt, and dark jeans.

28.     Prior to the investigation of Ms. Bullock's murder, Malcolm Bryant was known to Detective Ritz. Detective Ritz knew Mr. Bryant from a prior, unrelated investigation.

29.     Although there are records of tips identifying *other* suspects, no recorded independent tips or reports identified Mr. Bryant as a suspect in Ms. Bullock's murder.

30.     At trial, Detective Ritz testified that a tip from an unidentified family member of Ms. Bullock led him to identify Mr. Bryant as a suspect. Unlike the other tips the BPD received regarding Ms. Bullock's murder, no such report from any of Ms. Bullock's family members was ever documented in Detective Ritz's file, and the alleged family member was never identified.

31.     Upon information and belief, Detective Ritz unreasonably identified Malcolm Bryant as a suspect in Ms. Bullock's murder based either on his prior history with Mr. Bryant relating to a different investigation or on an unsupported hunch that Mr. Bryant was the perpetrator.

**D.      Detective Ritz Fails to Document His Initial Interviews with Ms. Powell and Suggests Malcolm Bryant as the Perpetrator to Ms. Powell.**

32.     Detective Ritz conducted multiple undocumented interviews with Ms. Powell in the days following the crime, culminating in a suggestive identification procedure during which he used direct or indirect suggestion to obtain a false identification from Ms. Powell of Malcolm Bryant as the perpetrator.

33.      Although Ms. Powell initially provided only a vague description of the perpetrator, the next day, November 21, 1998, Detective Ritz met with her and another detective to create a composite sketch of the suspect, which was ultimately disclosed to the public. The detectives did not record their interview with Ms. Powell on November 21, nor any information on the process by which the sketch was created. As the BERT consensus review also reported, "the procedures surrounding the composite sketch were not documented in the BPD file and the details of Ms. Powell's descriptions to the sketch artist were not recorded," with the review identifying this as one factor contributing to Ms. Powell's inaccurate eyewitness identification.

34.     Several other alternate or draft composite drawings were created but never disclosed to the prosecution or defense. At least one of these alternate or draft composites

depicted a suspect with no hair—which was consistent with the appearance of John Doe, who wore his hair closely shaven. Mr. Bryant, by contrast, had medium-length, bushy hair, which he sometimes wore in cornrows. Malcolm Bryant was wearing cornrows on the night when Ms. Bullock was murdered, and at the time of his arrest, his hair had been taken out of cornrows and was worn out at a short to medium length. The composite drawing that was ultimately published and disclosed depicted the suspect with medium-length bushy hair.

36. Upon information and belief, Detective Ritz used direct or indirect suggestion to manipulate the composite sketch to make it more closely resemble the person he suspected, Malcolm Bryant.

36. In the single sketch that was published and disclosed, Ms. Powell reiterated and added detail to her description of the perpetrator's attire: a red t-shirt, blue jeans, and a *dark colored waist-length puff styled jacket.*

**E.     Detective Ritz Directly Suggests Malcolm Bryant as the Perpetrator to Ms. Powell.**

37. On November 24, 1998, four days after Ms. Bullock's murder, Mr. Bryant had been arrested on charges completely unrelated to the murder investigation. He was taken into Central Booking, and in his booking photo he was wearing an orange shirt.

38. On December 1, 1998, at approximately 12:20 p.m.—eleven days after the murder—Detective Ritz conducted the first formal, recorded interview with Ms. Powell.

39. During the taped portion of the interview, which lasted a total of nine minutes, Ms. Powell recounted the events of the evening of November 20th.  She again described the assailant as wearing a black puff jacket.

40.     During the December 1 recorded interview, Detective Ritz asked Ms. Powell whether it was possible that the assailant's t-shirt was orange—like the one Mr. Bryant wore when he was taken into Central Booking—but Ms. Powell remarked that it was red.

41.     After the recorded interview concluded, Detective Ritz showed Ms. Powell a suggestive photographic lineup consisting of six individuals, including Malcolm Bryant. As the BERT consensus review acknowledged, "[t]he BPD file on Mr. Bryant's case does not describe the procedures used by BPD investigators to create the six-pack photo array." Mr. Bryant was the only individual in the lineup wearing an orange-colored shirt. Detective Ritz used direct or indirect suggestion to obtain an identification of innocent Malcolm Bryant from Ms. Powell. Detective Ritz did not disclose the suggestion he used to obtain this misidentification to the prosecutor or to Mr. Bryant's defense attorney.

42.     No physical evidence connected the innocent Mr. Bryant to the crime. Detective Ritz prepared and obtained an arrest warrant for Mr. Bryant based solely on Ms. Powell's identification.

**F.     Detective Ritz Deliberately Fails to Investigate Malcolm Bryant's Alibi.**

43.     On December 2, 1998, one day after obtaining the suggestive identification from Ms. Powell, Detective Ritz arrested Mr. Bryant on charges of first-degree murder and possession of a deadly weapon with intent to injure. Later that day, shortly after 7:30 p.m., Detective Ritz interviewed Mr. Bryant.

44.     Mr. Bryant truthfully informed the Detectives that he was with friends the night of the murder. He provided the Detectives with several alibi witnesses, including his friend Antonio "Tony" Brooks, whose home he had been visiting that day, and Tony's mother and younger sister.

45.     Mr. Bryant described to the Detectives an altercation that he had been involved in at a nightclub in the late evening of November 20th, which had resulted in an injury to his eye. Consistent with this alibi, on November 24, when Mr. Bryant was processed at Central Booking, he had a bandage above his left eye. Mr. Bryant described getting into a fight, ripping his shirt, and losing his sweater.  His friend, Donte, gave Mr. Bryant a spare orange shirt to wear.

46.     Mr. Bryant provided the names, and in some instances, the phone numbers of at least five additional people who had been with him at the nightclub.

47.     Detective Ritz never interviewed or conducted any follow-up investigation regarding any of the individuals with whom Mr. Bryant had spent the evening of November 20th.

48.     Mr. Bryant then told the Detectives that after the fight at the nightclub, he drove himself to Mercy Medical Center to receive treatment for the cut to his eye.  Hospital records obtained by Detective Ritz confirmed this alibi and indicated that Mr. Bryant did, in fact, receive treatment for a laceration to his eye, and that he gave medical personnel the name of a friend with medical insurance, "Donta Smith."

49.     During the interview with Mr. Bryant, Detective Ritz asked him to describe all the jackets he owned.  Mr. Bryant, who was homeless at the time, stated that he only owned one jacket—an army fatigue coat that his friend gave him.  Mr. Bryant did not own a black puff jacket similar to what the perpetrator wore on the night of Ms. Bullock's murder. Detective Ritz, however, ignored this fact and, suggestive identification in hand, pressed on with his case against Mr. Bryant.

50.     In a second statement that Mr. Bryant provided later that evening, he gave further, clarifying details regarding his whereabouts the evening of November 20th. Before heading to

the nightclub, Mr. Bryant stated that he was with three friends at a store called Gabriel Brothers. After they left the store, they went to Subway and then to the home of another friend. They arrived at the friend's house around 10:00 or 10:15 p.m. and later went to the nightclub where Mr. Bryant was involved in the fight.

51.     Mr. Bryant's mother, Vanessa Bryant, visited BPD headquarters during the investigation to meet with Detective Ritz and plead her son's innocence. Detective Ritz never recorded Ms. Bryant's statement, nor did he provide it to prosecutors, despite prosecutors having asked for it.

52.     There is no evidence that Detective Ritz ever investigated the veracity of Mr. Bryant's alibi witnesses or provided the prosecutors with any follow-up information regarding those witnesses.

**G.     Detective Ritz Buries Exculpatory Evidence Pointing to the Likely True Perpetrator.**

53.     On December 3, 1998—just one day after Mr. Bryant's arrest—evidence began to surface pointing to the likely true perpetrator of Ms. Bullock's murder, John Doe. But Detective Ritz, who had decided on his primary suspect and already manipulated a misidentification of Mr. Bryant from Ms. Powell, intentionally, or with deliberate indifference, ignored and buried several key pieces of evidence exculpating Mr. Bryant and pointing to Doe: an anonymous tip indicating that John Doe was a drug addict and had been seen near the scene of the crime with a knife; a statement by John Doe's father, including a key incriminating detail contradicting John Doe's own testimony; and a composite sketch that more closely resembled John Doe than Mr. Bryant.

54.     On December 3, 1998, two days after Ms. Powell's identification of Mr. Bryant and the day after Detective Ritz arrested him for the crime, an anonymous female caller reported

that she recognized the suspect portrayed in the publicly released composite sketch as a man known by the alias "Bo Peep." "Bo Peep" was John Doe's alias. The caller stated that she last saw "Bo Peep" on Holbrook Street—not far from the scene of the crime—three weeks prior, and that he was armed with a knife. It was the first of several leads that "Bo Peep" may have been the real killer. The report of this call was never disclosed to Mr. Bryant, Mr. Bryant's counsel, or the prosecutor.

55.     On December 10, 1998, an individual by the name of Jeffrey Hale called the Homicide Unit to report that he had information about Ms. Bullock's murder. Detective Ritz and another detective met with Mr. Hale the next day.

56.     Mr. Hale informed the Detectives that John Doe admitted to stabbing a young woman after following her and her friend.  According to Mr. Hale, John Doe told him that he needed money and saw two girls walking down the street. He had planned to rob them. John Doe followed the girls and asked for money. John Doe told Mr. Hale that he grabbed the girls, but one was able to run away. He pulled the other young woman down the street and stabbed her after she began to resist.

57.     Mr. Hale told Detective Ritz that John Doe had committed robberies and assaults in the past. When Detective Ritz asked whether this incident would have been an unusual act for John Doe to commit, Mr. Hale responded, "not at all."

58.     Just over two weeks later, on December 29th, John Doe's father spoke with Detective Ritz in an interview that was never disclosed to the prosecutor, Mr. Bryant's defense attorney, or Mr. Bryant. During this interview, John Doe's father informed Detective Ritz that his son was wearing a black puff jacket—the exact type of jacket Ms. Powell consistently described the perpetrator wearing—when he last saw him.

59.     The following week, on January 6, 1999, Detective Ritz separately interviewed both John Doe and his girlfriend.

60.     As an experienced, well-trained homicide detective, Detective Ritz knew how to conduct suspect interviews to attempt to elicit incriminating information. For example, he knew to withhold non-public facts about the crime during a suspect interview, to ask open-ended and non-leading questions to try and get as much information as possible, and to ask follow-up questions regarding a suspect's alibi. Ritz exhibited all of these tactics in his interviews with Malcolm Bryant—and they resulted in exculpatory information on Malcolm's alibi. However, in his interviews with Doe and his girlfriend, Ritz appears to have been attempting to eliminate Doe as a suspect so he could proceed with his case against Malcolm Bryant, rather than elicit any potentially incriminating information about Doe. Most notably, Ritz appears to have been trying to "fix" the fact that, according to Doe's father, Doe owned a black puff style jacket, just like the jacket Tyeisha Powell consistently described the perpetrator wearing.

61.     As even the BERT consensus report recognized, Ritz's questioning of Doe "consisted mainly of leading questions that clearly showed the desired direction of the interviewing officer. These questions, coming from an experienced interviewer, were seemingly designed to prevent [Doe] from providing information that might have contradicted the then-current investigational conclusions [implicating Malcolm Bryant]. Moreover, when [Doe] made statements that had been contradicted by others, the investigators did not confront [Doe] with the conflicting statements."

62.     Detective Ritz told John Doe's girlfriend that John Doe's name had arisen during the investigation of the murder of a 16-year-old girl. He asked the girlfriend whether John Doe owned a black puff style jacket and whether he ever told her anything about a robbery attempt.

13

He initially mentioned the jacket to the girlfriend off-tape, and it is possible that he told her, before turning the tape on, that the perpetrator had been identified as wearing a black puff jacket. She stated that John Doe did not own a black puff style jacket and had not mentioned any robbery to her. Detective Ritz concluded her interview after just seven minutes.

63.     Detective Ritz also interviewed John Doe. Detective Ritz told John Doe outright that the suspect wanted in connection with the crime was wearing a black puff type jacket and asked whether he owned a similar jacket. Unsurprisingly, John Doe responded that he did not own any such jacket, and Detective Ritz moved on from the topic altogether. Detective Ritz never confronted John Doe with the information he learned from John Doe's father that he was last seen wearing a black puff jacket. He never asked for Doe's alibi. He made no attempt to try to elicit incriminating admissions from Doe through open-ended questions. The interview with John Doe also concluded after a mere seven minutes.

64.     Because Detective Ritz never disclosed the interview with John Doe's father, to the prosecutor, Mr. Bryant's counsel, or Mr. Bryant, they were all unaware of the father's testimony that John Doe did, in fact, own a black puff jacket. This detail was doubly incriminating, as it both demonstrated John Doe owned a jacket matching that of the true perpetrator, and that he had made a false denial of this fact in his interview with Ritz.

65.     A six-person photo array with John Doe's photograph was prepared. This photo array was either never shown to Ms. Powell for identification purposes, or, if it was shown, the identification procedure and its results were not documented or shared with the prosecutor, Mr. Bryant's defense attorney, or Mr. Bryant.

**H.      Detective Ritz Buries Information on an Undisclosed Eyewitness Whose Account Contradicts Ms. Powell's.**

66.      The arrest and prosecution of Malcolm Bryant rested on the testimony of one eyewitness, Tyeisha Powell. But Detective Ritz failed to disclose to the prosecution and defense evidence from another eyewitness that contradicted Ms. Powell's account.

67.      At approximately 8:37 p.m. on November 20, 1998, the night of Ms. Bullock's murder, the Baltimore Police Department received three 911 calls mere seconds apart—all from locations close to where the crime occurred.

68.      One of the callers—a woman who identified herself as Tyeisha ("Tyeisha 2")— reported that a man armed with a gun pulled the weapon on her sister and cousin. She told the 911 operator that her sister ran from the location, but that her cousin remained with the armed man.

69.      The account of the crime from Tyeisha 2 differs from that of Tyeisha Powell—the sole disclosed eyewitness and basis for the prosecution—in key respects.

70.      First, Ms. Powell never reported seeing a gun during the attack.

71.      Second, Ms. Powell also never reported being with anyone besides Ms. Bullock and the assailant when the attack occurred. At trial, for the first time, Ms. Powell reported that after she ran from the assailant, she met with a "friend" named Tyeisha before returning to the scene of the crime.

72.      Detective Ritz never disclosed the report of this second potential eyewitness named Tyeisha, nor her account of the crime which contradicted Ms. Powell's account, to the prosecution, Mr. Bryant's counsel, or Mr. Bryant. None of the 911 call reports was disclosed.

73.      Detective Ritz either deliberately failed to investigate the existence of Tyeisha 2 and the accuracy of her report, or he deliberately failed to report the results of that investigation.

15

I.     **The Defendants Fail to Test Vital Physical Evidence That Would Have Excluded Mr. Bryant as the Perpetrator.**

74.     In the lead up to Mr. Bryant's trial, a sample of Mr. Bryant's blood was drawn for evidence comparison purposes.  However, the Defendants never tested critical items of evidence obtained from the crime scene for DNA.  Had they done so, and compared the DNA profiles from the evidence to the profile obtained from Mr. Bryant, Mr. Bryant would have been excluded as the perpetrator of the crime.

75.     During the investigation into Ms. Bullock's murder, Detective Ritz recovered several items of clothing that Ms. Bullock had been wearing at the time of her death, including a black leather jacket, blue denim vest, black t-shirt, and blue jeans.

76.     Detective Ritz purportedly submitted Ms. Bullock's clothing to the Trace Analysis Unit for analysis; however, not one item of clothing was examined for the possible presence of blood or DNA.

77.     Detective Ritz also recovered fingernail clippings from both of Ms. Bullock's hands, in addition to samples of her hair and blood. Detective Ritz submitted Ms. Bullock's fingernail clippings to Barry Verger, a BPD forensic analyst, to determine whether they contained the presence of any trace evidence.

78.     Mr. Verger only examined the fingernail clippings for the possible presence of blood—not DNA. Although that testing demonstrated the presence of blood in the fingernail clippings, no DNA testing was conducted because Mr. Verger falsely reported that the fingernails were consumed, and no further testing was possible.

79.     Mr. Verger's report and testimony regarding the total consumption of the fingernail clippings during his testing was obviously false; subsequent DNA testing of those same clippings led to Mr. Bryant's exoneration.

80.     Had Mr. Verger not falsely reported that the fingernail clippings had been consumed in his initial tests, DNA testing could have exonerated Mr. Bryant before he was ever wrongfully convicted.

**J.     Mr. Bryant's Prosecution and Wrongful Conviction.**

81.     Mr. Bryant's jury trial began on August 2, 1999, in the Circuit Court for Baltimore City.  Judge John N. Prevas presided. Assistant State's Attorney David Mabrey represented the State of Maryland and Assistant Public Defender Larry Rogers represented Mr. Bryant.

82.     The only evidence connecting Mr. Bryant to the murder was Tyeisha Powell's identification, which was the product of Detective Ritz's direct suggestion.

83.     Mr. Bryant's defense attorney argued that Mr. Bryant was innocent, and that Ms. Powell's identification of him was unreliable. Several witnesses testified that Mr. Bryant had an alibi on the night of November 20, and that at that time he was wearing an army fatigue jacket, not the black puff-style jacket Ms. Powell had described the perpetrator as wearing.

84.     But the prosecution, defense, judge, and jury never learned of the exculpatory evidence Detective Ritz suppressed, including (1) evidence of the suggestion Detective Ritz used to obtain the identification of Mr. Bryant by Ms. Powell; (2) evidence from John Doe's father, an anonymous tip, and the suppressed composite sketch implicating John Doe as the real perpetrator; or (3) evidence of an undisclosed witness (Tyeisha 2) contradicting Ms. Powell's account. And because of Mr. Verger's false report that the fingernail clippings had been consumed and could not be subjected to DNA testing, the prosecutor, defense, court, and jury never learned that someone else's DNA was under Ms. Bullock's fingernails.

85.     On August 5, 1999, Mr. Bryant was convicted of felony murder, carrying a concealed weapon, and related assault offenses.

86.     On September 9, 1999, he was sentenced to life imprisonment for the murder of Ms. Bullock, and to consecutive terms of twenty years on the assault charges.

**K.     Mr. Bryant's Exoneration by DNA Evidence.**

87.     In 2008, Mr. Bryant moved for post-conviction DNA testing, which the Circuit Court of Baltimore City granted. The State sent Ms. Bullock's fingernail clippings—which Mr. Verger had falsely claimed were "consumed"—to the Bode Technology Group ("Bode").

88.     A partial male DNA sample obtained from the fingernail clippings of Ms. Bullock's left hand was compared to Mr. Bryant's reference sample, and Mr. Bryant was excluded as a possible contributor of the DNA profile.

89.     Later, Mr. Bryant's DNA sample was also compared to a full male DNA profile generated from the area of a stab wound on Ms. Bullock's blood-stained t-shirt.  This full DNA profile was consistent with the partial male DNA profile that had already been created from the fingernail clippings. Here too, Mr. Bryant was excluded as a possible source of the DNA.

90.     After conducting its own investigation of the case and reviewing the DNA results, the Baltimore City State's Attorney's Office agreed that Mr. Bryant was innocent. On May 11, 2016, the Circuit Court for Baltimore City held a hearing and vacated Mr. Bryant's convictions.

91.     The State of Maryland entered nolle prosequi dispositions as to each of the counts against Mr. Bryant, and after spending more than 17 years wrongfully incarcerated, Mr. Bryant was finally released from prison.

L.     **The Baltimore Police Department's Policy and Practice of Misconduct in Murder Investigations.**

92.     The actions of Defendant Ritz and the other Officer Defendants, as alleged above, were done pursuant to one or more interrelated de facto policies, practices, and/or customs of the Baltimore Police Department. The Baltimore Police Department has long maintained a policy, pattern, and practice of misconduct in murder investigations, including fabricating evidence, suppressing exculpatory and impeachment evidence, and failing to conduct constitutionally adequate investigations.

93.     By focusing on clearing murder cases as quickly as possible, rather than conducting thorough and professional investigations, the Department cut corners and rushed to judgment, resulting in profound constitutional errors.

94.     Several cases in addition to Mr. Bryant's case demonstrate that the Department has systematically fabricated evidence, suppressed exculpatory and impeachment evidence, and failed to conduct constitutionally adequate investigations.

95.     In 1974, Michael Austin was convicted of shooting and killing a private security guard. Baltimore Police Department officers failed to turn over a non-identification of Mr. Austin by an eyewitness to the murder.  Baltimore police officers also failed to investigate other potential suspects, including a man who admitted to participating in the shooting.

96.     Wendell Griffin, convicted of murder in 1981, discovered that Baltimore Police Department officers never turned over key witness statements that excluded Mr. Griffin as the murderer, photo arrays in which a witness failed to identify Mr. Griffin as the assailant, and other evidence tending to show that someone else committed the crime.

97.     James Owens' 1988 convictions for burglary and felony murder were overturned after Mr. Owens discovered that Baltimore Police Department detectives withheld evidence of

several inconsistent statements by their star witness. Mr. Owens was released in 2008 after 21 years of wrongful incarceration.

98.     In 1995, Sabein Burgess was convicted of the shooting death of his girlfriend. Baltimore Police Department officers, including Detective William Ritz, failed to disclose notes and evidence regarding an alternate perpetrator of the murder, as well as other evidence refuting gunshot residue results, which indicated that Mr. Burgess had recently fired a gun. As a result of these violations, Mr. Burgess's conviction was vacated and the charges against him were dismissed.

99.     Antoine Pettiford was convicted of murder in 1995. Mr. Pettiford's post-conviction counsel discovered that Baltimore Police Department officers failed to disclose eyewitness statements and other exculpatory evidence to the defense. Mr. Pettiford's plea was ultimately vacated and charges against him were dismissed.

100.    In 1998, Rodney Addison was wrongfully convicted of a 1996 murder.  In October 2005, after nine years in prison, Mr. Addison was released when it was revealed that the State had withheld exculpatory witness statements and its sole witness recanted her testimony at a post-conviction proceeding.

101.    In 1999, Tyrone Jones was convicted of conspiracy to commit murder in the June 1998 shooting death of a 15-year-old boy. During the post-conviction phase of Mr. Jones's case, his post-conviction counsel discovered evidence in the homicide case file that the witness who identified Mr. Jones at trial had told a Baltimore Police Department officer that he had not seen the shooting or the shooter. In addition, as with Mr. Burgess, the Trace Analysis Unit misrepresented gunshot residue results related to Mr. Jones. Ultimately, Mr. Jones' conviction was vacated, and the State dismissed the charges against him.

102.     In 2002, Ezra Mable pled guilty to second-degree murder for an August 2000 homicide for which Detective William Ritz was the lead investigator. Mr. Mable was sentenced to 25 years in prison. Mr. Mable's plea was motivated by the State's representation that two eyewitnesses had identified him as fleeing the crime scene. The Baltimore Police Department failed to test fingernail clippings from the victim for DNA. The Baltimore City State's Attorney's Office joined Mr. Mable in moving for his release, which was granted in 2010.

103.     The Baltimore Police Department's policy, pattern, and practice of misconduct in murder investigations described above was caused by the Department's failure to train, supervise, and discipline its police officers, which effectively condones, ratifies, and sanctions the kind of misconduct that the Defendants committed against Mr. Bryant in this case. Constitutional violations such as occurred in this case are encouraged and facilitated as a result of the Department's practices and de facto policies, as alleged above.

104.     For example, there was a failure during the relevant time period to train police officers on disclosing evidence and complying with their obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), notwithstanding the obvious necessity of such training.

105.     In addition, the Department failed to properly supervise and discipline its police officers. As a result, officers continue to violate suspects' rights with impunity in the manner described more fully above, as evidenced by the recent revelations of misconduct within the Baltimore Police Department Gun Trace Task Force.

106.     The failure to train, supervise, and discipline Department employees was consciously approved at the highest policy-making level by policymakers who were deliberately indifferent to the violations of constitutional rights described herein, and was a cause of the injuries suffered by Mr. Bryant.

107.     Despite actual knowledge of the pattern of misconduct, including but not limited to repeated failure to tell homicide defendants of exculpatory witness statements and other exculpatory evidence and failure to conduct constitutionally adequate investigations, the Department did not act to remedy the abuses described in the preceding paragraphs. It thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to prevent or remedy Mr. Bryant's injuries.

**M.     Mr. Bryant's Damages.**

108.     Mr. Bryant spent more than 17 years in prison for a murder he did not commit. During his incarceration he missed birthdays, holidays, graduations, and other celebrations with his children and family.

109.     Mr. Bryant also missed watching his children grow up.  His older son, Lamar Estep, was four years old when Mr. Bryant was arrested, and his younger son, Malique Bryant, had been born only six months before Mr. Bryant's arrest. Indeed, Malique Bryant did not even meet his father until Mr. Bryant was released in 2016.

110.     As a result of the foregoing, Mr. Bryant suffered tremendous damage, including physical sickness, injury, and emotional damage, all proximately caused by Defendants' misconduct. Mr. Bryant sustained injuries and damages including: loss of freedom for more than 17 years; physical pain and suffering; severe mental anguish; emotional distress; loss of family relationships; severe psychological damage; loss of property; legal expenses; loss of income and career opportunities; humiliation, indignities, and embarrassment; degradation; permanent loss of natural psychological development; and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity,

athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression, for which the Estate is entitled to monetary relief.

111.    As a direct result of Defendants' intentional, bad faith, willful, wanton, reckless, and/or deliberately indifferent acts and omissions, Mr. Bryant sustained physical injuries and damages, including physical pain and suffering, personal injuries, physical illness, and inadequate medical care, for which he is entitled to monetary relief.

112.    These injuries and damages to Mr. Bryant were foreseeable to Defendants at the time of their acts and omissions.

113.    All of the acts and omissions committed by Defendants were done intentionally, unlawfully, maliciously, wantonly, recklessly, negligently, and/or with bad faith, and said acts meet all of the standards for imposition of punitive damages.

## FEDERAL CLAIMS

### Count I – 42 U.S.C. § 1983
### Violation of Due Process (Fifth and Fourteenth Amendments)
### *Failure to Disclose Exculpatory and Impeachment Evidence to the Prosecution*
### (Against Officer Defendants)

114.    Each foregoing paragraph is incorporated as if restated fully herein.

115.    As described more fully above, the Officer Defendants, while acting individually, jointly, and/or in conspiracy, as well as under color of law and within the scope of their employment, deprived Mr. Bryant of his constitutional right to a fair trial.

116.    In the manner described more fully above, the Officer Defendants, individually, jointly, and in conspiracy, either intentionally or with deliberate indifference withheld exculpatory and impeachment evidence. In doing so, the Officer Defendants violated their

clearly established duty to report all exculpatory and impeachment materials to prosecutors. No reasonable officer in 1998 and 1999 would have believed this conduct was lawful.

117.    Absent the Officer Defendants' misconduct, the prosecution of Mr. Bryant could not and would not have been pursued, and Mr. Bryant would not have been convicted.

118.    The Officer Defendants' misconduct directly and proximately resulted in the unjust and wrongful criminal conviction of Mr. Bryant and his continuing wrongful imprisonment, thereby denying him his constitutional right to a fair trial, in violation of the Due Process Clause of the Fifth Amendment to the United States Constitution.

119.    As a direct and proximate result of this violation of his constitutional right to a fair trial, Mr. Bryant suffered injuries, including but not limited to the loss of liberty, physical sickness and injury, and emotional distress.

120.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Mr. Bryant's clearly established constitutional rights.

**Count II – 42 U.S.C. § 1983**
**Violation of Due Process (Fifth and Fourteenth Amendments)**
***Fabrication of Evidence***
**(Against Officer Defendants)**

121.    Each foregoing paragraph is incorporated as if restated fully herein.

122.    In the manner described above, the Officer Defendants fabricated evidence against Mr. Bryant, including but not limited to the identification of Mr. Bryant by Tyeisha Powell.

123.    The Officer Defendants performed the above-described acts under color of state law, deliberately, recklessly, and/or with deliberate indifference for Mr. Bryant's clearly

established constitutional rights and innocence. No reasonable officer in 1998 or 1999 would have believed this conduct was lawful.

124.     As a direct and proximate result of the Officer Defendants' fabrication of evidence, Mr. Bryant suffered injuries, including but not limited to loss of liberty, physical injury and sickness, and emotional distress.

125.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Mr. Bryant's clearly established constitutional rights.

### Count III – 42 U.S.C. § 1983
### Malicious Prosecution (Fourth and Fourteenth Amendments)
### (Against Officer Defendants)

126.     Each foregoing paragraph is incorporated as if restated fully herein.

127.     In the manner described above, the Officer Defendants caused Mr. Bryant to be arrested, charged, and prosecuted for the murder of Ms. Bullock pursuant to a legal process that was unsupported by probable cause, thereby violating Mr. Bryant's clearly established rights, under the Fourth and Fourteenth Amendments of the United States Constitution, to be free of unreasonable searches and seizures. No reasonable officer in 1998 or 1999 would have believed this conduct was lawful.

128.     The misconduct was objectively unreasonable, and the Officer Defendants, with malice, acting individually and in concert, intentionally, knowingly, and/or with deliberate indifference, misrepresented the truth and withheld exculpatory facts from the prosecutor.

129.     The proceedings terminated in Mr. Bryant's favor.

130.     As a direct and proximate result of the Officer Defendants' malicious prosecution, Mr. Bryant suffered injuries, including but not limited to loss of liberty, physical injury and

sickness, and emotional distress. These Officer Defendants had a reasonable opportunity to prevent this harm but failed to do so.

### Count IV – 42 U.S.C. § 1983
### Conspiracy to Deprive Constitutional Rights
### (Against Officer Defendants)

131.    Each foregoing paragraph is incorporated as if restated fully herein.

132.    After the murder of Toni Bullock, the Officer Defendants, acting within the scope of their employment and under color of law, agreed among themselves and with other members of the Police Department to act in concert in order to deprive Mr. Bryant of his clearly established constitutional rights under the Fourth, Fifth, and Fourteenth Amendments, including his rights to be free from unreasonable searches and seizures, malicious prosecution, deprivation of liberty without due process of law, and to a fair trial, all as described in the various paragraphs of this Complaint.

133.    Additionally, before and after Mr. Bryant's conviction, the Officer Defendants further conspired to deprive Mr. Bryant of exculpatory information to which he was lawfully entitled and to fabricate evidence against him, which would have led to his not being charged, his acquittal, or his more timely exoneration.

134.    In this manner, the Officer Defendants, acting in concert with other unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

135.    In furtherance of the conspiracy, each of the co-conspirators engaged in and facilitated numerous overt acts, including but not limited to those set forth above—such as fabricating evidence, withholding exculpatory evidence, and committing perjury during hearings and trials—and was an otherwise willful participant in joint activity.

26

136.    As a direct and proximate result of the illicit prior agreement and actions in
furtherance of the conspiracy referenced above, Mr. Bryant's rights were violated, and he
suffered injuries, including but not limited to loss of liberty, physical injury and sickness, and
emotional distress.

137.    The misconduct described in this Count was objectively unreasonable and was
undertaken intentionally, with malice and willful indifference to Mr. Bryant's rights.

### Count V – 42 U.S.C. § 1983
### *Monell* Claim Under Fifth and Fourteenth Amendments
### (Against Defendant Baltimore Police Department)

138.    Each foregoing paragraph is incorporated as if restated fully herein.

139.    This claim is brought against Defendant the Baltimore Police Department.

140.    The actions of all the Officer Defendants were undertaken pursuant to policies
and practices of the Department, described above, which were ratified by policymakers with
final policymaking authority. These policies and practices included the failure to adequately train
or supervise police officers with regard to their constitutional obligations and failing to discipline
police officers who engaged in constitutional violations. The policies and practices also included
regularly failing to turn over exculpatory evidence and regularly fabricating evidence.

141.    These policies and practices were sufficiently widespread within the Department
to constitute a "custom or usage" of which Department policymakers and supervisors had actual
or constructive knowledge.

142.    The Department's policy, custom, or pattern and practice of promoting,
facilitating, or condoning improper, illegal, and unconstitutional investigative actions, and its
policy, custom, or pattern and practice of failing to adequately supervise, discipline, and train

BPD detectives and officers was reflected by the multiple acts of misconduct and illegality committed by multiple BPD detectives as described in paragraphs 92 to 107 above.

143.    The policies and practices described in this Count were maintained and implemented by the Department with deliberate indifference to Mr. Bryant's constitutional rights.

144.    As a direct and proximate result of the Department's actions, Mr. Bryant's constitutional rights were violated, and he suffered injuries and damages, as set forth in this Complaint.

145.    The Department is therefore liable for the misconduct committed by the Officer Defendants.

## STATE LAW CLAIMS

### Count VI – State Law Claim
### Malicious Prosecution
### (Against Officer Defendants)

146.    Each foregoing paragraph is incorporated as if restated fully herein.

147.    The Officer Defendants accused Mr. Bryant of criminal activity knowing those accusations to be without genuine probable cause, and they made statements to prosecutors and other officials with the intent of exerting influence and to institute and continue judicial proceedings.

148.    The Officer Defendants caused Mr. Bryant to be improperly subjected to judicial proceedings for which there was no probable cause, resulting in injury.

149.    The Officer Defendants withheld exculpatory evidence that would have demonstrated Mr. Bryant's absolute innocence. The Officer Defendants were aware that, as

described more fully above, no true or reliable evidence implicated Mr. Bryant in the murder of Toni Bullock.

150.    The Officer Defendants intentionally failed to investigate evidence which would have led to the actual perpetrator.

151.    The misconduct described in this Count was undertaken intentionally, with malice, willfulness, and/or reckless indifference to the rights of others.

152.    On May 11, 2016, the prosecution terminated in Mr. Bryant's favor when his conviction was vacated.

153.    As a direct and proximate result of this misconduct, Mr. Bryant sustained injuries, as set forth above, including physical sickness and injury, and emotional distress.

**Count VII – State Law Claim**
**Abuse of Process**
**(Against Officer Defendants)**

154.    Each foregoing paragraph is incorporated as if restated fully herein.

155.    As explained more fully above, each of the Officer Defendants willfully misused the criminal process against Mr. Bryant for a purpose different than the proceeding's intended purpose.

156.    Rather than investigate and prosecute the real killer, the Officer Defendants withheld exculpatory evidence to frame Mr. Bryant for a crime that he did not commit.

157.    The misconduct described in this Count was undertaken intentionally, with malice, willfulness, and/or reckless indifference to the rights of others.

158.    As a direct and proximate result of this misconduct, Mr. Bryant sustained injuries as set forth above, including physical sickness and injury, and emotional distress.

**Count VIII – State Law Claim**
**Intentional Infliction of Emotional Distress**
**(Against Officer Defendants)**

159.     The acts and conduct of the Officer Defendants as set forth above were extreme

and outrageous. The Officer Defendants' actions were rooted in an abuse of power or authority,

and they were undertaken with intent to cause, or were in reckless disregard of the probability

that their conduct would cause, severe emotional distress to Mr. Bryant, as is more fully alleged

above.

160.     As a direct and proximate result of the Officer Defendants' actions, Mr. Bryant

suffered physical sickness and injury, and severe emotional distress.

**Count IX – State Law Claim**
**Civil Conspiracy**
**(Against Officer Defendants)**

161.     Each paragraph of this Complaint is incorporated as if restated fully herein.

162.     As described more fully in the preceding paragraphs, the Officer Defendants,

acting in concert with other known and unknown co-conspirators, conspired by concerted action

to accomplish an unlawful purpose by unlawful means.

163.     In furtherance of the conspiracy, the Officer Defendants committed overt acts and

were otherwise willful participants in joint activity, including but not limited to the malicious

prosecution of Mr. Bryant and the intentional infliction of emotional distress upon him.

164.     The misconduct described in this Count was undertaken intentionally, with

malice, willfulness, and/or reckless indifference to the rights of others.

165.     As a direct and proximate result of the Officer Defendants' conspiracy, Mr.

Bryant suffered damages, including physical sickness and injury, and severe emotional distress,

as alleged more fully above.

**Count X – State Law Claim**
**Indemnification**
**(Against Defendant Baltimore Police Department)**

166.    Each paragraph of this Complaint is incorporated as if restated fully herein.

167.    Maryland law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

168.    The Officer Defendants are or were employees of the Baltimore Police Department who acted within the scope of their employment in committing the misconduct described herein.

WHEREFORE, Plaintiff the Estate of Malcolm J. Bryant respectfully requests that this Court enter judgment in its favor and against Defendants, awarding compensatory damages, attorneys' fees, and costs against each Defendant, and punitive damages against each Defendant, as well as any and all other relief this Court deems appropriate.

### JURY DEMAND

Plaintiff the Estate of Malcom J. Bryant hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Dated: February 8, 2019                    Respectfully submitted,

                                           _/s/_____
                                           Joshua R. Treem (Bar No. 00037)
                                           Jean Zachariasiewicz (Bar No. 19734)
                                           Chelsea J. Crawford (Bar No. 19155)
                                           Brown, Goldstein & Levy, LLP
                                           120 E. Baltimore Street, Suite 1700
                                           Baltimore, Maryland 21201
                                           jtreem@browngold.com
                                           jmz@browngold.com
                                           ccrawford@browngold.com
                                           T: (410) 962-1030/ F: (410) 385-0869

Nick Brustin
Anna Benvenutti Hoffmann
Meghna Philip
Rakim Brooks
Neufeld Scheck & Brustin, LLP
99 Hudson Street, 8th Floor
New York, NY 10013
nick@nsbcivilrights.com
anna@nsbcivilrights.com
meghna@nsbcivilrights.com
rakim@nsbcivilrights.com
T: (212) 965-9081/ F: (212) 965-9084

*Attorneys for Plaintiffs*