IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| THE ESTATE OF MALCOM J. BRYANT,<br>     *Plaintiff*<br><br>v.<br><br>BALTIMORE POLICE DEPARTMENT, *et al.*<br>     *Defendants.* | Civil Action No. ELH-19-384 |

**MEMORANDUM OPINION**

This case stems from the wrongful conviction of Malcom J. Bryant in 1998 in the Circuit Court for Baltimore City for the murder of 16-year-old Toni Bullock. Mr. Bryant was sentenced in 1999 to life imprisonment. In 2016, Mr. Bryant's convictions were vacated, following an investigation by the Baltimore City State's Attorney's Office that concluded he was innocent. Just a year later, in 2017, Mr. Bryant passed away at the age of 42.[1]

On February 8, 2019, Mr. Bryant's sons, Lamar Estep and Malique Bryant, as personal representatives of the Estate of Malcom J. Bryant,[2] initiated this civil rights action against the Baltimore City Police Department ("BPD" or the "Department"); former BPD Detective William F. Ritz; former BPD Forensic Analyst Barry Verger; and "unknown employees" of the BPD. ECF 1 (the "Complaint"). Detective Ritz and Analyst Verger (the "Officer Defendants") are sued in their individual capacities. *Id.* ¶¶ 15-16.

---

[1] I shall occasionally refer to Mr. Bryant as the "Decedent."

[2] The suit is captioned in the name of the Estate as the plaintiff. However, in the text, Lamar Estep and Malique Bryant are identified as the personal representatives of the Estate. Because the Estate acts through the personal representatives, I shall refer to them as the plaintiffs. *See* generally Md. Code (2017 Repl. Vol, 2019 Supp.), § 7-401(4) of the Estates and Trusts Article.

The Complaint contains ten counts. Counts I through V are filed under 42 U.S.C. § 1983, and Counts VI through X assert claims under Maryland law.

Count I, titled "Failure to Disclose Exculpatory and Impeachment Evidence to the Prosecution," is lodged against the Officer Defendants, and alleges a violation of due process under the Fifth and Fourteenth Amendments to the Constitution. *Id.* ¶¶ 114-20. Count II asserts a claim of "Fabrication of Evidence" against the Officer Defendants, in violation of due process. *Id.* ¶¶ 121-25. Count III alleges a claim of "Malicious Prosecution" against the Officer Defendants under the Fourth and Fourteenth Amendments. *Id.* ¶¶ 126-30. Count IV alleges that the Officer Defendants conspired to deprive Bryant of his constitutional rights. *Id.* ¶¶ 131-36. In Count V, plaintiffs assert a "*Monell*" claim against the BPD, pursuant to the Fifth and Fourteenth Amendments. *Id.* ¶¶ 138-45; *see Monell v. City Dep't of Soc. Servs. of New York City*, 436 U.S. 658 (1978).

Count VI asserts a claim against the Officer Defendants for "Malicious Prosecution." ECF 1, ¶¶ 146-53. Count VII, filed against the Officer Defendants, alleges "Abuse of Process." *Id.* ¶¶ 154-58. In Count VIII, plaintiffs assert a claim against the Officer Defendants for "Intentional Infliction of Emotional Distress." *Id.* ¶¶ 159-60. In Count IX, plaintiffs assert a claim against the Officer Defendants for "Civil Conspiracy". *Id.* ¶¶ 161-65. And, Count X seeks "Indemnification" from the BPD. *Id.* ¶¶ 166-68.

Two motions to dismiss are pending. The Officer Defendants have moved to dismiss the Complaint under Fed. R. Civ. P. 12(b)(6) (ECF 25), supported by a memorandum of law. ECF 25-1 (collectively, the "Officer Motion"). They contend that they are entitled to qualified immunity and that plaintiffs' claims for fabrication and intentional infliction of emotional distress are time-barred. The Officer Defendants also argue that plaintiffs fail to state plausible claims.

The BPD has moved to dismiss, pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) (ECF 26), supported by a memorandum of law. ECF 26-1 (collectively, the "BPD Motion"). The BPD asserts that it is protected by sovereign immunity, and it maintains that plaintiffs' *Monell* claims fail as a matter of law. Plaintiffs oppose both motions (ECF 29; ECF 30), and defendants have replied. ECF 36; ECF 37.

No hearing is necessary to resolve the motions. *See* Local Rule 105(6). For the reasons that follow, I shall grant the motions in part and deny them in part.

## I. Factual Background[3]

### A. The Investigation Concerning Mr. Bryant

At approximately 8:30 p.m. on November 20, 1998, Toni Bullock and Tyeisha Powell, both of whom were 16 years old, were approached by a man in the 1300 Block of Harford Road in Baltimore City. *See* ECF 1, ¶¶ 17, 21. The man demanded that they follow him, grabbed their arms, and forced them across the street to a dark grassy area. *Id.* ¶ 24. There, the man asked Ms. Bullock and Ms. Powell whether they had any money and threatened them. *Id.* ¶ 25. Ms. Powell managed to break free from the man's grasp and flee, but Ms. Bullock was unable to escape. *Id.* The perpetrator stabbed Ms. Bullock multiple times, killing her. *Id.* ¶ 17.

Detective Ritz, a veteran detective with the Homicide Unit of the BPD, was tasked with investigating Ms. Bullock's homicide. He arrived at the scene at around 9:15 p.m. *Id.* ¶ 20. Shortly thereafter, Detective Ritz spoke with Ms. Powell, who had returned to the crime scene. *Id.* ¶¶ 22, 26. In an unrecorded interview, Ms. Powell described the assailant as a black male in his

---

[3] Given the procedural posture of this case, I must assume the truth of all well-pleaded factual allegations in the Complaint. *See E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011). I may also take judicial notice of matters of public record. *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).

mid-20s who was wearing a black jacket, red shirt, and dark jeans. *Id.* ¶¶ 22, 27. With only this general description, Detective Ritz allegedly identified Mr. Bryant as the perpetrator. *Id.* ¶ 31. His decision was based either on his "prior history with Mr. Bryant relating to a different investigation or on an unsupported hunch[.]" *Id.*

The day after the murder, Detective Ritz met with Ms. Powell and another detective to create a composite sketch of the suspect. *Id.* ¶ 33. The interview with Ms. Powell was not documented, nor were any notes made concerning the composite sketches. *Id.* According to plaintiffs, Detective Ritz used "direct or indirect suggestion" during the interview to guide Ms. Powell to describe an individual resembling Mr. Bryant. *Id.* ¶ 35. One of the draft composites depicted a suspect with no hair, which was consistent with the appearance of an individual (referred to hereafter as "John Doe"), "who wore his hair closely shaven." *Id.* ¶ 34. However, another drawing depicted the suspect with medium-length bushy hair. *Id.* The suspect in the published sketch was wearing a red t-shirt, blue jeans, and a dark colored waist-length puffy jacket. *Id.* ¶ 36.

At the time of Ms. Bullock's murder, Mr. Bryant had medium-length, bushy hair. *Id.* ¶ 34. Only the composite drawing depicting the suspect with medium-length bushy hair was published and disclosed to the prosecution and the defense. *Id.*

On November 24, 1998, four days after Ms. Bullock's murder, Mr. Bryant was arrested on unrelated charges. *Id.* ¶ 37. At the time of the arrest, Mr. Bryant's hair was short-to-medium length. *Id.* ¶ 34. He also had a bandage above his left eye. *Id.* ¶ 48. In his booking photo, Mr. Bryant wore an orange shirt. *Id.* ¶ 37.

Detective Ritz conducted his first formal interview with Ms. Powell on December 1, 1998, at approximately 12:20 p.m. *Id.* ¶ 38. During the taped portion of the interview, which lasted a total of nine minutes, Ms. Powell recounted the events of the evening of November 20th. *Id.*

Again, she described the assailant as wearing a black puffy jacket. *Id.* During the interview, Detective Ritz asked Ms. Powell whether the assailant could have been wearing an orange t-shirt. *Id.* Ms. Powell responded that the perpetrator's shirt was red. *Id.*

After the conclusion of the recorded interview, Detective Ritz showed Ms. Powell a photographic array, consisting of six individuals, including Mr. Bryant. *Id.* ¶ 41. Of the six pictures, Mr. Bryant was the only individual wearing an orange-colored shirt. *Id.* Ms. Powell identified Mr. Bryant as the person who murdered Ms. Bullock. *See id.* ¶ 43. Detective Ritz allegedly suggested that response to Ms. Powell. *Id.*

On December 2, 1998, Detective Ritz arrested Mr. Bryant on charges of first-degree murder and possession of a deadly weapon with intent to injure. *Id.* ¶ 43. Later that day, shortly before 7:30 p.m., Detective Ritz interviewed Mr. Bryant. *Id.* Mr. Bryant told detectives that he was with friends the night of the murder. *Id.* ¶ 44. And, he provided the police with several alibi witnesses, including his friend Antonio "Tony" Brooks, whose home he visited on the day of the murder, as well as Tony's mother and younger sister. *Id.* Further, Mr. Bryant told detectives that on the night of Ms. Bullock's murder he was involved in an altercation at a nightclub, which resulted in an injury to his eye. *Id.* ¶ 45. Mr. Bryant described getting into a fight, ripping his shirt, and losing his sweater. *Id.* According to Mr. Bryant, his friend, Donte, gave him a spare orange shirt to wear. *Id.* In addition, Mr. Bryant provided the names, and in some instances, the phone numbers of at least five additional people who had been with him at the nightclub. *Id.* ¶ 46.

Further, Mr. Bryant told detectives that after the fight at the nightclub, he drove himself to Mercy Medical Center to receive treatment for the cut to his eye. Hospital records obtained by Detective Ritz indicated that Mr. Bryant did, in fact, receive treatment for a laceration to his eye, and that he gave medical personnel the name of a friend, "Donta Smith," who had medical

insurance. *Id.* ¶ 48. During the interview, Detective Ritz also asked Mr. Bryant to list the jackets that he owned. *Id.* ¶ 49. Mr. Bryant, who was homeless at the time, stated that he only owned one jacket—an army fatigue coat. *Id.*

In a second statement that Mr. Bryant made to detectives on December 2, 1998, he provided "clarifying details" regarding his whereabouts during the evening of November 20th. *Id.* ¶ 50. In particular, Mr. Bryant stated that before proceeding to the nightclub, he was with three friends at a store called Gabriel Brothers. *Id.* Mr. Bryant told detectives that after he left the store, he and his friends went to Subway and then, at around 10:00 or 10:15 p.m., to the home of another friend. *Id.*

Although Mr. Bryant provided Detective Ritz with numerous alibi witnesses, Detective Ritz never interviewed or investigated any of those individuals. *Id.* ¶¶ 47, 52. Nor did he provide any information regarding those witnesses to prosecutors. *Id.* ¶ 52. And, although Detective Ritz spoke with Mr. Bryant's mother, Vanessa Bryant, he did not record Ms. Bryant's statement or provide it to prosecutors, even though prosecutors asked for it. *Id.* ¶ 51.

In addition to failing to investigate Mr. Bryant's alibi witnesses, Detective Ritz also allegedly failed to disclose to the prosecution and to the defense evidence from an eyewitness that contradicted Ms. Powell's account of the events leading to Ms. Bullock's murder. *Id.* ¶ 66. At approximately 8:37 p.m. on the night of Ms. Bullock's murder, the BPD received three 911 calls, just seconds apart and all from locations near where the crime occurred. *Id.* ¶ 67. One of the callers, a woman who identified herself as Tyeisha,[4] told the 911 operator that a man had just pulled a gun on her sister and cousin. *Id.* 68. She stated that her sister ran from the location, but

---

[4] To avoid confusion, I shall refer to Tyeisha Powell as "Ms. Powell" and the individual who called 911 as "Tyeisha."

that her cousin remained with the armed man. *Id.* This statement differed from Ms. Powell's in several respects. *Id.* ¶ 69. Ms. Powell never reported seeing a firearm during the attack. *Id.* ¶ 70. And, Ms. Powell never said that she was with anyone besides Ms. Bullock when the attack occurred. *Id.* ¶ 71. Notably, at trial, Ms. Powell stated "for the first time" that after she ran from the perpetrator, she met a "'friend' named Tyeisha before returning to the scene of the crime." *Id.*

Despite these conflicting stories, Detective Ritz never disclosed the report of Tyeisha's call to the prosecution or the defense. *Id.* ¶ 72. Nor were the 911 calls disclosed. *Id.*

In preparation for Mr. Bryant's trial, a sample of Mr. Bryant's blood was drawn for evidence comparison purposes. *Id.* ¶ 74. However, the BPD never tested the evidence obtained from the crime scene for DNA. *Id.* Ms. Bullock's clothing was not examined for the presence of blood or DNA. *Id.* ¶ 76. Detective Ritz recovered fingernail clippings from Ms. Bullock as well as hair and blood. *Id.* ¶ 77. The fingernail clippings were sent to Analyst Verger, a BPD forensic analyst, to determine if they contained trace evidence. *Id.* But, Analyst Verger only inspected the fingernail clippings for the presence of blood, not DNA. *Id.* ¶ 78. Although the testing revealed that the clippings contained the assailant's blood, no DNA testing was conducted because Analyst Verger reported that the fingernails were destroyed during testing. *Id.* This report, plaintiffs allege, was "obviously false," because subsequent DNA testing of the same clippings led to Mr. Byrant's exoneration. *Id.* ¶ 79.

## B. Investigation Concerning John Doe

According to plaintiffs, evidence began to surface shortly after Ms. Bullock's murder, indicating that John Doe committed Ms. Bullock's murder. *Id.* ¶ 53. However, Detective Ritz either "intentionally, or with deliberate indifference," overlooked or hid several key pieces of evidence that inculpated John Doe and exculpated Mr. Bryant. *Id.*

Two days after Ms. Powell's identification, on December 3, 1998, an anonymous female caller reported that she recognized the suspect depicted in the publicly released composite sketch as a man known by the alias "Bo Peep." *Id.* ¶ 54. This was John Doe's alias. *Id.* Further, the caller stated that she last saw "Bo Peep" on Holbrook Street—which is located not far from the crime scene—three weeks prior, and that he was armed with a knife. *Id.* This call was never disclosed to the prosecutor or to the defense. *Id.*

Then, on December 10, 1998, Jeffrey Hale called the Homicide Unit to report that he had information about Ms. Bullock's murder. *Id.* ¶ 55. Detective Ritz and another detective met with Mr. Hale the following day. *Id.* Mr. Hale told the detectives that John Doe admitted to stabbing a young woman after following her and her friend. *Id.* ¶ 56. According to Mr. Hale, John Doe told him that he planned to rob the two girls. *Id.* Further, John Doe told Mr. Hale that he grabbed the girls, but one was able to run away. *Id.* Mr. Hale told the detectives that John Doe admitted to him that he pulled the other young woman down the street and stabbed her after she began to resist. *Id.* In addition, Mr. Hale told Detective Ritz that John Doe had committed robberies and assaults in the past. *Id.* ¶ 57. When Detective Ritz asked if this incident would have been an unusual act for John Doe to commit, Mr. Hale responded, "'not at all.'" *Id.*

Detective Ritz spoke with John Doe's father on December 29, 1998. *Id.* ¶ 58. During the interview, John Doe's father told Detective Ritz that his son was wearing a "black puff jacket" when he last saw him. *Id.* The interview was never disclosed to the prosecutor or to the defense. *Id.*

The following week, on January 6, 1999, Detective Ritz interviewed separately John Doe and his girlfriend. *Id.* ¶ 59. During the interview, Detective Ritz told the girlfriend that John Doe's name had surfaced during the investigation of the murder of a 16-year-old girl. *Id.* ¶ 62.

Detective Ritz asked the girlfriend whether John Doe owned a black puffy jacket and whether he ever disclosed a robbery attempt. *Id.* The girlfriend stated that John Doe did not own a black puff jacket, nor had he mentioned a robbery to her. According to plaintiffs, Detective Ritz initially mentioned the jacket to the girlfriend "off-tape," and also possibly told her that the perpetrator had been identified as wearing a black puff jacket. *Id.* The interview concluded in "just seven minutes." *Id.*

Detective Ritz told John Doe that the suspect was wearing a black puff jacket, and asked John Doe whether he owned a similar jacket. *Id.* ¶ 63. John Doe responded that "he did not own any such jacket." *Id.* During the interview, which lasted less than ten minutes, Detective Ritz never confronted John Doe with the disclosure by John Doe's father that he had seen John Doe wearing such a jacket. *Id.* Nor did he ask John Doe where he was at the time of the murder. *Id.* And, Detective Ritz made no effort to elicit incriminating admissions from John Doe. *Id.*

According to plaintiffs, Detective Ritz's questioning of John Doe and his girlfriend was unusual for an experienced, well-trained homicide detective. *Id.* ¶ 60. For example, Detective Ritz knew to withhold non-public facts about the crime during the interview of a suspect, to ask open-ended and non-leading questions to try and get as much information as possible, and to ask follow-up questions regarding a suspect's alibi. *Id.* However, Detective Ritz appeared "to have been attempting to eliminate Doe as a suspect." *Id.*

In addition, a six-person photo array with John Doe's photograph was prepared. *Id.* ¶ 65. However, it was either never shown to Ms. Powell for identification purposes, or, if it was shown, the identification procedure and its results were not documented or shared with the prosecution or the defense. *Id.*

**B. Mr. Bryant's Trial, Conviction, and Exoneration**

Mr. Bryant's jury trial began on August 2, 1999, in the Circuit Court for Baltimore City. *Id.* ¶ 81. Judge John N. Prevas, who is now deceased, presided. *Id.* Assistant State's Attorney David Mabrey represented the State of Maryland and Assistant Public Defender Larry Rogers represented Mr. Bryant. *Id.*

At trial, the only evidence the prosecution presented connecting Mr. Bryant to the murder was Ms. Powell's identification. *Id.* ¶ 82. Mr. Bryant's counsel argued that Mr. Bryant was innocent, and that Ms. Powell's identification was unreliable. *Id.* ¶ 83. Further, several witnesses testified to Mr. Bryant's alibi on the night of November 20, 1998, and that he was wearing an army fatigue jacket, not a black puff-style jacket. *Id.*

But, the jury never learned of the exculpatory evidence Detective Ritz suppressed, including evidence of the suggestion Detective Ritz used to obtain Ms. Powell's identification of Mr. Bryant; (2) evidence from John Doe's father, the anonymous tip, and the suppressed composite sketch implicating John Doe as the real perpetrator; or (3) evidence from Tyeisha, which contradicted Ms. Powell's account. *Id.* ¶ 84. And, because the fingernail clippings were never sent for DNA testing, the jury never learned that the DNA under Ms. Bullock's fingernails did not match that of Mr. Bryant. *Id.*

On August 5, 1999, the jury convicted Mr. Bryant of assault, felony murder, and carrying a concealed weapon. *Id.* ¶ 85. The court subsequently sentenced Mr. Bryant to life imprisonment for the murder of Ms. Bullock, and to consecutive terms of twenty years on the other charges. *Id.* ¶ 86.

In 2008, Mr. Bryant moved for post-conviction DNA testing. *Id.* ¶ 87. The Circuit Court for Baltimore City granted Mr. Bryant's motion, and the State sent Ms. Bullock's fingernail

clippings to the Bode Technology Group ("Bode") for testing. *Id.* Bode compared a partial male DNA sample obtained from Ms. Bullock's fingernail clippings to Mr. Bryant's reference sample. *Id.* The results excluded Mr. Bryant as a possible contributor of the DNA. *Id.* Mr. Bryant's DNA sample was subsequently compared to a DNA profile generated from Ms. Bullock's blood-stained t-shirt. *Id.* ¶ 89. Here too, the DNA profile excluded Mr. Bryant as a source of the DNA. *Id.*

After conducting its own investigation of the case and reviewing the DNA results, the Baltimore City State's Attorney's Office ("BSAO") agreed that Mr. Bryant was innocent. *Id.* ¶ 90. After a hearing held on May 11, 2016, the Circuit Court for Baltimore City vacated Mr. Bryant's convictions. *Id.* The State entered nolle prosequi dispositions as to each of the counts against Mr. Bryant, and he was released from custody. *Id.* ¶ 91.

In November 2018, the Baltimore Event Review Team ("BERT"), a collaboration between the BSAO, the BPD, the Maryland Office of the Public Defender in Baltimore City, and the University of Baltimore Innocence Project, issued a report on the investigation concerning Mr. Bryant. *Id.* ¶ 8. BERT's review found significant deviations from proper police practices, including failures to document adequately Ms. Powell's descriptions of the assailant and failures to document adequately the procedures used to create the photo array shown to Ms. Powell. *Id.* The report also raised serious concerns as to investigation of John Doe and Mr. Bryant's alibi. *Id.*

In total, Mr. Bryant spent 17 years in prison for a crime he did not commit. *Id.* ¶ 108. Mr. Bryant's older son, Lamar Estep, was four years old when his father was arrested. *Id.* Mr. Bryant's younger son, Malique Bryant ("Malique"), had been born only six months before Mr. Bryant's arrest. *Id.* ¶ 109.[5] In addition to suffering the loss of freedom and the indignities associated with

---

[5] Malique did not meet his father until Mr. Bryant was released in 2016. *Id.* As noted, just a year later, in 2017, Mr. Bryant passed away at the age of 42. *Id.* ¶ 109.

incarceration, Mr. Bryant missed birthdays, holidays, graduations, and other celebrations with his children and family. *Id.* Mr. Bryant was also deprived of the opportunity to help raise his two sons. *Id.* ¶ 109.

## B. Pattern and Practice Allegations

Plaintiffs allege that Detective Ritz and Analyst Verger acted "pursuant to one or more interrelated de facto policies, practices, and/or customs" of the BPD, including "fabricating evidence, suppressing exculpatory and impeachment evidence, and failing to conduct constitutionally adequate investigations." *Id.* ¶ 92. To support this allegation, plaintiffs point to several other cases that they allege "demonstrate that the Department has systematically fabricated evidence, suppressed exculpatory and impeachment evidence, and failed to conduct constitutionally adequate investigations." *Id.* ¶ 94. These are, *id.* ¶¶ 95-102:

- In 1974, Michael Austin was convicted of shooting and killing a private security guard. Baltimore Police Department officers failed to turn over a non-identification of Mr. Austin by an eyewitness to the murder. Baltimore police officers also failed to investigate other potential suspects, including a man who admitted to participating in the shooting.

- Wendell Griffin, convicted of murder in 1981, discovered that Baltimore Police Department officers never turned over key witness statements that excluded Mr. Griffin as the murderer, photo arrays in which a witness failed to identify Mr. Griffin as the assailant, and other evidence tending to show that someone else committed the crime.

- James Owens' 1988 convictions for burglary and felony murder were overturned after Mr. Owens discovered that Baltimore Police Department detectives withheld evidence of several inconsistent statements by their star witness. Mr. Owens was released in 2008 after 21 years of wrongful incarceration.

- In 1995, Sabein Burgess was convicted of the shooting death of his girlfriend. Baltimore Police Department officers, including Detective William Ritz, failed to disclose notes and evidence regarding an alternate perpetrator of the murder, as well as other evidence refuting gunshot residue results, which indicated that Mr. Burgess had recently fired a gun. As a result of these violations, Mr. Burgess's conviction was vacated and the charges against him were dismissed

- Antoine Pettiford was convicted of murder in 1995. Mr. Pettiford's post-conviction counsel discovered that Baltimore Police Department officers failed to disclose eyewitness statements and other exculpatory evidence to the defense. Mr. Pettiford's plea was ultimately vacated and charges against him were dismissed.

- In 1998, Rodney Addison was wrongfully convicted of a 1996 murder. In October 2005, after nine years in prison, Mr. Addison was released when it was revealed that the State had withheld exculpatory witness statements and its sole witness recanted her testimony at a post-conviction proceeding.

- In 1999, Tyrone Jones was convicted of conspiracy to commit murder in the June 1998 shooting death of a 15-year-old boy. During the post-conviction phase of Mr. Jones's case, his post-conviction counsel discovered evidence in the homicide case file that the witness who identified Mr. Jones at trial had told a Baltimore Police Department officer that he had not seen the shooting or the shooter. In addition, as with Mr. Burgess, the Trace Analysis Unit misrepresented gunshot residue results related to Mr. Jones. Ultimately, Mr. Jones' conviction was vacated, and the State dismissed the charges against him.

- In 2002, Ezra Mable pled guilty to second-degree murder for an August 2000 homicide for which Detective William Ritz was the lead investigator. Mr. Mable was sentenced to 25 years in prison. Mr. Mable's plea was motivated by the State's representation that two eyewitnesses had identified him as fleeing the crime scene. The Baltimore Police Department failed to test fingernail clippings from the victim for DNA. The Baltimore City State's Attorney's Office joined Mr. Mable in moving for his release, which was granted in 2010.

According to plaintiffs, the misconduct that plagued these murder investigations was the result of the Department's "failure to train, supervise, and discipline its police officers, which effectively condones, ratifies, and sanctions the kind of misconduct that the Defendants committed against Mr. Bryant in this case." ECF 1, ¶ 103. In particular, plaintiffs allege that "during the relevant time period," the BPD failed to train police officers to comply with their obligations under *Brady v. Maryland*, 373 U.S. 83 (1963). *Id.* ¶ 104. And, plaintiffs assert that the BPD has "failed to properly supervise and discipline its police officers." *Id.* ¶ 106. Thus, plaintiffs allege that the failure to train, supervise, and discipline BPD officers conducting homicide investigations "was consciously approved at the highest policy-making level by policymakers who were deliberately indifferent" to the constitutional rights of homicide defendants. *Id.*

## II.    Standard of Review

### A.  Rule 12(b)(1)

Under Rule 12(b)(1), the plaintiff bears the burden of proving, by a preponderance of evidence, the existence of subject matter jurisdiction.  *See Demetres v. E.W. Const., Inc*., 776 F.3d 271, 272 (4th Cir. 2015); s*ee also The Piney Run Preservation Ass'n v. Cty. Comm'rs of Carroll Cty*., 523 F.3d 453, 459 (4th Cir. 2008); *Evans v. B.F. Perkins Co*., 166 F.3d 642, 647 (4th Cir. 1999)*.*  A challenge to subject matter jurisdiction under Rule 12(b)(1) may proceed "in one of two ways": either a facial challenge or a factual challenge.  *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (citation omitted); *accord Hutton v. Nat'l Bd. of Examiners Inc.*, 892 F.3d 613, 620-21 (4th Cir. 2018); *Durden v. United States*, 736 F.3d 296, 300 (4th Cir. 2013).

In a facial challenge, "the defendant must show that a complaint fails to allege facts upon which subject-matter jurisdiction can be predicated."  *Hutton*, 892 F.3d at 621 n.7 (citing *Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017)); *see also Kerns*, 585 F.3d at 192.  Alternatively, in a factual challenge, "the defendant maintains that the jurisdictional allegations of the complaint are not true."  *Hutton*, 892 F.3d at 621 n.7 (citing *Beck*, 848 F.3d at 270).  In that circumstance, the court "may regard the pleadings as mere evidence on the issue and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment."  *Velasco v. Gov't of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004); *see also Beck*, 848 F.3d at 270; *In re KBR, Inc., Burn Pit Litig*., 744 F.3d 326, 333 (4th Cir. 2014); *Evans*, 166 F.3d at 647.

The Fourth Circuit recently reiterated that the defense of sovereign immunity is a jurisdictional bar, stating that "'sovereign immunity deprives federal courts of jurisdiction to hear claims, and a court finding that a party is entitled to sovereign immunity must dismiss the action

for lack of subject-matter jurisdiction.'" *Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 649 (4th Cir. 2018) (citation omitted), *cert. denied*, ___ U.S. ___, 139 S. Ct. 417 (2018). But, a defendant "bears the burden of demonstrating" sovereign immunity, because it is "akin to an affirmative defense." *Hutto v. S.C. Ret. Sys.*, 773 F.3d 536, 543 (4th Cir. 2014).

The BPD challenges subject matter jurisdiction, asserting that the BPD is entitled to Eleventh Amendment sovereign immunity. ECF 26-1 at 12-15. The BPD appears to raise a factual challenge to the Court's jurisdiction. Therefore, I may consider evidence outside the pleadings to resolve the jurisdictional issue, without converting the BPD Motion to one for summary judgment.

### B. Rule 12(b)(6)

A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Rule 12(b)(6). *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom.*, *McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2). That rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) (citation omitted) ("Our decision in *Twombly* expounded the pleading

standard for 'all civil actions' . . . ."); *see also Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 317 (4th Cir. 2019); *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). To be sure, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 10 (2014) (per curiam). But, mere "'naked assertions' of wrongdoing" are generally insufficient to state a claim for relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted).

In other words, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555. "[A]n unadorned, the-defendant-unlawfully-harmed-me accusation" does not state a plausible claim of relief. *Iqbal*, 556 U.S. at 678. Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co.*, 637 F.3d at 440 (citations omitted); *see Semenova v. Md. Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015); *Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir. 2011), *cert. denied*, 565 U.S. 943 (2011). But, a court is not required to accept legal conclusions drawn

from the facts. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986); *Glassman v. Arlington Cty.*, 628 F.3d 140, 146 (4th Cir. 2010). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

Courts ordinarily do not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses'" through a Rule 12(b)(6) motion. *Edwards*, 178 F.3d at 243 (quoting *Republican Party v. Martin,* 980 F.2d 943, 952 (4th Cir. 1992)). However, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.,* 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan,* 553 F.3d 334, 336 (4th Cir. 2009). Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst,* 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear[ ] *on the face of the complaint.*'" *Goodman,* 494 F.3d at 464 (quoting *Forst,* 4 F.3d at 250) (emphasis added in *Goodman*).

"Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'" *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at 448). Ordinarily, the court "may not consider any documents that are outside of the complaint, or not

expressly incorporated therein . . . ." *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013); *see Bosiger*, 510 F.3d at 450.

But, under limited circumstances, when resolving a Rule 12(b)(6) motion, a court may consider documents beyond the complaint without converting the motion to dismiss to one for summary judgment. *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015). In particular, a court may properly consider documents that are "explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits." *Goines*, 822 F.3d at 166 (citation omitted); *see also Six v. Generations Fed. Credit Union*, 891 F.3d 508, 512 (4th Cir. 2018); *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004); *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999).

However, "before treating the contents of an attached or incorporated document as true, the district court should consider the nature of the document and why the plaintiff attached it." *Goines*, 822 F.3d at 167 (citing *N. Ind. Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 455 (7th Cir. 1998)). Of import here, "[w]hen the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper." *Goines*, 822 F.3d at 167. Conversely, "where the plaintiff attaches or incorporates a document for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of that document as true." *Id.*

A court may also "consider a document submitted by the movant that [is] not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint

and there is no dispute about the document's authenticity." *Goines*, 822 F.3d at 166 (citations omitted); *see also Woods v. City of Greensboro*, 855 F.3d 639, 642 (4th Cir. 2017), *cert. denied*, __ U.S. __, 138 S. Ct. 558 (2017); *Oberg*, 745 F.3d at 136; *Kensington Volunteer Fire Dep't. v. Montgomery Cty.*, 684 F.3d 462, 467 (4th Cir. 2012). To be "integral," a document must be one "that by its 'very existence, *and not the mere information it contains*, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (citation omitted) (emphasis in original). *See also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

In addition, "a court may properly take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb*, 791 F.3d at 508; *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 466 (4th Cir. 2011), *cert. denied*, 565 U.S. 825 (2011); *Philips v. Pitt Cty. Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). However, under Fed. R. Evid. 201, a court may take judicial notice of adjudicative facts only if they are "not subject to reasonable dispute," in that they are "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

In support of plaintiffs' opposition to the BPD Motion, plaintiffs attached one exhibit, which contains two letters. ECF 30-1. The first letter, dated July 30, 2018, is from Ray Garvey, a claims adjuster at the Maryland State Treasury, to Andrew Freeman, Esq., of the law firm Brown, Goldstein, Levy, P.A. ECF 30-1 at 2. In the letter, Mr. Garvey explains that "for purposes of tort liability the Baltimore Police Department is a local government entity and its police officers are

local government actors." *Id.* The second letter, dated May 5, 2017, is from Mr. Garvey to Joshua R. Treem, Esq., also of Brown, Goldstein, Levy P.A. *Id.* at 3. That letter concerns the tort liability of the BPD. *Id.* These letters are not referenced in the Complaint, nor are they publicly available. Therefore, I shall limit my consideration of these letters to the issue of BPD's claim of sovereign immunity.

### III. Discussion

### A. Section 1983 Generally

Pursuant to 42 U.S.C. § 1983, a plaintiff may file suit against any person who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. *See, e.g.*, *Filarsky v. Delia*, 566 U.S. 377 (2012); *see also Owens v. Balt. City State's Attorney's Office*, 767 F.3d 379 (4th Cir. 2014), *cert. denied sub nom. Balt. City Police Dep't v. Owens*, 575 U.S. 983 (2015). However, § 1983 "'is not itself a source of substantive rights,' but provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)); *see Safar v. Tingle*, 859 F.3d 241, 245 (4th Cir. 2017). In other words, § 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief." *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 707 (1999).

"The first step in any such claim is to pinpoint the specific right that has been infringed." *Safar*, 859 F.3d at 245. To state a claim under § 1983, a plaintiff must allege (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a "person acting under the color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988); *see Davison v. Randall*, 912 F.3d 666, 679 (4th Cir. 2019); *Crosby v. City of Gastonia*,

635 F.3d 634, 639 (4th Cir. 2011), *cert. denied*, 565 U.S. 823 (2011); *Jenkins v. Medford*, 119 F.3d 1156, 1159-60 (4th Cir. 1997).

The phrase "under color of state law" is an element that "'is synonymous with the more familiar state-action requirement' for Fourteenth Amendment claims, 'and the analysis for each is identical.'" *Davison*, 912 F.3d at 679 (quoting *Philips*, 572 F.3d at 180); *see also Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 929 (1982). A person acts under color of state law "only when exercising power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *Polk Cty. v. Dodson*, 454 U.S. 312, 317-18 (1981) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)); *see also Philips*, 572 F.3d at 181 ("[P]rivate activity will generally not be deemed state action unless the state has so dominated such activity as to convert it to state action: Mere approval of or acquiescence in the initiatives of a private party is insufficient.") (citations and internal quotation marks omitted).

### B. The Officer Motion

The Officer Defendants have moved to dismiss the Complaint on the ground that they are shielded by qualified immunity and that Analyst Verger is protected by absolute testimonial immunity. ECF 25-1 at 21, 27-29. They also contend that plaintiffs' claims of fabrication of evidence and intentional infliction of emotional distress are barred by the statute of limitations. *Id.* at 18-19, 26-27.

In addition, the Officer Defendants argue that plaintiffs have failed to state plausible claims under either § 1983 or State law. In particular, they argue that plaintiffs' § 1983 claim for the suppression of evidence (Count I) should be dismissed because plaintiffs have not plausibly alleged a violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and because there is no constitutional right to forensic testing. ECF 25-1 at 14-17, 21-22. Further, they assert that plaintiffs' § 1983

claim for the fabrication of evidence (Count II) likewise fails because plaintiffs' allegations are conclusory. *Id.* at 17-19, 22-23. According to the Officer Defendants, plaintiffs' malicious prosecution claims (Counts III and VI) warrant dismissal because Mr. Bryant's arrest was supported by probable cause. *Id.* at 12-14. The Officer Defendants also challenge plaintiffs' conspiracy claims (Counts IV and IX), asserting that they are foreclosed by the intracorporate conspiracy doctrine. *Id.* at 23-25. And, the Officer Defendants posit that plaintiffs have failed to allege a plausible claim for abuse of process (Count VII). *Id.* at 25-26.

Plaintiffs agree to the dismissal of their claim for abuse of process. ECF 29 at 9 n.2. However, plaintiffs insist that neither Detective Ritz nor Analyst Verger is entitled to qualified immunity and that Analyst Verger's invocation of testimonial immunity is inapposite. *Id.* at 23, 27, 33 n.12. Further, plaintiffs maintain that their claims are not time-barred. *Id.* at 24-27, 35-36. And, plaintiffs argue that the Complaint teems with specific factual allegations that are sufficient to state plausible claims for the suppression of evidence, fabrication of evidence, malicious prosecution, and conspiracy. *Id.* at 17-23, 24, 28-35.

### 1. Immunity

The Officer Defendants contend that Detective Ritz is entitled to qualified immunity because Mr. Bryant's arrest was supported by probable cause and because plaintiffs fail to allege that Detective Ritz violated Mr. Bryant's right to the disclosure of exculpatory material. ECF 25-1 at 28. Further, they contend that because Mr. Bryant had no right to specific forensic testing, Analyst Verger is entitled to qualified immunity. *Id.* And, they contend that Analyst Verger is entitled to absolute immunity to the extent that plaintiffs' claims are rooted in Verger's trial testimony. *Id.* at 21.

a. Qualified Immunity Generally

"Qualified immunity shields government officials who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful." *Hunter v. Town of Mocksville*, 789 F.3d 389, 401 (4th Cir. 2015) (internal quotations omitted); *see also Humbert v. Mayor and City Council of Balt.*, 866 F.3d 546, 555 (4th Cir. 2017), *cert. denied*, ___ U.S. ___, 138 S. Ct. 2602 (2018); *Osborne v. Georgiades*, 679 F. App'x 234, 237 (4th Cir. 2017); *Scinto v. Stansberry*, 841 F.3d 219, 235 (4th Cir. 2016). In *Owens*, 767 F.3d at 395, the Fourth Circuit reiterated: "Qualified immunity protects government officials from liability for 'civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" (Quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

The doctrine of qualified immunity "'balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.'" *Wilson v. Prince George's Cty.*, 893 F.3d 213, 219 (4th Cir. 2018) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)); *see also Betton v. Belue*, 942 F.3d 184, 190 (4th Cir. 2019); *Smith v. Ray*, 781 F.3d 95, 100 (4th Cir. 2015). The cases are legion in support of these principles. *See, e.g.*, *District of Columbia v. Wesby*, 583 U.S. ___, 137 S. Ct. 577, 589 (2018); *Reichle v. Howards*, 566 U.S. 658, 664 (2012); *Saucier v. Katz*, 533 U.S. 194, 206 (2001); *Ray v. Roane*, ___ F.3d ___, 2020 WL 356486 (4th Cir. Jan. 22, 2020); *Hupp v. Cook*, 931 F.3d 307, 317 (4th Cir. 2019); *Attkisson v. Holder*, 925 F.3d 606, 623 (4th Cir. 2019); *Williamson v. Stirling*, 912 F.3d 154, 186 (4th Cir. 2018); *Wilson v. Prince George's Cty.*, 893 F.3d 213, 219 (4th Cir. 2018); *Sims v. Labowitz*, 885 F.3d 254, 260 (4th Cir. 2018); *Spivey v. Norris*, 731 F. App'x 171, 175 (4th Cir. 2018); *O'Neal v.*

*Rollyson*, 729 F. App'x 254, 255 (4th Cir. 2018) (per curiam); *Crouse v. Town of Moncks Corner*, 848 F.3d 576, 582-83 (4th Cir. 2017); *Occupy Columbia v. Haley*, 738 F.3d 107, 118 (4th Cir. 2013); *Bland v. Roberts*, 730 F.3d 368, 391 (4th Cir. 2013); *Merchant v. Bauer*, 677 F.3d 656, 661 (4th Cir. 2012), *cert. denied*, 568 U.S. 1068 (2012).

Qualified immunity turns on the "objective reasonableness of an official's conduct, as measured by reference to clearly established law." *Harlow*, 457 U.S. at 818. An officer who makes an honest but objectively unreasonable mistake is not protected by qualified immunity. Rather, the doctrine protects officials "'who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful.'" *Williams v. Ozmint*, 716 F.3d 801, 805 (4th Cir. 2013) (citation omitted); *accord Durham v. Horner*, 690 F.3d 183, 188 (4th Cir. 2012).

Qualified immunity "'gives government officials breathing room to make reasonable but mistaken judgments about open legal questions.'" *Lane v. Franks*, 573 U.S. 228, 243 (2014) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)); *accord Brawn v. Maynard*, 652 F.3d 557, 560 (4th Cir. 2011) (observing that qualified immunity protects government officials from liability for "'bad guesses in gray areas'") (citation omitted). In other words, "[t]he qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)); *accord Stanton v. Sims*, 571 U.S. 3, 5-6 (2013) (per curiam).

Notably, "a government official who is sued in his individual capacity may invoke qualified immunity." *Bland*, 730 F.3d at 391; *see Harlow*, 457 U.S. at 818. Moreover, "[t]he protection of qualified immunity applies regardless of whether the government official's error is

'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" *Pearson*, 555 U.S. at 231.

Of relevance here, qualified immunity is an "'*immunity from suit* rather than a mere defense to liability[.]'" *Ussery v. Mansfield*, 786 F.3d 332, 337 (4th Cir. 2015) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)) (emphasis in *Mitchell*). Accordingly, the immunity is "'effectively lost if a case is erroneously permitted to go to trial.'" *Ussery*, 786 F.3d at 337 (quoting *Mitchell*, 472 U.S. at 526). However, "[b]ecause an official 'who performs an act clearly established to be beyond the scope of his discretionary authority is not entitled to claim qualified immunity,' the defendant bears the initial burden 'of demonstrating that the conduct of which the plaintiff complains falls within the scope of the defendant's duties.'" *Henry v. Purnell*, 501 F.3d, 374, 377 n.2 (4th Cir. 2007) (citation omitted).

The Fourth Circuit has explained: "In determining whether defendant government officials are protected by qualified immunity, the court considers both 'whether a constitutional right [was] violated on the facts alleged' and 'whether the right was clearly established' at the time of the conduct in question." *Scinto*, 841 F.3d at 235 (citations omitted); *see also Cannon v. Village of Bald Head Island*, 891 F.3d 489, 497 (4th Cir. 2018). Thus, the qualified immunity analysis involves two inquiries: (1) whether the facts alleged, "[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a constitutional [or statutory] right," *Saucier*, 533 U.S. at 201; and (2) whether the right at issue "'was clearly established in the specific context of the case—that is, [whether] it was clear to a reasonable officer that the conduct in which he allegedly engaged was unlawful in the situation he confronted.'" *Merchant*, 677 F.3d at 662 (quoting *Figg v. Schroeder*, 312 F.3d 625, 635 (4th Cir. 2002)); *see Wesby*, 138 S. Ct. at 589; *Ray*, 2020 WL 356486, at *2; *Owens,* 767 F.3d at 395-96. The "two inquiries . . . may be

assessed in either sequence." *Merchant*, 677 F.3d at 661-62; *accord Ray*, 2020 WL 356486, at *2; *Labowitz*, 885 F.3d at 260; *Adams v. Ferguson*, 884 F.3d 219, 226 (4th Cir. 2018).

If an officer is shown to have violated the rights of a plaintiff, courts must then "evaluate whether the right at issue was 'clearly established' at the time of the officer's conduct." *Wilson*, 893 F.3d at 219. This is a question of law for the court to resolve. *Ray*, 2020 WL 356486, at *4; *Pritchett v. Alford*, 973 F.2d 307, 312 (4th Cir. 1992). Thus, "even when the facts in the record establish that the officer's conduct violated a plaintiff's constitutional rights, the officer still is entitled to immunity from suit 'if a reasonable person in the [officer's] position could have failed to appreciate that his conduct would violate those rights.'" *Wilson*, 893 F.3d at 219 (quoting *Torchinsky v. Siwinski*, 942 F.2d 257, 261 (4th Cir. 1991)); *see also Williams v. Strickland*, 917 F.3d 763, 768 (4th Cir. 2019); *Greene v. Feaster*, 733 F. App'x 80, 82 (4th Cir. 2018) (per curiam) ("Even when a prison official [is shown to have violated a constitutional right of a plaintiff], qualified immunity will shield him from liability as long as his 'conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'") (quoting *Goines*, 822 F.3d at 170). However, and of import here, a "question of material fact" as to whether "'the conduct allegedly violative of the right actually occurred . . . must be reserved for trial.'" *Willingham v. Crooke*, 412 F.3d 553, 559 (4th Cir. 2005) (citation omitted).

The second inquiry "turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (citing *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)). If the law at the time of the alleged violation was not "clearly established," the official will be entitled to qualified immunity because "an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct

not previously identified as unlawful." *Harlow*, 457 U.S. at 818. On the other hand, "[i]f the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Id.* at 818-19.

To determine whether the right was clearly established, the court first must define the right at issue. *Scinto,* 841 F.3d at 235; *see Occupy Columbia*, 738 F.3d at 118. "A right is clearly established only if its contours are sufficiently clear that 'a reasonable official would understand that what he is doing violates that right.'" *Carroll v. Carman*, 574 U.S. 13, 16 (2014) (quoting *Creighton*, 483 U.S. at 640). Notably, "a right may be clearly established by any number of sources, including a . . . case, a statute, or the Constitution itself." *Owens,* 767 F.3d at 399; *see Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 543 (4th Cir. 2017).

Generally, to "determine whether a right is clearly established", courts "assess whether the law has 'been authoritatively decided by the Supreme Court,[] the appropriate United States Court of Appeals, or the highest court of the state.'" *Wilson*, 893 F.3d at 221 (citation omitted); *see Doe ex rel. Johnson v. S.C. Dep't of Soc. Servs.,* 597 F.3d 163, 176 (4th Cir. 2010) (stating that "'ordinarily [courts] need not look beyond the decisions of the Supreme Court, [the Fourth Circuit], and the highest court of the state in which the case arose'" as of the date of the conduct at issue), *cert. denied*, 562 U.S. 890 (2010). "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Carroll*, 574 U.S. at 16-17 (quoting *al-Kidd*, 563 U.S. at 741); *see Kisela v. Hughes*, ___ U.S. ___, 138 S. Ct. 1148, 1152 (2018); *White v. Pauly,* ___ U.S. ___, 137 S. Ct. 548, 551 (2017) (per curiam); *San Francisco v. Sheehan*, ___ U.S. ___, 135 S. Ct. 1765, 1774 (2015); *Plumhoff v. Rickard*, 572 U.S. 765,778-79 (2014); *see also Reichle*, 132 S. Ct. at 2093 ("To be clearly established, a right must be sufficiently clear that 'every reasonable official would [have understood] that what he is doing violates that right.'")

(citation and some quotation marks omitted).

However, "[a] right need not be recognized by a court in a specific factual context before such right may be considered 'clearly established' for purposes of qualified immunity." *Wilson*, 893 F.3d at 221; *see Thompson v. Virginia*, 878 F.3d 89, 98 (4th Cir. 2017) ("[A] 'general constitutional rule . . . may apply with obvious clarity . . . even though the very action in question has not previously been held unlawful.'") (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)); *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 544 (4th Cir. 2017). Indeed, the Supreme Court has never required a "'case directly on point for a right to be clearly established.'" *Kisela*, 138 S. Ct. at 1152 (quoting *White*, 137 S. Ct. at 551); *see al-Kidd*, 563 U.S. at 741; *see also Crouse*, 848 F.3d, at 582-83. But, "courts are 'not to define clearly established law at a high level of generality.'" *Wilson*, 893 F.3d at 221 (quoting *Kisela*, 138 S. Ct. at 1152); *see also Sheehan*, 135 S. Ct. at 1775-76; *Plumhoff*, 572 U.S. at 779. Rather, courts are to "consider whether a right is clearly established 'in light of the specific context of the case, not as a broad general proposition.'" *Adams*, 884 F.3d at 227 (quoting *Mullenix v. Luna*, ___ U.S. ___, 136 S. Ct. 305, 308 (2015) (per curiam)).

The central question is "whether it would be clear to a reasonable official that his conduct was unlawful in the situation he confronted." *See Raub v. Campbell*, 785 F.3d 876, 882 (4th Cir. 2015). To defeat qualified immunity, "'the existing authority must be such that the unlawfulness of the conduct is manifest.'" *Merchant*, 677 F.3d at 665 (quoting *Wilson v. Layne*, 141 F.3d 111, 114 (4th Cir. 1998)); *see Bland*, 730 F.3d at 391 (stating that "[f]or a plaintiff to defeat a claim of qualified immunity, the contours of the constitutional right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right") (internal quotations omitted).

b.  Analysis

As discussed, the qualified immunity analysis involves two inquiries: (1) whether the facts alleged, "[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a constitutional right," *Saucier*, 533 U.S. at 201; and (2) whether the right at issue "'was clearly established in the specific context of the case—that is, [whether] it was clear to a reasonable officer that the conduct in which he allegedly engaged was unlawful in the situation he confronted.'" *Merchant*, 77 F.3d at 662 (citation omitted); *see Owens*, 767 F.3d at 395-96.

The Officer Defendants assert in a cursory manner that they are entitled to qualified immunity because "none of [their] conduct violated any established right on the part of Bryant." ECF 25-1 at 28-29.  Regarding plaintiffs' claim under *Brady v. Maryland*, 373 U.S. 83 (1963), they concede that "it is undisputed that Bryant had a clearly established right to the disclosure of potentially exculpatory evidence[.]"  *Id.* at 28.  But, the Officer Defendants assert that they are entitled to qualified immunity because no such evidence was withheld.  *Id.*  The Officer Defendants fail to address with any specificity why they are immune from plaintiffs' fabrication claim.  However, they appear to assert that Analyst Verger is generally immune from plaintiffs' claims because Mr. Bryant had no constitutional right "to a flawless investigation including any specific forensic testing."  *Id.*

At this juncture, neither Detective Ritz nor Analyst Verger is entitled to the benefit of qualified immunity.  As discussed in greater detail, *infra*, plaintiffs have pleaded facts which, together with reasonable inferences, are sufficient to state a plausible violation of Mr. Bryant's due process rights to a fair trial.  *See, e.g., Ray*, 2020 WL 356486, at *3.  And, plaintiffs are able to meet the second prong of the qualified immunity test.  When Mr. Bryant was prosecuted in 1999, it was clearly established that an investigator who withheld exculpatory evidence or

fabricated evidence violated the defendant's right to due process. *See Owens*, 767 F.3d at 401 ("[A] police officer's obligation to disclose material exculpatory evidence was clearly established by 1983[.]"); *Washington v. Wilmore*, 407 F.3d 274, 283 (4th Cir. 2005) (observing that the "constitutional right not to be deprived of liberty as a result of the fabrication of evidence by an investigating officer. . . . was clearly established in 1983"); *accord Burgess v. Balt. Police Dep't* ("*Burgess II*"), RBD-15-0834, 2017 WL 4947004, at *16 (D. Md. Oct. 31, 2017) (rejecting BPD officers' qualified immunity defense against the plaintiff's *Brady* and fabrication-of-evidence claims).

Nor is Analyst Verger shielded from suit by the doctrine of testimonial immunity. Of course, "[o]ur law affords absolute immunity to those persons who aid the truth-seeking mission of the judicial system." *Day v. Johns Hopkins Health Sys. Corp.*, 907 F.3d 766, 771 (4th Cir. 2018). This immunity, referred to as the "Witness Litigation Privilege," provides "broad" protection to witnesses. "It applies to those who come forward of their own volition as well as those who are compelled; to those who provide factual testimony as well as those who provide opinions; to those who appear before administrative tribunals as well as those who appear in court; and to those who act with malice or ill will as well as those who are simply mistaken in their recollections." *Id.* (internal citations omitted). And, the "immunity extends not only to the testimony a witness actually provides, but also to the witness's actions in preparing that testimony." *Id.*

Section 1983 did not abrogate the Witness Litigation Privilege. *Briscoe v. LaHue*, 460 U.S. 325, 345-46 (1983); *Wilmore*, 407 F.3d at 283 (calling officer's entitlement to testimonial immunity "indisputable"); *Lyles v. Sparks*, 79 F.3d 372, 378 (4th Cir. 1996). Therefore, the common law doctrine of absolute immunity afforded to witnesses also protects testifying police

officers from § 1983 liability. *Briscoe*, 460 U.S. at 345-46; *Wilmore*, 407 F.3d at 283; *White v. Wright*, 150 F. App'x 193, 197-98 (4th Cir. 2005) (per curiam) (observing that § 1983 liability cannot rest on police officer's testimony before the grand jury).

However, the Witness Litigation Privilege is not without limits. Notably, the immunity does not encompass non-testimonial pretrial conduct. *See Rehberg v. Paulk*, 566 U.S. 356, 370 n.1 (2012) ("[W]e have accorded only qualified immunity to law enforcement officials who falsify affidavits and fabricate evidence concerning an unsolved crime.") (internal citations omitted); *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1995) (refusing to extend absolute immunity to prosecutor accused of fabricating evidence during an investigation); *see also Lisker v. City of Los Angeles*, 780 F.3d 1237, 1242 (9th Cir. 2015) (officers were not immune for fabricating investigative materials); *Gregory v. City of Louisville*, 444 F.3d 725, 739 (6th Cir. 2006) ("This Court has consistently held that nontestimonial, pretrial acts do not benefit from absolute immunity, despite any connection these acts might have to later testimony."); *Pierce v. Gilchrist*, 359 F.3d 1279, 1300 (10th Cir. 2004) (ruling that an action could proceed against a forensic hair examiner accused of intentionally or recklessly falsifying her investigative report); *Manning v. Miller*, 355 F.3d 1028, 1031-33 (7th Cir. 2004) (FBI agents were not entitled to absolute immunity for *Brady* violations and fabricating evidence); *Castellano v. Fragozo*, 352 F.3d 939, 958 n.107 (5th Cir. 2003) ("Defendants cannot shield any pretrial investigative work with the aegis of absolute immunity merely because they later offered the fabricated evidence or testified at trial."); *Washington v. Wilmore*, No. CIV.A. 3:02CV00106, 2006 WL 2471611, at *8 (W.D. Va. Aug. 23, 2006) ("[I]n fabrication of evidence cases, it is clear that the fabricator may be liable for his pretrial actions even where he himself has offered the evidence in an immunized judicial proceeding.").

Plaintiffs have not asserted any claims against Analyst Verger based on his testimony at the underlying criminal trial. Rather, plaintiffs allege that Analyst Verger violated Mr. Bryant's constitutional rights by falsely reporting that Ms. Bullock's fingernail clippings had been consumed by testing and therefore no DNA analysis was possible. *See* ECF 1, ¶¶ 74-77. This report is a non-testimonial pretrial act that does not fall within the Witness Litigation Privilege. *See, e.g.*, *Gregory*, 444 F.3d at 741 (expert was not immune from the plaintiff's claim that the expert report contained fabricated evidence). Therefore, Analyst Verger is not shielded by absolute testimonial immunity.

## 2. Statute of Limitations

The Officer Defendants have moved to dismiss plaintiffs' fabricated evidence claim and claim for intentional infliction of emotional distress ("IIED") on the ground that they are time-barred. ECF 25-1 at 18-19, 26-27. The parties agree that these claims are subject to Maryland's three-year limitations period. *Compare* ECF 25-1 at 19, *with* ECF 29 at 24. However, they dispute the date on which the claims accrued.

According to the Officer Defendants, a fabricated evidence claim accrues "when a plaintiff learned of the evidence and its use against him in a [sic] his criminal trial and he was deprived of the liberty interest in his arrest and trial." ECF 25-1 at 19. Therefore, they contend that the clock on plaintiffs' fabrication claim began to run in 1999, when the criminal trial concluded. *Id.* Likewise, the Officer Defendants posit that plaintiffs' IIED claim accrued in 1999 because that was the last time they interacted with Mr. Bryant. *Id.* at 27.

### a. Section 1983 Claim (Count II)

Section 1983 does not contain a statute of limitations. Thus, to determine whether a § 1983 claim was timely filed, courts look to the statute of limitations from the most analogous state-law

cause of action. *Owens*, 767 F.3d at 388; *see also* 42 U.S.C. § 1988(a) ("[I]n all cases where [the laws of the United States] are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies . . . the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of such civil . . . cause is held, so far as the same is not inconsistent with the Constitution and laws of the United States, shall be extended to and govern the said courts in the trial and disposition of the cause[.]").

A suit filed pursuant to 42 U.S.C. § 1983 constitutes a personal injury action. *Owens v. Okure*, 488 U.S. 235, 249-50 (1989). Under Maryland law, "[a] civil action shall be filed within three years from the date it accrues unless another provision of the Code provides" otherwise. Md. Code (2013 Repl. Vol., 2018 Supp.), § 5–101 of the Courts and Judicial Proceedings Article ("C.J.").

"Limitations statutes . . . are designed to (1) provide adequate time for diligent plaintiffs to file suit, (2) grant repose to defendants when plaintiffs have tarried for an unreasonable period of time, and (3) serve society by promoting judicial economy." *Georgia-Pacific Corp. v. Benjamin*, 394 Md. 59, 85, 904 A.2d 511, 526 (2006); *see Pierce v. Johns-Manville Sales Corp.*, 296 Md. 656, 665, 464 A.2d 1020, 1026 (1983). In Maryland, "[a]s a general rule, the party raising a statute of limitations defense has the burden of proving that the cause of action accrued prior to the statutory time limit for filing the suit." *Newell v. Richards*, 323 Md. 717, 725, 594 A.2d 1152, 1156 (1991).

Although the Maryland statute of limitations applies, the matter of when a cause of action has accrued under § 1983 is a federal question. *Nassim v. Md. House of Correction*, 64 F.3d 951, 955 (4th Cir. 1995) (en banc) (citing *Cox v. Stanton*, 529 F.2d 47, 50 (4th Cir. 1975)); *see also McDonough v. Smith*, ___ U.S. ___, 139 S. Ct. 2149, 2155 (2019). "An accrual analysis begins

with identifying 'the specific constitutional right' alleged to have been infringed." *McDonough*, 139 S. Ct. at 2155 (quoting *Manuel v. Joliet*, ___ U.S. ___, 137 S. Ct. 911, 920 (2017)).

The date of accrual occurs "when the plaintiff possesses sufficient facts about the harm done to him that reasonable inquiry will reveal his cause of action." *Nassim*, 64 F.3d at 955 (citing *United States v. Kubrick*, 444 U.S. 111, 122-24 (1979)). However, "the answer is not always so simple." *McDonough*, 139 S. Ct. at 2155. "Where, for example, a particular claim may not realistically be brought while a violation is ongoing, such a claim may accrue at a later date." *Id*. Moreover, it would appear that, in the context of this case, the plaintiffs, as personal representatives of the Decedent's estate, stand in the shoes of the Decedent; the issue of accrual pertains to the Decedent, not his sons.[6]

Maryland law is largely consistent with federal law. Therefore, I shall look to both federal and Maryland cases concerning accrual.

As noted, under Maryland law, "[a] civil action shall be filed within three years from the date it accrues unless another provision of the Code provides" otherwise. C.J. § 5-101; *see Poole v. Coakley & Williams Const., Inc.*, 423 Md. 91, 131, 31 A.3d 212, 236 (2011). Ordinarily, "'the question of accrual in § 5-101 is left to judicial determination,' unless the determination rests on the resolution of disputed facts regarding discovery of the wrong." *Poole*, 423 Md. at 131, 31 A.3d at 236 (citation omitted); *see Bank of N.Y. v. Sheff*, 382 Md. 235, 244. 854 A.2d 1269, 1275 (2004) (stating that summary judgment may be appropriate if there is no dispute of material fact as to whether plaintiff was on inquiry notice more than three years before suit was file); *Frederick Road Ltd. P'ship v. Brown & Sturm*, 360 Md. 76, 95, 756 A.2d 963, 973 (2000) (explaining that the

---

[6] The parties have not addressed whether the issue of accrual is analyzed from the perspective of Mr. Bryant or, instead, his sons.

determination of accrual "may be based solely on law, solely on fact, or on a combination of law and fact, and is reached after careful consideration of the purpose of the statute and the facts to which it is applied").

Nevertheless, "[r]ecognizing the unfairness inherent in charging a plaintiff with slumbering on his rights where it was not reasonably possible to have obtained notice of the nature and cause of an injury," the so-called discovery rule is used to determine the date of accrual.  *See Sheff*, 382 Md. at 244, 854 A.2d at 1275; *Frederick Road Ltd. P'ship*, 360 Md. at 95, 756 A.2d at 973.  "The discovery rule acts to balance principles of fairness and judicial economy in those situations in which a diligent plaintiff may be unaware of an injury or harm during the statutory period." *Dual Inc. v. Lockheed Martin Corp.*, 383 Md. 151, 167, 857 A.2d 1095, 1104 (2004).

Under the discovery rule, "a plaintiff's cause of action accrues when the plaintiff knows or reasonably should have known of the wrong." *Brown v. Neuberger, Quinn, Gielen, Rubin & Gibber, P.A.*, 731 F. Supp. 2d 443, 449 (D. Md. 2010) (citing *Lumsden v. Design Tech Builders, Inc.,* 358 Md. 435, 749 A.2d 796, 801 (2000)), *aff'd*, 495 F. App'x 350 (4th Cir. 2012).  Accrual cannot occur until the plaintiff has (or should have) "possession of the critical facts that he has been hurt and who has inflicted the injury." *United States v. Kubrick,* 444 U.S. 111, 122 (1979) (discussing discovery rule in the context of the Federal Tort Claims Act, which requires notice to the government "within two years after such claim accrues"); *see also Gould v. U.S. Dep't of Health & Human Servs.*, 905 F.2d 738, 742 (4th Cir. 1990) (en banc) ("The clear import of *Kubrick* is that a claim accrues . . . when the plaintiff knows or, in the exercise of due diligence, should have known both the existence and the cause of his injury."); *Gilbert v. United States*, 720 F.2d 372, 374 (4th Cir. 1983).  Notably, "[t]his standard . . . does not require actual knowledge on the part of the plaintiff, but may be satisfied if the plaintiff is on 'inquiry notice.'" *Dual Inc.*, 383 Md.

at 167-68, 857 A.2d at 1104 (citing *Am. Gen. Assurance Co. v. Pappano,* 374 Md. 339, 351, 822 A.2d 1212, 1219 (2003); *Doe v. Archdiocese of Wash.*, 114 Md. App. 169, 188-89, 689 A.2d 634, 644 (1997)).

A plaintiff is on inquiry notice when the plaintiff "possesses 'facts sufficient to cause a reasonable person to investigate further, and . . . a diligent investigation would have revealed that the plaintiffs were victims of . . . the alleged tort.'" *Dual Inc.*, 383 Md. at 168, 857 A.2d at 1104 (quoting *Pennwalt Corp. v. Nasios*, 314 Md. 433, 448–49, 550 A.2d 1155, 1159 (1988)) (alterations in original). Inquiry notice must be actual notice, either express or implied. *Poffenberger v. Risser*, 290 Md. 631, 637, 431 A.2d 677, 681 (1981). But, "[c]onstructive notice or knowledge will not suffice for inquiry notice." *Benjamin*, 394 Md. at 89, 904 A.2d at 529; *see Poffenberger*, 290 Md. at 637, 431 A.2d at 681.

As indicated, defendants contend that the due process/fabricated evidence claim accrued in 1999, at the conclusion of Mr. Bryant's trial. ECF 25-1 at 19. In contrast, plaintiffs maintain that the three-year limitations period did not begin to run until 2016, when the criminal proceedings were resolved in Mr. Bryant's favor. ECF 29 at 25.

The Supreme Court's recent decision in *McDonough*, 139 S. Ct. at 2155, is instructive.[7] There, a grand jury indicted McDonough on numerous counts under New York law. *Id*. at 2154. The case against McDonough proceeded to trial but ended in a mistrial. *Id*. The state retried McDonough, and the second trial ended on December 21, 2012, with an acquittal on all charges. *Id*. Nearly three years later, McDonough filed suit under 42 U.S.C. § 1983, claiming that Smith, who was the prosecutor, and other defendants violated his due process rights by fabricating

---

[7] *McDonough* was issued on June 20, 2019, after the Officer Defendants filed their motion to dismiss. The day that *McDonough* was decided, plaintiffs filed a letter of supplemental authority notifying the Court of the decision. ECF 31.

evidence and using it against him before the grand jury and at both trials. *Id.* Based on this timeline, "McDonough's claim was timely only if the limitations period began running at acquittal." *Id.*

The district court dismissed McDonough's fabricated evidence claim as untimely. *McDonough v. Smith*, 15-cv-01505-MAD-DJS, 2016 WL 5717263, at *12 (N.D.N.Y. Sept. 30, 2016). The Second Circuit affirmed, finding that the limitations period began to run "when (1) McDonough learned that the evidence was false and was used against him during the criminal proceedings; and (2) he suffered a loss of liberty as a result of that evidence." *McDonough v. Smith*, 898 F.3d 259, 265 (2d Cir. 2018). In accordance with this standard, the court reasoned that McDonough's fabricated evidence claim accrued when he "was arrested and stood trial." *McDonough*, 139 S. Ct. at 2154.

The Supreme Court reversed. It concluded that the statute of limitations for McDonough's fabricated evidence claim began to run once "the criminal proceedings against him terminated in his favor," *i.e.*, "when he was acquitted at the end of his second trial." *Id.* at 2161.

The ruling of the Supreme Court was consistent with decisions of several circuits, concluding that a fabricated evidence claim begins to run when the criminal proceedings resolve in the defendant's favor. *See Floyd v. Attorney Gen.*, 722 F. App'x 112, 114 (3d Cir. 2018); *Mills v. Barnard*, 869 F.3d 473, 484 (6th Cir. 2017); *Bradford v. Scherschligt*, 803 F.3d 382, 387-389 (9th Cir. 2015); *Mondragon v. Thompson*, 519 F.3d 1078, 1083 (10th Cir. 2008); *Castellano v. Fragozo*, 352 F.3d 939, 959-60 (5th Cir. 2003) (*en banc*).

In light of the Supreme Court's ruling in *McDonough*, I conclude that the limitations period as to the fabricated evidence claim began to run when the criminal proceedings against Mr. Bryant

terminated in his favor. That occurred in 2016, when his convictions were vacated. Therefore, the fabricated evidence claim lodged in Count II was timely filed.

### b. State Law Claim (Count IX)

The Officer Defendants move to dismiss plaintiffs' claim for intentional infliction of emotional distress on the ground that it is barred by Maryland's three-year statute of limitations for tort claims. ECF 25-1 at 26 (citing *Kashaka v. Baltimore Cty.*, 450 F. Supp. 2d 610, 615 (D. Md. 2006)). In their view, plaintiffs' IIED claim expired in 2002 because the last act that could give rise to plaintiffs' IIED claim "occurred during Bryant's trial, back in 1999." ECF 25-1 at 27.

The Maryland Court of Appeals addressed the accrual of an IIED claim arising from a false imprisonment in the case of *Prince George's County v. Longtin*, 419 Md. 450, 19 A.3d 859 (2011). There, the court determined that where the plaintiff's IIED claim is rooted in "emotional distress [that] was the result of continuing actions by [a] police department to keep him wrongfully imprisoned," the claim "d[oes] not accrue until his release." *Id.* at 481, 19 A.3d at 878 (citing *Parish v. City of Elkhart*, 614 F.3d 677, 683 (7th Cir. 2010)).

Accordingly, the three-year clock on the IIED claim did not begin to run until 2016, when the State entered a *nolle prosequi. See id.*; *accord Burgess II*, 2017 WL 4947004, at *9 (rejecting BPD's statute of limitation defense as to plaintiff's IIED claim, and finding that the IIED claim accrued upon the plaintiff's release from prison). Therefore, plaintiffs' IIED claim is not time-barred.[8]

_____

[8] As limitations was the only ground for dismissal asserted by defendants, the claim shall proceed. I note, however, that claims for IIED are generally disfavored, difficult to establish, and rarely viable. *See, e.g.*, *Arsham v. Mayor & City Council of Balt.*, 85 F. Supp. 3d 841, 850 (D. Md. 2015); *Chin v. Wilhelm*, CCB-02-01551, 2006 WL 827343 (D. Md. Mar. 24, 2006); *Manikhi v. Mass Transit Admin.*, 360 Md. 333, 367, 758 A.2d 95, 113 (2000); *see also* David Crump, *Rethinking Intentional Infliction Of Emotional Distress*, 25 GEO. MASON L. REV. 287, 297 (2018)

### 3. Failure to State a Claim

a. *Brady v. Maryland* Claim (Count I)

In Count I, plaintiffs allege that the Officer Defendants violated Mr. Bryant's due process rights by failing to disclose exculpatory and impeachment evidence to the prosecution, as required by the Supreme Court's ruling in *Brady v. Maryland*, 373 U.S. 83 (1963). ECF 1, ¶¶ 114-20.

The Officer Defendants have moved to dismiss Count I, asserting that the facts alleged in the Complaint cannot support a *Brady* violation. ECF 25-1 at 14-17. They argue that the allegations concerning Ms. Powell cannot serve as the basis for a *Brady* claim because plaintiffs "point[] to no specific exculpatory or impeachment evidence which was supposedly discussed during [Ms. Powell's] interviews." *Id.* at 14. Further, they contend that Detective Ritz's investigation of John Doe does not give rise to a *Brady* claim because "the facts alleged in the complaint confirm that Bryant was aware of John Doe[.]" *Id.* at 15. The anonymous 911 call is likewise immaterial, the Officer Defendants argue, because the Complaint "is devoid of anything that suggests that either Det. Ritz or Analyst Verger . . . was aware of the call . . . let alone took steps to suppress it from the prosecution and Bryant's defense counsel." *Id.* at 17. They also assert that the interview with Tyeisha was not exculpatory. *Id.* at 16. And, they contend that plaintiffs cannot assert a *Brady* claim against Analyst Verger because there is no constitutional right to forensic testing and because "there is no plausible basis for a finding of bad faith." *Id.* at 23.

Plaintiffs counter that the Officer Defendants' arguments miss the mark; the allegations in the Complaint must be credited as true at this juncture. ECF 29 at 17. And, plaintiffs maintain

---

(noting that an IIED claim is "a kind of vituperative epithet" that "adds little that can be the subject of a separate or additional recovery" but "makes [the litigation] more expensive").

that the Complaint is replete with allegations that both Detective Ritz and Analyst Verger purposely suppressed exculpatory evidence concerning Mr. Bryant.  *Id.* at 17-23, 33-34.

In *Brady*, 373 U.S. at 87, the Supreme Court expressly held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  *See also United States v. Agurs*, 427 U.S. 97, 106-07 (1976); *Gilliam v. Sealey*, 932 F.3d 216, 238 (4th Cir. 2019), *pet. for cert. filed* No. 19-680 (U.S. Nov. 26, 2019); *United States v. Young*, 916 F.3d 368, 382 n.9 (4th Cir. 2019); *United States v. Chavez*, 894 F.3d 593, 600 (4th Cir.), *cert. denied*, ___ U.S. ___, 139 S. Ct. 278 (2018); *United States v. Savage*, 885 F.3d 212, 220-22 (4th Cir. 2018), *cert. denied*, ___ U.S. ___, 139 S. Ct. 238 (2018); *United States v. Horton*, 693 F.3d 463, 470 (4th Cir. 2012).  A *Brady* violation occurs when a defendant can show that the evidence at issue (1) was favorable to the defendant, (2) material to the defense, and (3) the prosecution had the evidence but failed to disclose it.  *Moore v. Illinois*, 408 U.S. 786, 794-95 (1972); *Young*, 916 F.3d at 383; *United States v. Sarihifard*, 155 F.3d 301, 309 (4th Cir. 1998).

Prosecutors are responsible for obtaining and disclosing evidence.  Law enforcement officers have a correlative duty to turn over to the prosecutor any material evidence that is favorable to a defendant.  *See Barbee v. Warden, Md. Penitentiary*, 331 F.2d 842, 846–47 (4th Cir. 1964); *see also Owens*, 767 F.3d at 396.  Notably, in some circumstances, "the knowledge of some who are part of the investigative team is imputed to prosecutors regardless of the prosecutors' actual awareness."  *United States v. Robinson*, 62 F.3d 941, 951 (4th Cir. 2010); *accord Kyles v. Whitley*, 514 U.S. 419, 437 (1995).  Nevertheless, there are no "hard and fast lines about the scope of *Brady* imputation . . . ."  *Robinson*, 627 F.3d at 952.

Evidence is "material" when there is a reasonable probability that, had the evidence been disclosed, the result of the proceedings would have been different. *See Kyles*, 514 U.S. at 433-34; *United States v. Bagley*, 473 U.S. 667, 682 (1985); *Chavez*, 894 F.3d at 600-01; *Savage*, 885 F.3d at 220-22; *United States v. Parker*, 790 F.3d 550, 558 (4th Cir. 2015); *United States v. Bartko*, 728 F.3d 327, 340 (4th Cir. 2013); *United States v. Kelly*, 35 F.3d 929, 936 (4th Cir. 1994). However, there is no *Brady* violation when the alleged exculpatory material is available to the accused from "a source where a reasonable defendant would have looked." *United States v. Wilson*, 901 F.2d 378, 380-81 (4th Cir. 1990). Moreover, mere speculation as to the materiality of the evidence is insufficient. *United States v. Caro*, 597 F.3d 608, 619 (4th Cir. 2010).

Notably, the "'reasonable probability' standard does not require a showing that a jury more likely than not would have returned a different verdict. Rather, the 'reasonable probability' standard is satisfied if 'the likelihood of a different result is great enough to undermine confidence in the outcome of the trial, or the suppression 'cast[s] serious doubt on the proceedings' integrity.'" *Gilliam*, 932 F.3d at 238 (quoting *Owens*, *supra*, 67 F.3d at 398) (internal citation omitted; alteration in *Gilliam*).

The Fourth Circuit recently explained: "Unlike prosecutors . . . police officers commit a constitutional violation only when they suppress exculpatory evidence in bad faith." *Gilliam*, 932 F.3d at 238; *see Owens*, 767 F.3d at 396 & n.6, 401. And, "to prove a due process violation, [plaintiffs] must prove both but-for causation and proximate causation—in other words, that the alleged wrongful act(s) caused [their] loss of liberty and the loss of liberty was a reasonably foreseeable result of the act." *Gilliam*, 932 F.3d at 238; *see Massey v. Ojaniit*, 759 F.3d 343, 354-56 (4th Cir. 2014); *Evans v. Chalmers*, 703 F.3d 636, 647-48 (4th Cir. 2012).

Plaintiffs have stated a plausible due process claim against Detective Ritz and Analyst Verger for withholding exculpatory evidence from the prosecution. With respect to Detective Ritz, the Complaint alleges that he failed to disclose multiple pieces of evidence concerning Mr. Bryant's guilt, including the use of "direct or indirect suggestion" to manipulate Ms. Powell's description of the suspect, ECF 1, ¶¶ 33, 35; the composite sketch that resembled John Doe, *id.* ¶ 34; the suggestive photo array, which led Ms. Powell to identify Mr. Bryant, *id.* ¶¶ 40-41; the anonymous tip suggesting that John Doe was Ms. Bullock's killer, *id.* ¶ 54; the statements by John Doe's father, implicating his son, *id.* ¶ 58; and the contents of Tyeisha's 911 call. *Id.* ¶¶ 66-73. As for Analyst Verger, the Complaint alleges that, despite the presence of blood on Ms. Bullock's fingernails, no DNA testing was conducted because Analyst Verger falsely "reported that the fingernails were consumed, and no further testing was possible." *Id.* ¶ 78. This statement was false, plaintiffs allege, because "subsequent DNA testing of those same clippings led to Mr. Bryant's exoneration." *Id.* ¶ 79.

As alleged, these are material omissions. The failure to disclose Detective Ritz's use of suggestive tactics would have been favorable to Mr. Bryant by undermining the veracity of Ms. Powell's identification. *See*, *e.g.*, *Carrillo v. County of Los Angeles*, 798 F.3d 1210, 1227–28 (9th Cir. 2015) (failure to disclose use a police officer's use of suggestive tactics to obtain an identification violates *Brady*); *Newsome v. McCabe*, 256 F.3d 747, 749, 752 (7th Cir. 2001) (withholding suggestive tactics during a lineup violated *Brady*). Likewise, the evidence that inculpated John Doe was material because it would have tended to exculpate Mr. Bryant. *See Kyles*, 514 U.S. at 429-30; *Gilliam*, 932 F.3d at 283-39. And, Tyeisha's statements were material because they could have been used to impeach Ms. Powell. *See United States v. Abdallah*, 911 F.3d 201, 217 (4th Cir. 2018) ("Evidence is favorable not only when it tends substantially to negate

guilt but also when it tends to impeach the credibility of a key witness for the prosecution.") (internal quotations omitted); *Monroe v. Angelone*, 323 F.3d 286, 317 (4th Cir. 2003) (concluding that failure to disclose evidence that "would have significantly impaired the credibility of . . . a key prosecution witness" constitutes a *Brady* violation); *see also Giglio v. United States*, 405 U.S. 150 (1972) (requiring government disclosure of evidence tending to impeach its witnesses).

Whether the suppression of the fingernail clippings is material within the meaning of *Brady* is a closer call. The Fourth Circuit has explained that "[w]hile the government is obligated to disclose favorable evidence in its possession, it is not required to create evidence that might be helpful to the defense." *Werth v. United States*, 493 F. App'x 361, 366 (4th Cir. 2012) (citing *United States v. Gray*, 648 F.3d 562, 567 (7th Cir. 2011); *United States v. Alverio–Meléndez*, 640 F.3d 412, 424 (1st Cir. 2011)). For example, the Seventh Circuit has ruled that *Brady* did not obligate the government to comb through computer files to find potentially exculpatory material. *Gray*, 648 F.3d at 567-68. On the other hand, the Sixth Circuit determined that the plaintiff had stated a plausible *Brady* claim against a forensic investigator who reported that DNA evidence was inconclusive when in fact a "full report would have would have proven that DNA in [the victim's] underwear was 'actually conclusively someone else's DNA.'" *See Mills v. Barnard,* 869 F.3d 476, 485 (6th Cir. 2017). The court found that the evidence was material because the DNA evidence was in the investigator's possession but was not released. *Id.* at 486.

Although *Mills* is not a perfect match, this case is not dissimilar. The gravamen of plaintiffs' claim against Analyst Verger is not that he should have conducted DNA testing but failed to do so. Rather, plaintiffs contend that Analyst Verger falsely reported that the nail clippings had been destroyed. And, those fingernail clippings were indisputably material because

DNA testing would have exonerated Mr. Bryant. Therefore, in the context of this case, the alleged withholding of the fingernail clippings can serve as the basis for a *Brady* violation.

Finally, plaintiffs have plausibly alleged that the Officer Defendants acted with the requisite bad faith needed to state a *Brady* violation claim against law enforcement officers. A plaintiff need not demonstrate bad faith directly; it can be inferred through gross deviations from routine police conduct. *See Mellen v. Winn*, 900 F.3d 1085, 1104 (9th Cir. 2018) (finding that, because the officer defendant "had participated in hundreds of homicide investigations," a reasonable jury "could conclude that [the officer] knowingly suppressed the statements to secure a conviction"); *Jimenez v. City of Chicago*, 732 F.3d 710, 721–22 (7th Cir. 2013) (noting that errors in investigation "were so severe or persistent as to support an inference of intentional or reckless conduct that violated a plaintiff's constitutional rights"). Moreover, bad faith can be inferred when the police officers fabricate evidence and fail to disclose especially pertinent exculpatory evidence. *See Gilliam*, 932 F.3d at 239-40 (finding that plaintiff had adequately alleged bad faith in light of allegations that the defendants "intentionally fabricated, obscured, and failed to disclose the most relevant and exculpatory evidence in the case").

Here, plaintiffs allege deliberate conduct that supports an inference of bad faith. Plaintiffs allege that Detective Ritz intentionally fabricated evidence—the composite sketch and Ms. Powell's identification of Mr. Bryant as the attacker. ECF 1, ¶¶ 35, 41. Further, plaintiffs allege that Detective Ritz intentionally or failed to disclose evidence, including the anonymous tip implicating John Doe, the statement by John Doe's father, and a composite resembling John Doe. *Id.* ¶ 53. With respect to Analyst Verger, plaintiffs allege that he lied about the availability of the nail clippings and failed to examine any of Ms. Bullock's clothing for the presence of blood or DNA. *Id.* ¶¶ 74-76. These allegations are more than sufficient to support the inference that the

Officer Defendants acted in bad faith. *See Gilliam*, 932 F.3d at 239-40 (defendant's alleged failure to disclose statement from an eye-witness was adequate to show bad faith).

In sum, because plaintiffs have stated plausible *Brady* claims against the Officer Defendants, I shall deny the Officer Motion as to Count I.

b.  Fabrication Claim (Count II)

In Count II, plaintiffs assert that the Officer Defendants fabricated evidence against Mr. Bryant, including the identification of Mr. Bryant by Ms. Powell. *Id.* ¶¶ 121-25. According to the Officer Defendants, plaintiffs have failed to state a plausible fabrication claim because the Complaint contains only "'unsupported allegations and speculation of fabrication[.]'" ECF 25-1 at 17 (quoting *Myers v. Morris*, 810 F.2d 1437, 1460-61 (8th Cir. 1987)). Further, they contend that the fabrication claim is barred by the statute of limitations.

To state a plausible fabrication claim under § 1983, plaintiffs must allege that an officer fabricated evidence and that the fabrication resulted in the deprivation of liberty. *Washington v. Willmore*, 407 F.3d 274, 282 (4th Cir. 2005); *see Burgess II*, 2017 WL 4947004, at *16; *Martin v. Cooper*, 882 F. Supp. 3d 820, 847 (D. Md. 2012). The causation prong is satisfied if the deprivation of liberty "was a reasonably foreseeable result of [the defendant's] initial act of fabrication[.]" *Washington*, 407 F.3d at 283. Thus, "an application for charges that includes fabrications does not violate the target's due process rights if the unfabricated information supports a finding of probable cause." *Martin*, 882 F. Supp. 3d at 847 (citing *Hovatter v. Widdowson*, CCB-03-2904, 2006 WL 890713 at *5 (D. Md. Mar. 29, 2006)).

The Officer Defendants' argument as to failure to state a claim is unconvincing. Plaintiffs allege that Detective Ritz "used direct or indirect suggestion" to produce a composite sketch that resembled Mr. Bryant. ECF 1, ¶ 35. In particular, they claim that Detective Ritz guided Ms.

Powell to describe the assailant as having medium-length bushy hair like Mr. Bryant's. Further, they assert that Detective Ritz elicited Ms. Powell's positive identification of Mr. Bryant by suggesting that the attacker could have been wearing an orange shirt immediately before showing Ms. Powell the photo array in which Mr. Bryant was the only individual in an orange shirt. *Id.* ¶¶ 40-41. These specific allegations are sufficient to support the claim that Detective Ritz manufactured the composite sketch and Ms. Powell's identification, both of which were damaging to Mr. Bryant.

In contrast, the Complaint is devoid of any allegations that Analyst Verger fabricated evidence that inculpated Mr. Bryant. Rather, plaintiffs allege that Analyst Verger falsely reported that Ms. Bullock's fingernails had been consumed by testing such that no DNA analysis was possible. ECF 1, ¶¶ 77-79. But, the Complaint contains no allegations that Analyst Verger created evidence that cast doubt on Mr. Bryant's innocence. *See Washington*, 407 F.3d at 283 (parsing the difference between a *Brady* and fabrication claim); *accord Miller*, 869 F.3d at 485; A*tkins v. Cty. of Riverside*, 151 F. App'x 501, 505-06 (9th Cir. 2005). Therefore, I shall dismiss Count II to the extent that it is lodged against Analyst Verger.

c. Malicious Prosecution Claims (Counts III and VI)

Count III lodges a claim of "Malicious Prosecution" against the Officer Defendants under § 1983. ECF 1, ¶¶ 126-30. And Count VI asserts the same claim under State law. *Id.* ¶¶ 146-53. In both counts, plaintiffs allege that the Officer Defendants intentionally caused Mr. Bryant to be arrested, charged, and prosecuted for Ms. Bullock's murder, despite the absence of probable cause.

A claim for malicious prosecution under § 1983 "'is properly understood as a Fourth Amendment claim for unreasonable seizure which incorporates certain elements of the common law tort.'" *Humbert v. Mayor & City Council of Balt.*, 866 F.3d 546, 555 (4th Cir. 2017) (quoting

*Evans v. Chalmers*, 703 F.3d 636, 647 (4th Cir. 2012)), *cert denied*, 138 S. Ct. 2602 (2018). To state a claim for malicious prosecution under § 1983, a plaintiff must plausibly allege that the defendant "'(1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in the plaintiff's favor.'" *Humbert*, 866 F.3d at 555 (quoting *Evans*, 703 F.3d at 647). A plaintiff asserting a malicious prosecution claim under Maryland law must plausibly allege those elements and that the defendant acted intentionally. *See Caldor, Inc. v. Bowden*, 330 Md. 632, 657, 625 A.2d 959, 971 (1993).

Notably, under both federal and State law, a claim for false imprisonment "'can only occur when there is no legal authority or justification for the arresting officer's actions.'" *Hines v. French*, 157 Md. App. 536, 551, 852 A.2d 1047, 1054 (2004) (citation omitted); *see Harrison v. Deane,* 426 F. App'x 175, 181 (4th Cir. 2011) ("'[T]here is no cause of action for 'false arrest' under section 1983 unless the arresting officer lacked probable cause[.]'" (citation omitted)); *Burgess II*, 2017 WL 4947004, at *9 (treating malicious prosecution claims brought under § 1983 and Maryland law as coextensive).

Probable cause for an arrest "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Illinois v. Gates*, 462 U.S. at 243-44, n.13 (1983); *see also District of Columbia v. Wesby*, ___ U.S. ___, 138 S. Ct. 577, 586 (2018). An officer has probable cause when there are "'facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed . . . an offense.'" *Cahaly v. Larosa*, 796 F.3d 399, 407 (4th Cir. 2015) (alterations in *Cahaly*) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)). This is an objective standard, viewed from the perspective of "an objectively reasonable police officer[.]'" *Wesby*, 138 S. Ct. at 586 (citation omitted).

To be sure, probable cause is "'not a high bar.'" *United States v. Bosyk*, 933 F.3d 319, 315 (4th Cir. 2019) (quoting *Wesby*, 138 S. Ct. at 586); *see Kaley v. United States*, 571 U.S. 320, 338 (2014); *United States v. Blakeney*, ___ F.3d ___, 2020 WL 580832, at *4 (4th Cir. Feb. 6, 2020). "Probable cause is a flexible standard that simply requires 'a reasonable ground for belief of guilt' and 'more than bare suspicion.'" *United States v. Ortiz*, 669 F.3d 439, 444 (4th Cir. 2011) (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)). It is a fluid concept, *Maryland v. Pringle*, 540 U.S. 366, 370 (2003), not a formulaic legal test, and it is "not readily, or even usefully, reduced to a real set of legal rules. *Illinois v. Gates*, 462 U.S. at 232; *see United States v. Drummond*, 925 F.3d 681, 687 (4th Cir. 2019); *United States v. Allen*, 631 F.3d 164, 172 (4th Cir. 2011).

The Officer Defendants argue that plaintiffs' malicious prosecution claims fall flat because a reasonable officer in Detective Ritz's position would have a basis to arrest Mr. Bryant for Ms. Bullock's death. ECF 25-1 at 12-13. They point out that, at the time of the arrest, Ms. Powell's description of the assailant matched Mr. Bryant; Ms. Powell had identified Mr. Bryant as the attacker; Mr. Bryant admitted to owning army fatigues, which are similar to the black jacket that Ms. Powell described; and family member of Ms. Bullock had provided information inculpating Mr. Bryant. *Id.* at 13.

This argument is not persuasive. The Officer Defendants overlook the Complaint's allegations, which must be accepted as true at this stage in the litigation. Plaintiffs allege that the composite sketch resembling Mr. Bryant was the product of Detective Ritz's suggestive tactics. ECF 1, ¶¶ 33, 35. And, they allege that Ms. Powell's identification of Mr. Bryant was also the product of Detective Ritz's suggestive tactics. *Id.* ¶¶ 40-41. Moreover, fabricated evidence cannot serve as the basis for probable cause. *See Manuel v. City of Joliet*, ___ U.S. ___, 137 S. Ct. 911, 918 (2017) ("The Fourth Amendment prohibits government officials from detaining a person in

the absence of probable cause. That can happen when . . . . a judge's probable-cause determination is predicated solely on a police officer's false statements."); *Miller v. Prince George's Cty.*, 475 F.3d 621, 632 (4th Cir. 2007) ("[T]he Constitution [does] not permit a police officer deliberately, or with reckless disregard for the truth, to make material misrepresentations or omissions to seek a warrant that would otherwise be without probable cause."). What remains is an anonymous tip from an unidentified family member of the victim. *See* ECF 1, ¶ 30. But, an anonymous tip does not necessarily justify a stop-and-frisk, much less an arrest. *See Florida v. J.L.*, 529 U.S. 266, 273-74 (2000) (anonymous tip, without indicia of reliability, cannot support reasonable suspicion). Thus, plaintiffs plausibly allege that Mr. Bryant was arrested without probable cause.

Therefore, I shall deny the Officer Motion as to the malicious prosecution claims lodged in Counts III and VI.

### d. Conspiracy Claims (Counts and IV and IX)

Count IV alleges that the Officer Defendants acted in concert and with other members of the BPD to "deprive Mr. Bryant of his clearly established constitutional rights," in violation of § 1983. ECF 1, ¶¶ 132; *see id.* ¶¶ 131-37. In Count IX, plaintiffs allege that the Officer Defendants, "acting in concert with other known and unknown co-conspirators," conspired to arrest, charge, and prosecute Mr. Bryant. ECF 1, ¶ 162; *see id.* ¶¶ 161-65. The Officer Defendants assert that plaintiffs' conspiracy claims under federal and State law are barred by the intracorporate conspiracy doctrine. ECF 25-1 at 24; ECF 37 at 11.

Under Maryland law, a claim of civil conspiracy requires proof of three elements: "(1) a confederation of two or more persons by agreement or understanding; (2) some unlawful or tortious act done in furtherance of the conspiracy or use of lawful or tortious means to accomplish an act not in itself illegal; and (3) actual legal damages resulting to the plaintiff." *Lloyd v. Gen.*

*Motors Corp.*, 397 Md. 108, 154, 916 A.2d 257, 284 (2007) (quoting *Van Royen v. Lacey*, 262 Md. 94, 97-98, 277 A.2d 13, 14-15 (1971)).  Similarly, to state a conspiracy claim under § 1983, the plaintiff must allege "'that the [defendants] acted jointly in concert and that some overt act was done in furtherance of the conspiracy which resulted in [the] deprivation of a constitutional right.'" *Penley v. McDowell Cty. Bd. of Educ.*, 876 F.3d 646, 658 (4th Cir. 2017) (alterations in *Penley*) (quoting *Massey v. Ojaniit*, 759 F.3d 343, 357–58 (4th Cir. 2014))

However, the intracorporate conspiracy doctrine may preclude a plaintiff from pursuing a conspiracy claim in certain circumstances.  Under the intracorporate conspiracy doctrine, "an agreement between or among agents of the same legal entity, when the agents act in their official capacities, is not an unlawful conspiracy." *Ziglar v. Abbasi*, ___ U.S. ___, 137 S. Ct. 1843, 1867 (2017); *see Painter's Mill Grille*, 716 F.3d at 352; *see ePlus Tech., Inc. v. Aboud*, 313 F.3d 166, 179 (4th Cir. 2002); *Buschi v. Kirven*, 775 F.2d 1240, 1251 (4th Cir. 1985).  The doctrine derives from the nature of a conspiracy and the legal conception of a corporation.

On the one hand, "[c]onspiracy requires an agreement—and in particular an agreement to do an unlawful act—between or among two or more separate persons." *Ziglar*, 137 S. Ct. at 1867; *see, e.g.*, *Hinkle v. City of Clarksburg*, 81 F.3d 416, 421 (4th Cir. 1996) (to establish a conspiracy under § 1983, a plaintiff must provide "evidence that each member of the alleged conspiracy shared the same conspiratorial objective").  On the other, under common law agency principles, the acts of a corporation's agents are attributed as acts of a single legal actor.  *See Ziglar*, 137 S. Ct. at 1867; *see, e.g.*, *United States v. Singh*, 518 F.3d 236, 249 (4th Cir. 2008) (recognizing corporation can be liable for criminal acts of its employees).  Therefore, the doctrine "recognizes that a corporation cannot conspire with its agents because the agents' acts are the corporation's own." *Painter's Mill Grille*, 716 F.3d at 352

Although the doctrine originally developed in the antitrust context, it has been extended to civil rights claims. *See Buschi*, 775 F.2d at 1251-52 (observing that the doctrine "has been applied in the civil rights area, involving 'officials of a public body who act within the scope of their employment'") (internal citations omitted); *accord Hicks v. Ferreyra*, 396 F. Supp. 3d 564, 580 (D. Md. 2019) (applying intracorporate conspiracy doctrine to plaintiff's § 1983 claims); *Bumgardner v. Taylor*, RBD-18-1438, 2019 WL 1411059, at *5 (D. Md. Mar. 28, 2019) (same); *See Burgess v. Balt. Police Dep't* ("*Burgess I*"), RBD-15-0834, 2016 WL 795975, at *10-11 (D. Md. Mar. 1, 2016) (same).

However, two exceptions exist to this general rule. First, the doctrine does not apply "'where a co-conspirator possesses a personal stake independent of his relationship to the corporation.'" *Painter's Mill Grille*, 716 F.3d at 352 (quoting *ePlus Tech.*, 313 F.3d at 179). Second, a plaintiff may assert a conspiracy claim "where the agent's acts were not authorized by the corporation." *Painter's Mill Grille*, 716 F.3d at 352 (citing *Buschi*, 775 F.2d at 1252-53).

Plaintiffs do not contend that either exception applies here. Rather, they argue that the Fourth Circuit "has found that police officers working for the same department *can* conspire with one another to violate constitutional rights." ECF 29 at 31 (emphasis in original) (citing *Hafner v. Brown*, 983 F.2d 570, 577 (4th Cir. 1992)). Alternatively, plaintiffs assert that they have plausibly alleged a conspiracy between the Officer Defendants and individuals outside of the BPD, specifically John Doe and his girlfriend. ECF 29 at 31.

Plaintiffs' reliance on *Hafner*, 983 F.2d 570, is misplaced. In that case, the Fourth Circuit considered whether the district court erred by instructing the jury that it could find the defendants, five BPD officers, liable for conspiracy under § 1983 based on mere acquiescence. *Id.* at 576. The

Court did not address if the intracorporate conspiracy doctrine precluded the claim in the first instance because that argument was not raised. Therefore, *Hafner* is of little guidance here.

Plaintiffs' contention that they have alleged a plausible conspiracy between the Officer Defendants, John Doe, and his girlfriend is likewise unavailing. The Complaint alleges that Detective Ritz separately interviewed John Doe and his girlfriend for approximately seven minutes each, during which he employed leading questions in a manner designed to eliminate John Doe as a suspect in Ms. Bullock's murder. *See* ECF 1, ¶¶ 59-64. Plaintiffs assert that these allegations "at least suggest[] that discovery may reveal evidence that Doe and/or his girlfriend were co-conspirators." ECF 29 at 32. But, that is insufficient. A Complaint must allege sufficient facts to "nudge [a] claim[] across the line from conceivable to plausible[.]" *Twombly*, 550 U.S. at 570.

Here, the Complaint contains no factual allegations that either John Doe or his girlfriend acted in concert with Detective Ritz or Analyst Verger to frame Mr. Bryant for Ms. Bullock's murder. Indeed, the Complaint's allegations focus on the conduct of Detective Ritz during the interviews, not on John Doe or the girlfriend. Nor does the Complaint allege that John Doe or his girlfriend were aware of Mr. Bryant, a fact that is necessary to draw the inference that they colluded with the Officer Defendants to deprive Mr. Bryant of his rights.

Accordingly, Count IX fails and is subject to dismissal.

### B. The BPD Motion

The BPD seeks to dismiss the Complaint, asserting that it is immune from suit under the Eleventh Amendment. ECF 26-1 at 12-15. In addition, the BPD argues that plaintiffs have failed to allege sufficient facts to support a *Monell* claim under § 1983. *Id.* at 15-23. The BPD also argues that plaintiffs cannot recover punitive damages under § 1983. *Id.* at 26-27. And, the BPD urges the Court to dismiss plaintiffs' indemnification claim on the basis that, in the absence of a

judgment against the Officer Defendants, plaintiffs lack standing to assert an indemnification claim. *Id.* at 27-28.

In response, plaintiffs strenuously argue that the BPD is not entitled to Eleventh Amendment Immunity. ECF 30 at 8-20. On the merits, plaintiffs agree to dismiss their claim for punitive damages. *Id.* at 12 n. 3. But, they posit that they have stated a plausible claim under *Monell* and that it is premature to dismiss their indemnification claim. *Id.* at 22-32.

### 1. Sovereign Immunity

#### a. Eleventh Amendment Immunity

The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another state, or by Citizens or subjects of any Foreign State."

Under the Eleventh Amendment, states generally enjoy immunity from suits brought in federal court by their own citizens. *See Hans v. Louisiana*, 134 U.S. 1, 3 (1890); *see also Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001) ("The ultimate guarantee of the Eleventh Amendment is that nonconsenting states may not be sued by private individuals in federal court."). Therefore, absent consent or a valid congressional abrogation of sovereign immunity, the Eleventh Amendment bars a private individual from bringing suit against a state in federal court to recover damages, unless there is an exception to sovereign immunity. *See Coleman v. Court of Appeals of Md.*, 556 U.S. 30, 35 (2012) ("A foundational premise of the federal system is that States, as sovereigns, are immune from suits for damages, save as they elect to waive that defense."); *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247 (2011); *see also Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54-55 (1996) ("For over a century we have reaffirmed that federal jurisdiction over suits against unconsenting States was not contemplated by the

Constitution when establishing the judicial power of the United States.") (internal quotation marks and citation omitted); *Edelman v. Jordan*, 415 U.S. 651 (1974).

The Eleventh Amendment did not create sovereign immunity, however. Rather, it preserved the sovereign immunity that the states enjoyed prior to the formation of the Union. *See Alden v. Maine*, 527 U.S. 706, 724 (1999); *see also Sossamon v. Texas*, 563 U.S. 277, 284 (2011). State sovereign immunity "accord[s] states the dignity that is consistent with their status as sovereign entities[.]" *Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 760 (2002).

The Fourth Circuit has recognized that the defense of sovereign immunity is a jurisdictional bar, stating that "'sovereign immunity deprives federal courts of jurisdiction to hear claims, and a court finding that a party is entitled to sovereign immunity must dismiss the action for lack of subject-matter jurisdiction.'" *Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 649 (4th Cir. 2018) (quoting *Ackerson v. Bean Dredging LLC*, 589 F.3d 196, 207 (5th Cir. 2009)). Moreover, a defendant "bears the burden of demonstrating" sovereign immunity, because it is "akin to an affirmative defense." *Hutto v. S.C. Ret. Sys.*, 773 F.3d 536, 543 (4th Cir. 2014).

Of relevance here, state sovereign immunity also bars suit against an instrumentality of a state, sometimes referred to as an "arm of the state," including state agencies. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101-02 (1984) ("It is clear, of course, that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment."); *see also Regents of Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997); *Pense v. Md. Dep't of Pub. Safety & Corr. Servs.*, 926 F.3d 97, 100 (4th Cir. 2019); *McCray v. Md. Transit Admin.*, 741 F.3d 480, 483 (4th Cir. 2014); *Bland v. Roberts*, 730

F.3d 368, 389 (4th Cir. 2013); *Constantine v. Rectors and Visitors of George Mason Univ.*, 411 F.3d 474, 479 (4th Cir. 2005).

The Fourth Circuit has identified three exceptions to the Eleventh Amendment's prohibition of suits against a state or an arm of the state. In *Lee-Thomas v. Prince George's County Public Schools*, 666 F.3d 244 (4th Cir. 2012), the Court said, *id.* at 249 (internal quotations omitted):

> First, Congress may abrogate the States' Eleventh Amendment immunity when it both unequivocally intends to do so and acts pursuant to a valid grant of constitutional authority. *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001) . . . . Second, the Eleventh Amendment permits suits for prospective injunctive relief against state officials acting in violation of federal law. *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004) . . . . Third, a State remains free to waive its Eleventh Amendment immunity from suit in a federal court. *Lapides v. Bd. of Regents of Univ. Sys. of Ga.,* 535 U.S. 613, 618 (2002).

Notably, sovereign immunity has not been congressionally abrogated for claims under § 1983. In *Quern v. Jordan*, 440 U.S. 332, 345 (1979), the Supreme Court concluded that § 1983 suits by individuals against a state for money damages are barred by the Eleventh Amendment. It said, *id.*: "[Section] 1983 does not explicitly and by clear language indicate on its face an intent to sweep away the immunity of the States[.]"

To be sure, a state may waive its Eleventh Amendment sovereign immunity and permit suit in federal court. *See Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 618 (2002); *see Pense*, 926 F.3d at 101; *Lee-Thomas*, 666 F.3d at 249. But, the test to determine whether a state has waived its immunity from suit in federal court is a "stringent" one. *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 240 (1985), *superseded on other grounds, as recognized in Lane v. Pena*, 518 U.S. 187, 198 (1996); *see Pense*, 939 F.3d at 101. Under *Atascadero*, 473 U.S. at 254, a court may find that a state has waived its Eleventh Amendment immunity "only where stated by the most express language or by such overwhelming implication from the text as will leave no room

for any other reasonable construction." (Internal quotation marks and alteration omitted); *accord Pense*, 926 F.3d at 101; *Lee-Thomas*, 666 F.3d at 250-51.

State sovereign immunity "is an immunity from private suit; it does not . . . bar federal enforcement actions." *Passaro v. Virgina*, 935 F.3d 243, 248 (4th Cir. 2019) (citing *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 71 n.14 (1996)). And, under *Ex parte Young*, 209 U.S. 123 (1908), sovereign immunity does not extend to a request for prospective injunctive relief to correct an ongoing violation of law. However, to avoid an Eleventh Amendment bar to suit on this basis, the complaint must be lodged against a state official, and it must "alleg[e] an ongoing violation of federal law and see[k] relief properly characterized as prospective." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002).

b. Analysis

The Department argues that it is entitled to sovereign immunity because it is a State agency. ECF 26-1 at 12-15. Plaintiffs counter that the BPD is a local government entity and therefore the BPD is not shielded from suit by the Eleventh Amendment. ECF 30 at 14-27.

As indicated, State agencies enjoy immunity from suit brought in federal court. *See Hans*, 134 U.S. at 3; *see also Garrett*, 531 U.S. at 363. On the other hand, sovereign immunity "does not immunize political subdivisions of the state, such as municipalities and counties, even though such entities might exercise a 'slice of state power.'" *Ram Ditta v. Md. Nat. Capital Park & Planning Comm'n*, 822 F.2d 456, 457 (4th Cir. 1987) (quoting *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency*, 440 U.S. 391, 401 (1979)). Thus, whether the Department is immune as to plaintiffs' *Monell* claim depends on whether it is a State agency or a local one for purposes of the Eleventh Amendment.

In a related argument, the BPD also asserts that it is not amenable to suit under § 1983 because it is not a "person" within the meaning of 42 U.S.C. § 1983. ECF 26-1 at 8-12. Whether an entity is a "person" depends on whether it is a State agency or a municipality. *Compare Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) (holding that neither a State nor a State official are "persons" under § 1983), *with Monell*, 436 U.S. at 658 (holding that municipalities are subject to suit under § 1983).

The inquiry to determine whether the BPD is a "person" under § 1983 is coextensive with the Eleventh Amendment analysis. *See Harter v. Vernon*, 101 F.3d 334, 338 n.1 (4th Cir. 1996) ("Once the Eleventh Amendment inquiry is complete, there is no need to consider "personhood. If an official or entity is not immune from suit under the Eleventh Amendment that official or entity *is* a 'person' subject to suit under § 1983." (emphasis in original)). For that reason, the Fourth Circuit has instructed that "federal courts should approach these issues solely under the rubric of the Eleventh Amendment, and should not consider an argument of 'personhood' under § 1983." *Id.*

Whether an entity is an arm of the state is ultimately a question of federal, not State, law. *See Oberg*, 745 F.3d at 138; *Harter*, 101 F.3d at 342; *Ram Ditta*, 822 F.3d at 458 n.5. To determine whether an entity is sufficiently connected to a state for purposes of immunity, the Fourth Circuit has directed courts to examine a nonexclusive list of four factors: (1) whether the state will pay a judgment against the defendant entity; (2) "'whether the entity exercises a significant degree of autonomy from the state,'" (3) "'whether the entity is involved with local versus statewide concerns,'" and (4) "'how the entity is treated as a matter of state law.'" *Lane v. Anderson*, 660 F. App'x 185, 195 (4th Cir. 2016) (alterations omitted) (quoting *Ram Ditta*, 822 F.2d at 457-58); *see also Oberg*, 745 F.3d at 136-38.

This is a holistic assessment, and courts should examine each factor "without giving preeminence to any single factor." *Owens*, 767 F.3d at 395 n.5. Further, although the state's characterization of the entity is informative, it may not be regarded as dispositive. S*ee Lane*, 660 F. App'x at 195 (reversing district court's Eleventh Amendment analysis where the court relied exclusively on state law); *Harter v. Vernon*, 101 F.3d 334, 342 (4th Cir. 1996) (noting that "[a] federal court may give deference to the rationale used by a state court, but the holding is not dispositive" when assessing sovereign immunity).

The first factor weighs decidedly against finding that the BPD is an arm of the State. As the BPD concedes, it is the Mayor and City Council of Baltimore (the "City") that indemnifies the BPD, not the State. ECF 26-1 at 13. The Maryland Tort Claims Act does not waive the State's immunity to suits lodged against the BPD or its officers. *See* Md. Code (2013 Repl. Vol., 2018 Supp.), § 12-101 of the State Government Article. Therefore, the State has no obligation to pay for settlements or judgments obtained against BPD officers. Conversely, the City and the BPD are expressly included in the list of local government entities covered by the Local Government Torts Claims Act ("LGTCA"). *See* C.J. § 301(d)(21). Moreover, the City has long paid judgments and settlements on behalf of PBD officers. *See Alderman v. Balt. City Police Dep't*, 952 F. Supp. 256, 258 (D. Md. 1997) (noting that the City has indemnified BPD officers in "numerous cases"). Indeed, in 2018, the City budgeted over $22 million for "Police legal fees, judgments, and lawsuits." *See* Fiscal 2018 Summary of the Adopted Budget City of Baltimore 36 (2018), https://bbmr.baltimorecity.gov/_sites/default/files/Fiscal%202018%20SOTA.pdf. Given that a judgment against the BPD will be paid by the City, not the State, the first factor counsels against holding that the BPD is an arm of the State. *See Oberg*, 745 F.3d at 139.

Regarding the second factor, the BPD maintains that it is "entirely autonomous from the City." ECF 26-1 at 13-14. As the BPD points out, the City exercises no managerial control over the BPD's day-to-day operations. Balt. City Charter, Art. II, § 27 ("[N]o ordinance of the City or act of any municipal officer . . . conflict, impede, obstruct, hinder or interfere with the powers of the Police Commissioner."); *see* ECF 26-1 at 14. And, citing both State and federal cases, the BPD stresses that "the BPD is treated as a State agency under Maryland law." ECF 26-1 at 14.

But, other indicia suggest that the BPD is not an arm of the State. The Mayor selects the BPD Commissioner, who "shall serve at the pleasure of the Mayor of Baltimore City[.]" Baltimore Public Local Law ("PLL"), Police Dep't § 16-5(a)(1). And, although the City does not train or supervise BPD officers, the City shares a close relationship with the BPD, including maintenance of the BPD's pension and retirement benefits system. Baltimore City Charter, Art. II, § 24(a); *see Alderman*, 952 F. Supp at 258.

Further, the City provides substantial funding to the BPD, including payment of the salaries of the BPD Commissioner and BPD officers. *Id.* §§ 16-5(b), 16-8(b); *see also* Baltimore City Charter, Art. II, § 24(a); Fiscal 2018 Summary, *supra*, at 127 (allocating nearly $500 million to the BPD). And, the City expressly permits the BPD Commissioner to use the funding that the BPD receives from the City to defend officers in lawsuits. *See* PLL § 16-13 (providing that the BPD Commissioner may use funds appropriated to the BPD in "any case, civil or criminal where a police officer of the Baltimore City Police Department is charged with the commission of any wrong, in consequence of an act done in the course of his official duty"). And, notably, the BPD is represented in this case by the City Solicitor's Office, not the Office of the Maryland Attorney General.

Although the facts cut in both directions, at this stage in the litigation I must draw all reasonable inferences in favor of the plaintiffs. *See E.I. du Pont de Nemours & Co.*, 637 F.3d at 440. Therefore, I find that the second factor counsels against finding that the BPD is entitled to sovereign immunity. *See Oberg*, 745 F.3d at 139 (concluding that second factor counseled against immunity despite conflicting facts).

The Department does not address the third factor, which assesses whether the BPD "is involved with statewide, as opposed to local or other non-state concerns." *Id.* (quoting *S.C. Dep't Disabilities & Special Needs v. Hoover Universal, Inc*., 535 F.3d 300, 307 (4th Cir. 2008)). The BPD's jurisdiction is "'unquestionably local.'" *Alderman*, 952 F. Supp at 258 (citation omitted). The BPD's authority is not state-wide but rather limited to the City limits. PLL, Police Dep't § 16-2(a) (delineating the BPD's duties "within the boundaries of [the City"). Indeed, to the extent that the BPD is authorized to act outside the City's corporate limits, it has authority only over properties that are "owned, controlled, operated or leased by the Mayor and City Council of Baltimore, or any [City] agency, commission, or department[.]" *Id.* § 16-2(b). Thus, because the BPD's jurisdiction is distinctly local, this factor weighs against Eleventh Amendment immunity. *See Harter*, 101 F.3d at 342 (third factor weighed against immunity because "the office of the sheriff has generally been involved with local rather than state concerns").

Finally, the last factor, "how [the entity] is treated under state law," *Oberg*, 745 F.3d at 140, heavily favors the BPD. To be sure, the Maryland Court of Appeals has acknowledged that, "with regard to federal law liability under 42 U.S.C. § 1983, the state law classification of the Baltimore City Police Department would not be decisive and the Baltimore City Police Department might well be regarded as a local government agency." *Clea v. Mayor & City Council of Baltimore*, 312 Md. 662, 670 n.5, 541 A.2d 1303, 1306 n.5 (1988). However, Maryland law has

long recognized the BPD as a State agency. *Mayor & City Council of Baltimore v. Clark*, 404 Md. 13, 23, 944 A.2d 1122, 1128 (2008) ("[T]he Baltimore Police Department is not an agency of the City of Baltimore and has not been for some time.") (citing Acts of 1860, ch. 7, § 14); *Clea*, 312 Md. at 669-70, 541 A.2d at 1306-07. Likewise, the City considers the BPD an arm of the State. *See* PLL, Police Dep't § 16-2(a) ("The Police Department of Baltimore City is hereby constituted and established as an agency and instrumentality of the State of Maryland.").

Ultimately, only one of the four factors points in the direction of recognizing the BPD as an arm of the State. But, State law has limited force, because the sovereign immunity analysis is a question of federal law. *Oberg*, 745 F.3d at 155; *Harter*, 101 F.3d at 342. Thus, on the record before me, plaintiffs have plausibly alleged that the BPD is not an arm of the State. Therefore, BPD is not entitled to Eleventh Amendment immunity at this juncture.

Finally, the BPD relies on two decisions issued by this Court to support its position that it is entitled to sovereign immunity. ECF 26-1 at 15 (citing *Whetstone v. Mayor & City Council of Baltimore*, ELH-18-738, 2019 WL 1200555, at *12 (D. Md. Mar. 13, 2019); *McDougald v. Spinnato*, ELH-17-2898, 2019 WL 1226344, at *11 (D. Md. Mar. 15, 2019)). However, its reliance on those cases is misplaced.

The plaintiff in *Whetstone* filed a civil rights suit under 42 U.S.C. § 1983 against several defendants, including BPD. 2019 WL 1200555, at *1. In particular, she asserted a *Monell* claim against the BPD. *Id.* The BPD moved to dismiss under Rule 12(b)(6), for failure to state a claim. *Id.* at *11. This Court observed that the BPD is a State agency and thus immune to *Monell* actions. *Id.* at *12. Specifically, I said, *id.*: "In the first instance, the claim against the BPD is not viable under *Monell*, as the BPD has been a State agency, not a local agency, since 1867."

Similarly, in *Spinnato*, the plaintiff lodged several claims under 42 U.S.C. § 1983 against many defendants, including former BPD Commissioner Anthony W. Batts, individually and in his official capacity. 2019 WL 1226344, at *1. Batts moved to dismiss plaintiff's claims, including a *Monell* claim asserted against him in his official capacity, pursuant to Rule 12(b)(6), for failure to state a claim. *Id.* at *2. As Batts was sued in his official capacity, the Court regarded plaintiff's *Monell* claim as a suit against the BPD. *Id.* at *8. It said, *id.* at *12:

> Under Maryland law, the BPD has been a State agency, not a local agency, since 1867. *See Mayor & City Council of Baltimore v. Clark*, 404 Md. 13, 23, 944 A.2d 1122, 1128 (2008); *Clea v. Mayor & City Council of Balt.*, 312 Md. 662, 669-70, 541 A.2d 1303, 1306-07 (1988). If the BPD is an arm of the State, it is not a municipality subject to suit under *Monell* . . . . Therefore, there is no basis for a *Monell* claim based on actions of the BPD.

However, defendants place more weight on *Whetstone* and *Spinnato* than those cases should bear. In both cases, after discussing sovereign immunity, the Court proceeded to examine whether the plaintiff stated a plausible *Monell* claim. And, in both cases, I determined that the factual allegations contained in the complaints were insufficient to support a *Monell* claim against the BPD. *See Spinnato*, 1226344, at *12; *Whetstone*, 2019 WL 1200555 at *11. Therefore, because my analysis regarding sovereign immunity was not outcome determinative, it was dicta.

Moreover, I recently declined to embrace those decisions and instead found that, in regard to a claim under § 1983, the BPD is not a State agency for the purpose of Eleventh Amendment immunity. *See Grim v. Balt. Police* Dep't, ELH-18-3864, 2019 WL 5865561, at *14-15 (D. Md. Nov. 8, 2019); *Burley v. Balt. Police Dep't*, ELH-18-1743, 2019 WL 6253251, at *28 (D. Md. Sept. 12, 2019) [9]; *see also Jones v. Chapman*, ELH-14-2627, 2015 WL 4509871, at *10 (D. Md. July 24, 2015).

---

[9] *Burley* has since been reassigned to Judge Stephanie Gallagher. Therefore, the current case number is SAG-18-1743.

I note that on September 17, 2019, the BPD filed an interlocutory appeal to the Fourth Circuit in *Burely v. Baltimore Police Department*, SAG-18-1743, 2019 WL 4325295 (D. Md. Sept. 12, 2019), *appeal filed*, No. 19-2029 (4th Cir.). In the meantime, I point out that numerous decisions in this District have reached the same result as *Burley*. *See Hill v. CBAC Gaming LLC*, DKC-19-0695, 2019 WL 6729392, at *4-5 (D. Md. Dec. 11, 2019) (Chasanow, J.); *Lucero v. Early*, GLR-13-1036, 2019 WL 4673448, at *4 (D. Md. Sept. 25, 2019) (Russell, J.); *Bumgardner v. Taylor*, RBD-18-1438, 2019 WL 1411059, at *5 (D. Md. Mar. 28, 2019) (Bennett, J.); *Fish v. Mayor of Baltimore*, CCB-17-1438, 2018 WL 348111, at *3 (D. Md. Jan. 10, 2018) (Blake, J.); *Humbert v. O'Malley*, WDQ-11-0440, 2011 WL 6019689, at *5 n.6 (D. Md. Nov. 29, 2011) (Quarles, Jr., J.); *Munyiri v. Haduch*, 585 F. Supp. 2d 670, 676 (D. Md. 2008) (Davis, J.); *Hector v. Weglein*, 558 F. Supp. 194, 197-99 (D. Md. 1982) (Kaufman J.).

Accordingly, the Eleventh Amendment does not compel the dismissal of plaintiffs' *Monell* claims lodged against the BPD in Count I.

## 2. *Monell* Claim (Count V)

In Count V, plaintiffs bring a *Monell* claim against the BPD under several theories. ECF 1, ¶¶ 138-45. First, plaintiffs allege that the Officer Defendants acted "pursuant to policies and practices" of the BPD that were "ratified by policymakers with final policymaking authority," including a policy of "regularly failing to turn over exculpatory evidence and regularly fabricating evidence." *Id.* ¶ 140. Second, plaintiffs allege that the BPD failed adequately to supervise, train, or discipline officers "with regard to their constitutional obligations[.]" *Id.* Third, plaintiffs allege that the BPD condoned a custom or policy of "improper, illegal, and unconstitutional investigative actions[.]" *Id.* ¶¶ 142. The BPD has moved to dismiss Count V, asserting that the factual

averments in the Complaint fail to state a plausible *Monell* claim under any theory. ECF 26-1 at 15-26.

### a. *Monell* Generally

A municipality is subject to suit under § 1983. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978). The Supreme Court determined in *Monell* that local governmental bodies may be liable under § 1983 based on the unconstitutional actions of individual defendants, but only where those defendants were executing an official policy or custom of the local government resulting in a violation of the plaintiff's rights. *Id.* at 690-91. The *Monell* Court explained that, "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury the government as an entity is responsible under § 1983." *Id.* at 694; *see Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004). But, liability attaches "only where the municipality itself causes the constitutional violation at issue." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (emphasis in original); *accord Holloman v. Markowski*, 661 F. App'x 797, 799 (4th Cir. 2016) (per curiam), *cert. denied*, ___U.S. ___, 137 S. Ct. 1342 (2017).

In *Connick v. Thompson*, 563 U.S. 51, 60 (2011), the Supreme Court explained (emphasis in *Connick*):

> A municipality or other local government may be liable under [§ 1983] if the governmental body itself "subjects" a person to a deprivation of rights or "causes" a person "to be subjected" to such deprivation. *See Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 692, 98 S. Ct. 2018, 56 L.Ed.2d 611 (1978). But, under § 1983, local governments are responsible only for "their *own* illegal acts." *Pembaur v. Cincinnati*, 475 U.S. 469, 479, 106 S. Ct. 1292, 89 L.Ed.2d 452 (1986) (citing *Monell*, 436 U.S. at 665-683, 98 S. Ct. 2018). They are not vicariously liable under § 1983 for their employees' actions. *See id.*, at 691, 98 S. Ct. 2018; *Canton*, 489 U.S. at 392, 109 S. Ct. 1197; *Board of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 403, 117 S. Ct. 1382, 137 L.Ed.2d 626 [] (1997) (collecting cases).

Thus, a viable § 1983 *Monell* claim consists of two components: (1) the municipality had an unconstitutional policy or custom; and (2) the unconstitutional policy or custom caused a violation of the plaintiff's constitutional rights. *See, e.g.*, *Bd. of Comm'rs of Bryan Cty., v. Brown*, 520 U.S. 397, 403 (1997); *Kirby v. City of Elizabeth City*, 388 F.3d 440, 451 (4th Cir. 2004), *cert. denied*, 547 U.S. 1187 (2006); *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003).

However, a municipality cannot be held liable in a § 1983 action under a theory of respondeat superior. *Monell*, 436 U.S. at 693-94. Rather, "[i]t is well established that in a § 1983 case a city or other local governmental entity cannot be subject to liability at all unless the harm was caused in the implementation of 'official municipal policy.'" *Lozman v. City of Riviera Beach*, ___ U.S. ___, ___, 138 S. Ct. 1945, 1951 (2018) (citation omitted); *see Milligan v. City of Newport News*, 743 F.2d 227, 229 (4th Cir. 1984). In other words, a municipality is liable when a "policy or custom" is "fairly attributable to the municipality as its 'own,' and is . . . the 'moving force' behind the particular constitutional violation." *Spell v. McDaniel*, 824 F.2d 1380, 1387 (4th Cir. 1987) (internal citations omitted); *see Moore v. Howard Cty. Police Dep't*, CCB-10-1430, 2010 WL 4722043, at *2 (D. Md. Nov. 15, 2010).

A plaintiff may demonstrate the existence of an official policy in three ways: (1) a written ordinance or regulation; (2) certain affirmative decisions of policymaking officials; or (3) in certain omissions made by policymaking officials that "manifest deliberate indifference to the rights of citizens." *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999). "Locating a 'policy' ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." *Bd. of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 403-04 (1997).

"An official policy often refers to 'formal rules or understandings . . . that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time,' and must be contrasted with 'episodic exercises of discretion in the operational details of government.'" *Semple v. City of Moundsville*, 195 F.3d 708, 712 (4th Cir. 1999) (alteration in *Semple*; citations omitted). In addition, "the governmental unit may create an official policy by making a single decision regarding a course of action in response to particular circumstances." *Id.*

Moreover, "[o]utside of such formal decisionmaking channels, a municipal custom may arise if a practice is so 'persistent and widespread' and 'so permanent and well settled as to constitute a "custom or usage" with the force of law.'" *Carter*, 164 F.3d at 218 (quoting *Monell*, 436 U.S. at 691); *see Simms ex rel. Simms v. Hardesty*, 303 F. Supp. 2d 656, 670 (D. Md. 2003). A policy or custom "may be attributed to a municipality when the duration and frequency of the practices warrants a finding of either actual or constructive knowledge by the municipal governing body that the practices have become customary among its employees." *Spell*, 824 F.2d at 1387; *see Holloman*, 661 Fed. App'x at 799. In addition, "a policy or custom may possibly be inferred from continued inaction in the face of a known history of widespread constitutional deprivations on the part of city employees, or, under quite narrow circumstances, from the manifest propensity of a general, known course of employee conduct to cause constitutional deprivations to an identifiable group of persons having a special relationship to the state." *Milligan*, 743 F.2d at 229 (internal citations omitted).

In *Owens*, 767 F.3d at 402, the Fourth Circuit reiterated that to establish a *Monell* claim the plaintiff "must point to a 'persistent and widespread practice[] of municipal officials,' the 'duration and frequency' of which indicate that policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their 'deliberate indifference.'"

(Quoting *Spell*, 824 F.2d at 1386-91) (alteration in *Owens*). Therefore, "Section 1983 plaintiffs seeking to impose liability on a municipality must . . . adequately plead and prove the existence of an official policy or custom that is fairly attributable to the municipality and that proximately caused the deprivation of their rights." *Jordan by Jordan v. Jackson*, 15 F.3d 333, 338 (4th Cir. 1994).

A policy or custom that gives rise to § 1983 liability will not, however, "be inferred merely from municipal inaction in the face of isolated constitutional deprivations by municipal employees." *Milligan*, 743 F.2d at 230. Only when a municipality's conduct demonstrates a "deliberate indifference" to the rights of its inhabitants can the conduct be properly thought of as a "policy or custom" actionable under § 1983. *Jones v. Wellham*, 104 F.3d 620, 626 (4th Cir. 1997) (citing *Canton*, 489 U.S. at 389).

b. Official Policy

According to plaintiffs, the practices of the BPD in failing to disclose exculpatory evidence and fabricating inculpatory evidence in murder investigations "was consciously approved at the highest policy-making level by [BPD] policymakers[.]" ECF 1, ¶ 105; *see id.* ¶140.

Under *Monell*, "'municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances.'" *Hunter v. Town of Mocksville*, 897 F.3d 538, 554 (4th Cir. 2019) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986)). Although an "official policy" is often a formal rule committed to writing, "the concept 'of official policy' for purposes of Section 1983 extends beyond formal ordinances and policies" to include ad hoc policy choices and decisions. *Hunter*, 897 F.3d at 554; *accord Spell*, 824 F.2d at 1385 (explaining that a municipal policy can be found "in formal or informal *ad hoc* 'policy' choices or decisions of municipal officials authorized to make and implement municipal policy").

However, municipal liability based on this theory "'attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered.'" *Lane*, 660 F. App'x at 197 (quoting *Pembaur*, 475 U.S. at 479). In order to qualify as a "final policy making official," the "'municipal official must have the responsibility and authority to implement final municipal policy with respect to a particular course of action.'" *Lane*, 660 F. App'x at 197 (quoting *Riddick v. Sch. Bd. of Portsmouth*, 238 F.3d 518, 523 (4th Cir. 2000)). "'The question of who possesses final policymaking authority is one of state law.'" *Hunter*, 897 F.3d at 555 (quoting *Riddick*, 238 F.3d at 523).

Relying on *Lucero v. Early*, GLR-13-1036, 2018 WL 4333745 (D. Md. Sept. 11, 2018), BPD argues that plaintiffs have failed to state a viable *Monell* claim because the Complaint "is entirely devoid of allegations regarding the identity of any final policymaking officials, and does not allege any specific, affirmative decisions on the part of any such officials that led to the constitutional deprivation." ECF 26-1 at 17. In *Lucero*, the plaintiff asserted a *Monell* claim against BPD and the City, alleging that the City's policy prohibiting leafletting violated the First Amendment. *Id.* at *1. Judge Russell dismissed the plaintiff's claim on the ground that the amended complaint was "devoid of factual matter concerning the decisionmaker who implemented the Policy." *Id.* at *7. Instead, the plaintiff only stated that "BPD and the City 'jointly promulgated and ratified [the Policy] through their policymakers.'" *Id.* (alterations in original) (quoting the amended complaint). These "brief, conclusory allegations," Judge Russell found, "do not sufficiently allege that an official with final policymaking authority implemented the policy." *Id.*

But, *Lucero* is distinguishable. As plaintiffs point out, ECF 30 at 30, the plaintiff in *Lucero* never identified which of the two entities was responsible for the allegedly unconstitutional policy. And, in the absence of factual allegations concerning who was responsible for implementing the

policy, it was unclear whether the BPD or the City was liable. *See Id.* (finding that the policy "cannot be fairly attributed to the BPD or the City"). In contrast, there is no attribution problem here. Plaintiffs allege that policymakers at the BPD established unconstitutional investigative policies that resulted in Mr. Bryant's wrongful conviction. ECF 1, ¶¶103, 106, 140.

In essence, the BPD's argument seeks to foist an unreasonable pleading standard upon plaintiffs' *Monell* claim. As noted, to survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). That standard applies to § 1983 claims. *See Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168 (1993) (rejecting heightened pleading standards for § 1983 claims).

This standard, the Supreme Court has explained, is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. And, in the context of *Monell* liability, it will often be the case that a plaintiff lacks specific details regarding the municipal actor's internal policies and training procedures before discovery. Although boilerplate allegations will not suffice, at the motion to dismiss stage, courts should not expect the plaintiff to possess a rich set of facts concerning the allegedly unconstitutional policy and the responsible policymakers. *See Ulloa v. Prince George's Cty.*, DKC 15-0257, 2015 WL 7878956, at *6 (D. Md. Dec. 4, 2015) (requiring that the plaintiff "pair *general* averments of a policy or custom with particular examples" to state a *Monell* claim) (emphasis added); *see also Estate of Osuna v. Cty. of Stanislaus*, 392 F. Supp. 3d 1162, 1174 (E.D. Cal. 2019) ("[T]the details of the alleged policy or custom . . . is a topic properly left to development through discovery. It is a rare plaintiff who will have access to the precise contours of a policy or custom prior to having engaged in discovery, and requiring a plaintiff to plead its existence in detail is likely to be no

more than an exercise in educated guesswork."); *Mitchell v. City of New Orleans*, 184 F. Supp. 3d 360, 373 (E.D. La. 2016) (same); *Thomas v. City of Galveston*, 800 F.Supp.2d 826, 841–45 (S.D. Tex. 2011) (same).

Plaintiffs' official policy claim is supported by factual allegations that "give the [BPD] fair notice of what the claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. In particular, plaintiffs allege that policymakers at the BPD implemented "policies and practices [that] included regularly failing to turn over exculpatory evidence and regularly fabricating evidence." ECF 1, ¶ 140. And, they provide specific examples of unconstitutional conduct by BPD officers engaging in these acts. *Id.* ¶¶ 95-102. At this stage of the litigation, these allegations are sufficient to put the BPD on notice of the nature of the claims against it and allow it to prepare an adequate defense. *See Burgess II*, 2017 WL 4947004, at *12 (plaintiff's allegations concerning "three specific examples of *Brady* violations by BPD in 1981, 1988, and 1995" were sufficient to plead a plausible *Brady* claim).

Therefore, I shall deny the BPD Motion as to plaintiffs' official policy claim lodged in Count I.

### c. Failure to Train Theory

Plaintiffs allege that the BPD failed "to train police officers on disclosing evidence and complying with their obligations under *Brady*[.]" ECF 1, ¶ 104. Further, plaintiffs allege that the BPD failed to supervise and discipline its officers properly, resulting in "officers continu[ing] to violate suspects' rights with impunity[.]" *Id.* ¶ 105. In *Canton v. Harris*, 489 U.S. at 389, the Supreme Court said that "where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants . . . such a shortcoming [can] be properly thought of as a city 'policy or custom' that is actionable under § 1983."

Indeed, the manner in which a police force chooses to train its officers is "necessarily a matter of 'policy[.]'" *Spell*, 824 F.2d at 1389. Therefore, "the inadequacy of police training may serve as the basis for § 1983 liability," but "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Canton*, 489 U.S. at 388.

When a plaintiff asserts a claim based on inadequate training, the "complaint should contain facts revealing: (1) the nature of the training, (2) that the training was a 'deliberate or conscious' choice by the municipality, and (3) that the officer's conduct resulted from said training." *Lewis v. Simms*, AW-11-CV-2172, 2012 WL 254024, at *3 (D. Md. Jan. 26, 2012) (quoting *Drewry v. Stevenson*, WDQ-09-2340, 2010 WL 93268, at *4 (D. Md. Jan. 6, 2010)), *aff'd*, 582 F. App'x 180 (4th Cir. 2014). The *Connick* Court observed, 563 U.S. at 61: "To satisfy [§ 1983], a municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." (Alteration in *Connick*); *see also Canton*, 489 U.S. at 388. Only then "can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Canton*, 489 U.S. at 389.

Notably, even if "a particular officer may be unsatisfactorily trained," that "will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." *Canton*, 489 U.S. at 390-91. The *Canton* Court reasoned, *id.* at 391:

> Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal. And plainly, adequately trained officers occasionally make

mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable.

Although the procedural posture of this case distinguishes it from *Connick*, 563 U.S. 51, that case is pertinent, as it highlights the challenge a plaintiff faces when seeking to prevail on a failure to train claim. In *Connick*, the Court reiterated: "[P]rov[ing] that an injury or accident could have been avoided if an [employee] had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct will not suffice." *Id.* at 68 (alteration in *Connick*) (internal quotations omitted).

In *Connick*, respondent Thompson was prosecuted and convicted for attempted armed robbery and murder. *Id.* at 54. However, his convictions were overturned when it was discovered that the prosecution failed to disclose the existence of a certain crime lab report. *Id.* Based on the violation of *Brady*, 373 U.S. 83, Thompson filed a § 1983 suit against Harry Connick, in his official capacity as the Orleans Parish District Attorney. 563 U.S. 54. He alleged, *inter alia*, a "deliberate indifference to an obvious need to train prosecutors in his office to avoid such constitutional violations." *Id.* at 57. The district court ruled that, in order to establish deliberate indifference, Thompson was not required to show a pattern of similar *Brady* violations, when he could demonstrate that the need for training was "'so obvious.'" *Id.* at 58. The jury found for Thompson and awarded him damages. *Id.* A divided Fifth Circuit affirmed. *Id.* at 57.

The Supreme Court considered whether a "district attorney's office [could be] held liable under § 1983 for failure to train its prosecutors based on a single *Brady* violation." *Id.* at 54. The Court noted that the *Canton* Court "sought not to foreclose the possibility . . . that the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations." *Id.* at 64. Nevertheless, the Court said, *id.* at 61:

In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983. A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train. *See Oklahoma City v. Tuttle*, 471 U.S. 808, 822-823, 105 S. Ct. 2427, 85 L.Ed.2d 791 (1985) (plurality opinion) ("[A] 'policy' of 'inadequate training' "is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell*").

The case of *Peters v. City of Mount Rainier*, GJH-14-00955, 2014 WL 4855032 (D. Md. Sept. 29, 2014), also provides guidance. In that case, the plaintiff lodged a § 1983 claim for failure to train the police force. *Id.* at *5. The complaint stated, *id.* (alteration in *Peters*) (quoting the complaint):

> [T]he City maintained an "official policy" of . . . "fail[ing] to properly train and supervise its officers; fail[ing] to implement effective procedures for investigating allegations of police misconduct; fail[ing] to discipline officers who violate the Constitutional rights of private citizens through false arrests, malicious prosecutions, and brutal conduct; and generally fail[ing] to provide safeguards against Constitutional abuses by its overzealous officers."

In considering whether to dismiss the failure to train claim, Judge Hazel highlighted the complaint's failure to allege facts concerning the "'nature of the training'" or "'that the officer's conduct resulted from said training.'" *Id.* at *5 (quoting *Lewis*, 2012 WL 254024, at *1). He noted: "Peters has not even attempted to allege any such facts; instead, he has simply stated in broad, conclusory terms and in a variety of different ways that the City failed to train and supervise its officers." *Id.* (citation to the record omitted). Emphasizing this deficiency, Judge Hazel concluded that the plaintiff's allegation was "nothing more than a bare-bones generalization that a legal element (i.e. the policy[-]or-custom element) is met. Without more, Peters has failed to adequately allege the existence of a policy or custom through the City's purported failure to train its officers." *Id.*

And, *Hall v. Fabrizio*, JKB-12-754, 2012 WL 2905293 (D. Md. July 13, 2012), is instructive. There, Judge Bredar dismissed a failure to train claim against the BPD because the complaint "d[id] not . . . allege a single instance of these alleged violations other than Plaintiff's own experience, and thus falls well short of showing the sort of 'widespread and permanent practice' that is required to show a municipal 'custom.'" *Id.* at *2. The plaintiff's claim also faltered, Judge Bredar noted, because "the complaint [did] not allege any facts regarding the sort of training that Baltimore police officers actually receive or how that training reflects the decision of any municipal policymaker." *Id.*

In contrast, in *Jones v. Jordan*, GLR-16-2662, 2017 WL 4122795 (D. Md. Sept. 18, 2017), Judge Russell found that the plaintiff had stated a plausible failure-to-train claim against the BPD. *Id.* at *9. Rejecting the BPD's contention that the plaintiff failed to identify specific training deficiencies, Judge Russell observed that the plaintiff "alleges that BPD 'relies on deficient training on a broad array of substantive policing functions' and 'numerous important topics,' specifically pointing to lack of 'proper[] train[ing]' on 'use of force,' 'de-escalation,' 'stops, searches, and arrests,' and 'how to supervise and investigate misconduct.'" *Id.* at *6 (alterations in original) (quoting the complaint). Thus, Judge Russell found that, because the plaintiff had "identifi[ed] 'specific deficienc[ies]' with the training," the plaintiff had "stated the nature of the training for his failure to train claim." *Id.* at *7 (alterations in original) (citation omitted).

The Fourth Circuit has observed that "[a]lthough prevailing on the merits of a *Monell* claim is difficult, simply alleging such a claim is, by definition, easier." *Owens*, 767 F.3d at 403. Plaintiffs' failure-to-train claim falls closer to *Jones* than to either *Connick*, *Peters*, or *Hall*. The Complaint contains far more than boilerplate allegations that the BPD failed to train and supervise its officers. Plaintiffs identify a specific deficiency with BPD's training: its failure to train officers

on the obligation to disclose exculpatory information and to otherwise comply with their obligations under *Brady*. ECF 1, ¶ 104. To illustrate this training defect, plaintiffs highlight eight instances where an individual was wrongfully convicted of murder after the BPD had suppressed exculpatory evidence. *Id.* ¶¶ 95-102. These factual allegations regarding the BPD's liability go well beyond a generic restatement of the elements of a *Monell* claim and are sufficient to provide the BPD with fair notice of the grounds for which has been sued. *See Leatherman*, 507 U.S. at 168.

Thus, plaintiffs have sufficiently alleged a *Monell* claim against the BPD for failure to train and supervise its officers with respect to their obligations under *Brady*.

### d. Condonation Theory

Under the condonation theory of liability, "a city violates § 1983 if municipal policymakers fail 'to put a stop to or correct a widespread pattern of unconstitutional conduct.'" *Owens*, 767 F.3d at 402 (quoting *Spell*, 824 F.2d at 1389). To assert a plausible claim, a plaintiff must allege "a 'persistent and widespread practice[] of municipal officials,' the 'duration and frequency' of which indicate that policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their 'deliberate indifference.'" *Owens*, 767 F.3d at 402 (quoting *Spell*, 824 F.2d at 1386-1391). Both "knowledge and indifference can be inferred from the 'extent' of employees' misconduct." *Owens*, 767 F.3d at 402-03 (quoting *Spell*, 824 F.2d at 1391). However, only "'widespread or flagrant'" misconduct is sufficient. *Owens*, 767 F.3d at 403 (quoting *Spell*, 824 F.2d at 1387). In contrast, "[s]poradic or isolated" misconduct is not. *Owens*, 767 F.3d at 403.

*Owens*, 767 F.3d 379, is illustrative. There, Owens brought a § 1983 claim against the BPD, several BPD officers, the Baltimore City State's Attorney's Office, and an assistant State's

Attorney, alleging, *inter alia*, that the BPD "'maintained a custom, policy, and/or practice' of condoning its officers' conduct in 'knowingly, consciously, and repeatedly with[holding] and suppress[ing]' exculpatory evidence." *Id.* at 402 (quoting the complaint). The district court granted the defendants' motion to dismiss and Owens appealed. The Fourth Circuit reversed. *Id.* at 404.

As relevant here, the Fourth Circuit scrutinized Owens's complaint to determine whether it alleged a plausible condonation claim. The Court observed, *id.* at 403 (alterations in original):

> In support of his claim, Owens alleges that "[r]eported and unreported cases from the period of time before and during the events complained of" establish that the BCPD had a custom, policy, or practice of knowingly and repeatedly suppressing exculpatory evidence in criminal prosecutions. He further alleges that "a number of motions were filed and granted during this time period that demonstrate that [the BCPD] maintained a custom, policy, or practice to allow this type of behavior either directly or . . . by condoning it, and/or knowingly turning a blind eye to it."

According to the Court, "[t]he assertions as to 'reported and unreported cases' and numerous 'successful motions' are factual allegations, the veracity of which could plausibly support a *Monell* claim." *Id.* Further, Owens's allegation that the BPD officers withheld exculpatory information "on multiple occasions could establish a 'persistent and widespread' pattern of practice, the hallmark of an impermissible custom." *Id.* (quoting *Spell*, 824 F.2d at 1386). Thus, the Court ruled that the complaint contained sufficient allegations to support a *Monell* claim premised on a condonation theory of liability. *Id.* at 404.

A similar result was reached in *Garcia v. Montgomery Cty.*, Md., JFM-12-3592, 2013 WL 4539394, at *5 (D. Md. Aug. 23, 2013). There, Garcia, his wife, and a family friend were leaving a restaurant when Garcia observed two young men being arrested by the Montgomery County Police ("MCP"). *Id.* at *1. Concerned that the arresting officers were using excessive force, Garcia, "an award-winning freelance photojournalist," began to photograph the incident from at

least thirty feet away.  *Id.*  One of the officers flashed Garcia with a spotlight, and he moved across the street to continue photographing the incident from a distance of about one hundred feet.  *Id.*

Garcia was then approached by an officer. Garcia identified himself as a member of the press, and opened his hands to show that he had nothing in his possession except his camera. *Id.* The officer "shouted that Mr. Garcia was under arrest, placed him in a chokehold, and forcibly dragged him along the ground to the police cruiser." *Id.* Subsequently, the officer "placed Mr. Garcia in handcuffs and confiscated his camera." *Id.* The officer then "kicked Mr. Garcia's right foot out from under him, causing Mr. Garcia to hit his head on the police cruiser as he fell to the ground." *Id.*  Garcia was subsequently taken into custody and charged with disorderly conduct. *Id.* At a trial in a Maryland court, Garcia was acquitted of disorderly conduct.  *Id.*

Thereafter, Garcia filed suit against the County and, among other counts, he lodged a *Monell* claim. Garcia's complaint stated "that his injury resulted from 'Montgomery County's policy or custom of indifference to misconduct by [MCP] officers' and a 'lack of training and supervision requiring the police to follow the law and established departmental policies.'" *Id*. at *5 (quoting the complaint).  Further, Garcia alleged that, despite a written media relations policy, which provides that police should maintain a cooperative working relationship with members of the media, there is a "'custom and practice among [MCP] officers of obstructing and/or preventing members of the media from filming police activity conducted in public.'" *Id.* (quoting the complaint). He also complained that Montgomery County has a policy, custom, or practice of "'failing to supervise and discipline officers who unlawfully obstruct and/or prevent members of the media and the public from recording police activity conducted in public view, despite its awareness that these violations happen.'" *Id.* (quoting the complaint). According to Garcia,

Montgomery County effectively sanctioned and endorsed his treatment by the police because of its inadequate investigation of the incident. *Id.*

The defense moved to dismiss, asserting: "Mr. Garcia's complaint mentions only his incident and . . . he has pled nothing more than an isolated constitutional deprivation . . . ." *Id.* at *5. Judge Motz rejected that argument, reasoning, *id.*:

> Mr. Garcia has stated a valid *Monell* claim. Contrary to the defendants' assertion that Mr. Garcia's complaint mentions only his incident and that he has pled nothing more than an isolated constitutional deprivation, the complaint alleges that Montgomery County was aware of unconstitutional actions by MCPD officers directed towards members of the media but chose to ignore such behavior. The Fourth Circuit has made clear that a *Monell* plaintiff need not "plead the multiple incidents of constitutional violations that may be necessary at later stages to establish the existence of an official policy or custom and causation." *Jordan by Jordan v. Jackson*, 15 F.3d 333, 339-40 (4th Cir. 1994) (citations omitted).

Judge Motz concluded: "At this stage, it is enough that Mr. Garcia has alleged that Montgomery County was aware of ongoing constitutional violations by [MCP] officers and that the county's failure to supervise and discipline its officers allowed a pattern and/or practice of unconstitutional actions to develop." *Id.* Judge Motz added, *id.*:

> Under *Twombly* and *Iqbal*, the factual allegations in the complaint are sufficient to survive a motion to dismiss as they are "enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555; *see also Jordan*, 15 F.3d at 338 (stating that "section 1983 claims are not subject to a 'heightened pleading standard' paralleling the rigors of proof demanded on the merits") (citing *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168 (1993)).

Careful review of the Complaint here demonstrates that it adequately alleges that the BPD condoned "a policy, pattern, and practice of misconduct in murder investigations, including fabricating evidence, suppressing exculpatory and impeachment evidence, and failing to conduct constitutionally adequate investigations." ECF 1, ¶ 92. In support of this averment, plaintiffs point to particular examples of unconstitutional conduct, most of which preceded the events at

issue. Specifically, as set forth earlier, the Complaint recounts eight instances in which individuals were wrongfully convicted of murder, allegedly because the BPD suppressed exculpatory evidence or fabricated incriminating evidence. *See id.* ¶¶ 94-106.

The similarities are stark. In each case, the BPD withheld exculpatory evidence, such as witness identifications, critical testimony, and evidence pointing to an alternate assailant. *Id.* ¶¶ 95-102. These cases also involved the failure to disclose or misrepresentation of exculpatory forensic evidence. *Id.* ¶¶ 98, 101, 102. And, plaintiffs allege a conviction that was later vacated in which Detective Ritz was the lead investigator *and* fingernail clippings were not tested for DNA. *Id.* ¶ 102.

The BPD insists that these cases are "sporadic and isolated incidents [that] fail to establish the required persistent and widespread practice, let alone one that BPD actively condoned or ignored." ECF 26-1 at 25. According to the BPD, eight cases over a thirty-year period does not serve as factual support that the BPD actively condoned unlawful investigative practices at the time of Bryant's arrest and conviction in 1998, BPD. *See id.*; ECF 36 at 12. And, the BPD contends that the alleged pattern-and-practice cases are insufficient to state a plausible claim because they occurred either well before or well after Mr. Bryant's prosecution. ECF 26-1 at 25.

These arguments are without merit. To be sure, the "Law of Large Numbers" all but guarantees "the inevitability of mistakes over enough iterations of criminal trials." *Connick*, 563 U.S. at 73 (Scalia, J., concurring). But, plaintiffs' allegations do not allege isolated mistakes. Rather, the Complaint paints a compelling picture of a police department that turned a blind eye to the conduct of its officers in murder investigations, suppressing exculpatory evidence. *See Burgess I*, 2016 WL 795975, at *12. Likewise, the timing of the eight cases is besides the point. Plaintiffs do not allege that the cases of Tyrone Jones or Ezra Mable put the BPD on notice of the

department-wide practice of withholding evidence. Rather, plaintiffs allege that, at least since 1974, there has been a widespread practice among BPD officers of conducting unconstitutional investigations such that the BPD had actual or constructive knowledge of this misconduct. *See* ECF 1, ¶¶ 103, 106.

Accordingly, I will deny the BPD Motion as to the condonation claim lodged in Count I.

### 3. Indemnification Claim (Count X)

In Count X, plaintiffs seek "indemnification" against the BPD. ECF 1, ¶¶ 166-68. Plaintiffs allege that the "Officer Defendants are or were employees of the [BPD] who acted within the scope of their employment in committing the misconduct" set forth in the Complaint. *Id.* ¶ 168.

As discussed, *supra*, the LGTCA limits the civil liability of local governments and their employees. C.J. § 5-301 *et seq.* Under the LGTCA, "a local government shall be liable for any judgment against its employee for damages resulting from tortious acts or omissions committed by the employee within the scope of employment with the local government." *Johnson v. Francis*, 239 Md. App. 530, 550, 197 A.3d 582, 594 (2018). Thus, the LGTCA "provide[s] 'a remedy for those injured by local government officers and employees, acting without malice in the scope of their employment, while ensuring that the financial burden of compensation is carried by the local government ultimately responsible for the public officials' acts.'" *Rios v. Montgomery Cty.*, 157 Md. App. 462, 475-76, 852 A.2d 1005, 1012 (2004) (quoting *Ashton v. Brown*, 339 Md. 70, 108, 660 A.2d 447, 466 (1995)), *aff'd*, 386 Md. 104, 872 A.2d 1 (2005).

The statute provides, in pertinent part, C.J. § 5-303(b):

(1) [A] local government shall be liable for any judgment against its employee for damages resulting from tortious acts or omissions committed by the employee within the scope of employment with the local government.

(2) A local government may not assert governmental or sovereign immunity to avoid the duty to defend or indemnify an employee established in this subsection.

Thus, "an entity that is designated a local government under the LGTCA, and has available the common law defense of governmental or sovereign immunity, can no longer raise that defense to escape the statutorily imposed duties to defend and indemnify." *Cherkes*, 140 Md. App. at 323, 780 A.2d at 434. However, the LGTCA does not create a direct cause of action to sue a local government entity. *Id.* at 319 (citing *Williams v. Prince George's Cty.*, 112 Md. App. 526, 552, 685 A.2d 884 (1996)).

Of import here, the BPD is included in the list of "local governments" covered by the LGTCA. C.J. § 301(d)(21). However, "by adding the [BPD] to the list of local governments in the [LGTCA] . . . the General Assembly waived [BPD's] common law State sovereign immunity only to the extent of the statutory duties to defend and indemnify. Otherwise, the [BPD's] State sovereign immunity remain[s] intact." *Cherkes*, 140 Md. App. at 323, 780 A.2d at 434.

The BPD avers that indemnification under the LGTCA "flows directly and solely from the employer-employee relationship, and is not a right held by anyone other than BPD employees." ECF 26-1 at 28. Therefore, in the BPD's view, Count X fails to state a claim for indemnification, because plaintiffs have "not obtained a judgment against any of the [Officer Defendants] nor has it been established whether the [Officer Defendants] were acting within the scope of their employment. ECF 26-1 at 28.

The Department's arguments are unavailing. The Maryland Court of Special Appeals has squarely rejected BPD's contention that the LGTCA's obligations extend only to employees. *See Johnson v. Francis*, 239 Md. App. 530, 550-51, 197 A.3d 582, 594-95 (2018), *cert. denied*, 463 Md. 155 (2019).

In *Johnson*, 239 Md. 530, 197 A.3d 582, the BPD argued that the plaintiff could assert an indemnification claim only if the officers assigned their rights against the BPD to the plaintiff. *Id.*

at 549, 197 A.3d at 594. To support the theory that an assignment is required for a plaintiff to pursue an indemnification claim, the BPD argued that C.J. § 5-303(b)(2) "establishes that the 'shall be liable' language in [§ 5-303(b)(1)] really just imposes on the local government an obligation of indemnification running to the employee, not liability running to the underlying plaintiff." *Id.* at 551, 197 A.3d at 595. The court acknowledged that § 5-303(b)(2) could "create an ambiguity in a vacuum as to the nature of the indemnification obligation[.]" *Id.* But, it explained that "[w]hen read in the context with the statute, the local government's obligation under § 5-303(b)(1) unambiguously runs directly to the underlying plaintiff." *Id.* Thus, the court found that a plaintiff can seek recovery directly against the local government. *Id.* at 555, 197 A.3d at 597.

Moreover, the cases on which the BPD relies do not preclude a plaintiff from *pleading* an indemnification claim before final judgment. Instead, those decisions provide that the LGTCA's wavier of a local government's immunity extends only to indemnification claims. *See Cherkes*, 140 Md. App. 282, 303, 780 A.3d at 422 (dismissing BPD from suit because "none of the [plaintiff's] claims asserted against the [BPD] concern th[e] possible eventuality" that plaintiff would be entitled to indemnification); *Williams*, 112 Md. App. at 552-54, 685 A.2d at 897-98 (dismissing LGTCA claim where plaintiff had not also sued a local government employee); *Hansen v. City of Laurel*, 420 Md. 670, 678 n.5, 25 A.3d 122, 128 n.5 (2011) (noting that under the LGTCA, plaintiffs are "*unable* to sue directly (that is, name as the singular defendant) a local government for many tort violations" (emphasis in original)).

Certainly, a judgment against a local government employee is a precondition to recovering against a local government under the LGTCA. *See id.* at 555, 197 A.3d at 597. And, other courts have dismissed an indemnification claim brought against the BPD as premature. *See Burgess II*, 2016 WL 795975, at *11 n.13 (dismissing indemnification claim as premature); *Jones v. Ziegler*,

894 F. Supp. 880, 897 (D. Md. 1995) (same). But, permitting plaintiffs to plead an indemnification claim against the BPD at the outset avoids the possibility of redundant litigation, thereby facilitating the efficient resolution of this case. *See, e.g.*, Fed. R. Civ. P. 13(g) (allowing parties to file cross-claims for indemnification in pleadings). Indeed, for that reason, courts in this District have permitted the BPD to file a cross-claim for indemnification against an officer under Rule 13(g), seeking a declaration that it has no duty to indemnify despite the officer's liability not having been established. *See Bumgardner v. Taylor*, GLR-18-1438, 2019 WL 4115414, at *11 (D. Md. Aug. 29, 2019) (finding that "permitting BPD's Cross-Claim to proceed directly behind [the plaintiff's] claims serves the purposes of Rule 13(g)"); *Harrod v. Mayor & City Council of Balt.*, GLR-18-2542, 2019 WL 5636392, at *4 (D. Md. July 24, 2019) (same). That approach makes good sense where, as here, "[d]etermining whether [the] Officer Defendants were acting within the scope of their employment will, in turn, determine whether BPD is liable for [the] Officer Defendants' actions." *Bumgardner*, 2019 WL 4115414, at *11.

Accordingly, I shall deny the BPD Motion as to Count X.

## IV.    Conclusion

For the foregoing reasons, I shall grant in part and deny in part the Officer Motion (ECF 25). In particular, I shall grant the Officer Motion as to Counts IV, VII, and IX. However, I shall deny the Officer Motion as to Counts I, III, VI, and VIII. With respect to Count II, I shall dismiss Count II only to the extent that it is lodged against Analyst Verger.

I shall also grant in part and deny in part the BPD Motion (ECF 26). In particular, I shall deny the BPD Motion with respect to Counts V and X. But, I shall grant it to the extent that

plaintiffs seek punitive damages under § 1983.[10]

An Order follows, consistent with this Memorandum Opinion.

Date: February 10, 2020

_____/s/_____
Ellen L. Hollander
United States District Judge

---

[10] The BPD moved to dismiss the Complaint to the extent that plaintiffs sought to recover punitive damages under § 1983.  ECF 26-1 at 26-27.  And, plaintiffs have agreed not to pursue punitive damages against the BPD.  ECF 30 at 12 n.3.