**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| | * | |
| THE ESTATE OF MALCOLM J. BRYANT, | * | |
| Plaintiff, | * | |
| v. | * | Case No.: ELH-19-384 |
| BALTIMORE POLICE DEPARTMENT, *et al.*, | * | |
| | * | |
| Defendants. | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

<u>**MEMORANDUM OPINION AND ORDER**</u>

In this civil rights lawsuit based on Malcolm Bryant's wrongful conviction for the murder of Toni Bullock, plaintiffs seek to compel the production of Baltimore Police Department investigative files for other homicide cases in which defendant Detective William F. Ritz allegedly committed misconduct similar to the misconduct he committed in the Bullock homicide investigation (collectively referred to herein as "homicide files").[1] Pls.' Aug. 31, 2020 Ltr., ECF No. 95; *see also* Defs.' Aug. 31, 202 Ltr., ECF No. 96. I held a discovery conference via Zoom on September 1, 2020, and I ordered the parties to brief the issue informally. ECF No. 97. The parties submitted letter briefs. Pls.' Sept. 9, 2020 Ltr., ECF No. 100; Defs.' Sept. 16, 2020 Ltr., ECF No. 104. For the following reasons, plaintiffs' request to compel production of the homicide files is denied.

---

[1] The Estate of Malcolm J. Bryant appears in the caption of the complaint as the plaintiff. Lamar Estep and Malique Bryant are identified as its personal representatives. Because an estate acts through its personal representatives, I shall refer to Lamar Estep and Malique Bryant as the plaintiffs. *See* Feb. 10, 2020 Mem. Op. 1 n.2, ECF No. 41; Md. Code Ann., Est. & Trusts § 7-401(y).

## I.     Background

### A. *Plaintiffs' Allegations and Claims*

Plaintiffs, the personal representatives of the Estate of Malcolm J. Bryant, have sued individual officers Detective Ritz and forensic analyst Barry Verger and the Baltimore Police Department for Malcolm Bryant's 1999 wrongful conviction of Toni Bullock's murder.  The pending claims against Detective Ritz "include failure to disclose exculpatory and impeachment evidence, fabrication of evidence, malicious prosecution under state and federal law, and intentional infliction of emotional distress under state law."  Pls.' Sept. 9, 2020 Ltr. 1 n.1, ECF No. 100.  In their complaint, plaintiffs allege

> BPD lead investigator William F. Ritz intentionally, or with deliberate indifference, obtained a misidentification of Mr. Bryant from Tyeisha Powell, the single eyewitness presented at trial. Detective Ritz failed to disclose evidence about a second eyewitness whose account contradicted and undermined Tyeisha Powell's. He also failed to disclose incriminating evidence pointing to the likely true perpetrator, John Doe, including a witness statement incriminating Doe and undermining his denials of culpability, and a composite sketch that more closely resembled Doe than Mr. Bryant.

Compl. ¶ 3, ECF No. 1 (footnote omitted).  Plaintiffs claim that when "Detective Ritz met with [Ms. Powell] and another detective to create a composite sketch of the suspect, . . . Detective Ritz used direct or indirect suggestion to manipulate the composite sketch to make it more closely resemble the person he suspected, Malcolm Bryant." *Id.* ¶¶ 33, 35.  Plaintiffs also claim "Detective Ritz showed Ms. Powell a suggestive photographic lineup consisting of six individuals, including Malcolm Bryant." *Id.* ¶ 41.

In addition to the alleged misconduct during Ms. Powell's interview, plaintiffs claim "Detective Ritz never interviewed or conducted any follow-up investigation regarding any of the individuals with whom Mr. Bryant had spent the evening of November 20th," who could have provided an alibi for him. *Id.* ¶ 47.  Detective Ritz also allegedly failed to investigate other

evidence of Bryant's whereabouts on the night of the murder.  *Id.* ¶¶ 48–52.  Additionally, plaintiffs allege Detective Ritz did not disclose to Mr. Bryant, Mr. Bryant's counsel, or the prosecutor some of the evidence he obtained that incriminated another suspect, and he did not conduct proper interviews about or of the suspect.  *Id.* ¶¶ 54–64.

Plaintiffs also allege the police received three 911 calls on the night of the murder, one of which was from a "potential eyewitness" whose "account of the crime . . . contradicted Ms. Powell's account."  *Id.* ¶¶ 67–72.  Plaintiffs claim Detective Ritz did not investigate this potential witness's report and "never disclosed the report of this second potential eyewitness" or the other 911 calls to Mr. Bryant, Mr. Bryant's counsel, or the prosecution.  *Id.* ¶¶ 72–73.  Plaintiffs also claim "the Defendants never tested critical items of evidence obtained from the crime scene for DNA," which would have exonerated Mr. Bryant.  *Id.* ¶¶ 74–80.

Plaintiffs bring claims against Detective Ritz and Analyst Verger pursuant to 42 U.S.C. § 1983.  Plaintiffs claim Ritz and Verger violated Bryant's due process rights under the Fifth and Fourteenth Amendments by failing to disclose exculpatory and impeachment evidence under *Brady v. Maryland*, 373 U.S. 83 (1963) (Count I).  To prevail on a § 1983 claim based on a law enforcement officer's *Brady* violation, a plaintiff must establish that "the evidence at issue (1) was favorable to the defendant, (2) material to the defense, and (3) the [officer] had the evidence but failed to disclose it [to the prosecutor]."  *Estate of Bryant v. Baltimore Police Dep't*, No. ELH-19-384, 2020 WL 673571, at *21 (D. Md. Feb. 10, 2020); *see Moore v. Illinois*, 408 U.S. 786, 794–95 (1972); *Barbee v. Warden, Md. Penitentiary*, 331 F.2d 842, 846–47 (4th Cir. 1964).  "Unlike prosecutors . . . police officers commit a constitutional violation only when they suppress exculpatory evidence in bad faith."  *Estate of Bryant*, 2020 WL 673571, at *22 (quoting *Gilliam v. Sealey*, 932 F.3d 216, 238 (4th Cir. 2019)).  In a second § 1983 claim, plaintiffs allege that

Detective Ritz fabricated evidence, also in violation of Bryant's due process rights under the Fifth and Fourteenth Amendments (Count II).  To prove a claim for fabrication of evidence under § 1983, a plaintiff must show that "(1) the defendants fabricated evidence, and (2) the fabrication resulted in a deprivation of [the criminal defendant's] liberty."  *Johnson v. Gondo*, No. GLR-19-995, 2020 WL 1529002, at *5 (D. Md. Mar. 31, 2020) (quoting *Martin v. Conner*, 882 F. Supp. 2d 820, 847 (D. Md. 2012) ("*Martin I*")).

Plaintiffs also bring a § 1983 claim for malicious prosecution by Detective Ritz and Analyst Verger.  Plaintiffs assert that Ritz and Verger violated Bryant's rights under the Fourth and Fourteenth Amendments to be free from unreasonable searches and seizures (Count III). Additionally, plaintiffs bring state law claims for malicious prosecution (Count VI) and intentional infliction of emotional distress (Count VIII) by Detective Ritz and Analyst Verger.  To prevail on a § 1983 claim for malicious prosecution, plaintiffs must show that defendants "(1) caused (2) a seizure of [Bryant] pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in [Bryant's] favor."  *Estate of Bryant*, 2020 WL 673571, at *24 (quoting *Humbert v. Mayor & City Council of Baltimore*, 866 F.3d 546, 555 (4th Cir. 2017), *cert. denied*, 138 S. Ct. 2602 (2018)).  To prove a claim for malicious prosecution under Maryland law, a plaintiff must demonstrate "those elements and that the defendant acted intentionally."  *Id.* (citing *Caldor, Inc. v. Bowden*, 625 A.2d 959, 971 (Md. 1993)).  To prove a claim for intentional infliction of emotional distress, a plaintiff must establish "1) intentional and reckless conduct; 2) extreme and outrageous conduct; 3) a causal connection between the wrongful conduct and the emotional distress; and 4) emotional distress of a severe nature."  *Felder v. MGM Nat'l Harbor, LLC*, No. PJM 18-3405, 2019 WL 3860272, at *6 (D. Md. Aug. 15, 2019) (quoting *Harris v. Jones*, 380 A.2d 611, 614 (Md. 1977)).

### B.  Plaintiffs' Request for Homicide Files

Plaintiffs have identified other Baltimore homicide investigations in which Detective Ritz

allegedly engaged in similar police misconduct.  Pls.' Sept. 9, 2020 Ltr. 1.  In their first request

for production of documents, plaintiffs sought

> 5. . . . true and correct copies of any and all BPD homicide files or other
> BPD investigative files pertaining to BPD criminal investigations involving
> Defendant Ritz that were produced to Sabein Burgess' counsel or made available
> for inspection to Sabein Burgess' counsel in discovery in the matter of Sabein
> Burgess v. Baltimore Police Dep't, et al., Civil Action No. 1:15-cv-00834-RDB (D.
> Md.).

> 6. . . . true and correct copies of any and all communications and BPD
> investigative files, including homicide files, regarding any BPD criminal
> investigation or subsequent criminal prosecution involving Defendant Ritz in
> which Defendant Ritz has been alleged by any person to have committed
> misconduct, including without limitation the complete BPD investigative files
> relating to the investigations of the October 5, 1994, murder of Michelle Dyson [for
> which Sabein Burgess was wrongfully convicted], the August 30, 2000, murder of
> Kevin Dukes, the July 5, 2002, murder of Sherene Moore and attempted murder of
> Marcus Booker, and the April 16, 2002, murder of Elliott Scott.

Plaintiffs argue the homicide files are relevant because the files may lead to the discovery

of admissible Rule 404(b) evidence.[2]  In particular, plaintiffs contend the homicide files "could

provide admissible evidence relevant to proving Ritz's intent."  Pls.' Sept. 9, 2020 Ltr. 4–5, ECF

No. 100.  Plaintiffs also argue the files could lead to evidence "regarding Ritz's practices in other

contemporaneous homicide investigations" that would "impeach Ritz's testimony."  *Id.* at 4–5.[3]

---

[2] Plaintiffs apparently recognize request number 6 is overbroad as written, because they has limited
their request to the four homicide files identified in the request.  Pls.' Sept. 9, 2020 Ltr. 5.

[3] Plaintiffs do not explain how files for homicides other than the one at issue here would contain
admissible prior inconsistent statements or extrinsic evidence that they could use to impeach
Detective Ritz in this case.

Defendants argue that these files are relevant only to plaintiffs' *Monell* claim against

Baltimore Police Department (Count V), which was bifurcated.[4]  *See* Defs.' Aug. 31, 2020 Ltr. 3–

4; *see also* Mar. 11, 2020 Order, ECF No. 50 (granting consent motion to bifurcate).  Defendants

further argue that plaintiffs' "request for these additional homicide files is disproportional to the

needs of this case . . . because the massive amount of documents sought has limited, if any,

probative value as potential 404(b) evidence, and the danger of unfair prejudice is substantially

greater than any such value."  Defs.' Sept. 16, 2020 Ltr. 1.

## II.     Discussion

"Parties may obtain discovery regarding any nonprivileged matter that is relevant to any

party's claim or defense and proportional to the needs of the case."  Fed. R. Civ. P. 26(b)(1).

Discoverable evidence is broader than admissible evidence because "it is 'relevance and not

admissibility' that determines whether a matter is discoverable."  *In re Verizon Wireless*, No. TDC-

19-1744, 2019 WL 4415538, at *4 (D. Md. Sept. 16, 2019) (quoting *Herchenroeder v. Johns

Hopkins Univ. Applied Physics Lab.*, 171 F.R.D. 179, 181 (D. Md. 1997)); *see Gross v. Morgan

State Univ.*, No. JKB-17-448, 2018 WL 9880053, at *5 (D. Md. Feb. 9, 2018) (noting that "the

Federal Rules of Civil Procedure 'impose a more liberal standard of relevance which does not turn

on admissibility'" (quoting *Marvin J. Perry, Inc. v. Hartford Cas. Ins. Co.*, No. RWT-08-138,

2008 WL 11367475, at *2 (D. Md. Dec. 22, 2008))).  Under this standard, "[r]elevancy has been

'broadly construed to encompass any possibility that the information sought may be relevant to

the claim or defense of any party.'" *O'Malley v. Trader Joe's East, Inc.*, No. RDB-19-3273, 2020

WL 6118841, at *3 (D. Md. Oct. 15, 2020) (quoting *Revak v. Miller*, 18-CV-206-FL, 2020 WL

1164920, at *2 (E.D.N.C. Mar. 9, 2020)).  Nonetheless, "[w]hat is discoverable is limited by the

---

[4] *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978).

requirement of '[p]roportionality[,] [which] requires courts to consider, among other things, whether the burden or expense of the proposed discovery outweighs its likely benefit.'" *In re Verizon Wireless*, 2019 WL 4415538, at *4 (quoting *Va. Dep't of Corr. v. Jordan*, 921 F.3d 180, 188–89 (4th Cir. 2019)). The Court also considers "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, [and] the importance of the discovery in resolving the issues." Fed. R. Civ. P. 26(b)(1).

### A. Relevance

Plaintiffs argue that the homicide files are relevant because they may lead to the discovery of evidence admissible under Rule 404(b) of the Federal Rules of Evidence. Specifically, plaintiffs contend that "evidence regarding Ritz's practices in other contemporaneous homicide investigations could provide admissible evidence relevant to proving Ritz's intent in this case" because "evidence of a defendant's persistent deviations from 'applicable professional standards' can 'support an inference of intentional or reckless conduct that violated a plaintiff's constitutional rights.'" Pls.' Sept. 9, 2020 Ltr. 4–5 (quoting *Restivo v. Hessemann*, 846 F.3d 547, 580 (2d Cir. 2017); citing *Jimenez v. City of Chicago*, 732 F.3d 710, 721–22 (7th Cir. 2013)).[5] Evidence of

---

[5] *Jimenez v. Chicago* and *Restivo v. Hessemann,* both of which are section 1983 cases based on wrongful convictions, are not particularly instructive here. In the portions of the opinions cited by plaintiffs, the Seventh Circuit held that the testimony of a defense expert in police practices was not reversible error. In *Jimenez*, for example, the expert testified about "reasonable practices for police investigations and how the investigation of the murder [for which the plaintiff was wrongly convicted] departed from those practices." 732 F.3d at 719. The court found the expert's testimony "tended to show that the errors in defendants' handling of the investigation were so severe and numerous as to support an inference of deliberate wrongdoing in violation of the Constitution." *Id. Jimenez* was cited in *Restivo* in support of a similar finding that the trial court did not err by admitting expert testimony on police practices. The court did not discuss in either case whether alleged misconduct in other homicide cases was relevant to the defendant police officers' intent in the homicide investigation at issue in each case. Even so, I accept plaintiffs' assertion that similar alleged misconduct by Ritz in other cases may be relevant to his intent in this case.

prior bad acts may be admissible to prove intent. *See* Fed. R. Evid. 404(b)(2). Thus, the first issue is whether the homicide files may contain information about Detective Ritz's conduct in other investigations that is relevant to his intent in this case.

### 1. *Murder of Michelle Dyson*

Plaintiffs seek the homicide file for the murder of Michelle Dyson. In 1995, Sabein Burgess was wrongfully convicted of Dyson's murder. *Burgess* Am. Compl. ¶¶ 1, 51, ECF No. 141 in *Burgess v. Baltimore Police Dep't*, No. RDB-15-834 (D. Md.); *Burgess v. Baltimore Police Dep't*, No. RDB-15-834, 2017 WL 4947004, at *6 (D. Md. Oct. 31, 2017). He was sentenced to life in prison and exonerated in 2014 after having served nineteen years in prison. *Burgess* Am. Compl. ¶¶ 1, 39, 51, ECF No. 141 in RDB-15-834. After his release from prison, Burgess filed a civil rights lawsuit against BPD, Detective Ritz, and other officers involved in the investigation of the murder that led to his wrongful conviction. *Burgess* Compl., ECF No. 1 in RDB-15-834. Detective Ritz was a non-supervisory detective assigned to the investigation. *Burgess* Am. Compl. ¶ 8. Burgess claimed that Ritz interviewed "one of the real perpetrators of Ms. Dyson's murder" but discounted the testimony without justification. *Id.* ¶¶ 40–42. Burgess alleged a § 1983 claim against Ritz based on a *Brady* violation. This alleged misconduct, although not the same as the misconduct alleged here, is similar to some of the allegations in this case. As a result, I find that the Dyson homicide file could contain information relevant to Detective Ritz's intent in this case.

However, it must be noted that the allegations against Detective Ritz were never proven in *Burgess*. After an exhaustive discovery period, Judge Bennett granted summary judgment in Ritz's favor. *Burgess*, 2017 WL 4947004, at *14–15. The Court allowed the *Brady* claims against

other defendants to proceed to trial but concluded that there was insufficient evidence that Ritz committed a *Brady* violation. *Id.*[6]

### 2. *Murder of Sherene Moore and Shooting of Marcus Booker*

Plaintiffs also seek the homicide/investigation file for the murder of Sherene Moore and the shooting of Marcus Booker. In 2003, Tony Dewitt was convicted of Moore's murder and Booker's shooting. Mem. Op. 1–2, ECF No. 38 in *Dewitt v. Ritz*, No. DKC-18-3202 (D. Md. Jan. 31, 2020). Like Burgess, Dewitt later was released from prison after it was determined he was innocent. After his release, he filed a civil rights lawsuit against Ritz, among others. *Dewitt* Compl., ECF No. 1 in DKC-18-3202. Ritz, a lead investigator, allegedly coerced a witness to identify Dewitt as the shooter and ignored exculpatory statements by other witnesses. *Id.* ¶ 26. This alleged misconduct is factually similar to the alleged misconduct in this case and is therefore relevant to Ritz's intent in this case.

While I acknowledge the similarities between the misconduct allegations in this case and those in *Dewitt*, I cannot ignore the fact that Dewitt's allegations against Ritz have been called into serious question. According to the defendants in Dewitt's civil rights lawsuit, Dewitt was captured on recorded jail calls offering to pay $10,000 each to two key witnesses from his criminal trial in exchange for helpful testimony in his post-conviction proceedings and his civil case. Based on those alarming allegations, Detective Ritz and the other defendants filed a motion to dismiss

---

[6] In document request number 5, plaintiffs seek "BPD homicide files or other BPD investigative files pertaining to BPD criminal investigations involving Defendant Ritz that were produced to Sabein Burgess' counsel" in *Burgess*. Insofar as plaintiffs argue that because Burgess obtained discovery of other homicide files, "including some involving Ritz," they should too, I disagree. *See* Pls.' Sept. 9, 2020 Ltr. 2. That they were produced in the *Burgess* case does not make them necessarily discoverable here. I do not have sufficient information about these unidentified homicide/investigation files to determine whether they are discoverable in this case.

Dewitt's civil rights lawsuit. Defs.' Mot. 1, ECF No. 48 in DKC-18-3202 (pending). The

defendants in *Dewitt* also argue:

> The recordings also establish that Plaintiff paid Tyrell Curtis for his helpful post-
> conviction testimony and closely coordinated with Curtis regarding the details of
> that testimony. In order to lend credibility to this purchased, false testimony from
> Curtis, Plaintiff obtained a wholly fabricated police report . . . which purports to
> memorialize a prior statement from Curtis to BPD Officer Mark Veney identifying
> an alternative suspect in the crime at issue.

Mot. 2.[7] Dewitt's counsel filed a motion to strike the defendants' motion to dismiss, which was

soon followed by counsel's motion to withdraw from the case. ECF Nos. 51 and 53 in DKC-18-

3202 (pending). The alleged misconduct of Dewitt raises serious doubts about the veracity of his

claims, including those against Detective Ritz.

### 3.  Murder of Kevin Dukes

Plaintiffs also seek the homicide file for the murder of Kevin Dukes. Ezra Mable was

convicted of Dukes' murder and later released after it was determined he was innocent of the crime.

He filed a civil rights lawsuit on March 1, 2013. *Mable v. Mayor & City Council of Baltimore*

*City*, No. JKB-13-650 (D. Md.). Ritz was named as a defendant for his supervisory role in the

investigation that lead to Mable's arrest. Compl. ¶ 71, ECF No. 1 in JKB-13-650. The complaint

offers little in terms of conduct by Ritz himself, as opposed to his subordinates. In the complaint,

Mable alleged that numerous police officer defendants, including Detective Ritz, conspired not to

test DNA evidence and failed to properly investigate other evidence. *Id.* ¶¶ 74–84, 107–40. Mable

also claimed that Ritz in particular failed to question a suspect. *Id.* ¶ 106. These allegations of

misconduct are sufficiently similar to the allegations in this case such that they qualify as relevant.

---

[7] *See also* Justin Fenton & Tim Prudente, *Convicted Baltimore man won freedom with forgery and
bribery, city attorneys allege in lawsuit response*, Balt. Sun (July 28, 2020), *available at*
https://www.baltimoresun.com/news/crime/bs-pr-ci-cr-exoneration-questions-20200728-
bn45n3u4ufgc5filo4isw3ecte-story.html.

Having made that relevance finding, however, I note that none of Mable's allegations of misconduct by Ritz were proven. The case was dismissed for lack of prosecution after Mable failed to serve the defendants. Jan. 9, 2014 Order, ECF No. 8 in JKB-13-650.

### 4. *Murder of Elliot Scott*

The last homicide file that plaintiffs seek is for the murder of Elliot Scott. In that case, Detective Ritz interrogated Brian Cooper, and Cooper was convicted of Scott's murder. Cooper appealed, and the Maryland Court of Special Appeals reversed his conviction, concluding that Ritz's interrogation technique violated Cooper's *Miranda* rights. *See Cooper v. State*, 877 A.2d 1095, 1103 (Md. Ct. Spec. App. 2005). The court noted that "Detective Ritz candidly acknowledged that he intentionally withheld the reading of the *Miranda* warnings during the first 90–minute stage of the interrogation, for fear that appellant would refuse to talk or ask for a lawyer." *Id.* at 1109. After the interrogation but before the appeal, the Supreme Court announced a new *Miranda* rule in *Missouri v. Seibert*, 542 U.S. 600 (2004). The Supreme Court "struck down the two-step, 'question first' interrogation strategy employed by some police." *Cooper*, 877 A.2d at 1097. Ritz admittedly had employed this strategy with Cooper. On appeal, the Maryland appellate court applied the new ruling in *Missouri v. Seibert* to Cooper's case and concluded that Ritz had violated Cooper's *Miranda* rights. On remand, Cooper was convicted again. *Id.*

Plaintiffs argue that Ritz's admission that he "violat[ed] Cooper's *Miranda* rights . . . is . . . evidence of an intentional constitutional violation during an interrogation in a homicide case during roughly the same time period as the investigation of Malcolm Bryant." Pls.' Sept. 9, 2020 Ltr. 4. Not so. Because the Supreme Court had not decided *Missouri v. Seibert* when Ritz conducted the interview at issue in *Cooper*, Ritz did not have the benefit of the Supreme Court holding to inform him that his conduct amounted to a *Miranda* violation. For that reason, the Scott

homicide file is not relevant to Ritz's intent in this case.  The file is also not relevant because the

allegations of misconduct against Ritz in the Scott investigation are not similar to the misconduct

allegations here.  Plaintiffs do not allege a *Miranda* violation.  Even if the Scott homicide file

appeared to contain information relevant to this case, Ritz admitted the conduct that violated

Cooper's Fifth Amendment rights, and discovery of additional documents to prove the undisputed

violation is unnecessary. [8]

### B.  The Requested Discovery is Not Proportional to the Needs of the Case

In addition to considering whether the homicide files are relevant, I must consider whether

they are proportional to the needs of the case.  *See* Fed. R. Civ. P. 26(b)(1).   In doing so, I

"consider[] the importance of the issues at stake in the action, the amount in controversy, the

parties' relative access to relevant information, the parties' resources, the importance of the

discovery in resolving the issues, and whether the burden or expense of the proposed discovery

outweighs its likely benefit." *Id.*  Plaintiffs, as "[t]he party seeking discovery[,] ha[ve] the burden

to establish . . . proportionality, at which point the burden shifts to the party resisting discovery to

demonstrate why the discovery should not be permitted."  *Bost v. Wexford Health Sources, Inc.*,

No. ELH-15-3278, 2020 WL 1890506, at *8 (D. Md. Apr. 15, 2020).

---

[8] Plaintiffs rely on *Martin v. Conner*, 287 F.R.D. 348, 352 (D. Md. 2012) ("*Martin II*") for the proposition that "courts, including this Court, have permitted plaintiffs in police misconduct cases to obtain discovery concerning other similar allegations of misconduct, even where unsustained, as long as the other complaints are 'relevant to the [plaintiffs'] cause of action.'"  Pls.' Sept. 9, 2020 Ltr. 4 (quoting *Martin II*, 287 F.R.D. at 352).  *Martin II* has limited applicability to the issues presented here.  *Martin II* involved a plaintiff's request for the production of sustained and unsustained complaints against the defendant Maryland State Police troopers.  Defendants objection to the request based on the law enforcement privilege.  Those issues are not presented here.  In addition, *Martin II* was decided before Rule 26(b)(1) was amended in 2015 to require that discovery be proportional to the needs of the case, an issue I address next.

Plaintiffs argue that the "strong public interest in § 1983 actions" counsels in favor of discovery. Pls.' Ltr. 4–5 (quoting *Martin v. Conner*, 287 F.R.D. 348, 352 (D. Md. 2012) ("*Martin II*"). I agree as a general matter that there is a strong public interest in § 1983 cases, especially cases brought by individuals who were wrongfully convicted and imprisoned for many years. That said, I also must consider the burden and expense associated with the production of the homicide files. And here, both would be significant.

To be clear, the burden and expense of producing the files themselves would not be particularly burdensome or expensive. But any subsequent investigation into Ritz's conduct in the other cases would be. If the homicide files were produced, plaintiffs almost certainly would attempt to investigate the police conduct in those cases. The investigations likely would include interviews and depositions of myriad individuals and additional document requests. In response, defendants would be forced to conduct counter-investigations to refute the allegations of misconduct. These investigations would be time-intensive, resource-draining, and costly for everyone.

The burden and expense that production of the homicide files would impose outweighs the likely benefit of the discovery, which I find would be minimal. The homicide files are nearly twenty years old. Memories fade over time, and the memories of people with knowledge of the decades-old homicide cases are no exception. Plaintiffs claim that the files *may* lead to the discovery of admissible prior bad act evidence, but at this point, that is mere speculation. As we know, one of the cases, the Dyson murder investigation, has been thoroughly investigated by highly capable and experienced civil rights attorneys in the *Burgess* case. Despite counsel's best efforts, the *Brady* claims against Ritz were dismissed on summary judgment after a robust discovery period. There is no reason to believe another set of attorneys can do a better job

establishing Ritz's misconduct in that case.  As for Ritz's alleged misconduct in the Moore murder

investigation, it has not been thoroughly investigated in the pending civil rights lawsuit against

Ritz.  But the entire lawsuit soon may be dismissed in light of the troubling allegations that the

plaintiff fabricated evidence to secure his release from prison.  These allegations apparently caused

Dewitt's counsel to file a motion to withdraw.  Against this backdrop, the likely benefit of the

Moore homicide file appears minimal.  It is difficult to predict the likely benefit of the Dukes

homicide file, because the allegations against Ritz in the *Mable* complaint are not particularly

specific and the case was dismissed pre-discovery for failure to prosecute.

Even if plaintiffs' investigation were to uncover evidence of Ritz's misconduct in the other

homicide cases, the likelihood that such evidence would be admissible in this case is debatable. I

recognize the question of admissibility is not before me and that discovery is broader than

admissibility.  But the likely benefit of discovery of the homicide files turns, at least in part, on

how likely their production would lead to admissible 404(b) evidence.[9]  Because plaintiffs rely on

the potential for admissible Rule 404(b) evidence as the hook for relevance, I cannot divorce the

discoverability analysis from the Rule 404(b) admissibility requirements.  They are: "(1) the prior-

act evidence must be relevant to an issue other than character, such as intent; (2) it must be

necessary to prove an element of the [claim]; (3) it must be reliable; and (4) its probative value

must not be substantially outweighed by its prejudicial nature."  *Smith v. Baltimore City Police

Dep't*, 840 F.3d 193, 201 (4th Cir. 2016), *as amended* (Nov. 1, 2016) (quoting *United States v.

Garcia–Lagunas*, 835 F.3d 479, 493, 2016 WL 4547206, at \*9 (4th Cir. Sept. 1, 2016)).  At trial,

---

[9] Plaintiffs appear to acknowledge that the analysis for discoverability of the homicide files is intertwined with an admissibility analysis.  *See* Pls.' Sept. 9, 2020 Ltr. 4 ("[T]here is at least a reasonable possibility discovery of these case files will lead to evidence admissible under Rule 404(b).").

any attempt to introduce evidence of Detective Ritz's conduct in other cases undoubtedly will be contested vigorously by the defendants. Among the hurdles that plaintiffs will face is the Fourth Circuit's disapproval of mini-trials within a trial, because of the time and expense involved and because the tangential allegations may cause juror confusion and unfair prejudice. *See United States v. Rubio*, 87 F.3d 1309 (4th Cir. 1996) (affirming district court ruling preventing the defendant from questioning a witness "about specific details regarding the incidents in order to prevent a mini-trial about the issues and an undue waste of time under Rule 403"); *United States v. Myers*, 589 F.3d 117, 124 (4th Cir. 2009) (affirming trial court exclusion of reverse 404(b) evidence, in part because "further evidence on th[e] issue was not 'of high probative value,' and . . . it would result in a 'mini trial'"). *Cf. United States v. Rachel*, No. WMN-02-754, 2008 WL 11509294, at *3 (D. Md. Feb. 26, 2008) (admitting evidence where "the Court is not persuaded that it would result in a time-wasting or distracting 'mini-trial'").

Another factor that cuts against discoverability is the importance of the discovery in resolving the issue of Ritz's intent. The files for the Dyson, Dukes, and Moore homicide investigations do not contain information about Ritz's conduct in the homicide investigation at issue in this case. And we can only speculate at this point as to whether the files will lead to the discovery of admissible Rule 404(b) evidence of intent. Whether Ritz acted with the requisite intent is an important issue that will be hotly contested, but the homicide files are not particularly important in resolving it.

In sum, I find that plaintiffs have met the relatively low standard for establishing relevance of three of the four homicide files. However, I find that plaintiffs have not met their burden of establishing proportionality. The minimal likely benefit of the homicide files is outweighed by the burden and expense associated with the post-production investigation, and the homicide files

are not important in resolving the issue of Ritz's intent.  For these reasons, plaintiffs' request to

compel the production of the homicide files is denied.


Date: <u>October 21, 2020</u>                                                    <u>        /S/        </u>

                                                                                    Deborah L. Boardman
                                                                                    United States Magistrate Judge

16