# Exhibit A

*Transcript of Verger Deposition*

```
1              IN THE UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF MARYLAND

3                        AT BALTIMORE

4                 File No. 19-cv-00384-ELH

5

6    THE ESTATE OF MALCOLM J. BRYANT,     )

7                    Plaintiff,           )

8        -v-                              )

9    BALTIMORE POLICE DEPARTMENT, et al   )

10                   Defendants           )

11   _____ )

12

13      Videotaped Zoom Deposition of Barry Scott Verger

14                     Baltimore, MD

15               Wednesday Aril 21, 2021

16                      10:07 a.m.

17

18

19   Job No:  J6901626

20   Pages:   1-387

21   Reported by:  Kenneth Norris
```



Case 1:19-cv-00384-ELH   Document 186-1   Filed 05/12/21   Page 3 of 388
BARRY SCOTT VERGER                                          April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police                      2

1        Deposition of Barry Scott Verger

2        Taken via Zoom

3

4

5

6

7

8

9

10          Pursuant to Notice, before Kenneth Norris, a

11   Professional Reporter and Notary Public in and for the

12   State of Maryland.

13

14

15

16

17

18

19

20

21



Case 1:19-cv-00384-ELH   Document 186-1   Filed 05/12/21   Page 4 of 388
BARRY SCOTT VERGER                                           April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police                      3

```
 1    APPEARANCES:

 2         ON BEHALF OF THE PLAINTIFF:

 3         AMELIA GREEN, ESQUIRE, NICK BRUSTIN, ESQUIRE and

 4         CHELSEA CRAWFORD, ESQUIRE

 5         (Appearing via Zoom Hookup)

 6              Neufel, Scheck & Brustin, LLP

 7              99 Hudson Street, 8th Floor

 8              New York, New York 10013

 9              Telephone(212)965-9081

10              E-mail:  amelia@nsbcivilrights.com

11

12         ON BEHALF OF THE DEFENDANTS:

13         AVI KAMIONSKI, ESQUIRE and

14         JASMINE ENGLAND-CARSAR, ESQUIRE

15         (Appearing via Zoom Hookup)

16              Nathan & Kamionski LLP

17              33 W. Monroe Street

18              Chicago, IL 60603

19              Telephone(312)612-1928

20              E-mail:  akamionski@nklawllp.com.

21
```



Case 1:19-cv-00384-ELH Document 186-1 Filed 05/12/21 Page 5 of 388
BARRY SCOTT VERGER
The Estate of Malcolm J. Bryant vs Baltimore Police
April 21, 2021
4

1   ON BEHALF OF THE DEFENDANT, BALTIMORE CITY POLICE

2   DEPARTMENT:

3   NATALIE AMATO, ESQUIRE

4   (Appearing via Zoom Hookup)

5       Baltimore City Law Department

6       100 North Holliday Street, Suite 101

7       Baltimore, MD 21202

8       Telephone(410)396-9298

9       E-mail:  natalie.amato@baltimorecity.gov

10

11       ALSO PRESENT: JAHNE BROWN

12                 Kyle ASHE

13                 (Appearing via Zoom hookup)

14

15       VIDEOGRAPHER: GEORGE ELLIS

16       (Present via Zoom)

17

18

19

20

21



Case 1:19-cv-00384-ELH   Document 186-1   Filed 05/12/21   Page 6 of 388
BARRY SCOTT VERGER                                          April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police                    5

1              CONTENTS

2   EXAMINATION OF Barry Scott Verger              Page

3       By Ms. Green                               7,372

4       Mr. Kamionski                              368

5

6

7

8

9

10  Exhibits                                       Page

11  Exhibit   84   Verger Resume                   26

12  Exhibit   85   Trial witness Barry Verger      80

13                 Testimony

14  Exhibit   86   Verger bench notes              97

15  Exhibit   87   Verger letter submitting items to  139

16                 MSP, dated 6/1/99

17  Exhibit   88   Verger Report on Orange T shirt  218

18                 Dated 2/8/99

19

20

21



Case 1:19-cv-00384-ELH   Document 186-1   Filed 05/12/21   Page 7 of 388
BARRY SCOTT VERGER                                              April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police                        6

1              P R O C E E D I N G S

2              THE VIDEOGRAPHER:  Okay.  We are now on the

3    record.  The time is now 10:07 a.m., Eastern Standard

4    Time on April 21st, 2021.

5              This begins the video conference deposition

6    of Barry Verger taken in the matter of the Estate of

7    Malcolm J. Bryant versus the Baltimore Police

8    Department, et al., filed in the United States

9    District Court for the District of Maryland at

10   Baltimore.  File number:  19-CV-00384-ELH.

11             My name is George Ellis.  I am your remote

12   videographer.

13             The court reporter is Kenneth Norris here

14   representing Esquire Depositions Solutions.

15             As a courtesy, whoever is not speaking,

16   please mute your audio.  Please remember to un-mute

17   your audio if you wish to speak.

18             Counsel, will you please state your name and

19   who you represent, after which the court reporter will

20   swear in the witness.

21             MS. GREEN:  Amelia Green from Offices of



BARRY SCOTT VERGER                                          April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police                      7

1   Scheck & Brustin on the behalf of the Plaintiff.

2          MR. KAMIONSKI:  Avi Kamionski on behalf of

3   Barry Verger.

4          MS. AMATO:  Natalie Amato on behalf of the

5   Baltimore Police Department along with my colleague

6   Kyle Ashe.

7          MS. GREEN:  And my colleagues Nick Brustin

8   and Chelsea Crawford are also here on behalf of the

9   Plaintiff.

10  Whereupon,

11                  Barry Scott Verger,

12  A witness of lawful age, after being duly sworn to

13  tell the truth, the whole truth and nothing but the

14  truth, testified as follows:

15                  EXAMINATION:

16  BY MS. GREEN:

17     Q.   Good morning, Mr. Verger.

18     A.   Good morning.

19     Q.   Could you please state your full name for

20  the record?

21     A.   My name's Barry, middle name Scott, Verger,



```
 1    V-E-R-G-E-R.

 2         Q.   What's your age?

 3         A.   I am currently 58.

 4         Q.   Have you ever sat for a deposition in a

 5    civil case before?

 6         A.   No, I haven't.

 7         Q.   Okay.  This is your first civil deposition?

 8         A.   Yes.

 9         Q.   Okay.

10              Well, you understand that today although

11    we're conducting this deposition virtually, you are

12    under oath just as if you're testifying in court,

13    correct?

14         A.   That's correct.

15         Q.   And I'm just going to ask if you don't

16    understand any questions that I ask you today, please

17    let me know and I'll rephrase the question.  Okay?

18         A.   Okay.

19         Q.   If you answer a question, I'm going to

20    assume you understand it.  Is that fair?

21         A.   That's fair.
```



1    Q.   If you need to take a break at any time,

2  just let me know.  I'm only going to ask that you

3  complete the answer to the pending question.  Okay?

4    A.   Okay.

5    Q.   Attorneys on this Zoom conference might

6  object from time to time, actually probably will

7  object from time to time.  Unlike in court, there is

8  no judge here to rule on an objection.  So unless your

9  attorney, Mr. Kamionski, instructs you not to answer a

10  question, after anyone objects, just pause, let the

11  folks make their objection and then go ahead and

12  answer.  Okay?

13    A.   Okay.

14    Q.   And if at any time there's any technical

15  trouble and you are having trouble hearing me or

16  technically or vice versa if I'm having trouble

17  hearing you, just let us know and we'll pause the

18  deposition and get it straightened out.  Okay?

19    A.   Okay.

20    Q.   Do you have any health conditions or memory

21  issues that might affect your memory or ability to



1   testify truthfully here today?

2        A.   No, I don't.

3        Q.   Are you taking any medications that might

4   affect your memory or ability to testify truthfully

5   here today?

6        A.   No.

7        Q.   All right.  You understand that this is a

8   case that involves a Baltimore Police Department

9   homicide investigation relating to a November 1998

10  murder of a 16-year old girl named Toni Bullock?

11       A.   Yes.

12       Q.   All right.  You understand that you're a

13  defendant, you're being sued in this case.  Correct?

14       A.   Correct.

15       Q.   Have you seen the complaint in this case?

16       A.   Pardon?

17       Q.   Have you seen the complaint in the case of

18  the filing made that initiated the lawsuit?

19       A.   Yes, I've glanced at it.

20       Q.   Okay.

21            Did you read it?



1        A.   Glanced through it.

2        Q.   Did you read the allegations about you?

3        A.   Yes.

4        Q.   Have you seen the amended complaint?  We

5   recently amended our complaint a couple months ago.

6        A.   No, I haven't.

7        Q.   Okay.

8             What's your understanding of the allegations

9   against you in this case?

10            MR. KAMIONSKI:  Objection to the form of the

11   question.

12            You can answer.

13            THE WITNESS:  Not really sure what you're

14   looking for.

15   BY MS. GREEN:

16        Q.   What is your understanding of -- you

17   understand we're suing you, right?

18        A.   That's correct.

19        Q.   You understand the plaintiff in this case is

20   alleging you did something wrong, right?

21        A.   That's correct.



Case 1:19-cv-00384-ELH   Document 186-1   Filed 05/12/21   Page 13 of 388
BARRY SCOTT VERGER                                    April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police            12

1        Q.   Do you know what the term "allegation"

2   means?

3             MR. KAMIONSKI:  Objection to the form of the

4   question.

5             THE WITNESS:  I don't.

6   BY MS. GREEN:

7        Q.   You don't know what the word "allegation"

8   means?

9             MR. KAMIONSKI:  Objection, asked and

10  answered.

11            You can answer.

12            THE WITNESS:  Yes, I know what allegation

13  is.

14  BY MS. GREEN

15       Q.   All right.  What's your understanding of the

16  allegations against you in the case, like what the

17  plaintiff is saying you did wrong?

18            MR. KAMIONSKI:  Objection to the form of the

19  question.

20            MS. AMATO:  Join.

21            THE WITNESS:  I'm not sure which -- I don't



Case 1:19-cv-00384-ELH   Document 186-1   Filed 05/12/21   Page 14 of 388
BARRY SCOTT VERGER                                           April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police                      13

1  think I did anything wrong.  So I'm not sure what your

2  -- what your point is.

3  BY MS. GREEN:

4       Q.   Okay.  That's fair.

5            You don't think you did anything wrong in

6  this case, right?

7       A.   Yes.

8       Q.   Sorry.  That was a bad question with a

9  double negative.

10           But you understand we're claiming you did

11 something wrong, right?

12      A.   Yes.

13      Q.   I'm not asking you to concede you did

14 anything wrong.  I understand it's your position that

15 you didn't and that's fine, but I just want to get

16 your understanding of what you understand the claims

17 to be against you?

18           MR. KAMIONSKI:  Objection to form of the

19 question, asked and answered.

20           THE WITNESS:  Okay.

21 BY MS. GREEN:



1          Q.    You can answer.

2          A.    Ask it again.  I thought I answered it.

3          Q.    What is your understanding of the claims

4    against you in this case?

5          A.    I think lab work.

6          Q.    You have no idea what the claims against you

7    are in this case?

8               MR. KAMIONSKI:  Objection to the form of the

9    question, asked and answered.

10              THE WITNESS:  Not sure of, like, procedures?

11   BY MS. GREEN:

12         Q.    All right.  Let's take a step back just to

13   answer the question.

14              Right now, you are not able to give me any

15   information about the claims -- your understanding of

16   the claims or allegations against you in this case,

17   other than lab work.  Is that right?

18         A.    I understand it's something that had to do

19   with my testimony in the case.

20         Q.    Okay.

21              Do you know what your testimony was about?



1        A.   Yes.

2        Q.   Tell me, what was your testimony about?

3        A.   My testimony was about whether or not my

4  findings were -- my findings were what I wrote in my

5  report and what I said on the stand.

6        Q.   Okay.  We'll circle back to that.

7             Let's talk a little bit about your

8  preparation for the deposition today.  Okay?

9        A.   Okay.

10       Q.   I'm not able to ask you about the substance

11  of your conversations with your attorney in this case.

12  Okay?

13       A.   Okay.

14       Q.   However, I can ask you about the number of

15  meetings you had with them, how long they lasted, that

16  type of the thing.  Okay?

17       A.   Okay.

18       Q.   So first I'm going to start with documents.

19            Have you reviewed any documents in

20  preparation to testify for this deposition today?

21       A.   Just saw my -- reviewed my testimony and my



1  worksheet.

2       Q.   All right.  You understand that you're being

3  sued for many millions of dollars in this case.

4  Right?

5            MR. KAMIONSKI:  Objection to the form of the

6  question.

7            THE WITNESS:  Yes.

8  BY MS. GREEN:

9       Q.   You understand that it's our claim that a

10 man named Malcolm Bryant was wrongly convicted and

11 spent many years in prison, wrongfully, because of you

12 and Detective William Ritz.  Did you understand that

13 before just now?

14           MR. KAMIONSKI:  Objection to the form of the

15 question.

16           THE WITNESS:  Yes.

17 BY MS. GREEN:

18      Q.   All right.  So I take it you made every

19 effort to prepare for this deposition today to explain

20 your lab work, correct?

21      A.   That's correct.



BARRY SCOTT VERGER                                          April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police              17

 1        Q.   So you reviewed your testimony from trial
 2   which was approximately 18 pages, right?
 3        A.   That's correct.
 4        Q.   You reviewed that carefully, correct?
 5        A.   Correct.
 6        Q.   Did you identify anything in your testimony
 7   that was untruthful when you reviewed it?
 8        A.   No, ma'am.
 9        Q.   Okay.
10             And you said you also reviewed your report
11   in this case?
12        A.   That's correct.
13        Q.   What else did you look at to prepare for
14   your deposition today?
15        A.   I don't recall anything else.
16        Q.   So you reviewed 18 pages of testimony and a
17   June 17th, 1990 report -- '99 report, that's one-page.
18   Is that right?
19        A.   That's correct.
20        Q.   All right.
21             You didn't review any other -- any portions



BARRY SCOTT VERGER                                          April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police                     18

```
 1    of the police file in the homicide investigation?

 2         A.    No.

 3         Q.    You didn't review your February 1st, 1999

 4    report?

 5         A.    No.

 6         Q.    You didn't review any of your training

 7    materials or any policies and procedures relating to

 8    the tests you conducted in this case?

 9         A.    No.

10         Q.    You -- did you review anyone else's trial

11    testimony other than your own?

12         A.    No, I did not.

13         Q.    Did you review anyone's deposition testimony

14    prior -- in the civil case?

15         A.    No, I did not.

16         Q.    Do you have an understanding of who has been

17    deposed in this case before you?

18         A.    Yes.

19         Q.    Who do you understand has been deposed?

20              MR. KAMIONSKI:  Objection to the extent that

21    it calls for communications with his attorney.  I'll
```



1   instruct him not to answer information that he has

2   learned from an attorney in the case.

3          If you can only answer that question by

4   getting information that you got from your attorney in

5   this case, then I will instruct you not to answer that

6   question.

7          Are you able to answer that question without

8   using information that you got from your attorney in

9   the case?

10         THE WITNESS:  No.

11  BY MS. GREEN:

12     Q.   Do you -- all right.

13         So the only documents in the world that you

14  reviewed to prepare to testify at this deposition

15  today were 18 pages of your trial testimony and your

16  one-paged June 1999 report.  Is that right?

17     A.   That's correct.

18     Q.   All right.  And I'd now, like to talk to you

19  about your meeting with your attorney; whether in

20  person or by phone.

21         How many meetings have you had with your



```
1   attorneys regarding this case since you were named as

2   a defendant in this case?  So essentially since we

3   filed the complaint?

4        A.   Three times.

5        Q.   All right.  I'd like -- what were the dates

6   of those three meetings?

7        A.   I don't remember.

8        Q.   What?

9        A.   I don't remember.  The first one was when I

10  got the -- the summons and I found out that I was

11  being sued.  And the other one was this past Monday

12  for approximately two hours, and this morning for

13  approximately a half hour.

14       Q.   Okay.  Monday.  So Monday being -- what's

15  today?  I don't even know.  Is today Wednesday?

16            So two days ago you had a two-hour meeting,

17  two and a half hours?

18       A.   No, it was -- it was roughly -- it was

19  approximately two hours.

20       Q.   Okay.

21            Then you had a half hour meeting this
```



Case 1:19-cv-00384-ELH   Document 186-1   Filed 05/12/21   Page 22 of 388
BARRY SCOTT VERGER                                    April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police            21

1   morning.  Is that right?

2        A.   That's correct.

3        Q.   And then when you got the summons, did you

4   meet with anyone in person?

5        A.   Yes, they came in from Chicago.

6        Q.   Okay.

7        A.   We just talked briefly about what was going

8   on and that was it.  It couldn't have been more than

9   30 minutes.

10       Q.   Okay.  Who was at that first meeting when

11  you were talking about what was going on?  Just who

12  was present, what names, it's not --

13       A.   My lawyer Avi and his assistant, I don't

14  remember the person's name.

15       Q.   Okay.  Was Rick there?

16       A.   No.

17       Q.   So it's just you, Avi and one other person

18  that works with Avi, as you understand it?

19       A.   Yes.

20       Q.   Okay.  And then the meeting on Monday, that

21  was in person as well?



1          A.    That is correct.   That was just me and Avi.

2          Q.    Okay.   And this morning, the same?

3          A.    The same.

4          Q.    All right.

5                Any meetings by phone regarding this case

6     with anyone in the world?

7          A.    No.

8          Q.    Have you spoken -- since you filed this

9     complaint, aside from your counsel -- I mean since we

10    filed this complaint, I'm sorry.   Aside from your

11    counsel, who have you spoken with about this case?

12         A.    Just they know I have a case, nothing

13    pertinent to the case.

14         Q.    Who is they?

15         A.    People I work with, so they know where I'm

16    at.

17         Q.    Got you.

18               Did you have to give the people you work

19    with the complaint?

20         A.    No.

21         Q.    You work at the Baltimore Police Department?



```
 1        A.    That's correct, in the Drug Analysis Unit.

 2        Q.    Okay.

 3              What's your role there right now?

 4        A.    My job is to analyze controlled dangerous

 5   substances.

 6        Q.    Did you ever talk to anybody in the

 7   Baltimore lab about this case?

 8        A.    Just --

 9        Q.    Other than just saying you have a case?

10        A.    Yes, one person, Leon White.  He's a

11   colleague who worked with me in the Trace Analysis

12   Unit at that time.

13        Q.    Tell me about that conversation.

14        A.    It was just a conversation saying, you know,

15   I -- I, you know, told him what it was about and just

16   said just go -- just go in there and tell the truth.

17        Q.    What was it about?  What did you tell him it

18   was about?

19        A.    Just told him it was -- it had to do

20   something with the case that happened back 20-some

21   years ago.
```



1      Q.    Okay.

2            Have you done anything as to refresh your

3      recollection of the BPD lab protocols from 1999 in

4      preparation to testify here today?

5            MR. KAMIONSKI:   Objection, asked and

6      answered.

7            You may answer.  You can answer.

8            THE WITNESS:  Yes.

9      BY MS. GREEN:

10     Q.    And what did you do?

11     A.    I just looked at, you know, how I -- you

12     know, trying to refresh my memory on how I did things

13     back then.

14     Q.    And how did you do that?  What did you look

15     at to do that?

16     A.    Looking at my lab sheet, trying to recall

17     what I had done.

18     Q.    Okay.  You mean your bench notes?

19     A.    Yes, that's correct.

20     Q.    So you looked, in addition to your report,

21     you also looked at your bench notes.  Is that right?



1       A.   Yes, that's what I was referring to when you

2   said report.

3       Q.   Did looking at your notes help you refresh

4   your recollection?

5       A.   Yes.

6       Q.   Terrific.

7            Any other conversations with anyone else in

8   the world about this case or your preparation to

9   testify here today?

10      A.   No.

11      Q.   Haven't spoken to your supervisor, Mr.

12  Profili, at the time?

13      A.   No, I haven't seen him.  Last time I saw him

14  was years back.

15      Q.   Haven't spoken with anyone from the Michigan

16  State Police?

17      A.   No, I haven't.

18      Q.   All right.

19           I'd like to go over just a little bit of

20  your background briefly, and I'd like to mark as an

21  exhibit a resume that was provided to us in the case



Case 1:19-cv-00384-ELH   Document 186-1   Filed 05/12/21   Page 27 of 388
BARRY SCOTT VERGER                                      April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police             26

 1  which might help us go through that background a

 2  little bit.

 3          Jahne, what exhibit number are we up to?

 4          MS. BROWN:  This will be 84.

 5          MS. GREEN:  Okay.  Let's put Mr. Verger's

 6  resume on the screen, please.  We'll be marking this

 7  as Exhibit 84.

 8          MR. KAMIONSKI:  I'm also showing him a paper

 9  copy.  Is that okay?

10          MS. GREEN:  I'd actually prefer to control

11  when paper copies are shown and when they aren't, but

12  if you confirm it's the same document as what I --

13          MR. KAMIONSKI:  Yes.

14          MS. GREEN:  I'm sorry?

15          MR. KAMIONSKI:  Yeah, Barry's holding it up

16  right now.

17          MS. GREEN:  It's NKDS 2228 to 2229?

18          MR. KAMIONSKI:  Correct.

19          MS. GREEN:  Then we can take this off the

20  screen.  We're marking this as Exhibit 84.

21          (Verger Exhibit No. 84 was marked for



Case 1:19-cv-00384-ELH   Document 186-1   Filed 05/12/21   Page 28 of 388
BARRY SCOTT VERGER                                       April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police                27

1  identification.)

2  BY MS. GREEN

3      Q.   Mr. Verger, is this a current copy of your

4  resume?

5      A.   It doesn't have anything from 2021 updated.

6      Q.   Okay.  Did you prepare this document?

7      A.   This is an old copy of, you know, when it

8  stopped in -- looks like it is 2002.

9      Q.   All right.  But that -- the last page said

10  it's updated on January 14th, 2020?

11     A.   Yeah.  Yes, it is.  Yes.

12     Q.   Okay.  Did you prepare this document, sir?

13     A.   Yes, I did.

14     Q.   All right.

15          Did you look at this document in preparation

16  to testify?

17     A.   No, I did not.

18     Q.   By the way, do you have any other documents

19  in front of you that your counsel has provided you, or

20  is this the only thing?

21     A.   This is the only thing I have in front of



```
 1   me.
 2            MR. KAMIONSKI:  But to be clear, I do have
 3   on the side here a stack of documents that were turned
 4   over that were delivered yesterday.
 5            MS. GREEN:  Right.  But he hasn't reviewed
 6   them or seen them, right?
 7            MR. KAMIONSKI:  No, no, no.
 8            MS. GREEN:  Okay.
 9            MR. KAMIONSKI:  I have them nearby.
10            MS. GREEN:  Okay.  Thank you for that.
11   BY MS. GREEN:
12       Q.   So, why don't you walk me -- did you make
13   any notes in preparation to testify here today,
14   handwritten notes?
15       A.   No, I don't have any notes and I didn't make
16   any notes.
17       Q.   Okay.
18            Why don't you just state for the record your
19   education starting with high school?
20       A.   I graduated -- can I get something to drink?
21       Q.   Sure, of course.
```



1        A.    Okay.   I graduated high school back in 1981

2    from Randallstown High School.  I went to Catonsville

3    Community College and from there I went to Towson.  It

4    was Towson State University and I graduated with a

5    Bachelor's of Science degree in Biology.

6        Q.    Okay.

7              Any other higher education after that?

8        A.    No.

9        Q.    What year did you graduate from Towson

10   University?

11       A.    I believe it was like around '86, '87.

12       Q.    Okay.

13             Can you take a look at Exhibit 84, your

14   resume, and just confirm that the information on there

15   is accurate?  Take the time you need to review it.

16       A.    It's accurate as far as my memory goes.

17       Q.    All right.

18             So after you graduated from college, you

19   were working as a chemist at GFX Services, your first

20   job out of college?

21       A.    It actually was at the Garis Laboratory, and



1    then from Garis Laboratory, I went to GFX Services.

2         Q.   All right.   What were you doing at the Garis

3    Laboratory?

4         A.   They were experimenting at -- with medicines

5    on dogs, and they would collect -- they would collect

6    the tissue samples from the dogs after the medicine to

7    see if the medicine was working.

8         Q.   Okay.   What was your role there?

9         A.   My role there was to take care of, you

10   know -- well, actually to feed the animals and take

11   blood from the animals.   That's all I can remember.

12        Q.   Okay.

13             At GFX Services you worked as a chemist from

14   1988 to 1989.   Is that right?

15        A.   Yes.

16        Q.   And then you joined the Baltimore Police

17   Department in 1989, correct?

18        A.   That's correct.

19        Q.   And why did you join the police department?

20        A.   Just looking for a better job.

21        Q.   Okay.



1          Walk me through the different roles you've

2    had at the police department since joining in 1989,

3    please, with the approximate years.  Feel free to use

4    your resume to refresh your recollection.

5          A.   Sure.  My -- I first started in the mobile

6    unit.  And that was -- part of my job while I was

7    there was going out to crime scenes and we would

8    collect evidence, dust for fingerprints, take

9    photographs and do sketches of scenes, if necessary.

10          Then I was led to the firearms unit for

11    three years, and my job there was to take -- I would

12    go down and get the evidence from the evidence control

13    section and bring the evidence -- bring that evidence

14    up to the gun lab.  And from there I would take the --

15    I would be the first one to touch the evidence.

16          So I would have to -- if it was a gun

17    submitted, I would have to take the gun.  First, you

18    make sure it's unloaded, then you have to look for the

19    model, the make, the serial number, do a measurement

20    of the barrel, you look in the barrel to scan the

21    lands and grooves, then once I wrote all that down, I



Case 1:19-cv-00384-ELH   Document 186-1   Filed 05/12/21   Page 33 of 388
BARRY SCOTT VERGER                                                April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police                        32

1  put the -- the evidence was put in a storage room.

2          And also what I did in the firearms unit is

3  I helped with the restoration of serial numbers.

4  Serial numbers that were grinded down on the butt of a

5  gun, and you had to take acid, swab the acid -- well,

6  first you had to make the surface smooth and you had

7  to grind it down.  And then you took some acid and you

8  wiped the butt of the gun or wherever the serial

9  number was destroyed and try to make it come back with

10  acid, and you could see the numbers appear on the gun.

11      Q.   So just so I understand it, from 1989 to

12  1997 you were part of the mobile unit?

13      A.   Yes, that's correct.

14      Q.   And you performed crime scene investigation

15  and examination, right?

16      A.   Right.  For six years, and then I was lent

17  over to the firearms unit.

18      Q.   And when you were in the mobile unit, you

19  were a crime lab technician.  Is that right?

20      A.   That's correct.

21      Q.   And then in the firearms unit from 1997 to



1 │ 1999, you were conducting forensic testing on

2 │ firearms.  Is that correct?

3 │     A.   That's correct.  And I might add that I test

4 │ fired guns, too.

5 │     Q.   You test fired guns.  Okay.

6 │     A.   Yes.

7 │     Q.   And then from there you went to the Trace

8 │ Analysis Unit.  Is that right?

9 │     A.   That's correct.

10 │     Q.   And you were promoted to criminalist in

11 │ 1998.  Is that right?

12 │     A.   Yes.  If that's what it says, yes.  I don't

13 │ remember the exact date.

14 │     Q.   Your resume actually doesn't say that but I

15 │ was taking a look through your personnel file and your

16 │ testimony, and it said you joined trace analysis

17 │ actually in November 1998.  Did you testify to that

18 │ back in 1999?  Does that sound about right?

19 │     A.   It sounds about right.

20 │     Q.   Okay.  So somewhere in late 1998 you joined

21 │ the Trace Analysis Unit, right?



Case 1:19-cv-00384-ELH   Document 186-1   Filed 05/12/21   Page 35 of 388
BARRY SCOTT VERGER                                         April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police                    34

1        A.    Yes.

2        Q.    And you were a criminalist, right?

3        A.    Yes.

4        Q.    And that was a promotion for you, right?

5        A.    Yes.  Now, we're all forensic scientists.

6        Q.    Okay.  Your -- the word we use now is

7    "forensic scientist?"

8        A.    That's correct.  The police -- the crime lab

9    changed over five years ago, approximately, and made

10   us all in to forensic scientists.

11            So we were actually -- there was a

12   separation between examiner and criminalists, and the

13   criminalist -- well, the Firearms Unit, we were

14   examiners and the Latent Print Unit was examiner.  And

15   the criminalists were in the Drug Analysis Unit and

16   the Trace Analysis Unit, and they combined us and made

17   us all into forensic scientists.

18       Q.    And then you were in the Trace Analysis Unit

19   until when?

20       A.    I believe in 2000.

21       Q.    Okay.  And then from there you went to the



BARRY SCOTT VERGER                                             April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police                      35

1    Drug Analysis Unit?

2         A.    That is correct, that is where I'm presently

3    at now.

4         Q.    Okay.

5               And in the Drug Analysis Unit, you conduct

6    forensic testing on controlled substances, right?

7         A.    That's correct.

8         Q.    And in the Trace Analysis Unit, you

9    conducted testing on bodily fluid; things like semen,

10   blood, that type of thing, right?

11        A.    Yes.

12        Q.    All right.  So fair to say you have decades

13   of experience conducting forensic testing on

14   substances.  Is that right?

15        A.    Yes.

16        Q.    All right.

17              And, in fact, even before then when you were

18   in the Mobile Unit it was your job to handle crime

19   scene evidence to make sure it's preserved, correct?

20        A.    That's correct.

21        Q.    And at every level, first in the Mobile Unit



1  you were trained on preservation practices and

2  procedure and crime scene examination procedures,

3  correct?

4       A.   That's correct.

5       Q.   And when you got to the Firearms Unit, you

6  got even more training, this time on firearms testing,

7  right?

8       A.   That's correct.

9       Q.   Then you moved to Trace Analysis Unit, you

10 received additional training, this time on blood?

11      A.   Yeah.

12      Q.   Other bodily fluid testing?

13      A.   Yes.

14      Q.   Fair to say, every time you received your

15 promotion it was because of BPD's determination that

16 you were a good and careful analyst and capable of

17 doing the testing, correct?

18           MS. AMATO:   Objection.   The form of the

19 question calls for speculation.

20 BY MS. GREEN:

21      Q.   Was that your understanding?



1        A.   Yes.  I would -- yes.

2        Q.   Okay.  And before you could even begin doing

3   any testing, you had to become certified in any

4   particular area, correct?

5        A.   I --

6        Q.   Or begin doing testing on your own?  I'm

7   sorry.

8        A.   Well, that's not correct.

9        Q.   Okay.  Well --

10       A.   I was -- certified --

11       Q.   You had to go though that training program,

12   right?

13       A.   Yeah.  You have an inhouse training, but I

14   had to be certified when I got into the Drug Analysis

15   Unit.  That had certification attached to it.

16       Q.   Okay.  So as you sit here today, what

17   certifications do you have right now?

18       A.   I have a certification for the Maryland

19   Department of Health and Mental Hygiene to analyze all

20   controlled dangerous substances.

21       Q.   When did you get certified in that area?



```
 1        A.    In 2002.

 2        Q.    Okay.

 3              Were the BPD doing certifications before

 4   that?

 5              MS. AMATO:  Objection.

 6              THE WITNESS:  I'm not aware of any.

 7   BY MS. GREEN:

 8        Q.    Okay.  So it's not that -- you didn't have

 9   the opportunity to get it, certified in to the Trace

10   Analysis Unit, it's not that you didn't want to or

11   didn't pass the test, right?

12        A.    I don't recall them having anything to be

13   certified to be doing anything.

14        Q.    When you went to the Trace Analysis Unit,

15   you went through a rigorous training program.  Is that

16   right?

17              MR. KAMIONSKI:  Objection to the form of the

18   question.

19              MS. AMATO:  Join.

20              MR. KAMIONSKI:  You can answer.

21              THE WITNESS:  Yeah, it's hands-on training,
```



1   and we were given proficiency tests.

2   BY MS. GREEN:

3       Q.   What proficiency testing did you take upon

4   entry to the Trace Analysis Unit?

5       A.   It was to test an unknown and then come up

6   with an answer, you know, with the correct answer.

7       Q.   Okay.

8            So, hands-on type testing, performing the

9   analysis?

10      A.   Yes.

11      Q.   Okay.

12           And at trial you testified you were trained

13  in the area of serology also by your supervisor, Mark

14  Profili.  Is that right?

15      A.   That's correct.

16      Q.   And you said you did -- in addition to

17  forensic testing, you also did oral exams and written

18  exams as part of your training, correct?

19      A.   That's correct.

20      Q.   And you knew going into the Trace Analysis

21  Unit just as you had been in the Mobile Unit, that you



1   would be handing important evidence relating to

2   criminal investigations, correct?

3        A.   That's correct.

4        Q.   Evidence that could potentially include or

5   exclude suspects as a perpetrator of a crime, correct?

6        A.   That's correct.

7        Q.   And so when you were going through that

8   training, you took it very seriously, right?

9        A.   Yes.

10       Q.   You made sure you understood it, right?

11       A.   That's correct.

12       Q.   You followed it always, correct?

13       A.   That's correct.

14       Q.   You never conducted any scientific analysis

15   that you didn't feel that you weren't qualified to

16   conduct, correct?

17       A.   That's correct.

18       Q.   And do you think the BPD did a good job with

19   the training program for you?  Did you feel like you

20   were competent when you went out in to the world to

21   start doing analysis yourself in the trace analysis



```
 1   unit?

 2           MS. AMATO:  Objection to the form of the

 3   question.

 4           MR. KAMIONSKI:  Join.

 5           You can answer.

 6           THE WITNESS:  Looking back, I mean from that

 7   time point, yes.

 8   BY MS. GREEN

 9       Q.   Okay.  And any --

10       A.   In other words -- excuse me, in other words,

11   I would never have known if there was something

12   better, because that's what they had.

13       Q.   And you felt you were competent when you

14   were doing your job and you had been trained to do it?

15       A.   Yes.

16       Q.   Like the leucomalachite green test that you

17   did in this case, do you recall that test?

18       A.   That's correct.  Yes.

19       Q.   You understood how to conduct that test,

20   correct?

21       A.   Yes, at that time.  Yes.
```



1        Q.    You were familiar with the policy and

2    procedures of conducting that testing, right?

3        A.    Yes, we used that in the Mobile Unit also.

4        Q.    Oh, you used that in the Mobile Unit too?

5        A.    Yes.

6        Q.    Oh, okay.  And so, when you -- so you

7    started conducting leucomalachite green test as early

8    as 1989, right?

9        A.    It depends on when it was needed.

10       Q.    Right.  But you were conducting the

11   leucomalachite green test throughout your time and

12   throughout your many years from 1989 to 1997 in the

13   Mobile Unit as needed, right?

14       A.    When it was needed, yes.

15       Q.    And when you came to the Trace Analysis

16   Unit, leucomalachite green test was not new to you,

17   right?

18       A.    That's correct.

19       Q.    It's a very common test that used to test

20   for the presumption of the presence of blood, right?

21       A.    That's correct.  You're breaking up.



Case 1:19-cv-00384-ELH   Document 186-1   Filed 05/12/21   Page 44 of 388
BARRY SCOTT VERGER                                          April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police                    43

1       Q.   Can you hear me?

2       A.   Yes, I can hear you but you were kind of

3    like --

4            MR. KAMIONSKI:  You went through a choppy

5    period.

6            MS. GREEN:  Just let me know if that happens

7    again.

8    BY MS. GREEN:

9       Q.   Is it clear now?

10      A.   Yes, it's clear.

11           MS. AMATO:  We heard everything you said,

12   Amelia, you were just in slow mo.

13           MS. GREEN:  Okay.  Thank you for letting me

14   know.

15   BY MS. GREEN:

16      Q.   Okay.  Now, I can't remember what the last

17   question was.  Whether you answered it or not.

18           So when you joined the Trace Analysis Unit

19   you already had considerable experience conducting a

20   leucomalachite green test in the Mobile Unit and that

21   test wasn't new to you, right?



1    A.    That's correct.

2    Q.    And the leucomalachite green test is a

3    common test used to identify whether a substance is

4    presumptively blood, correct?

5    A.    That's right.  That's correct.  It could be

6    blood, yes.

7    Q.    And as I -- so I've been in preparation for

8    this deposition trying to read up on this test.  So

9    I've never conducted it, but I think I understand it;

10   but you'll have to correct me as I go along.

11        I was reading some old BPD protocols from

12   back in the 1980's and I was also reading some more

13   recent article on leucomalachite green testing and as

14   far as I can tell, the procedure for the test didn't

15   really change over time.  So in other words, the same

16   -- when you were in the Mobile Unit, you followed the

17   same procedure of the leucomalachite green test as you

18   did when you were in the Tract Analysis Unit, correct?

19   A.    That's correct.

20   Q.    To your knowledge, from 1989 when you were

21   in the Mobile Unit all the way up to 2000 when you



1  were in the Trace Analysis Unit, the same procedure

2  every time?

3        MR. KAMIONSKI:  Objection, asked and

4  answered.  You can you answer again.

5        THE WITNESS:  Yes.

6  BY MS. GREEN:

7     Q.   Okay.

8          Now, I'll do a little bit more on your

9  current role.

10         So how -- you've been in the Drug Analysis

11  Unit for quite a while now, right, about 21 years,

12  right?

13    A.   Yes, since 2000 -- since 2000, yes.

14    Q.   Has your role changed at all?

15    A.   We do different things, yes.

16    Q.   Technology developed, you learned new

17  procedures?

18    A.   That's correct.

19    Q.   But generally the whole time you've been a

20  forensic scientist II -- I believe that's what your

21  resume says?



1        A.    Yes.  That's what it says, forensic

2    scientist II.

3        Q.    All right.  And so given your substantial

4    experience with forensic testing, I take it you've

5    testified over the last 30 years at numerous criminal

6    proceedings.  Is that right?

7        A.    That's correct.

8        Q.    And you've been qualified as an expert in

9    numerous criminal proceedings, correct?

10       A.    That's correct.

11       Q.    Could you estimate approximately how many

12   times you've been qualified as an expert?

13       A.    No.

14       Q.    Okay.  Fair to say you are an expert,

15   though, right?

16             You're an expert witness?

17       A.    Yes.

18       Q.    That's your job when you testify, to testify

19   as an expert, correct?

20       A.    That's correct.

21       Q.    It's also your job in the BPD, including



Case 1:19-cv-00384-ELH   Document 186-1   Filed 05/12/21   Page 48 of 388
BARRY SCOTT VERGER                                    April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police                    47

 1   back when you were in the Trace Analysis Unit to

 2   consult with investigators and the prosecutor on the

 3   case to explain to them the different testing that was

 4   available and what you did, so they could use it in

 5   their investigation for prosecution, right?

 6              MS. AMATO:  Objection.

 7              THE WITNESS:  That is correct.

 8              MR. KAMIONSKI:  Objection to the form of the

 9   question.

10              You can answer.

11              THE WITNESS:  That is correct but I don't --

12   I don't recollect anything that happened in your case.

13   BY MS. GREEN:

14       Q.   All right.  But that was part of your job,

15   you routinely spoke with investigators on case --

16   criminal investigations that you were asked to conduct

17   analysis on, right?

18       A.   That's correct.

19       Q.   And you routinely communicated with the

20   prosecutors when the case was going to prosecution

21   about the testing you had done, the testing that's



1   available, correct?

2        A.   I think they got the report.

3        Q.   Sir, if you were going to testify in a

4   criminal prosecution, you didn't talk to the

5   prosecutor before they put you on the stand?

6             MR. KAMIONSKI:  Objection to the form of the

7   question.

8             MS. AMATO:  Join.

9             MR. KAMIONSKI:  You can answer.

10            THE WITNESS:  I don't recollect talking to

11  any prosecutors.

12  BY MS. GREEN:

13       Q.   Is it your testimony that in the last

14  30 years, you have never spoken to a prosecutor before

15  you testified in a criminal case?

16            MR. KAMIONSKI:  Objection to the form of the

17  question, mischaracterizes his testimony.

18            You can answer.

19            MS. AMATO:  Join.

20            MR. KAMIONSKI:  You can answer.

21            THE WITNESS:  In the 30 years, you're



1  talking about the Drug Analysis Unit and the Trace

2  Analysis Unit.  I have spoken to attorneys only when

3  they are getting ready to go to court in the Drug

4  Analysis Unit.

5  BY MS. GREEN:

6       Q.   When you were in the Mobile Unit, did you

7  testify from time to time about crime scene

8  investigations?

9       A.   Yes.

10      Q.   All right.  When you were in the Trace

11  Analysis Unit, I read your testimony, you said that

12  you had testified and been designated an expert in

13  prior cases.  So I take it while you were in the Trace

14  Analysis Unit you also testified in --

15      A.   Yes.

16      Q.   -- prosecutions?

17           And it's the same thing you do in the drug

18  cases, right?

19      A.   Yes.

20      Q.   And typically you're testifying on behalf of

21  the prosecution, right?



Case 1:19-cv-00384-ELH   Document 186-1   Filed 05/12/21   Page 51 of 388
BARRY SCOTT VERGER                                      April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police                50

1        A.    Correct.  But my job is to be impartial.

2        Q.    Okay.  But even part of being impartial is

3   explaining to the attorneys who are going to ask you

4   questions, how the testing you did worked, right?

5             MR. KAMIONSKI:  Objection to the form of the

6   question, calls for speculation.

7             You can answer.

8             THE WITNESS:  That's correct.

9   BY MS. GREEN:

10       Q.    Right.  And that's what you do every time

11  you testify, you talk to the attorney who is going to

12  be asking you questions and you tell them in advance

13  of getting on the stand, you go through your testimony

14  and talk about what you can say and how the testing

15  works so they can prepare their examination, right?

16            MR. KAMIONSKI:  Objection to form of the

17  question, calls for speculation.

18            You can answer.

19            THE WITNESS:  Yes --

20            MS. AMATO:  Join.

21            THE WITNESS:  -- I prepare a report.



 1  BY MS. GREEN:

 2       Q.   Okay.

 3            And you explain to -- verbally to the

 4  prosecutor the limits of the testing and the meaning

 5  of the testing to the extent they have any questions,

 6  right?

 7            MR. KAMIONSKI:  Objection to the form of the

 8  question.

 9            You can answer.

10            THE WITNESS:  Right, go over testimony.

11  BY MS. GREEN:

12       Q.   I'm sorry?

13       A.   That's correct.

14       Q.   Okay.

15       A.   I'm sorry.

16       Q.   And you also -- but it sounds like when

17  you're working in the lab, your main contact is with

18  the lead investor in the case, right?

19            MR. KAMIONSKI:  Objection to the form of the

20  question.

21            You can answer.



1               THE WITNESS:  That would be correct.

2    BY MS. GREEN:

3        Q.   There -- when you were in the Trace Analysis

4    Unit, the investigator is the one that you coordinate

5    with to learn about what the case is all about, right?

6        A.   Yes.

7        Q.   What evidence that they're looking at

8    getting tested, right?

9        A.   That's correct.

10       Q.   What -- you explain the type of testing

11   you're able to do, right?

12       A.   That's correct.

13       Q.   They explain what they're looking for in

14   terms of --

15       A.   Yes.

16       Q.   -- that's right, the investigator?

17              MS. AMATO:  Objection to the form of the

18   question.

19              MR. KAMIONSKI:  Join.

20              You can answer, if you understand.

21              THE WITNESS:  That's what the evidence that



Case 1:19-cv-00384-ELH   Document 186-1   Filed 05/12/21   Page 54 of 388
BARRY SCOTT VERGER                                          April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police              53

1    I find, it's usually not in my hands whether it goes

2    to -- it goes to court or not.

3    BY MS. GREEN

4         Q.   I'm not talking about whether it goes to

5    court.  I'm talking about your job as an expert in the

6    BPD is to talk to investigators and help them when

7    they needs forensic analysis done in a case, right?

8         A.   That's correct.

9         Q.   And part of that job as the expert, is

10   explaining to the investigator hey, we can't test

11   this, we don't have the capability to test that.

12            Hey, I visualize a stain.  Like, do you want

13   us to do X. Y, Z type of testing?

14            That was your job?

15            MR. KAMIONSKI:  Objection to the form of the

16   question.

17            THE WITNESS:  That -- that all depends on

18   what kind of information you're looking for.  It's a

19   -- if the evidence had to -- if it involved blood and

20   wanting to get DNA testing, that was out of my hands.

21   BY MS. GREEN:



1    Q.   Okay.  We'll come back to that.  I'm very

2    interested in that.

3         But right now, I want to talk about your

4    communication with investigators generally.  Okay?

5    You with me?

6    A.   Sure.  Go ahead.

7    Q.   All right.  So in a homicide case you

8    typically speak with the detective regularly before

9    you conducted any forensic testing.  Is that right?

10        MR. KAMIONSKI:  Objection to the form of the

11   question.

12        You can answer.

13        THE WITNESS:  I don't recollect that.

14   BY MS. GREEN:

15   Q.   You just told me the investigator would call

16   -- you'd talk to the investigator and they'd tell you

17   what the case is all about and what they're looking

18   for.  Are you changing your testimony?

19        MR. KAMIONSKI:  Objection, that

20   mischaracterizes his testimony, objection to the form

21   of the question.



1              You can answer.

2              MS. AMATO:  Join.

3              THE WITNESS:  I don't recollect talking to

4    them.  Like I said, I don't recollect talking to any

5    attorney about this case.

6    BY MS. GREEN:

7         Q.   I'm sorry.  There must have been a

8    miscommunication.  I'm talking about the detective.

9         A.   All right.

10        Q.   I'm not talking about this case.  I'm

11   talking about your practice.  Okay?  Are you with me?

12        A.   No.  Are you talking about in general for

13   all cases or just the --

14        Q.   Yeah.  You've been working in the BPD as an

15   expert for decades, and I'm asking you -- and you've

16   been assisting in criminal investigation by conducting

17   forensic testing.  Is that right?

18        A.   That's correct.

19        Q.   All right.

20             Now, I'm asking you how it works.  You've

21   been at this place for a long time.  You know how it



Case 1:19-cv-00384-ELH   Document 186-1   Filed 05/12/21   Page 57 of 388
BARRY SCOTT VERGER                                    April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police              56

1  works when you're working on a criminal investigation.

2  You talk to the detectives before you do any testing.

3  This is not controversial.

4          MR. KAMIONSKI:  Objection to the form of the

5  question.

6          THE WITNESS:  I don't recollect any of the,

7  you know, whether I talked to the detective before or

8  after I did the analysis.  I'm sure I did speak to the

9  detective, but I can't recollect, you know, whether I

10  did or not in this case.

11  BY MS. GREEN

12     Q.   I'm talking about your practice.

13     A.   Right.  I'm talking about -- I'm talking

14  about in cases, too.

15     Q.   Listen, this case -- let's just take a step

16  back.  This case happened back in 1999, right?

17     A.   That's correct.

18     Q.   A lot's happened in your life since 1999,

19  right?

20          MR. KAMIONSKI:  Objection to the form of the

21  question.



Case 1:19-cv-00384-ELH   Document 186-1   Filed 05/12/21   Page 58 of 388
BARRY SCOTT VERGER                                        April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police                    57

 1             THE WITNESS:  Yes.

 2    BY MS. GREEN:

 3        Q.   You are not going to remember everything

 4    that happened in 1999, correct?

 5        A.   That's correct.

 6        Q.   So I understand that.  That's a challenge we

 7    have in this case, and so instead of asking you -- I'm

 8    going to ask you some questions about the way it

 9    worked in your practices to try and get at what you

10    would have done, right?

11        A.   Yes.

12        Q.   Even if you don't remember a specific

13    conversation, I'm asking about your general practice.

14    Okay?  Does that make sense?

15        A.   Yes, that's correct.  Yes.

16        Q.   Okay.  And that's why I'm asking it that

17    way, because I know you may not remember everything.

18    Okay?

19        A.   Okay.

20        Q.   So generally when you were working

21    in the Trace Analysis Unit, you would typically have a



1    conversation with the detective on the case before you

2    began doing testing, correct?

3        A.   I don't recollect that.  I believe I did the

4    testing.  I just can't remember.

5        Q.   Okay.

6             Sometimes you'd have conversations with

7    detectives before you did testing?

8        A.   That could be correct.  I'm not sure.  I

9    don't recollect all the, you know, what came before

10   and what went after.

11       Q.   You work in the BPD right now, right?

12       A.   Yes.

13       Q.   You talk with detectives right now?

14       A.   No.

15       Q.   You never speak with detectives?

16       A.   No, I don't.

17       Q.   Why not?

18            MR. KAMIONSKI:  Objection to the form of the

19   question.

20            You may answer.

21            THE WITNESS:  Well, the police officers



Case 1:19-cv-00384-ELH   Document 186-1   Filed 05/12/21   Page 60 of 388
BARRY SCOTT VERGER                                    April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police              59

 1  submit the drugs.  The drugs are brought from the

 2  evidence control section up to our lab, dropped in a

 3  bowl.

 4          We go in there and we take the drugs out and

 5  we analyze them.  And then it goes back downstairs.

 6  There's no detect -- no talking to detectives or

 7  anything.

 8  BY MS. GREEN:

 9      Q.   What about police officers, do you ever talk

10  to police officers in your work?

11      A.   No, I don't.

12      Q.   Before you were in the Drug Analysis Unit,

13  did you talk to police officers?

14      A.   When I was in the Mobile Unit on the crime

15  scene, I had to talk to the detectives to find out

16  what he wanted in the case.

17      Q.   Okay.

18      A.   If he needed photographs, I took

19  photographs.  If we needed -- if he thought that this

20  was pertinent to the case, I'd pick up the evidence

21  and submit it.



Case 1:19-cv-00384-ELH   Document 186-1   Filed 05/12/21   Page 61 of 388
BARRY SCOTT VERGER                                          April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police                    60

1        Q.   All right.

2             What about in the Trace Analysis Unit, any

3   -- did you ever have any conversations as part of your

4   job with police officers or detectives or any other

5   type of investigator when you were working in the

6   Trace Analysis Unit?

7        A.   They --

8             MR. KAMIONSKI:   Objection, asked and

9   answered.

10            You can answer.

11            THE WITNESS:   Yes, they came up to the

12   office and -- to discuss the case.  But I don't

13   recollect whether -- I was pretty much collecting

14   evidence, you know, they give you the -- whatever

15   needed to be examined and they told you, you know, to

16   do the examination.

17   BY MS. GREEN

18        Q.   Okay.

19        A.   And I just did it, but I don't recall

20   talking to the detectives about, you know, what you're

21   trying to --



Case 1:19-cv-00384-ELH   Document 186-1   Filed 05/12/21   Page 62 of 388
BARRY SCOTT VERGER                                          April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police                    61

1     Q.   That is what I'm talking about.  So

2  detectives were often in the office and they'd give

3  you the evidence and explain the case, right?

4     A.   Right.  We brought the evidence upstairs on

5  our own from the evidence control section.  The

6  evidence was already upstairs when I pulled it out of

7  storage to do my examination.

8     Q.   All right.  And before you did that

9  examination, you'd have conversations with the

10 detectives about the testing you were going to do and

11 the evidence?

12          MS. AMATO:  Objection, asked and answered.

13          MR. KAMIONSKI:  Join.

14          You can answer again.

15          THE WITNESS:  Like I --

16 BY MS. GREEN:

17     Q.   Just said --

18     A.   I'm sorry?

19     Q.   You just said that there was --

20          MR. KAMIONSKI:  Let him answer the question.

21 You asked a question and he can answer the question.



1          MS. GREEN:  I'll withdraw the question.

2    BY MS. GREEN:

3       Q.   Did you just say that you -- there were

4    detectives in the office?

5       A.   No, there were not -- not when I'm -- when

6    I'm doing my examinations, no detectives were around.

7       Q.   Sure.  You said there were detectives in and

8    out of the office.  I'm not talking about when you're

9    doing your forensic examination.  I understand there's

10   contamination issues and all sorts of things.

11          But you would have face-to-face

12   conversations with detectives, that's what you just

13   said.

14          MS. AMATO:  Objection, mischaracterizes his

15   testimony.

16          MR. KAMIONSKI:  Objection, mischaracterizes

17   his testimony, form.

18          You can answer.

19          THE WITNESS:  There were officers,

20   detectives who came up, but I don't recollect talking

21   to them about the case.  I could have already started



Case 1:19-cv-00384-ELH   Document 186-1   Filed 05/12/21   Page 64 of 388
BARRY SCOTT VERGER                                      April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police                63

1  my examination before they -- before I spoke with

2  them.

3  BY MS. GREEN:

4      Q.   Okay.  Well, I'm going to show you what I

5  have marked today -- so just so I understand your

6  position, you do not recall ever having a single

7  conversation with a detective when you were in the

8  Trace Analysis Unit before you started testing rape

9  kits, blood evidence, homicide evidence, that's not

10  something you did?

11          MR. KAMIONSKI:  Objection to the form of the

12  question.  Mischaracterizes testimony, compound --

13          MS. AMATO:  Join.

14          MR. KAMIONSKI: -- question.

15          You can answer if you understand the

16  question.

17          THE WITNESS:  That's correct.  I don't

18  recollect talking to a detective or an officer before

19  I did my examination.

20  BY MS. GREEN:

21      Q.   And taking -- let's take a rape kit, for



 1  example, right?  That's something that you would test?

 2      A.   That's correct.

 3      Q.   Before you tested rape kit evidence for a

 4  rape, you had zero conversations with any

 5  investigating officers on a case about the case?

 6      A.   That is correct.

 7      Q.   Okay.

 8           You also tested other evidence for the

 9  presence of other type of substances, right?

10           What type of substances would you test for

11  in the Trace Analysis Unit?

12      A.   Test for bodily fluid.

13      Q.   Okay.

14      A.   Which includes blood and semen.

15      Q.   Did you ever have any conversations with

16  detectives before you tested homicide evidence for

17  bodily fluid?

18      A.   No, I don't recollect any conversations

19  before -- before I did it.

20      Q.   And I take it there wasn't any information

21  that you needed to learn from detectives to do your



```
 1   testing?

 2              MS. AMATO:  Objection to the form of the

 3   question.

 4              MR. KAMIONSKI:  You can answer.

 5              THE WITNESS:  Can you rephrase that one more

 6   time?

 7   BY MS. GREEN:

 8       Q.   I'll withdraw the question.

 9              MR. KAMIONSKI:  Let us know when there is a

10   good time for a bathroom break.

11              MS. GREEN:  I was going go in to something

12   else.  So I think we can do one right now.  Why don't

13   come back at 11:10.  Is that okay?

14              MR. KAMIONSKI:  Sounds great.

15              THE VIDEOGRAPHER:  We're going off the

16   record.

17              The time is 11:02.

18              (Whereupon, a recess ensued.)

19              THE VIDEOGRAPHER:  We're back on the record.

20              The time is 11:12.

21   BY MS. GREEN:
```



1      Q.   All right.  Just to close the loop on our

2    last -- where we left off, Mr. Verger, when you were

3    in Trace Analysis Unit, did you have conversations

4    with investigators before you conducted testing for

5    semen and blood?

6              MS. AMATO:  Objection.

7              THE WITNESS:  I did not.

8              MR. KAMIONSKI:  You can answer.

9              THE WITNESS:  I do not recollect having

10   conversations before I conducted examinations.

11   BY MS. GREEN:

12     Q.   And you say you do not recollect.  Do you

13   think it could have happened and you just don't

14   remember the conversations, or are you saying it never

15   happened?

16             MR. KAMIONSKI:  Objection, asked and

17   answered.

18             You can answer.

19             THE WITNESS:  I don't recollect.  That's all

20   I'm saying.  It's been a long time.  I don't recollect

21   whether that had happened or not.



```
 1   BY MS. GREEN:
 2        Q.   Okay.  You cannot dispute that you would
 3   have conversation -- if an investigator testified I
 4   did have a conversation with Mr. Verger before he did
 5   the testing, you don't have any basis to dispute that?
 6        A.   That would be correct.
 7             MS. AMATO:  Objection to the form of
 8   question, calls for speculation, incomplete
 9   hypothetical.
10             MR. KAMIONSKI:  Join.
11   BY MS. GREEN:
12        Q.   Now, I think we covered this but in terms of
13   your work in the Trace Analysis Unit, you understood
14   that the testing that you were doing could provide
15   important evidence leading to either the inclusion or
16   elimination of suspects, correct?
17        A.   That is correct.
18        Q.   And that was -- so you understood when you
19   were in the Trace Analysis Unit that the evidence that
20   you were handling could potentially lead to a suspect
21   being convicted, correct?
```



1    A.    That's correct.  That's my job, is to

2  examine evidence.

3    Q.    And you also understood on the other hand

4  that the evidence you were handling had the capability

5  to exonerate a suspect as well, correct?

6    A.    That's correct, that's impartiality.

7    Q.    And I take it that was always in the back of

8  your mind when you were doing your testing, you

9  understood the power of forensic evidence in a

10  criminal prosecution, correct?

11         MR. KAMIONSKI:  Objection to the form of the

12  question.

13         You can answer.

14         THE WITNESS:  I was very -- I was impartial

15  to whatever I had to examine.  It didn't have a name

16  in my mind to it.

17  BY MS. GREEN:

18    Q.    Okay.  That's not my question.  I'm just --

19  you understood it was important evidence?

20    A.    That's correct.

21    Q.    Whether it -- and had the power to determine



1   the results of a criminal prosecution regardless of

2   what the result may be, correct?

3           MR. KAMIONSKI:  Objection to the form of the

4   question, asked and answered.

5           You can answer.

6           THE WITNESS:  Correct.

7   BY MS. GREEN:

8       Q.   Okay.  And I take it that's why you were so

9   careful in understanding the laboratory protocols and

10  procedures?

11      A.   Yes.  Correct.

12      Q.   And why you followed them to the best of

13  your ability in every case, right?

14      A.   That's correct.

15      Q.   Okay.

16          Now, as I understand it back in 1999, the

17  Baltimore Police Department did not have a lab -- the

18  lab was not doing DNA testing yet.  Is that right?

19      A.   That is correct.

20      Q.   Okay.  So if you wanted to do DNA testing,

21  there were a number of labs that you could potentially



Case 1:19-cv-00384-ELH   Document 186-1   Filed 05/12/21   Page 71 of 388
BARRY SCOTT VERGER                                        April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police                  70

1    send the testing, the items to, correct?

2          A.   That's correct.

3          Q.   And it was your -- although you didn't -- so

4    you didn't do DNA testing as Barry Verger, correct?

5          A.   That's correct.

6          Q.   But you did work as a liaison and coordinate

7    sending items that were -- that needed DNA testing out

8    to the appropriate lab, correct?

9          A.   That's correct.

10         Q.   And in doing that, you would of course

11   confer with the investigator on the case to let them

12   know where you were sending their homicide evidence,

13   right?

14         A.   That's, when I find evidence, the -- they

15   determine whether it goes out for DNA testing.

16         Q.   Okay.

17              So it sounds like the detective was the

18   decisionmaker in terms of which items went out for DNA

19   testing and which didn't.  Is that right?

20         A.   That's my supervisor, yes.

21         Q.   Okay.



 1           And I take it your supervisor would have

 2    been relying on the detective to let them know what

 3    needed to be done on any particular case, right?

 4           MR. KAMIONSKI:  Objection to the form of the

 5    question, calls for speculation.

 6           MS. AMATO:  Join.

 7           MR. KAMIONSKI:  Go ahead.

 8           THE WITNESS:  That part, I wouldn't know.

 9    BY MS. GREEN:

10      Q.   Okay.  So the detectives would make the

11    request for items that needed to be DNA tested and

12    after approval from your supervisor, you'd coordinate

13    sending it out.  Is that right?

14           MR. KAMIONSKI:  Objection to the form of the

15    question, calls for speculation.

16           You can answer.

17           THE WITNESS:  Right.  I don't know how they

18    determine what went out for DNA testing.  I'm sure

19    they spoke to each other for sure.

20    BY MS. GREEN:

21      Q.   Okay.  And this was the practice -- and was



1   it -- just so you know, I'm talking about Trace

2   Analysis Unit when we're in 1998 to 1999.  Okay?

3        A.   Yes.

4        Q.   And in any event, you coordinated sending

5   items out for DNA testing?  I have literally letters

6   written by you sending something to like, a DNA lab.

7   That was part of your job, right?

8        A.   Right.  That was not my decision, whether to

9   I send it out to the DNA lab.  That was somebody

10  else's decision.

11       Q.   And that other -- that somebody else was the

12  detective on the case, right?

13       A.   Detective and a supervisor.

14       Q.   And you take your cues from them, right?

15       A.   That's correct.

16       Q.   And just to be clear, your supervisor on

17  this case was Mark Profili, right?

18       A.   That's correct.

19       Q.   All right.

20            So I'm going to be deposing him on May 3rd,

21  so I'll ask him about that too.  Okay?



Case 1:19-cv-00384-ELH   Document 186-1   Filed 05/12/21   Page 74 of 388
BARRY SCOTT VERGER                                      April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police                73

1      A.    Okay.

2      Q.    Now, by the way, we had a lot of trouble

3  getting any of your training exams in this case when

4  we requested documents.  We were trying to kind of see

5  exactly what exams you took when you went in to the

6  Trace Analysis Unit.

7           Has anyone ever asked you to look in your

8  personal files for your training -- your personal

9  training records?

10     A.    They did.  And I couldn't find any.

11     Q.    All right.

12           You do not have any training records in your

13  personal possession?

14     A.    No, I don't.

15     Q.    You did not maintain any documents relating

16  to forensic examinations that you conducted?

17     A.    No, I don't normally keep that stuff.

18     Q.    That's supposed to be keep at the BPD.  Is

19  that right?

20     A.    That's correct.

21           MS. AMATO:   Objection.



Case 1:19-cv-00384-ELH   Document 186-1   Filed 05/12/21   Page 75 of 388
BARRY SCOTT VERGER                                      April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police              74

1  BY MS. GREEN:

2      Q.   As a BPD employee, is it your understanding

3  that the BPD is like supposed to maintain your

4  training history and the different examinations that

5  you pass when you are in their training program?

6           MS. AMATO:  Objection to the form of the

7  question, calls for speculation.

8           MR. KAMIONSKI:  Form.  Join.

9           You can answer.

10          THE WITNESS:  Yes.

11 BY MS. GREEN:

12     Q.   Okay.

13          Do you know anyone other than the BPD who

14 would have that information?

15     A.   I don't.

16     Q.   All right.  So now, I'd like to move and

17 talk a little bit about your work in the case.

18          One document that we did get on your

19 training indicates that when you joined the Trace

20 Analysis Unit you went through a training program that

21 had about approximately one-month of training on blood



BARRY SCOTT VERGER                                          April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police                    75

```
 1  analysis?

 2        A.   I don't recollect that but --

 3        Q.   You don't have a reason to dispute it,

 4  though?

 5        A.   No, I don't.

 6        Q.   So, at the trial in this case, you were

 7  qualified as an expert in serology relating to the

 8  identification of particular bodily fluids, correct?

 9        A.   That is correct.

10        Q.   And you considered yourself an expert as it

11  relates to the use and interpretation of the

12  leucomalachite green test, correct?

13        A.   Correct, at that time.  Yes.

14        Q.   Yes.  I know it's been a while.  And at the

15  time of the trial, you put yourself forth as an expert

16  to the Court and the jury, correct?

17        A.   Yes, I did.

18        Q.   You understood that you were testifying in a

19  homicide case, right?

20        A.   That's correct.

21        Q.   You had an obligation to tell the truth at
```



Case 1:19-cv-00384-ELH   Document 186-1   Filed 05/12/21   Page 77 of 388
BARRY SCOTT VERGER                                    April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police                76

1  trial?

2      A.   That's correct.

3      Q.   That's what you did, right?

4      A.   That's correct.

5      Q.   You understood that it's part of telling the

6  truth, is if you don't know the answer to a question

7  that's posed, you just have to say you don't know.

8  You can't guess, right?

9          MR. KAMIONSKI:  Objection to the form of the

10  question.

11          THE WITNESS:  Correct.

12  BY MS. GREEN:

13      Q.   And that's what you're doing today?  You're

14  telling the truth and telling me when don't know and

15  when you're answering, your -- it's truthful

16  testimony, right?

17      A.   That's correct.

18      Q.   Now, at trial you testified about testing --

19  leucomalachite green telling, right?

20      A.   That's correct.

21      Q.   And you conducted leucomalachite green



 1   telling on a number of items of evidence in this case,

 2   correct?

 3        A.   That's correct.

 4        Q.   And one item that you conducted such testing

 5   on were the victim's fingernails, right?

 6        A.   That's correct.

 7        Q.   All right.  And you started -- well you

 8   received the fingernails, right?

 9        A.   That's correct.

10        Q.   All right.  And as part of your job, the

11   leucomalachite green test is a test that you conduct

12   to see if a substance is blood, correct?

13        A.   That's correct.

14        Q.   So you --

15        A.   If possible, yes.

16        Q.   If possible?

17        A.   Yes.

18        Q.   It's a presumption test, right?

19        A.   Yes.

20        Q.   All right.  And so when you're conducting

21   this testing with respect to the fingernails, the



1  first thing that you do is you visualize the nails to

2  see if you can see any stains on the nails that could

3  be blood that you could test, right?

4       A.   That's correct.

5       Q.   And, so, before you even conduct a

6  leucomalachite green test, you would have looked at

7  the victim's fingernails and looked for red stains

8  that might be blood, right?

9       A.   That's correct.

10      Q.   Now, and as I understand it when you conduct

11 a leucomalachite green test, you use a swab or a tip

12 of filter paper to -- and you rub the blood like

13 substance in so that you get it on the tip of the

14 filter paper, correct?

15      A.   That's correct.  I believe the -- it has to

16 be like moist.

17      Q.   Okay.  Yes.  You take deionized water and

18 put it on just a moist swab.  The idea is you're

19 trying to transfer what you think might be the blood

20 like substance to the swab, right?

21      A.   That's correct.



Case 1:19-cv-00384-ELH   Document 186-1   Filed 05/12/21   Page 80 of 388
BARRY SCOTT VERGER                                    April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police              79

1    Q.    And then you conduct the testing on the

2   blood-like substance directly on the swab, right?

3    A.    That's correct.

4    Q.    Or the -- the piece of filter paper.  Did

5   you use filter paper, like the tip of a filter paper,

6   or did you use a swab?

7    A.    I don't recollect what I used.

8    Q.    But one or the other, right?

9    A.    Possibly correct.

10   Q.    Okay.  In any event, you're transferring the

11  blood-like substance to another item and then

12  performing the testing on that other item, correct?

13   A.    Right.

14   Q.    And --

15   A.    I took a sample and -- and conduct my

16  examination on the sample from the papers.

17   Q.    And the reason that you do that is

18  because -- well -- withdrawn.

19        As I understand it, when you have that

20  sample, the first thing you're going to do is apply

21  the leucomalachite green to it, right?



Case 1:19-cv-00384-ELH   Document 186-1   Filed 05/12/21   Page 81 of 388
BARRY SCOTT VERGER                                    April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police              80

```
 1          A.    Correct.

 2          Q.    And then you wait some amount of time, then

 3   you apply hydrogen peroxide, right?

 4          A.    That's correct.

 5          Q.    And then if the sample turns like this

 6   blue-green color, right, blue-green color, that means

 7   it's presumptively positive for the presence of blood,

 8   right?

 9          A.    That's correct.

10          Q.    Okay.  Let's put on the screen -- I don't

11   need you to hand this to him, Avi or Mr. Kamionski.

12   I'm just going to show him something very briefly.

13   Mr. Verger's testimony at Page 128.

14                And I guess we will mark this Exhibit Number

15   85.

16                (Verger Exhibit No. 85 was marked for

17   identification.)

18                MS. GREEN:  Mr. Verger's trial testimony.

19                MS. BROWN:  What page did you say?

20                MS. GREEN:  178, please.

21                MR. KAMIONSKI:  Can you make it bigger?
```



1   It's kind of small.

2            MS. GREEN:  178, there you are.

3            THE WITNESS:  I see it.

4   BY MS. GREEN:

5       Q.   All right.  Just read the page to yourself

6   and let me know when you're done, or we can scroll

7   through when you're ready.

8       A.   You got to scroll up.  You went a little bit

9   too far.  Okay.  Keep going.  Okay.

10      Q.   Okay.  So we can take that off the screen.

11           So there your -- you reviewed this testimony

12  before the deposition today, right?

13      A.   Correct.

14      Q.   And so there you're testifying in response

15  to questions from the Court and in response to

16  questions from Mr. Mabrey, the prosecutor, that the

17  samples, the blood samples were consumed in the test,

18  correct?

19      A.   Yes, the blood samples were consumed in the

20  test.

21      Q.   Okay.



Case 1:19-cv-00384-ELH   Document 186-1   Filed 05/12/21   Page 83 of 388
BARRY SCOTT VERGER                                          April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police                    82

1           And then -- that is in fact what happened?

2  The blood samples, the blood stains from the nails

3  were consumed within the leucomalachite green test,

4  correct?

5      A.   Yes, in both tests.

6      Q.   Okay.

7           So let's --

8           MS. GREEN:  Actually if you don't mind, Avi,

9  it might be easier if you just hand out the testimony.

10 It should be there.  The only testimony we have

11 current copies of.

12          MR. KAMIONSKI:  He's got them in front of

13 him now.

14          MS. GREEN:  All right.

15 BY MS. GREEN:

16     Q.   So, why don't you turn with me to Page 179?

17     A.   Okay.  I got it.

18     Q.   Look at Line 15 to 23, just read it to

19 yourself.

20     A.   Twenty-three.

21          MR. KAMIONSKI:  From which line, starting



1   from what?

2          MS. GREEN:   From 15 to 23 on Page 179,

3   please.

4   BY MS. GREEN:

5      Q.   So here you're also testifying again, to

6   questions from Mr. Mabrey that the -- all the blood

7   from the nails were consumed in your analysis,

8   correct?

9      A.   Yes, all of the samples were consumed.

10     Q.   Okay.  And the samples were the blood

11  samples, correct?

12     A.   I don't remember what the results were, but

13  yes.

14     Q.   Okay.  Yeah.  I'll show you the results.

15          The red stains were consumed, correct?

16     A.   Red stains, yes.

17     Q.   So when you did the testing, you consumed

18  all of the red stains on the nails?

19     A.   That's correct.

20     Q.   And what you're telling the Court is because

21  you consumed all the red stains on the nails, they



 1  couldn't be tested any further.  Is that right?

 2      A.   That's correct, the samples were consumed.

 3      Q.   Okay.

 4           And they couldn't be DNA tested any further,

 5  you're telling the Court that as well, right?

 6           MR. KAMIONSKI:  Objection to the form of the

 7  question, calls for speculation, foundation.

 8           MS. AMATO:  Join.

 9  BY MS. GREEN:

10      Q.   Let me read it to you.

11           "Can those stained nails be tested for DNA

12  or once they're consumed, that's it?

13           ANSWER:  "Once they're consumed, that's it."

14           There you're testifying that --

15      A.   Well, if it's consumed there's nothing left

16  to be tested.

17      Q.   Right.  All the red stains on the nails were

18  destroyed in your testing, correct?

19      A.   That's correct.

20      Q.   The red stains could not be DNA tested.

21  There was nothing left, right?



1        A.    That's correct.   The analyses destroys --

2    totally destroys the DNA.

3        Q.    Right.

4        A.    It's consumed.   It's altered.

5        Q.    And that's something that you were trained

6    on, that the leucomalachite green test is a

7    destructive test, right?

8        A.    Correct.

9        Q.    Basic forensics, right?

10       A.    Correct.

11       Q.    And you understood that when you do that

12   test, the DNA in any sample that you're testing is

13   destroyed, right?

14       A.    That's correct.

15       Q.    And, so, for that reason, you're testifying

16   to the Court the nails could not be tested for DNA,

17   right?

18       A.    Yes, referring to the sample.

19       Q.    All right.

20             So when you're testifying here, you were

21   asked a question, Line 16, "Can those same nails be



1  tested or once they're consumed, that's it?"

2          ANSWER:  "Once they're consumed, that's it."

3          Did I read that correctly?

4      A.   Yes.  I was referring to the sample.

5      Q.   All right.  Did you use the word "the

6  samples?"

7      A.   No, but, I was referring to the sample.

8      Q.   Okay.  Fair enough.  But you'd agree that

9  the transcript -- in the transcript, Mr. Mabrey is

10  asking you can the nails be tested for DNA?

11     A.   No.  Like I said, I was referring to the

12  samples at issue.  I don't know if, you know, if

13  that's what he meant.  The nails were not destroyed.

14     Q.   Okay.  You agree now, the nails weren't

15  destroyed, right?

16     A.   Yes.

17     Q.   Now, I'm asking you an easy question.

18     A.   Yes.

19     Q.   You can read the transcript.  Okay?

20          MR. KAMIONSKI:  Objection to the form of the

21  question and the tone of the question.



1  BY MS. GREEN:

2      Q.   You were asked the question, can those same

3  nails be tested for DNA, right?

4      A.   Yes.  But, I was referring to the sample

5  when I said the nails.

6      Q.   Sir, you've already said that a few times.

7  You got to answer my question.  Okay?

8          MR. KAMIONSKI:  He is answering your

9  question.

10 BY MS. GREEN:

11     Q.   Can those same nails be tested for DNA?  Did

12 I read that correctly, that's the pending question.

13         MR. KAMIONSKI:  Objection to the form of the

14 question, asked and answered.

15         You can answer again.

16         THE WITNESS:  I was referring to the sample

17 that was under the nails.

18 BY MS. GREEN:

19     Q.   You're not willing to answer yes or no, did

20 I read that correctly?

21         MR. KAMIONSKI:  Objection to the form of the



```
 1   question.

 2            THE WITNESS:  I don't -- I don't recollect.

 3   I just was referring to the sample when I said it was

 4   consumed in analysis.

 5   BY MS. GREEN:

 6        Q.   Sir, can you read?

 7        A.   Yes, I can.

 8        Q.   Can you --

 9            MR. KAMIONSKI:  Objection to the question.

10   BY MS. GREEN:

11        Q.   Can you please look with me to the

12   transcript on Page 179, Lines 16 to 17, please?

13            Do you see the word "Can those same nails be

14   tested for DNA," appear on the transcript?

15        A.   Yes, they do.

16        Q.   The word "used" is nails, correct?

17        A.   That's correct.

18        Q.   The word "sample" is nowhere in this

19   question and answer.  Is that right?

20        A.   That's correct.

21        Q.   And you answered, "Once they're consumed,
```



1  that's it."   Did I read that correctly?

2       A.   Yes, you did.

3       Q.   Is it your position that a transcription

4  error was made by the court reporter?

5       A.   That, I don't know.

6       Q.   You think that's a possibility?  You think

7  you said sample and she didn't take it down; he or

8  she?

9       A.   I don't know.

10      Q.   All right.  Do you have a memory of

11  answering that question and saying the word "sample?"

12      A.   I don't -- I don't recollect my testimony.

13  It was 20 years ago today.

14      Q.   So 20 years later after meeting with your

15  attorney --

16      A.   I still don't remember 20 years ago when I

17  testified.

18      Q.   Fair enough.

19           But now, 20 years later after meeting with

20  your attorney you're able to tell me what you meant

21  when you answered once they're consumed, that's it.



1    Although you didn't use the word "samples," you were

2    saying sample.  Is that right?

3         A.   I had in my mind samples.

4              MS. AMATO:  Objection.

5              MR. KAMIONSKI:  Join.

6    BY MS. GREEN:

7         Q.   Well, 20 years -- well, 22 years --

8              MR. KAMIONSKI:  Objection -- objection,

9    asked and answered.

10             You may answer.

11   BY MS. GREEN:

12        Q.   You remember that you had supplied the word

13   "sample?"

14             MR. KAMIONSKI:  And you can answer again.

15   Objection, asked and answered.

16             THE WITNESS:  I'm referring to the sample

17   when I'm talking about the nail.

18   BY MS. GREEN:

19        Q.   Okay.  Got it.

20             Do you know -- do you think someone would

21   fairly read this transcript -- do you think a



1   layperson could read this transcript and know that

2   you're referring to the word "sample?"

3           MR. KAMIONSKI:  Objection to the form of the

4   question, calls for speculation.

5   BY MS. GREEN:

6       Q.   When you said once they're consumed, that's

7   it in response to a question about whether the nails

8   can be tested for DNA?

9       A.   I can't -- I can't put my -- I can't answer

10  for somebody else.

11      Q.   Do you agree that is a fair reading of the

12  transcript, one fair reading of the transcript is that

13  you were testifying that the nails were consumed,

14  right?

15          MR. KAMIONSKI:  Objection to the form of the

16  question, asked and answered.

17          You can answer again.

18          THE WITNESS:  I was referring to the samples

19  being consumed.

20  BY MS. GREEN:

21      Q.   I understand what you now say you were



 1  referring to.  And that's fine, I'm not disputing

 2  that.

 3       I'm just asking, do you think it's a fair

 4  reading for someone to read it and interpret it --

 5  someone like me, who's not an expert like you to --

 6  that you're saying the nails were consumed?  Is that a

 7  fair reading?

 8       MR. KAMIONSKI:  Objection to the form of the

 9  question, asked and answered.

10       You can answer again.

11       THE WITNESS:  I really couldn't tell you.

12  You know, it's up to the person, you know, reading it.

13  BY MS. GREEN:

14    Q.  Is it your job as an expert to give clear

15  impartial testimony?

16       MR. KAMIONSKI:  Objection to the form of the

17  question.

18       THE WITNESS:  Yes.

19  BY MS. GREEN:

20    Q.  That's an obligation you have, right?

21    A.  Yes, to tell the truth.



1    Q.   Okay.  In any event, I'm glad you're

2  cleaning this up now and I think I understand it.

3         You -- every sample -- every stain that

4  could have possibly been blood were consumed in the

5  testing, right?

6         MR. KAMIONSKI:  Objection, misstates his

7  testimony.

8         MS. AMATO:  Join.

9         THE WITNESS:  I don't understand.  I don't

10  understand what you're getting at.

11  BY MS. GREEN:

12    Q.   I'm off the nails sample thing.  I'm going

13  with your testimony today, which is you were -- you

14  were trying to say not that the nails were consumed

15  but rather the blood stains were consumed, right?

16    A.   That's correct.

17    Q.   You're saying blood stain -- and when you're

18  saying samples, you're referring to the red stains on

19  the nails that you saw?

20    A.   Right, samples taken from the fingernails.

21    Q.   Okay.  So every potential stain on the nails



```
 1  that you thought could be blood potentially was

 2  consumed by your telling?

 3           MR. KAMIONSKI:  Objection to the form of the

 4  question, asked and answered.

 5           You can answer.

 6           THE WITNESS:  Whatever was in the sample was

 7  destroyed.

 8  BY MS. GREEN:

 9      Q.   Okay.

10           And when you picked up the sample, when you

11  make the sample -- like there was no -- this is your

12  whole point here.  There was no blood left to test,

13  right.

14           MR. KAMIONSKI:  Objection to the form,

15  mischaracterizes his testimony.

16           You can answer again.

17           THE WITNESS:  Whatever sample I took, and I

18  thought I took it all, was consumed in analysis.

19  BY MS. GREEN:

20      Q.   Right.  Because if you hadn't taken it all,

21  you could have said hey, take this and DNA test that,
```



 1  right?  But you actually took all the staining off the

 2  nails and it was consumed and that's why you gave that

 3  testimony here, right?

 4        MR. KAMIONSKI:  Objection to the form of the

 5  question, mischaracterizes his testimony.

 6        MS. AMATO:  Join.

 7        MR. KAMIONSKI:  You can answer.

 8        THE WITNESS:  That's correct.  The sample

 9  was consumed.

10  BY MS. GREEN:

11     Q.   Okay.

12        And so, you're testifying here at trial no

13  DNA testing could be done because you consumed the

14  material, potential blood-like material, right?

15        MR. KAMIONSKI:  Objection, asked and

16  answered.

17        You can answer again.

18        THE WITNESS:  That's correct.  Pertaining to

19  the sample I took from the nails.

20  BY MS. GREEN:

21     Q.   All right.  You understood even as you were



Case 1:19-cv-00384-ELH   Document 186-1   Filed 05/12/21   Page 97 of 388
BARRY SCOTT VERGER                                           April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police                    96

1   testifying, even at the time you did the testing that

2   the nails still remained, right?

3        A.   Yes.  I knew the nails were still around.

4   They were not destroyed.

5        Q.   You knew that through the entirety of your

6   work on this case, correct?

7        A.   That's correct.  I sealed them up and -- and

8   they were put in a safe place.

9        Q.   Okay.  I would now, like to go to what I

10  believe are -- sorry.  I'm losing my documents.

11            MR. KAMIONSKI:  I need a two-minute break.

12            MS. GREEN:  Okay.

13            THE VIDEOGRAPHER:  Off the record.

14            The time is 11:43.

15            (Whereupon, a recess ensued.)

16            THE VIDEOGRAPHER:  We're back on the record.

17            The time is 11:44.

18  BY MS. GREEN:

19        Q.   I would like to mark as Exhibit 86, what I

20  believe are your bench notes.  We're going to put them

21  on the screen because I didn't send a paper copy of



Case 1:19-cv-00384-ELH   Document 186-1   Filed 05/12/21   Page 98 of 388
BARRY SCOTT VERGER                                          April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police                    97

```
 1   those.
 2            Do you recognize this document, sir?
 3            (Verger Exhibit No. 86 was marked for
 4   identification.)
 5            THE WITNESS:  Yes, it's the document I wrote
 6   up.
 7   BY MS. GREEN:
 8       Q.   This is your handwriting?
 9       A.   That's correct.
10       Q.   And this is what you reviewed in preparation
11   to testify today?
12       A.   Yes, that's what I saw.
13       Q.   Okay.
14            You were -- you said the word -- you said
15   report.  But when you said report, this is actually
16   what you were referring to?
17       A.   Yes, the worksheet.  Yes.
18       Q.   Okay.  So, let's zoom in a little bit and go
19   through this document just so all the writing on the
20   documents is visible.
21            So just zoom out a little bit.  Get rid of
```



1  the bottom.  We don't need to see the part about semen

2  testing.

3          MS. BROWN:  Are you marking this?

4          MS. GREEN:  Yes, it's 86.

5          Zoom out a little bit more.

6  BY MS. GREEN

7      Q.   All right.  Let's walk through this.

8          So do you recognize these as your notes from

9  the testing that you conducted in this case relating

10  to the investigation of the murder of Toni Bullock?

11      A.   Yes, this is the report I filled out.

12      Q.   Okay.

13      A.   On the worksheet.

14      Q.   Okay.  And this is a worksheet that you

15  would have created in real time as you were doing the

16  leucomalachite green telling on the fingernails,

17  right?

18      A.   That's correct.

19      Q.   And let's just walk through it, and I want

20  to make sure I understand it correctly.

21          So, you conducted the testing in this case



1  referenced on this -- I'm on Page BPD -- Bryant BPD

2  394.  This is the page about the fingernails.

3           You conducted that testing on May 21st,

4  1999, correct?

5       A.   Yes.

6       Q.   All right.  And so the first thing we have

7  in the boxes are descriptions of the items, correct?

8       A.   That's correct.

9       Q.   So you had for the purposes of testing five

10  clippings -- five fingernail clippings from the

11  victim's right hand.  Am I reading that correctly?

12       A.   That's correct.

13       Q.   Okay.  And you had with -- with fragments

14  right?

15       A.   That's correct.

16       Q.   You also had five different fingernail

17  clippings from the victim's left hand, correct?

18       A.   That's correct.

19       Q.   All right.

20           And so, the next -- and then it says with

21  fragments after that, too, right?



1      A.   Yes.

2      Q.   All right.  And so you would have done a

3  visual test of the nails, correct?

4      A.   Yes.

5      Q.   And as we already discussed, you would be

6  looking on the nail, looking at the nails to identify

7  whether there are any potentially substance --

8  substances there that you could test for the presence

9  of blood, correct?

10     A.   That's correct.

11     Q.   And then when you were looking at the nails,

12  it looks like again, on the right hand -- I'm in the

13  same row -- you saw two nails with red on the bottom

14  surface.  Am I interpreting that correctly?

15     A.   That's correct.

16     Q.   Okay.  So two nails from the right hand with

17  red staining on the bottom surface, right?

18     A.   That's correct.  Two -- red on the bottom

19  surface.

20     Q.   And when you say the bottom surface, that

21  means underneath the nail?



1        A.   I can't tell you for sure, but I think -- I

2   believe so.

3        Q.   Okay.

4             Looking at it back 20 years later, you think

5   it means when you say bottom surface, you're referring

6   to the underside of the nail?

7        A.   Yes, that would be correct.

8        Q.   Okay.

9             And then on that right hand there was also

10  an additional nail with a soiled surface on the

11  bottom.  In addition to the two with the red stains on

12  them, the two different nails with the red stains on

13  them.  Is that right?

14       A.   That's correct.

15       Q.   All right.  And then you had three -- moving

16  to the left hand --

17            MR. KAMIONSKI:  Can you zoom in a little

18  more?  I'm sorry.

19            MS. GREEN:  No problem.

20            MR. KAMIONSKI:  Okay.

21  BY MS. GREEN:



```
1        Q.   Moving to the left hand, we have -- you're

2   indicating that there were -- from the five fingernail

3   clippings from the left hand, there were three

4   different nails with red-brown staining underneath the

5   nail, correct?

6        A.   That's correct.

7        Q.   Okay.

8             And then if we go down here, we move down to

9   blood, it says blood PRE and then there's a plus sign,

10  right?

11       A.   That's correct.

12       Q.   And that means presumptively positive for

13  the presence of blood, correct?

14       A.   That's correct.

15       Q.   And you have the -- it's presumptively

16  positive from the nails from the right hand and

17  presumptively positive for the nails from the left

18  hand, right?

19       A.   That's correct.

20       Q.   Okay.  So you tested -- so -- and just to

21  make sure we're on the same page, this is the
```



1   leucomalachite green test that you conducted, right?

2       A.   That's correct.

3       Q.   All right.  And then underneath, if you scan

4   down both for the left hand and the right hand, you

5   indicate consumed?

6       A.   That's correct.

7       Q.   Okay.

8            So in terms of the testing you conducted,

9   the staining on the three different nails from the

10  right hand were consumed in the leucomalachite green

11  testing, correct?

12      A.   Correct, the samples.  That's correct.

13      Q.   And the staining from the three -- the three

14  different red-brown stainings underneath the left hand

15  nails were also consumed in the test?

16      A.   That's correct.

17      Q.   Okay.

18           So, I'd like you to walk me through -- and

19  so, again, just reading this correctly, all of these

20  stains that you're indicating were consumed?

21      A.   That's correct.



1      Q.   All right.

2           And the stains come from six different

3    nails, right?

4      A.   Five on each hand, right.

5      Q.   Well, the stains --

6      A.   Yes.  I see what you're saying; three from

7    the bottom, three -- yeah.  Yes.

8      Q.   Okay.  So, I'd like you to -- well, so let's

9    talk about the test then.

10          And we're going to conduct this testing on

11   these stains that you identified from the nails which

12   ended up being presumptively positive for blood.  You

13   first had to look at the stain on each nail, right?

14     A.   That's correct.

15     Q.   And you had to take an item, a corner of a

16   felt -- a piece of filter paper that is wet and rub it

17   against the nail, right?

18     A.   Right.  I don't remember if it was a swab or

19   filter paper, but that's correct.

20     Q.   Either way you're rubbing the nail and when

21   you did this test, did you do one swab per nail?



Case 1:19-cv-00384-ELH   Document 186-1   Filed 05/12/21   Page 106 of 388
BARRY SCOTT VERGER                                                April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police                       105

1    A.   Yes, I believe I would have but I'm not

2  sure.

3    Q.   Okay.

4         But going by best practice, you want to make

5  sure you're understanding what came from where, right?

6  Otherwise you're going to cross contaminate to

7  different substances from the nail.  So it makes a bit

8  of sense to do the swab one at a time, right?

9         MR. KAMIONSKI:  Objection to the form of the

10  question, calls for speculation.

11         MS. AMATO:  Join.

12         THE WITNESS:  Yeah, I just don't recollect

13  in what order that I did those tests in.

14  BY MS. GREEN:

15    Q.   Well, I'm not talking about order.  I'm

16  talking about nail -- nail by nail.

17    A.   Yes.

18         MR. KAMIONSKI:  Objection, asked and

19  answered.

20  BY MS. GREEN:

21    Q.   I don't care whether you did the left nail



```
1   or the right nail first.  That doesn't matter.  But

2   you're going nail by nail and swabbing each nail where

3   -- that has a red stain with a different swab, right?

4        A.   Correct.

5        Q.   Okay.  So let's just start with nail one.

6             So explain to me how you would test that --

7   just take and test just that one nail?

8             You started with swabbing the nail and

9   taking the red substance off the nail.  What would you

10  do next?

11       A.   I would do a preliminary test on it.

12       Q.   Okay.  Tell me about that?

13       A.   That's the leucomalachite green test.

14       Q.   Okay.

15       A.   I would take a -- I would apply the

16  leucomalachite solution to the sample and then I would

17  perform, I think -- apply hydrogen peroxide to the

18  sample and was looking for a blue color.  And if it

19  changed blue, then it told me possibly it could be

20  blood.  And I wrote positive at the top.

21       Q.   Okay.  That makes sense.
```



1          So for the first nail you -- I'm just

2    repeating back to you to make sure I understand it,

3    the process would have been swabbing the nail, taking

4    the entirety of the red substance off the nail, right?

5          A.   That's correct.

6          Q.   And putting it on the swab?

7          A.   That's correct.

8          Q.   Then you put the leucomalachite green on the

9    swab, right?

10         A.   That's -- yes, that's correct.

11         Q.   Then you apply the hydrogen peroxide, right?

12         A.   That's correct.

13         Q.   And then in this case we know it turned that

14   green-blue color, the leucomalachite green, right?

15         A.   Yes.

16         Q.   And it's a catalyst type reaction.  It's a

17   quick -- it quickly changes to that blue-green if it's

18   blood, right?

19         A.   I don't recollect how long it took.

20         Q.   Okay.  Well, either way you got the

21   blue-green?



1     A.   Yes.

2     Q.   And once you get that blue-green color, you

3  know that sample is consumed.  It can't be used again?

4     A.   That's correct.

5     Q.   Okay.

6          So you went, tested the first red stain from

7  the nail, saw -- conducted the test, confirmed it's

8  presumptively positive for blood.  That sample's

9  consumed, correct?

10     A.   Could you restate the question?

11     Q.   I'll withdraw it.  It's a bad question.

12          So after you did the test -- when the

13  test -- when the color turns the blue-green color the

14  sample is done, it's consumed, right?

15     A.   That's correct.

16     Q.   All right.  So you did the first nail, you

17  confirmed that the stain from the first nail turned

18  the blue-green color, right?

19     A.   That's correct.

20     Q.   All right.  Then you went to the next stain

21  on the next nail, right?



1        A.    That's correct.

2        Q.    And you got a different swab for that nail,

3   right?

4        A.    That's correct.

5        Q.    You're not going to use the old -- the other

6   swab, right?

7        A.    That's correct.

8        Q.    And on the second nail on the right

9   fingernail clipping, you performed that exact same

10  process, correct?

11       A.    That's correct.

12       Q.    Removed the entirety of the stain from the

13  nail, right?

14       A.    That's correct.

15       Q.    Applied on that second swab the

16  leucomalachite green, then hydrogen peroxide?

17       A.    That's correct.

18       Q.    And then you watched it turn blue-green and

19  confirmed that second nail also was presumptively

20  positive for the presence of blood?

21       A.    That's correct.



 1        Q.    All right.  And then you went to the third

 2    soiled surface on the bottom, right?

 3        A.    Yes.

 4        Q.    And conducted that process over again?  The

 5    same thing; swab the nail, remove the stain, right?

 6        A.    That's correct.

 7        Q.    Applied the leucomalachite green, then the

 8    hydrogen peroxide, right?

 9        A.    That's correct.

10        Q.    Watched it turn blue-green?

11        A.    That's correct.

12        Q.    Then you moved to the left hand, right?

13        A.    That's correct.  I don't know which hand I

14    did first but --

15        Q.    Well, whichever one, you moved from one hand

16    to the other and you want one by one, nail by nail,

17    confirming that the -- removing the stain and then

18    confirming that the stain was blood, right?

19        A.    That's correct.

20        Q.    And one by one you're recognizing that as

21    you're going nail by nail, you're consuming all the



1 | stain?

2 |     A.   That's correct.

3 |     Q.   In other words, you went one by one and

4 | confirmed all the stains were presumptively positive

5 | for blood and that's why you put the positive down

6 | there, right?

7 |     A.   You're correct, it's a possibility it could

8 | be blood.

9 |     Q.   There's a possibility it could be blood.

10 |         And you did that all the way until there was

11 | no other stain left to test, right?

12 |     A.   Right.  Just going by the samples that I

13 | took.

14 |     Q.   Okay.  And you understood that when you got

15 | to last nail, you knew all of the material under the

16 | nails would be consumed when you did that last test?

17 |         MR. KAMIONSKI:  Objection to the form of the

18 | question.

19 |         You can answer.

20 |         THE WITNESS:  Yes, I -- it was consumed in

21 | analysis.



```
 1  BY MS. GREEN:

 2       Q.   Okay.

 3            And, so, you understood as you were

 4  conducting this testing, that you were consuming all

 5  of the blood stains in the analysis as you were doing

 6  it?

 7       A.   That's correct, I knew they were consumed as

 8  I did the test.

 9       Q.   And you understood that once those blood

10  stains were consumed they couldn't be tested for DNA?

11       A.   That's correct.

12       Q.   And you understood that before you did the

13  test, right?

14       A.   Yes, that's correct.

15       Q.   And you knew there was blood under at least

16  one of the nails before you went on and did the five

17  other nails, right?

18       A.   I don't recollect.

19            MS. AMATO:  Objection to the

20  characterization of his testimony.

21            MR. KAMIONSKI:  Join.
```



BARRY SCOTT VERGER                                          April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police                    113

```
 1   BY MS. GREEN:

 2       Q.   You knew the first nail had tested

 3   presumptively positive for blood before you tested the

 4   other nails, right?

 5       A.   Oh, yeah.  I did the first one and it got

 6   consumed.  Then I went to the next one and it got

 7   consumed.

 8       Q.   You want one by one consuming all of the

 9   stains that could potentially be blood, correct?

10       A.   That's correct.

11       Q.   And you did that until there was no

12   staining, nothing left.  Is that correct?

13       A.   That's correct.

14       Q.   And you were fully aware of what procedure

15   you were conducting as you were doing it, right?

16       A.   Correct.

17            MS. AMATO:  Objection to the form of the

18   question.

19   BY MS. GREEN:

20       Q.   Did you answer?

21       A.   I said correct.
```



1      Q.   And you knew that the leucomalachite green

2  test that you were doing by definition destroying DNA?

3           MS. AMATO:  Objection.

4  BY MS. GREEN:

5      Q.   That exactly, what you were doing, destroys

6  the DNA from the sample.

7           MR. KAMIONSKI:  Objection to the form of the

8  question, calls for speculation.

9           MS. AMATO:  Join.

10          THE WITNESS:  It was consumed.

11 BY MS. GREEN:

12     Q.   Sir --

13     A.   Yes?

14     Q.   -- you understand by consumed, that means

15 destroyed.  You testified earlier that --

16     A.   That's correct.  That's correct.  Consumed

17 means it's gone.

18     Q.   It means the DNA --

19     A.   Is destroyed.  The DNA is destroyed,

20 consumed.  The sample is gone.  Consumed.

21     Q.   All right.  And you also understood that



1   these nails came from the victim in a homicide case,

2   correct?

3          A.    That's correct.

4          Q.    And you understood that the reason nails of

5   a victim, a deceased victim are collected are to

6   identify whether there are any evidence on the nails

7   which could point to a specific perpetrator, correct?

8          A.    That's correct.

9          Q.    You understand that the leucomalachite green

10  test is just a presumptive test for the presence of

11  blood, correct?

12         A.    That's correct.

13         Q.    That test does not have the capability to --

14  it's not specific enough or individualized enough to

15  exclude or include a perpetrator, right?

16         A.    That's correct.

17         Q.    You understood that?

18         A.    It's a preliminary test for blood.  It

19  doesn't tell you whether it is blood.  It just says it

20  could be blood.

21         Q.    Right.  And you also understood that DNA



1   testing is the type of testing that actually can

2   include or exclude a specific perpetrator, right?

3        A.   Well, I am not a DNA analyst, but I believe

4   you're right.

5        Q.   You understood that in context, right?

6        A.   Yes.

7        Q.   And you knew once you did this preliminary

8   test it would be consumed such that no DNA testing

9   could be done, right?

10            MS. AMATO:  Objection.

11            MR. KAMIONSKI:  Objection, calls for

12   speculation.

13   BY MS. GREEN:

14        Q.   What's your answer?

15        A.   I said correct.  It was consumed.

16        Q.   So you knew when you consumed the testing

17   that -- you knew that when the testing was done and it

18   tested presumptively positive for blood, you

19   understood on that first nail that this was possibly

20   blood, correct?

21        A.   That's correct.



1      Q.   And you understood it could possibly be the

2   blood of the true perpetrator, right?

3            MS. AMATO:   Objection.

4            MR. KAMIONSKI:   Objection to the form of the

5   question, calls for speculation.

6            THE WITNESS:   It could be blood.

7   BY MS. GREEN:

8      Q.   You knew -- you understood that was a

9   possibility, that was the blood of the true

10  perpetrator in the homicide case, right?

11           MR. KAMIONSKI:   Objection to the form of the

12  question, asked and answered.

13           MS. AMATO:   Join.

14           THE WITNESS:   I couldn't tell you whether it

15  was because it was a preliminary test and was

16  consumed.

17  BY MS. GREEN:

18     Q.   Sir, you understood it was a possibility

19  that that was blood, right?

20     A.   Right.

21           MR. KAMIONSKI:   Objection to the form of the



```
 1  question.

 2            MS. AMATO:  Join.

 3            THE WITNESS:  That it could be blood.

 4  BY MS. GREEN:

 5     Q.   The whole point of the testing was to try

 6  and identify whether the perpetrator's DNA -- the

 7  whole point of collecting the fingernails was to try

 8  and see is you could connect the DNA under the nails

 9  to the perpetrator, you knew that, right?

10            MR. KAMIONSKI:  Objection to the form of the

11  question, calls for speculation, assumes facts.

12            You can answer.

13            MS. AMATO:  Objection.

14            Go ahead.  I'm sorry.

15            Join and mischaracterization of the

16  testimony.

17            THE WITNESS:  Yes, I knew it was being --

18  once it was tested, it was destroyed in a preliminary.

19  BY MS. GREEN

20     Q.   Okay.  You understood it, sir, the only

21  reason the nails were collected and the only reason
```



1    any testing was being done on the nails was to try and

2    identify if the perpetrator's DNA or skin cells or

3    blood was under the nails.  This is a homicide

4    investigation.  You understood that?

5              MR. KAMIONSKI:  Objection to the form of the

6    question, asked and answered, calls for speculation.

7              You can answer again.

8              MS. AMATO:  Join, and mischaracterization of

9    the testimony.

10             THE WITNESS:  I only understood that when I

11   did the case, I examined the evidence, I did a

12   preliminary test on it and it destroyed the -- the

13   sample was consumed in analysis.

14   BY MS. GREEN:

15       Q.   Okay.  Now, you've already said that.  We

16   got that in excruciating detail, sir.

17             Now, I'm asking you something else.

18             The top of this sheet, let's scroll up a

19   little bit.

20       A.   Okay.

21       Q.   The top of this sheet says -- actually let's



1  scroll to the second page.

2          That says "homicide" on it, right?  At the

3  very top?

4      A.   Oh, yeah.  It's on the right.

5      Q.   So when you were doing the testing, you knew

6  it was a homicide case?

7      A.   That's correct.

8      Q.   Let's go back up, please, to the first page.

9          Is there handwriting at the top, let's

10  scroll up again.  You understood the detective on the

11  case was Detective William Ritz, right?

12      A.   That's correct.

13      Q.   The ID.  What's that stand for?

14      A.   Where are you looking?

15      Q.   Under Detective William Ritz.

16      A.   Criminal -- I think that's where he worked,

17  in homicide.

18      Q.   This is a homicide case.  A young girl was

19  killed.  See that name, B, Toni Bullock?

20      A.   Yes, I see it.

21      Q.   See the date of birth; 7-16-82?



Case 1:19-cv-00384-ELH   Document 186-1   Filed 05/12/21   Page 122 of 388
BARRY SCOTT VERGER                                          April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police                    121

1        A.    That's correct.

2        Q.    In has the address; 906 East Preston Street?

3        A.    That's correct.

4        Q.    Place of occurrence, you even knew where the

5    homicide took place, right?

6        A.    That's correct.

7        Q.    And who would you have gotten this

8    information from other than Detective Ritz?

9        A.    It would have been written on the evidence

10   forms, I believe.

11       Q.    All right.  Well, we'll see about that.

12             But in any event, so as you were doing this

13   testing, you understood, you were testing the victim's

14   nails?

15       A.    That's correct.

16       Q.    And it's a homicide investigation.  The

17   purpose of a homicide investigation is to identify who

18   the killer is, right?

19       A.    That's correct.

20       Q.    All right.  So the whole reason you were

21   doing this testing is to identify who killed Toni



1   Bullock.  That's the whole reason you collect those

2   fingernails at autopsy, right?

3          MR. KAMIONSKI:  Objection to the form of the

4   question.

5          THE WITNESS:  That's correct.

6   BY MS. GREEN:

7      Q.  There's no -- in the hope that the

8   fingernails will have some evidence that can help us

9   identify who the true perpetrator is, right?

10     A.  That's correct.

11     Q.  Now, in killings sometimes if there's a

12  struggle, the perpetrator and -- the victim is

13  fighting back.  You understand that the perpetrator's

14  DNA or skin cells might be under the victim's

15  fingernails?

16     A.  Yes.

17         MR. KAMIONSKI:  Objection to the form --

18  objection to the form of the question, foundation,

19  calls for speculation.

20         You can answer, if you know.

21         MS. AMATO:  Join, also incomplete



 1  hypothetical.

 2          MR. KAMIONSKI:  Join.

 3          THE WITNESS:  I don't know what was under

 4  the fingernails.  That's why we do a presumptive test.

 5  BY MS. GREEN:

 6      Q.   Oh, yes.  You do the presumptive test

 7  because you're trying to get -- find out, you

 8  understood that there was a possibility under those

 9  nails was biological material from the perpetrator.

10  You understood that, sir?

11          MS. AMATO:  Objection, mischaracterizes the

12  testimony, assumes facts, calls for speculation.

13          MR. KAMIONSKI:  Join.

14          MS. AMATO:  Argumentative.

15          THE WITNESS:  I just did a preliminary test

16  to figure out if it could possibly be blood, and it

17  was consumed in analysis.

18  BY MS. GREEN:

19      Q.   You got to answer my question.  This is very

20  important.  I want you to listen carefully.

21          You understood that under the victim's



```
 1   fingernails, there was a possibility that there was

 2   biological material from the perpetrator in this

 3   homicide case?

 4            MR. KAMIONSKI:  Objection to the form of the

 5   question, asked and answered.

 6            You can answer, again.

 7            THE WITNESS:  The only thing I can tell you

 8   from the fingernails is I did a preliminary test, that

 9   it could possibly be blood and it was consumed in

10   analysis.

11   BY MS. GREEN:

12       Q.   Why would you do -- why would you be trying

13   to test for blood?  What's the point of that?  What's

14   the end game in a homicide investigation?

15            MS. AMATO:  Objection.

16            MR. KAMIONSKI:  Objection to the form of the

17   question, calls for speculation.

18            THE WITNESS:  I was just doing my job.

19   That's what they, you know, that's part of the

20   procedures that I did, and I did it correctly.

21   BY MS. GREEN:
```



1     Q.   Sir, as an expert witness who was then

2   employed at the BPD conducting forensic testing for

3   nearly 30 years -- or actually, over 30 years, is it

4   your testimony that you wouldn't have understood in

5   May of 1999 when you were conducting testing on the

6   deceased victim's fingernails that there's a

7   possibility that there's biological material from the

8   perpetrator under the fingernails?

9         MR. KAMIONSKI:  Objection to the form of the

10  question, calls for speculation, asked and answered.

11        THE WITNESS:  All can I tell you is I did a

12  preliminary test and it tested positive, that it could

13  possibly be blood on the samples I took.  And it was

14  consumed in analysis.  That's it.

15  BY MS. GREEN:

16    Q.   Do you deny -- do you deny -- is it your

17  testimony that you did not understand it was possible

18  the perpetrator's biological material was under the

19  nail?  You didn't understand that?

20    A.   I understand what you're saying.

21    Q.   All right.  And you understood that at the



Case 1:19-cv-00384-ELH   Document 186-1   Filed 05/12/21   Page 127 of 388
BARRY SCOTT VERGER                                    April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police                126

1   time in 1999, because you worked at the police

2   department on homicide investigations, right?

3       A.   I did, yes.

4       Q.   All right.  So when you went through one by

5   one -- well, withdrawn.

6            So when you got a presumptive positive for

7   blood on the first nail, right, you understood there

8   could have been blood on that nail, right?

9       A.   That's correct.

10      Q.   And is blood biological material?

11      A.   Yes.

12      Q.   Okay.  You understood that that blood, the

13  potential blood was possibly from the perpetrator,

14  possibly?

15      A.   Yes.  If it was blood, possibly.

16      Q.   All right.

17           And then you went to the next nail and you

18  destroyed the possible blood on the next nail, right?

19      A.   Yes, it's an preliminary test and I didn't

20  know what was under the nail until I did the

21  preliminary test.



1        Q.    Oh, believe me I got that.

2        A.    It could be positive for blood.

3        Q.    When you went to the third nail and once you

4   got a positive for a possible blood on the second

5   nail, you went to the third nail and you destroyed the

6   blood stain on the third nail.

7        A.    Yes, it was consumed in analysis.

8        Q.    All right.  And then after you got that --

9   and not only consumed in analysis, tested positive for

10  possible presence of blood, right?

11       A.    That's correct.

12       Q.    Then when your got three positives for

13  possible presence of blood, the perpetrator's blood

14  potentially, you still went to the fourth nail and you

15  consumed the blood stain on that nail, too, right?

16       A.    Where do you see the fourth nail?

17       Q.    I'm sorry, three nails on each side.

18             So there's six nails total that that

19  potential blood stains?

20             MR. KAMIONSKI:  Can you scroll down, because

21  you're -- you don't see everything here.



```
 1              MS. GREEN:  We don't even need this
 2    document.
 3              Take it off the screen.
 4    BY MS. GREEN:
 5         Q.   We -- when you -- you understand, you've
 6    testified about -- you've been testifying about this
 7    for now, almost an hour.  There were six potential
 8    stains that you've visualized as that could
 9    potentially be blood stains?
10         A.   That's correct.
11         Q.   And you went one by one, nail by nail and
12    conducted testing on each stain?
13         A.   That's correct.
14         Q.   And one by one, nail by nail you saw each
15    one presumptively positive for blood?
16         A.   Possibly, yes.
17         Q.   And you still went forward and consumed the
18    next nail, the potential blood from the next nail?
19         A.   Yes, I did.
20         Q.   You did that knowingly, sir?
21         A.   That was -- that was doing my examination.
```



1    Q.   You knew exactly what you were doing, right?

2         MS. AMATO:  Objection.

3         MR. KAMIONSKI:  Objection to the form of the

4    question.

5         MS. AMATO:  Join.

6         MR. KAMIONSKI:  Objection to the form of the

7    question.

8         MS. AMATO:  Join.

9    BY MS. GREEN:

10    Q.   You can answer.

11    A.   I was doing what our procedures say we

12    should do.  I did a preliminary test because the way

13    it works is if you do find human blood, it would be --

14    that's the only way you could send it out to the

15    Maryland State Police Lab.

16    Q.   Got it.

17         So you found potential human blood, right?

18    A.   Possibly, yes.

19    Q.   Yes.  And then you went to the next nail and

20    you destroyed the potential human blood, right?

21    A.   Yes, it was consumed in analysis.



```
 1        Q.    All right.

 2              Each time you destroyed the blood, you

 3   understood that when you conducted that test, there

 4   cannot be any further testing on the nail to determine

 5   if the blood was from the perpetrator?

 6              MR. KAMIONSKI:  Objection to the form of the

 7   question, calls for speculation.

 8              THE WITNESS:  That's correct.  It was

 9   consumed.

10   BY MS. GREEN

11        Q.    You understood you could never send the

12   nails to the lab -- or the blood stains from the nail

13   to lab, because you destroyed all the blood?

14        A.    If it was -- yes, if it was blood.  If the

15   preliminary tests were blood.

16        Q.    Everything you thought could potentially be

17   blood, you destroyed.  Is that right?

18              MR. KAMIONSKI:  Objection to the form of the

19   question, mischaracterizes his testimony.

20              THE WITNESS:  The samples were --

21              MS. AMATO:  Join.
```



```
 1  BY MS. GREEN:

 2       Q.   All right.  And you did that intentionally,

 3  right?

 4       A.   It's part of my job.

 5       Q.   And so you did it intentionally, right?

 6            MR. KAMIONSKI:  Objection to the form of the

 7  question.

 8            THE WITNESS:  I did a preliminary

 9  examination and the stains were consumed in analysis,

10  the samples were consumed.

11  BY MS. GREEN:

12       Q.   Sir, you did this intentionally, right?

13            MR. KAMIONSKI:  Objection, he answered your

14  question.  Asked and answered.

15            Answer again.

16            THE WITNESS:  I consumed -- the samples were

17  consumed in analysis.  That's all I can tell you.

18  BY MS. GREEN:

19       Q.   You consumed the samples in analysis

20  intentionally, right?

21            MR. KAMIONSKI:  Objection to the form of the
```



1    question.

2            THE WITNESS:  Not intentionally.

3    BY MS. GREEN:

4        Q.   What do you mean not intentionally?  Did you

5    not know what -- you already told me you knew it was

6    destructive test, sir?

7        A.   It's a preliminary test.  I don't know if

8    that was blood or not.

9        Q.   It's a preliminary destructive test,

10   correct?

11       A.   That's correct.

12           MS. AMATO:  Objection.  I'm sorry, Mr.

13   Verger, just let me give my objection before you

14   answer.

15           Objection to the form of the question,

16   argumentative, mischaracterizes the testimony.

17   BY MS. GREEN:

18       Q.   Were you in your right mind when you did

19   this testing?

20           MS. AMATO:  Objection.

21           MR. KAMIONSKI:  Objection.



1          MS. AMATO:  Objection to the form of the

2   question.  Argumentative.  Please stop yelling at the

3   witness.

4   BY MS. GREEN:

5       Q.   Were you in your right mind when you did

6   this testing, sir?

7          MR. KAMIONSKI:  Objection to the form of the

8   question.

9          MS. AMATO:  Join.

10          THE WITNESS:  Yes.

11   BY MS. GREEN:

12       Q.   Did you conduct this testing on each of

13   these nails knowingly?

14          MR. KAMIONSKI:  Objection to form of the

15   question.

16          MS. AMATO:  Join.

17          THE WITNESS:  Like I said, I did the tests.

18   It was a presumptive test.  I don't know whether it

19   was, you know, blood or not.  It could possibly be

20   blood and that's what the test does.

21   BY MS. GREEN:



1    Q.   That's not my question, sir.  Please try and

2    answer my question.  Okay?

3    A.   You're putting words in my mouth saying I

4    intentionally destroyed evidence, and it's not true.

5    Q.   Is the potential --

6         MR. KAMIONSKI:  He just answered your

7    question.

8         MS. GREEN:  Wait a minute.

9    BY MS. GREEN:

10   Q.   Did you conduct the testing knowingly?

11        MR. KAMIONSKI:  Objection to the form of the

12   question, asked and answered.

13        MS. AMATO:  Join.

14        MR. KAMIONSKI:  You can answer again for the

15   25th time.

16        THE WITNESS:  I did not intentionally

17   destroy evidence.  It was consumed in analysis.

18   That's part of the test.

19   BY MS. GREEN:

20   Q.   Can you -- are you refusing to answer the

21   question with the word "knowingly" in it?



Case 1:19-cv-00384-ELH   Document 186-1   Filed 05/12/21   Page 136 of 388
BARRY SCOTT VERGER                                      April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police              135

1           MR. KAMIONSKI:  He's answered your question.

2           Answer it again.

3           THE WITNESS:  I performed the test, the

4    preliminary test, and it tested positive and it was

5    consumed in analysis.

6    BY MS. GREEN:

7       Q.   Do you have any regrets?

8           MS. AMATO:  Objection to the form of the

9    question.

10          MR. KAMIONSKI:  Objection to the form of the

11   question, harassing.

12          THE WITNESS:  Regrets about what?

13   BY MS. GREEN:

14      Q.   Consuming all the potential blood stains?

15      A.   No regrets.  I did a preliminary test.

16   That's what the test does and it was consumed in

17   analysis.

18      Q.   You understand that these nails after --

19   well, first of all, you understand the nails were

20   never sent for DNA testing, right?

21          MR. KAMIONSKI:  Objection to the form of the



 1  question.

 2            THE WITNESS:  I don't know.

 3            MR. KAMIONSKI:  It's actually false.

 4  BY MS. GREEN:

 5      Q.   To this day no one's ever told you you did

 6  anything wrong by consuming the blood stains on the

 7  nails, correct?

 8            MR. KAMIONSKI:  Objection to the form of the

 9  question.

10            THE WITNESS:  Nobody said anything about --

11  I made a report, the report was looked at and that's

12  what -- nobody said anything about it.

13  BY MS. GREEN:

14      Q.   You want --

15      A.   They did -- they said I did everything

16  right.

17      Q.   And that's what you believe?  You did -- you

18  did -- you did do everything right?

19      A.   Thank you.

20      Q.   That's a question, sir.  It's a leading

21  question.



```
 1              MR. KAMIONSKI:  He took it as a compliment.

 2   Thank you.

 3   BY MS. GREEN:

 4       Q.   Let's try a different question.

 5              You believe you did everything right here,

 6   right?

 7       A.   That's correct.

 8       Q.   In this case and in every other case, right?

 9              MS. AMATO:  Objection.

10       A.   That's correct.

11              MS. AMATO:  Mr. Verger, let me just put my

12   objection on the record.

13              Objection, argumentative, harassing.

14              MR. KAMIONSKI:  Join, agreed.

15   BY MS. GREEN:

16       Q.   You understood -- so you testified at

17   Malcolm Bryant's trial, right?

18              MR. KAMIONSKI:  Asked and answered.

19              You can answer again.

20              MS. AMATO:  Join.

21              THE WITNESS:  I didn't get the name.
```



```
 1   BY MS. GREEN:

 2        Q.   You testified at Malcolm Bryant's trial?

 3        A.   That's correct.

 4        Q.   You understood when you testified at trial,

 5   that these nails although the nails still existed,

 6   were never sent to the Maryland State Police for DNA

 7   testing by the time of trial, correct?

 8        A.   I didn't -- I didn't have that information

 9   in front of me or knew about it, no.

10        Q.   If I told you you testified that it never --

11   withdrawn.

12             You understand that -- I know that DNA

13   testing can be done on nails regardless of whether

14   there is blood on them, right?

15             MR. KAMIONSKI:  Objection, foundation, calls

16   for speculation.

17             THE WITNESS:  It's the sample that gets

18   tested for DNA.

19   BY MS. GREEN:

20        Q.   You understand that someone can swab a nail

21   and take epithelial cells off the nail and test those
```



Case 1:19-cv-00384-ELH   Document 186-1   Filed 05/12/21   Page 140 of 388
BARRY SCOTT VERGER                                    April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police              139

 1  for DNA, right?

 2          MR. KAMIONSKI:  Objection, calls for

 3  speculation, foundation.

 4          MS. AMATO:  Join, and incomplete

 5  hypothetical.

 6          THE WITNESS:  Correct.

 7  BY MS. GREEN:

 8      Q.   All right.

 9          And so, you sent some items out for DNA

10  testing in this case, correct?

11      A.   I did not.  Somebody -- if I did,

12  somebody -- it was at somebody's -- somebody told me

13  to.

14      Q.   All right.  Let's put on the screen the

15  June 1st, 1999 letter from Barry Verger to the State

16  of Maryland, Department of State Police.  Please?

17          We'll mark this as Exhibit 87.

18          (Verger Exhibit No. 87 was marked for

19  identification.)

20  BY MS. GREEN:

21      Q.   Is this your signature at the bottom of this



 1  document, sir?

 2      A.   That's correct.

 3      Q.   All right.  This is a letter -- June 1st,

 4  1999 letter signed by you, right?

 5      A.   1998 letter, yes.  Yes.  Pertaining to the

 6  1998 -- I'm sorry, yes.

 7      Q.   At the top it's addressed to the State of

 8  Maryland, Department of State Police Crime Laboratory

 9  Division?

10      A.   Yes.

11      Q.   This is you sending out Toni Bullock's

12  homicide investigation evidence to the Maryland State

13  Police for DNA PCR analysis, right?

14      A.   That's correct.

15      Q.   You did not send the fingernails even though

16  they still existed, right?

17           MR. KAMIONSKI:  Objection.

18           THE WITNESS:  That's correct.

19  BY MS. GREEN:

20      Q.   I take it the reason you didn't send the

21  fingernails was because Detective Ritz told you don't



1   -- the fingernails shouldn't be tested for DNA, right?

2           MR. KAMIONSKI:  Objection, calls for

3   speculation, incomplete hypothetical.

4           THE WITNESS:  I don't recollect anything he

5   said.  No.

6           MS. AMATO:  Join.

7   BY MS. GREEN:

8       Q.   Well, you're saying it was -- it says at the

9   request of his -- let's just look at the document.  At

10  the request of Detective William Ritz, the following

11  samples are submitted for DNA PCR analysis, correct?

12      A.   That's correct.

13      Q.   So Detective William Ritz told you to send

14  these batch samples for DNA testing, right?

15      A.   That would be correct.

16      Q.   Are the nails here?

17      A.   No, I do not see nails listed.

18      Q.   Okay.  Is it safe to assume that the reason

19  the nails weren't sent for DNA testing along with

20  these other items is because Detective Ritz told you

21  -- Detective Ritz did not want these tested, right?



Case 1:19-cv-00384-ELH   Document 186-1   Filed 05/12/21   Page 143 of 388
BARRY SCOTT VERGER                                    April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police              142

1          MR. KAMIONSKI:  Objection to the form of the

2    question, calls for speculation.

3          MS. AMATO:  Join.

4          THE WITNESS:  Because the samples were

5    consumed in analysis.

6    BY MS. GREEN:

7       Q.   Well, you already told me the nails still

8    exist.  So what's your explanation for why they --

9    because you already told me that you can get -- we can

10   take this off the screen.

11          You already told me that you can get -- you

12   understood that you can get DNA from epithelial cells,

13   not just blood.  So why didn't the nails get sent out?

14      A.   I cannot tell you that.  I don't know.

15      Q.   Detective Ritz is running the show

16   determining what got sent out, right?

17          MR. KAMIONSKI:  Objection to the form of the

18   question, mischaracterizes his testimony.

19          MS. AMATO:  Join.

20          THE WITNESS:  I cannot recollect, you know,

21   what Detective Ritz, you know, wanted to -- why his



1    reasoning would be to send stuff out for DNA testing.

2    BY MS. GREEN

3         Q.   Well, was it your decision or his?

4         A.   It's not my decision.

5         Q.   Okay.

6              That letter indicates that he was deciding

7    what was going out for a DNA test and what wasn't,

8    right?

9              MR. KAMIONSKI:   Objection to the form of the

10   question.  Mischaracterizes the testimony and the

11   letter.

12             MS. AMATO:   Join.

13   BY MS. GREEN:

14        Q.   You would have known that then even though

15   you don't remember it today?

16        A.   Well, I only know what the letter says, that

17   items went to the state police.

18   BY MS. GREEN:

19        Q.   The letter indicates that --

20        A.   Items.

21        Q.   That Detective Ritz was directing which



1   items go to the Maryland State Police for DNA testing,

2   right?

3          MR. KAMIONSKI:  Objection to the form of the

4   question.

5          THE WITNESS:  I only know what was on that

6   letter, those items.

7          MS. AMATO:  Join.

8          THE WITNESS:  I can't tell you what he said

9   because I don't remember.

10  BY MS. GREEN:

11     Q.   Let's put the letter back up, please,

12  Exhibit 87, the June 1st, 1999 letter.

13          It says at the request of Detective William

14  Ritz the following samples are submitted for DNA PCR

15  analysis, correct?

16     A.   That's correct.

17     Q.   All right.  So based on the face of the

18  letter, it appears Detective Ritz is directing which

19  samples -- directing you as to which sample to send

20  for DNA analysis, right?

21          MR. KAMIONSKI:  Objection to the form of the



Case 1:19-cv-00384-ELH   Document 186-1   Filed 05/12/21   Page 146 of 388
BARRY SCOTT VERGER                                        April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police                  145

1   question.

2          THE WITNESS:  Correct.

3   BY MS. GREEN:

4      Q.   Okay.

5          And so you would have had to communicate

6   with Detective Ritz as to what to send and what not to

7   send, right?

8      A.   That's correct.

9      Q.   All right.  And so although you don't

10  remember it today, we know from this letter you had

11  some communication with Detective Ritz about what

12  should be sent for DNA testing, right?

13     A.   That's correct.

14     Q.   Okay.

15         MS. GREEN:  Take this letter off the screen,

16  please.

17  BY MS. GREEN:

18     Q.   Oh, man.  Let's -- it's about 12:30.  I'd

19  like to take a quick break.  We can go ahead and take

20  lunch now, or if you want to keep going we can just

21  take a 10-minute break and take lunch later.



1          It's totally up to your counsel, Mr. Verger.

2          MR. KAMIONSKI:  What's your schedule?

3          MS. GREEN:  I think this one's going to be a

4   pretty lengthy deposition.  I'd be prepared for a full

5   day.

6          MR. KAMIONSKI:  What does that mean?  What's

7   the schedule?

8          MS. GREEN:  What do you mean, what's the

9   schedule?

10          MR. KAMIONSKI:  What time -- like how many

11   more hours?

12          MS. GREEN:  Can we go off the record,

13   please?

14          THE VIDEOGRAPHER:  Off the record.

15          The time is 12:29.

16          (Whereupon, a recess ensued.)

17          THE VIDEOGRAPHER:  We are back on the

18   record.  The time is 1:09.

19   BY MS. GREEN:

20     Q.  Mr. Verger, did you have an opportunity to

21   have some lunch?



1      A.   Yes, I had a little bit of lunch.  I didn't

2   want to end up with an upset stomach.

3      Q.   Okay.  Got you.  So before we broke for

4   lunch, we were asking -- we were talking about the

5   leucomalachite green testing that you performed on the

6   red stains that you removed from the fingernails, and

7   I just wanted to circle back on that.

8           As you recall earlier in the deposition

9   before we broke for lunch I asked you a series of

10   questions about the procedure and process that you

11   followed conducting that leucomalachite green testing

12   in this case, correct?

13      A.   That's correct.

14      Q.   Okay.  And the procedure and process that

15   you followed was the way you were trained to conduct

16   such testing, correct?

17           MS. AMATO:  Objection.

18           THE WITNESS:  Yes.

19           MS. AMATO:  Go ahead and answer.

20           MS. GREEN:  Natalie, we're getting a little

21   bit of feedback from your objections I think.



1              Is that right, Mr. Verger?  Is that why you

2    made that face or is that my --

3              THE WITNESS:  Yes, that was it.  You're

4    interpreting.

5              MS. GREEN:  Interpreting?

6              MS. AMATO:  I just said objection.

7              MS. GREEN:  No, like when we're hearing you,

8    we're hearing -- I'm just letting you know, we're

9    hearing like a high pitched noise and it's hard to

10   hear that you're saying objection.  I don't know if

11   you're really close to the mic.

12             MS. AMATO:  I'll try and move around.

13   BY MS. GREEN:

14      Q.  So let me re-ask the question and then

15   she'll object and then you can answer, okay?

16             So when -- when you conducted the

17   leucomalachite green testing on the victim's

18   fingernails in this case, you were following the

19   procedure that you were trained on by the BPD,

20   correct?

21             MS. AMATO:  Objection.



Case 1:19-cv-00384-ELH   Document 186-1   Filed 05/12/21   Page 150 of 388
BARRY SCOTT VERGER                                    April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police                149

1               THE WITNESS:  That was the sample I was --

2      from the nails.  I did that leucomalachite test on.

3      BY MS. GREEN:

4          Q.   When you did the testing, were you following

5      the BPD procedure you were trained to follow?

6          A.   Yes.

7          Q.   And your supervisor, Mark Profili, reviewed

8      -- supervised you on this case, correct?

9          A.   That's correct.

10         Q.   And he was fully aware of, as your

11     supervisor, the testing that you conducted on the

12     samples from the nails in this case, correct?

13         A.   That's correct.

14              MS. AMATO:  Objection, calls for

15     speculation.

16     BY MS. GREEN:

17         Q.   You can answer.

18         A.   I prepare a report and he reads it, yes.

19         Q.   Okay.  And to the extent you had any

20     questions during the course of the testing you went to

21     him, right?



1    A.   That's correct.

2    Q.   Okay.

3    A.   That's correct.

4    Q.   Okay.  And I think you told me previously no

5  supervisor ever told you you had done any testing

6  correctly -- incorrectly, I'm sorry -- in this case,

7  correct?

8    A.   That's correct.

9    Q.   No one ever suggested to you that in

10  consuming all of -- withdrawn.

11         No BPD supervisor ever indicated to you that

12  in consuming all of the stains on the nails in the

13  leucomalachite testing that there was any issue with

14  that, correct?

15         MR. KAMIONSKI:  Objection to the form of the

16  question, mischaracterizes his testimony.

17         MS. AMATO:  Join.

18         THE WITNESS:  The samples were tested.  If

19  there's anything else on the nails, they were left on

20  the nail.

21  BY MS. GREEN:



1    Q.   Is it correct that no supervisor -- you

2    consumed all the samples you tested, right?

3    A.   Correct.

4    Q.   You tested samples from every nail, right?

5    A.   No.

6    Q.   All right.

7         Is the case now, sir, that you had lunch and

8    you had an opportunity to talk to your attorney and

9    you would like to change some of your testimony about

10   the testing you conducted in this case?

11        MR. KAMIONSKI:  Objection as to his

12   testimony and the question is inappropriate as well.

13        MS. AMATO:  Join.

14        THE WITNESS:  Could you restate that

15   question one more time?

16   BY MS. GREEN:

17   Q.   You had lunch with your attorney during the

18   break, correct?

19   A.   That's incorrect.  I didn't have lunch.

20   Q.   You just told me you had a small bite to eat

21   when we went --



1    A.   Yes, that was more like a snack.  It's not a

2    good meal.

3    Q.   You consumed food during the break, sir?

4    A.   It was a peanut bar.

5    Q.   All right.

6    A.   You want to call that lunch, so be it.

7    Q.   You remember I asked if you had a chance to

8    eat lunch and you said you got a bite to eat?

9    A.   I was referring to what I ate.

10   Q.   Okay.

11   A.   I don't consider that lunch.

12   Q.   All right.  In any event over the break you

13   had a break from the deposition, right?

14   A.   That's correct.

15   Q.   Consumed a peanut butter bar, right?

16   A.   That's correct.

17   Q.   All right.  Did you meet with your attorney

18   during the break?

19   A.   Yes, I saw him.  Yes.

20   Q.   Did you have a conversation with your

21   attorney during the break?



1        A.   Yes, I did.

2        Q.   After -- now that you've had a conversation

3    with your attorney during the break in the middle of

4    your deposition, would you like to change any of your

5    testimony that you gave earlier today?

6        A.   No, I would not.

7        Q.   You stand by the testimony that you gave

8    before lunch?

9        A.   I do.

10       Q.   Okay.  So in terms of -- so before lunch you

11   gave testimony about the procedures that you followed

12   and conducted testing on samples from the nails in

13   this case, right?

14       A.   That's correct.

15       Q.   And all I'm asking you is no BPD supervisor

16   ever indicated to you that you followed improper

17   procedures in this case, correct?

18            MR. KAMIONSKI:  Objection, asked and

19   answered.

20            You can answer again.

21            THE WITNESS:  That's correct.



Case 1:19-cv-00384-ELH   Document 186-1   Filed 05/12/21   Page 155 of 388
BARRY SCOTT VERGER                                     April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police              154

1   BY MS. GREEN:

2        Q.   Okay.

3             And in fact, you understood yourself when

4   you were conducting the leucomalachite testing on each

5   of the nails -- samples from the nails in this case,

6   that you were following BPD procedures to a T,

7   correct?

8             MR. KAMIONSKI:  Objection to the form of the

9   question, mischaracterizes his previous testimony.

10            You can answer.

11            MS. AMATO:  Join.  Join.

12            THE WITNESS:  That's correct.

13  BY MS. GREEN:

14       Q.   You had been doing leucomalachite testing at

15  BPD for many years, correct?

16       A.   Correct.

17       Q.   And that's how you were trained to do it?

18            MR. KAMIONSKI:  Objection to form of the

19  question.

20  BY MS. GREEN:

21       Q.   Just as you described to me earlier in the



1   deposition before lunch, correct?

2            MR. KAMIONSKI:  Objection to the form of the

3   question.

4            You can answer.

5            THE WITNESS:  That's correct.

6   BY MS. GREEN:

7       Q.   And when you --- when I deposed your

8   supervisor on May 3rd, Mark Profili, you would expect

9   that he would endorse the procedure you described as

10  something he trained you to do, correct?

11           MS. AMATO:  Objection to the form of the

12  question.

13           THE WITNESS:  That's correct.

14  BY MS. GREEN:

15      Q.   Because in fact he did train you to do that,

16  right?

17           MR. KAMIONSKI:  Objection to form and -- to

18  the form of the question, vague the term "that."

19           You can answer -- you can answer if you

20  understand the question.

21           THE WITNESS:  That could be -- there was



1  other people in the laboratory at the time, and they

2  could have showed me how to do it.

3  BY MS. GREEN:

4      Q.   Okay.

5           In any event, were you supervised by anyone

6  other than Mark Profili at that time in the Trace

7  Analysis Unit Tract Analysis in 1999?

8      A.   There were people working -- were in the lab

9  and that they would help me if I had any questions,

10  yes.

11     Q.   What were their names?

12     A.   Rosalyn Bowman, Sal Bianco, Dan VanGelder,

13  Leon White.  I don't think I said that name.

14     Q.   And was Rosalyn Bowman, was she senior to

15  you or at your same level?

16     A.   Well, at the same job title but she had more

17  years on me.  Yes.

18     Q.   Were you a direct report of hers?

19     A.   One more time?

20     Q.   Were you a direct report of hers?

21          MR. KAMIONSKI:  Objection to the form of the



1    question.

2            THE WITNESS:  Object as to form?  Rephrase

3    that.

4    BY MS. GREEN:

5        Q.   Was she a direct supervisor of you?

6        A.   No.

7        Q.   Okay.  What about Sal Bianco?

8        A.   No.

9        Q.   Dan VanGelder?

10       A.   No.

11       Q.   All right.  Leon -- Leon -- I didn't get

12   down the last name correctly.

13       A.   Leon White, no.

14       Q.   Okay.  So they were all -- had your same

15   title.

16       A.   They -- yes.

17       Q.   But it's your understanding, each one of

18   them, if they were to conduct leucomalachite testing

19   on the nails in this case would have followed the

20   exact same procedures you did, because that's how

21   everyone was trained to your knowledge?



1       A.   That's correct.

2            MS. AMATO:   Objection.

3   BY MS. GREEN:

4       Q.   And the manner in which you conducted the

5   leucomalachite testing on samples from Toni Bullock's

6   nail clippings, there should also be policies and

7   procedures that outline conducting the testing that

8   way?

9            MR. KAMIONSKI:   Objection to the form of the

10  question.

11           MS. AMATO:   Join.

12           THE WITNESS:   I don't recollect.

13  BY MS. GREEN:

14      Q.   Well, certainly what you were doing as you

15  understood it was consistent with BPD policy and

16  procedure, correct?

17           MR. KAMIONSKI:   Objection.   Objection, asked

18  and answered.

19           MS. AMATO:   Join.

20           THE WITNESS:   With the laboratory.

21  BY MS. GREEN:



1         Q.    Yes.   The BPD laboratory, correct?

2         A.    Yes.

3         Q.    Okay.   All right.   I would like to take some

4    time to turn to your activities in this case before

5    that day on May 21st, 1999, when you conducted the

6    testing.   So now, I'm going to work myself backward a

7    little bit.   Okay?

8         A.    Okay.

9         Q.    Now, we deposed Detective Ritz, the lead

10   detective in the case earlier this year.   Okay?   You

11   know Mr. Ritz, Detective Ritz?

12        A.    Yes.   It's been a long time.

13        Q.    Okay.   You recall interacting with him when

14   he was working at BPD?

15        A.    Yes.

16        Q.    Okay.   So you're familiar that Detective

17   Ritz is a homicide -- or was a homicide detective,

18   correct?

19        A.    Correct.

20        Q.    Did you have a -- and from time to time, you

21   would do testing on Detective Ritz's cases, correct?



1    A.   I don't recollect, you know, how many cases

2  he had that were brought to my attention.

3    Q.   You do recall him though as a person, even

4  though it was a long time ago, right?

5    A.   Yes.

6    Q.   Did you find him to be in your actions -- in

7  your interactions with him, a conscientious and

8  responsible detective?

9    A.   He was a person who was doing a job.  I

10  really couldn't say anything other than that.

11    Q.   Okay.

12    And in the context of doing that job, you

13  would interact with him from time to time?

14    A.   Yes.  Because he was -- I believe he was a

15  detective when I was in the Mobile Unit also.

16    Q.   Okay.  So you knew him both from the Mobile

17  -- even when you were in the Mobile Unit processing

18  crime scenes you would sometimes interact with him in

19  that capacity?

20    A.   That's correct.

21    Q.   Fair to say you and him had a cordial



Case 1:19-cv-00384-ELH   Document 186-1   Filed 05/12/21   Page 162 of 388
BARRY SCOTT VERGER                                                    April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police                          161

1   working relationship?

2          A.   Just job related.

3          Q.   You weren't friends outside of work?

4          A.   No, I wasn't.

5          Q.   Okay.  But in work, your cordial,

6   professional relationship, correct?

7          A.   Yes.  I'm cordial to everybody.

8          Q.   All right.  So if he had questions, he was

9   able about crime scene collection when you were in the

10  Mobile Unit or testing you were doing on a case, he

11  could call you up or come and talk to you and you

12  would have made yourself available to answer those

13  questions, right?

14         A.   Yes, if I was in -- but that never happened

15  in the Mobile Unit.

16         Q.   So how did you know him in the Mobile Unit?

17         A.   For -- if we shared a call.

18         Q.   Okay.

19              Then --

20         A.   He came out and maybe, you know, he'd tell

21  me -- he'd say what evidence he wanted collected at



1   the crime -- if it was a stabbing or something of that

2   nature.

3        Q.   And so in the Mobile Unit, he was directing

4   you as to the collection of evidence when you-all were

5   working together?

6        A.   That is correct.  Bur, you know, that's what

7   he would have done.  I don't recollect, though.

8        Q.   Okay.

9             But you do remember him as a person?

10            MR. KAMIONSKI:  Objection, asked and

11   answered.

12            THE WITNESS:  Yes.

13   BY MS. GREEN:

14        Q.   Do you recall his reputation as a detective?

15        A.   No, I don't.

16        Q.   Do you recall that he was well known for

17   closing cases?

18            MR. KAMIONSKI:  Objection to the form of the

19   question.

20            MS. AMATO:  Join.

21            THE WITNESS:  I don't know any of that.



1   BY MS. GREEN:

2       Q.   Do you have any reason to question his

3   honesty or integrity?

4       A.   I do not know the person.  I just work

5   with -- you know, just worked with the person, that's

6   all.

7       Q.   Since you've been sued in this case, you

8   haven't had any conversations with Detective Ritz?

9       A.   That is correct.

10      Q.   When -- when was the last time you recall,

11  like working with him?  I actually don't know when he

12  retired off the top of my head.

13      A.   Twenty-some years ago.  I don't remember

14  anything other than that.

15      Q.   All right.

16           So in any event, and when you were working

17  in Trace Analysis to the extent you had any cases like

18  this one, similar, he would tell you what type of

19  testing he wanted done in the case, right?

20      A.   I only -- I only remember taking out

21  evidence from -- that needed, you know, to some -- I



1   don't remember who said it.  We were given property to

2   look at and examine.  And that's what I would do, I

3   would do my job.

4       Q.   All right.  How did you know what type of

5   examination to conduct if you -- like, walk me through

6   that?

7       A.   I know -- I personally don't recollect

8   knowing how I got the information that dealt with --

9   it's all foggy to me.  I just remember, you know,

10  getting it, you know.  I somehow knew how to do it,

11  you know, what they wanted tested but I don't remember

12  how I got it.

13      Q.   All right.  Well, I'd like to show you

14  what's been previously marked as, I believe it's

15  Exhibit 23.  It's the homicide file in this case.  I

16  think you have a hardcopy notebook there that your

17  counsel might be able to provide you.

18      A.   Yes, I think I see it.  Yes.

19      Q.   Yes.  If you could open that up, it's a

20  lengthy document but it is Bates labeled in the bottom

21  right corner with an NKDEF Bates stamp, the different



1    pages?

2          A.   Yes, I see it.

3          Q.   All right.

4               Why don't you turn to NKDEF 1091.  It's

5    about halfway into the notebook.

6          A.   Okay.  Got it.

7          Q.   Okay.  Do you recognize this form as the

8    form request for examination from the Baltimore Police

9    Department?

10         A.   I see it but I don't remember it.

11         Q.   I'm just asking if you recognize -- right,

12   recognize the form?

13         A.   That's what I'm telling you, I don't

14   recognize the form.

15         Q.   Okay.  Do the forms look different now?

16         A.   It's been 20 years.  I don't recognize it.

17         Q.   I'm asking you, do the forms look different

18   now?

19              MR. KAMIONSKI:  Objection to the form of the

20   question.

21              THE WITNESS:  I don't know.  I can't



```
 1  recollect that.  I don't know what the new one looks

 2  like, if there was a new one made.

 3          I just don't recollect seeing this one.

 4  BY MS. GREEN:

 5      Q.   What division of the BPD do you work in

 6  right now?

 7      A.   The Drug Analysis Unit.

 8      Q.   And that's within the Laboratory Division?

 9      A.   Yes.

10      Q.   When you get -- I know it's been decades,

11  but when you get requests for examination in the Drug

12  Analysis Unit, does it come to you on a form like this

13  right now or it comes on a computer?

14      A.   Well, we do it on a computer.  We write our

15  reports on the computer.

16          The evidence comes from downstairs.  The

17  officers write on, it's called a 56 form, and all the

18  items are listed and you go through the item and you

19  examine what they say, what they believe to be drugs.

20      Q.   Okay.  So in terms of this document, you see

21  that -- I understand you don't remember it -- but you
```



1  see that it's a Laboratory Division Request For

2  Examination form?

3       A.   Yes.

4       Q.   And you see at the top right corner it says,

5  homicide stabbing, correct?

6       A.   Yes, I see that.

7       Q.   And the date the request is sent is

8  December 4th, 1998, that's also on the top, right?

9       A.   That's correct.

10      Q.   And the requesting officer is Detective

11 William Ritz, right?

12      A.   Yes.

13      Q.   And it indicates that the evidence

14 pertaining to the request -- now I'm in the body of

15 the form, are two envelopes with fingernails

16 clippings, correct?

17      A.   That's correct.

18      Q.   Okay.

19           And Detective Ritz is requesting that the

20 aforementioned items; the fingernail clippings by the

21 Trace Analysis Unit to determine the presence of trace



1    evidence, correct?

2         A.    That's correct.

3         Q.    And we received a BPD Homicide Section

4    standard operating procedure which states, "All

5    requests for trace analysis of any evidence are a

6    responsibility of the primary investigator."  Is that

7    consistent with your recollection?

8         A.    I don't recollect that.

9         Q.    Okay.  Now, we showed Detective Ritz this

10   document at his deposition and he said that he, at

11   this time, requested testing on the fingernail

12   clippings.  Okay?

13        A.    Okay.

14        Q.    And he said that at the time he made it

15   clear to the analysts that he wanted the fingernails

16   to be analyzed for DNA testing?

17        A.    I don't recollect that.

18        Q.    Okay.

19              Do you have any reason to dispute it?

20        A.    I just don't remember him saying that,

21   that's all.



1      Q.   Okay.  So you don't -- so you don't dispute

2   Detective Ritz's testimony that when he submitted this

3   request, he was seeking DNA testing on the fingernail

4   clippings?

5           MS. AMATO:  Objection, mischaracterization

6   of testimony.

7           MR. KAMIONSKI:  Join.

8           THE WITNESS:  I don't recollect that.

9   BY MS. GREEN:

10      Q.   Sir, do you dispute it?

11      A.   I can't dispute what I don't remember.

12      Q.   Exactly.  So you can't say Detective Ritz is

13   lying about that, when he testified to that, right?

14           MR. KAMIONSKI:  Objection, mischaracterizes

15   his testimony.

16           MS. AMATO:  Join.

17           THE WITNESS:  Right, I don't remember.

18   BY MS. GREEN:

19      Q.   Okay.

20           In any event, if you got a request like this

21   and it came across your desk to test fingernails for



Case 1:19-cv-00384-ELH   Document 186-1   Filed 05/12/21   Page 171 of 388
BARRY SCOTT VERGER                                        April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police              170

1  the presence of any trace evidence, the first thing

2  that you would want to do is give the investigator a

3  call to determine what the case is about and what type

4  of the trace evidence they're looking for, correct?

5       A.   I don't recollect you know, having a

6  conversation with him.

7       Q.   I'm not talking about your conversation.

8  I'm talking about what you would do when you try and

9  get these -- when you get a request like this across

10 your desk, you would call the detective before you

11 start running tests on the fingernails, right?

12           MR. KAMIONSKI:   Objection, asked and

13 answered.

14           THE WITNESS:   Like I said, I don't recollect

15 having a conversation with any detectives before or

16 after, you know, I examined evidence.

17 BY MS. GREEN:

18      Q.   So you think it's possible that you

19 conducted the destructive testing on the samples of

20 nails without having any conversation with the

21 detective either before or after you conducted that



1   destructive testing.  Is that your testimony?

2               MR. KAMIONSKI:  Objection to the form of the

3   question, mischaracterizes the testimony.

4               MS. AMATO:  Join.

5               THE WITNESS:  I'm saying in my words, that I

6   don't recollect any conversation with Bill Ritz before

7   I took out the fingernails and examined them.

8   BY MS. GREEN:

9      Q.   So I'm not asking you that question, sir.

10              MR. KAMIONSKI:  That's the question you

11  asked him.  That's exactly the question you asked him.

12  BY MS. GREEN:

13     Q.   You got to focus on my question.

14              You think it's possible that -- do you think

15  it's possible that you conducted testing,

16  leucomalachite green testing which is destructive

17  testing in this case, correct?

18              MR. KAMIONSKI:  Objection to the form of the

19  question.

20              THE WITNESS:  That's -- I can't tell you

21  that because I can't answer that question.



1  BY MS. GREEN:

2       Q.   You cannot answer the question whether you

3  conducted leucomalachite green testing in this case?

4       A.   No, I can't -- I can't answer the second

5  part of your question which is whether I knew whether

6  it would be possible if I talked to Detective Ritz

7  before or after that.

8       Q.   And now, I'm asking something different.

9  I'm just backing it up a little bit to take you

10 through a logical line of questioning and get you in

11 the mindset of what it's like being an expert

12 conducting very serious testing on homicide evidence.

13 Okay?

14           So I'm just backing you up a little bit so

15 you're following me.  And my new question is:  Have

16 you conducted leucomalachite green testing in this

17 case, correct?

18      A.   That's correct.

19      Q.   You -- leucomalachite green testing is

20 destructive testing by definition, correct?

21      A.   Not by definition but that's correct.



1    Q.   Okay.

2         It's -- it has a reagent that's destructive

3    when you add hydrogen peroxide to it, correct?

4    A.   That's correct.

5    Q.   Okay.  You conducted that testing on

6    evidence taken from the victims's body; her

7    fingernails, correct?

8    A.   Yes.

9         MR. KAMIONSKI:  Objection to the form of the

10   question, mischaracterizes his testimony.

11   BY MS. GREEN:

12   Q.   When you conducted that destructive testing

13   on the evidence taken from the victim's body in the

14   course -- in this homicide case, you knew that was

15   evidence that could potentially be used in a criminal

16   prosecution, right?

17   A.    I was only doing my job as to taking the

18   evidence and doing the leucomalachite test on samples

19   underneath the fingernails, and they were consumed in

20   analysis.

21   BY MS. GREEN



1    Q.   That's fair.  So it's your -- you did not

2   know that the victim's fingernails was evidence that

3   could be used in a criminal prosecution when you were

4   doing your job in this case?

5    A.   I don't recollect knowing that, no.

6    Q.   Okay.

7        You had -- you didn't realize that was a

8   possibility here, right?

9        MR. KAMIONSKI:  Objection to the form of the

10   question, it misstates his testimony and

11   mischaracterizes it.

12        THE WITNESS:  I don't recollect any of that.

13   BY MS. GREEN:

14    Q.   All right.  So in any event, you -- and you

15   think it's possible you did not know that the victim's

16   fingernails might be evidence pertinent to a criminal

17   -- a homicide prosecution?

18    A.   I don't have any recollection of -- alls I

19   did was do a -- you know, pull the evidence out,

20   examine it and did a leucomalachite test on the

21   samples, and they were consumed.  That's all I can





1    tell you.

2         Q.   And there's nothing that you've reviewed

3    today that's refreshed your recollection in that

4    regard.  You do think it's possible -- we've been

5    through a number of documents, right?

6         A.   Yes.

7         Q.   Okay.  And you did your best before

8    testifying here today to prepare and get yourself

9    ready to testify and to try and refresh your

10   recollection, right?

11        A.   I just don't remember stuff that was done

12   20 years ago.

13        Q.   No problem.  But you did your best to

14   refresh your recollection before you came in today to

15   testify in this deposition.  You read your report, you

16   read your testimony, right?

17        A.   Yes, I did read it.  Yes.

18        Q.   And even after the documents I've shown you

19   today and after reading your testimony, you still

20   think it's possible that you had no idea that the

21   fingernails that you were testing in this case could



1  potentially be used in a homicide prosecution.  Is

2  that right?

3          MS. AMATO:  Objection to the form of the

4  question.

5          MR. KAMIONSKI:  Objection to the form of the

6  question, mischaracterizes his testimony.

7          THE WITNESS:  Yes, I don't recollect any

8  part of that case, if I did.

9  BY MS. GREEN:

10     Q.   All right.

11          So, nothing -- you haven't seen anything

12 here today that would convince you that you would have

13 understood back in 1999 that these were nails, that --

14 that the nails were evidence potentially in a homicide

15 prosecution, right?

16          MR. KAMIONSKI:  Objection to the form of the

17 question, asked and answered.

18          THE WITNESS:  I was only going to do an

19 examination of the fingernails, of the sample taken

20 from the fingernails.

21          If there was sample left on the fingernails,



1   I don't know.  You know, that's all I did.

2   BY MS. GREEN:

3       Q.   You've seen nothing here today that

4   convinces you that in 1999 you -- it's possible you

5   knew that this was evidence from -- that could be used

6   in a homicide prosecution?

7            MR. KAMIONSKI:  Objection to the form of the

8   question, asked and answered.

9            THE WITNESS:  But it says it's a homicide

10  case on it.

11  BY MS. GREEN

12      Q.   Okay.  And even after reading that, you

13  still can't say that you would have understood in 1999

14  that this was evidence that could potentially be used

15  in a homicide prosecution, right?

16           You don't -- still don't feel comfortable

17  saying that because you can't remember, right?

18      A.   Yes.  I don't recollect anything I said -- I

19  don't recollect what I was thinking back in 1999.

20      Q.   You think it's possible that you wrote down

21  homicide on your bench note without understanding that



1   the victim's fingernails that you were testing could

2   be pertinent to a homicide prosecution, right?

3            MR. KAMIONSKI:  Objection to the form of the

4   question, asked and answered.

5            You can answer it again.

6            THE WITNESS:  I only recollect examining the

7   samples from the fingernails and they were consumed.

8   That's all I remember.

9   BY MS. GREEN:

10       Q.   And you're doing your best right now to give

11   truthful and honest testimony, right?

12       A.   Yes.

13       Q.   You are not lying, right?

14       A.   I'm not lying.

15       Q.   You haven't told a single lie in this

16   deposition, right?

17       A.   Right.

18       Q.   When you tell me right now that you don't

19   even know if it's possible that you understood that

20   the fingernails were pertinent to a homicide

21   prosecution, you are being as truthful as you were at



Case 1:19-cv-00384-ELH  Document 186-1  Filed 05/12/21  Page 180 of 388
BARRY SCOTT VERGER                                                April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police                        179

1  the trial of this case, right?

2       A.   All I'm saying is back in 1999, I had the

3  opportunity to examine this evidence.  And I took

4  samples from the fingernails and I did a presumptive

5  test using a -- a leucomalachite test, and it was

6  consumed in analysis, the samples that I had taken.

7            I don't know anything -- have anything else.

8       Q.   Are you trying to answer my question?  Are

9  you doing the best you can to answer the questions I'm

10  asking?

11      A.   Maybe you need to restate them in a

12  different way.

13      Q.   You understand you have an obligation or you

14  agreed to let me know if you don't understand my

15  questions, right?

16      A.   Okay.  That's correct.

17      Q.   Okay.  And you'll do that throughout this

18  deposition?  That's what you've been doing?

19      A.   That's correct.

20      Q.   Okay.  So for the last five minutes of

21  questioning, you have been doing your best to answer



```
 1   the questions that I'm asking you?

 2        A.   That's correct.

 3        Q.   You're taking your testimony very seriously

 4   today, correct?

 5        A.   Correct.

 6        Q.   You understand that a man named Malcolm

 7   Bryant spent many years in prison, right?

 8             MS. AMATO:  Objection, asked and answered.

 9             MR. KAMIONSKI:  Objection to the form of the

10   question, relevance.

11             THE WITNESS:  I --

12             MR. KAMIONSKI:  You may answer.

13             THE WITNESS:  Yes.

14   BY MS. GREEN:

15        Q.   You understand that we have alleged that

16   you, because of what you did in this case caused this

17   man to be wrongfully convicted?  Do you understand

18   that?

19        A.   Yes, I do.

20        Q.   Do you understand those are very serious

21   allegations, correct?
```



1        A.    Yes, I do.

2        Q.    You understand that this is a serious case?

3        A.    Yes, I do.

4        Q.    And you have come in today prepared to do

5   your best to truthfully and honestly answer the

6   questions that I'm asking, right?

7        A.    Yes.

8        Q.    And oftentimes when you testify at criminal

9   trials, you testify months or even years after

10  conducted testing, right?

11       A.    Sometimes, yes.

12       Q.    Okay.  And sometimes you don't always

13  remember the exact testing that you conducted when

14  you're testifying years down the road, right?

15            That's not uncommon, correct?

16       A.    Correct.

17       Q.    And -- but nonetheless, it's your job as an

18  expert and as an employee of the Baltimore Police

19  Department to testify to the best of your ability,

20  right?

21       A.    That's correct.



1      Q.   You testified consistent with your

2   practices, right?

3      A.   That's correct.

4      Q.   And you refresh your recollection, right,

5   with your notes?

6      A.   That's correct.

7      Q.   That's what I'm asking you to do here today.

8   Do you understand that?

9      A.   Yes, I do.

10      Q.   And you do that all the time because you've

11   been an expert at the BPD for decades, correct?

12      A.    I have -- I seldom do it.  I don't do it as

13   much as you think I do it.

14      Q.   At trial when you would answer questions

15   about testing you didn't specifically remember, did

16   you just say sorry, I don't remember that today?

17          MR. KAMIONSKI:  Objection to the form of the

18   question.

19          THE WITNESS:  I don't recollect what I would

20   say.

21   BY MS. GREEN:



1      Q.   You don't recollect what you do at a trial

2    if you don't recall your testing?

3      A.   I said I don't recall -- recollect, you

4    know, what had happened.

5      Q.   You'd refresh your recollection with your

6    notes, right?

7           MR. KAMIONSKI:  Objection to the form of the

8    question.

9           THE WITNESS:  That's correct.

10   BY MS. GREEN:

11     Q.   And that's why it's critically important to

12   take detailed notes, right?

13     A.   That's correct.

14     Q.   Because you don't -- you're going to be

15   called upon to testify down the road?

16     A.   That's correct.

17     Q.   And in this case when you conducted the

18   leucomalachite green testing, you understood you might

19   be called to testify about the testing you conducted

20   down the road, right?

21     A.   That's correct.



1     Q.   And it was your obligation to take detailed

2  notes on every thing that you did and everything with

3  respect to the fingernails and everything that you

4  visualized, right?

5          MR. KAMIONSKI:  Objection, asked and

6  answered.

7          THE WITNESS:  That's correct.

8  BY MS. GREEN:

9     Q.   And even at trial in this case -- at a trial

10  have you ever been asked why did you conduct a

11  particular kind of testing?  What was the purpose?

12          MR. KAMIONSKI:  Objection to the form of the

13  question.

14          THE WITNESS:  I don't recollect.

15  BY MS. GREEN:

16     Q.   Is it your job as an expert and analyst to

17  understand the purpose of the testing that you're

18  doing?

19     A.   Yes.

20     Q.   As an analyst, do you have to use some

21  discretion in terms of deciding what test to conduct



1  and what not to conduct, right?

2      A.   That's correct.

3      Q.   All right.

4           And so, going back to Exhibit 23, Page 1091,

5  the December 4th report.

6           MR. KAMIONSKI:  Hold on a second.

7           THE WITNESS:  Hold on a second.

8  BY MS. GREEN:

9      Q.   Well, while he's getting that for you, the

10  testing that you conducted in this case -- well, in

11  terms of assessing what testing to conduct and using

12  your discretion which testing to conduct, you have to

13  understand some context about the case, right, the

14  investigation?

15          MR. KAMIONSKI:  Objection to the form of the

16  question.

17          THE WITNESS:  Yes.

18  BY MS. GREEN:

19      Q.   And so in order to understand context about

20  the investigation, you would talk to the detective,

21  learn what the item is and the potential testing that



1   they're looking to do so that you can evaluate how to

2   move forward with the trace analysis, right?

3        A.   I don't recollect having a conversation with

4   anybody.

5        Q.   I get that.  Now, you got to start answering

6   my questions, sir.

7             MR. KAMIONSKI:  He is answering your

8   questions.  Don't say that to him.

9   BY MS. GREEN:

10       Q.   Although you don't remember today, you know

11  that to get context about the case so you can, as an

12  expert, use your judgement on what testing to conduct

13  and what not to conduct, you would talk to detectives

14  about the case because it's their case.

15            MR. KAMIONSKI:  Objection, asked and

16  answered, now for the 26th time.

17  BY MS. GREEN:

18       Q.   -- sir?

19       A.   I don't recollect talking to him.

20       Q.   You don't recollect of having a practice of

21  talking to detectives?



1      A.   With Detective Ritz about this case.

2      Q.   I'm not talking about Detectives Ritz.  I'm

3  talking about your practice?

4      A.   I don't recollect that either.

5      Q.   You have no idea what your practice was in

6  terms of getting context on a case?

7      A.   That's correct.

8      Q.   Okay.

9           You have no idea how you would find out the

10  context you need to make discretionary decisions about

11  what testing to perform?

12      A.   Right, I don't recollect any of that.

13      Q.   You can't even reason through it right now?

14      A.   I don't want to make stuff up.  I don't

15  recollect it.

16      Q.   And you currently conduct testing on cases?

17  You are a BPD analyst right now?

18      A.   For drugs, yes.

19      Q.   Okay.  And you work in the BPD, you go to

20  work every day, right -- or Monday through Friday?

21  What's your hours?



1        A.    You want to join it?  4 o'clock.

2        Q.    Sorry?

3        A.    4 o'clock in the morning.

4        Q.    All right.  So you start early.  Right?

5   What time do you get off?

6        A.    I get off around 12:00.

7        Q.    How many days a week do you work typically

8   in a -- any given week?

9        A.    Five days a week.

10       Q.    So you work five days a week -- full time

11  job, right?

12       A.    That's correct.

13       Q.    As a BPD analyst?

14       A.    That's correct.

15       Q.    Conducting forensic testing on cases in all

16  kinds of criminal investigations, right?

17       A.    Certified that -- I've looked at controlled

18  dangerous substances --

19       Q.    And you know --

20       A.    -- and whether they are.

21       Q.    You know your testing's going to be used in



1  prosecutions, right?

2       A.   Yes.

3       Q.   You know that right now for the Drug

4  Analysis Unit, right?

5       A.   Yes.

6       Q.   But you have no idea if you understood that

7  your testing in the Toni Bullock homicide case might

8  have been used in a prosecution?

9       A.   I don't recollect having any conversation

10  with anybody.

11       Q.   Okay.

12            And you can't think of any reason as you sit

13  here today why you would need to have a conversation

14  with anybody before conducting testing on a victim's

15  nails in a homicide case?

16       A.   No.

17       Q.   And you don't even recollect having a

18  practice of talking to detectives before you would

19  conduct destructive testing in a homicide case, right?

20       A.   I don't recollect -- that was 20 years ago.

21  I don't recollect anything that happened back then.



1    Q.   And even working as a BPD analyst now, you

2    don't feel comfortable saying that back then when you

3    were doing testing on rape kits, blood from homicide

4    cases, that had the ability to potentially inculpate

5    or exculpate suspects, you still cannot say that you

6    would have had a practice of talking to detectives

7    about those important cases?

8    A.   I just don't recollect talking to any

9    detectives back then.

10   Q.   Okay.  Fair enough.

11        So -- and you didn't need to, right?

12   A.   Like I said before, the items that were

13   asked to be analyzed were written on a piece of paper

14   and it was with the evidence.

15   Q.   All right.  So let's go to Page 1091, which

16   I think you have in front of you now?

17   A.   Yes.

18   Q.   Looking at your report like this, you -- it

19   says, "Request the aforementioned items of evidence be

20   examined by the Trace Analysis Unit to determine the

21   presence of any trace evidence."



Case 1:19-cv-00384-ELH   Document 186-1   Filed 05/12/21   Page 192 of 388
BARRY SCOTT VERGER                                        April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police             191

1        So obviously, it's a request to examine

2   fingernail clippings, right?

3        A.   That's correct.

4        Q.   How do you know what testing to do when you

5   got this report?  What do you do next in this case?

6        A.   Well, it went to me.  We didn't do DNA.  So

7   I would test it for what I was taught to test for;

8   human blood and semen -- bodily fluids.

9        Q.   All right.  So when you got this report to

10  test the victim's fingernails, you had two choices;

11  you could either test it for blood or for semen.  Is

12  that right?

13       A.   That's correct.

14       Q.   And how did you make the decision to start

15  with the blood test rather than a semen test?

16       A.   Observations of the red.

17       Q.   Okay.  Did you consider doing any semen

18  testing?

19       A.   Not at that moment.  I don't recollect that.

20       Q.   Did you consider doing any testing for semen

21  on the nails after you tested for the presence of



1   blood?

2       A.   I don't recollect whether I did or not.

3       Q.   Now, in deciding to do the blood testing as

4   opposed to the semen testing on the nails, that would

5   be something you decided in your own discretion, you

6   wouldn't need to talk to an investigator about what he

7   might prefer in that regard?

8       A.   The trace evidence.  The detective wrote on

9   a paper, "trace evidence."

10      Q.   Right.  So semen is trace evidence, right?

11      A.   Semen and blood.

12      Q.   And blood is trace evidence?

13      A.   Any -- yeah, bodily fluid.

14      Q.   Okay.  And so I'm just saying, you had two

15  choices but you decided on your own to do blood

16  testing; it's irrelevant, you don't need to talk to

17  the detective to let him know, hey, I can test for

18  blood or I can test for semen.  Is there any

19  background, in case I need to know, to believe that

20  perhaps there's a reason to believe there's semen

21  under the little girl's nails?



1      A.   I don't recollect any conversations with

2  him.

3      Q.   Okay.  And so when you're deciding whether

4  to test for blood or for semen, you don't need to

5  know, for example, whether there was a sexual assault

6  component here?

7      A.   I don't recollect anybody saying anything to

8  me about sexual assault.

9      Q.   Well, you understand the only reason you

10  would ever decide to do testing for semen is if there

11  is some evidence of sexual assault, right?

12      A.   That's correct.

13      Q.   All right.  So the only way you would find

14  that out is by talking to the investigator, right?

15      A.   Like I said, I don't recollect talking to

16  any investigators.  I don't recollect any conversation

17  with them.

18      Q.   What other way would you find out if there's

19  -- so you -- you understand it was your job to decide

20  whether to do semen testing or blood testing?

21      A.   Well, if it was a rape kit, it was -- you're



1  looking for semen.  They came in special envelopes.

2      Q.   Sir, you got to stick with me.  I'm talking

3  about this form, NKVF 1091, what you would have done

4  when you'd gotten it and how you went through your

5  decisionmaking process in this case?

6      A.   Right.  I conducted it -- I conducted an

7  observation with my eye, I looked and saw that they

8  had a red stain.  I did a preliminary test on the

9  samples that I took of the red stains and it was

10  consumed.

11          That's all I can tell you.

12      Q.   Okay.  And before conducting the consumptive

13  testing, did you need to notify anyone that, hey, I

14  know you want to test it, but this is destructive,

15  potentially.  I'm just giving you a heads-up because I

16  don't want you to be mad that I'm destroying your

17  evidence.

18          Would you tell that to the investigator or

19  the prosecutor or do you just go ahead and do it?

20      A.   You're asking me to think of something that

21  happened 20 years.  I can't recollect what I was



1   thinking back then.

2        Q.   Can you recollect even what your BPD would

3   know what you were permitted to say?

4            Are these hard questions for you?

5        A.   No.

6            MS. AMATO:  Objection, argumentative.

7   BY MS. GREEN:

8        Q.   So why don't we pretend, like, right now?

9   Because you're still an analyst.  That's the trouble

10  I'm having.  You still work at the BPD.  You still

11  testify as an expert.  You still hold yourself out as

12  an expert but right now, you're trying to tell me you

13  have no idea what you would do in any of these

14  situations.  And I'm telling you, sir, it doesn't

15  sound very credible, and I'd like to walk through, if

16  you got this report right now, what would you do?

17           MR. KAMIONSKI:  Objection to the pouncing on

18  the witness's testimony.  The witness has been sitting

19  here for hours and hours and hours and answering

20  questions from you based on what he recalls.

21           If you don't like the answers, you don't



1    like the answer.  But he's giving you the answers to

2    the best of his recollection.

3               MS. GREEN:  Okay.

4    BY MS. GREEN:

5       Q.   So let's look at this report.  If you were

6    in the Trace Analysis Unit now and you were getting

7    ready to test these nails for blood.  Okay?

8       A.   Okay.

9       Q.   You still know today just as you did in

10   1999, that the leucomalachite test is a destructive

11   test, right?

12      A.   That's correct.

13      Q.   If you had this report on your desk today

14   and you were about to conduct destructive testing on

15   the victim's fingernails in a homicide case, would you

16   have any obligation to tell the investigator and the

17   prosecutor before you do that testing that it's

18   destructive?

19      A.   But it was the samples taken from the

20   fingernails, not the fingernails themselves.

21               You're putting words in my mouth.



```
 1            Alls I said was, I can't think of what I

 2    would do today as far as, you know, what I'd do

 3    20 years ago.  That's impossible.

 4        Q.   You can't -- do you do any destructive

 5    testing now?

 6        A.   Do I do any destructive testing now?

 7        Q.   In the Drug Analysis Unit, do you run tests

 8    that are consumptive in nature?

 9        A.   Yes.

10        Q.   Okay.  Do you notify anyone before you

11    consume the evidence in the test?

12        A.   No, I don't.

13        Q.   Okay.  And I take it back in the Trace

14    Analysis Unit, you recall no obligation to tell either

15    the investigator or prosecutor that you were going to

16    be conducting destructive testing?

17        A.   That's correct.  I said I did, you know, the

18    leucomalachite test and tested the samples until they

19    were consumed.

20        Q.   And thinking back now, you remember

21    notifying the prosecutor in the case that the testing
```



1   was consumptive that the stains couldn't be tested for

2   DNA?

3        A.   I just -- what I recollect is I looked

4   through my notes, is I performed a presumptive test

5   which is a leucomalachite test and I consumed the

6   samples that were under the fingernails.  What was

7   left on the fingernails, was left on the fingernails.

8        Q.   You did not give the prosecutor any notice

9   before you conducted destructive testing on the

10  fingernails, right?

11            MR. KAMIONSKI:  Objection to the form of the

12  question, asked and answered.

13            THE WITNESS:  I don't recollect that.

14  BY MS. GREEN:

15       Q.   And as you sit here today, you don't see any

16  reason why you would do that, right?

17       A.   I'm telling you, I don't recollect talking

18  to anybody about this case.

19       Q.   All right.  So you get -- so essentially you

20  got 1091, that form, and you looked at the fingernails

21  and you saw red on them.  You just went ahead and



1  sampled the red stains and consumed the samples,

2  correct?

3      A.   That's correct, consumed the samples.

4      Q.   Okay.

5           And on this report -- this report would be

6  enough, this report that just says request that the

7  aforementioned items be examined by the Trace Analysis

8  Unit to determine the presence of -- trace evidence,

9  that's enough to trigger you to conduct leucomalachite

10 green testing, correct?

11     A.   I don't recollect what had happened.

12          MR. KAMIONSKI:  Could you rephrase that

13 question?

14          MS. GREEN:  You know what?  I will withdraw

15 the question.  In terms of the --

16          MR. KAMIONSKI:  Can you also tell me if it's

17 a good time for a bathroom break?

18          MS. GREEN:  Yeah, we can take a break now.

19          How long would you like?

20          MR. KAMIONSKI:  Probably five minutes.

21          THE VIDEOGRAPHER:  We're going off the



1   record.

2            The time it 2:03.

3            (Whereupon, a recess ensued.)

4            THE VIDEOGRAPHER:  We're back on the record.

5            The time is 2:14.

6   BY MS. GREEN:

7       Q.   Mr. Verger, I understand that you don't

8   remember any conversations you had in this case.  Is

9   that right?

10      A.   That's correct.

11      Q.   Okay.  I'm going to ask you some questions

12  about those practices.  Okay?

13      A.   Go ahead.

14      Q.   So, in the scenario where you received

15  fingernail clippings in a homicide case and the

16  detective requests DNA testing on those clippings,

17  what would you do?

18      A.   Talk to my supervisor.

19      Q.   Okay.  Then what?

20      A.   And then I would proceed under his guidance

21  what to do.



1    Q.   Okay.  Now, you are not able to do DNA

2  testing, right?

3    A.   That's correct.

4    Q.   And -- but as you saw from the letter I

5  showed you today, one of your jobs was to be a liaison

6  in terms of actually sending the items out for DNA

7  testing to the DNA lab, including the Maryland State

8  Police Lab, correct?

9    A.   That's correct.

10    Q.   Okay.

11       Now, when you do DNA testing on nails -- DNA

12  testing on nails, there is -- so you would talk to

13  your supervisor and you get a request from an

14  investigator on DNA testing.  So you say you talk to

15  your supervisor and they tell you what to do, right?

16    A.   That's correct.

17    Q.   So earlier in the deposition you said

18  whether or not to do DNA testing was out of your

19  hands.  Do you recall that?  You volunteered that?

20    A.   That -- I don't recollect what I said.

21    Q.   Okay.  So, in terms of DNA -- conducting DNA



```
 1   testing on fingernails, you understood that you could

 2   send fingernails directly out to the lab for DNA

 3   testing if that's what the case called for, correct?

 4           MS. AMATO:  Objection, mischaracterization

 5   of his testimony.

 6           MR. KAMIONSKI:  Join and foundation, calls

 7   for speculation.

 8           You can answer.

 9           THE WITNESS:  I believe swabbings would --

10   of the fingernails, they would be sent out.

11   BY MS. GREEN:

12       Q.   Okay.  So you could have fingernails and you

13   could send the nails -- you're familiar with the

14   Maryland State Police Lab, you would liaison with

15   them, correct?

16       A.   I don't remember too much about how it all

17   works.

18       Q.   Well, you know they had a DNA lab back then?

19   You know it from this case, right?

20       A.   Yes, that's correct.

21       Q.   You also know they had a serology lab back
```



 1   then, right?

 2        A.   That's correct.

 3        Q.   So if something needed to be sent out to the

 4   Maryland State Police Lab, there was no reason for you

 5   to conduct any testing on it because they could do it,

 6   right?

 7             MR. KAMIONSKI:   Objection to the form of the

 8   question, calls for speculation, foundation.

 9             THE WITNESS:   I would -- it was our

10   procedures if I remember correctly that we would swab

11   the fingernail and send them out.

12   BY MS. GREEN:

13        Q.   Okay.  So -- and you would just send out the

14   swabs?

15        A.   Yes.

16        Q.   Okay.  So in the event that an investigator

17   requested DNA testing in a case, you would check with

18   your supervisor, right?

19        A.   That's correct.

20        Q.   And if the supervisor approved it, you would

21   swab the nails, right?



```
 1        A.   That's correct.

 2        Q.   And then you would send the swab from the

 3   nails out for DNA testing, correct?

 4        A.   That's correct.

 5        Q.   Now -- and you -- you can't do DNA testing,

 6   right?

 7        A.   I don't do DNA tests.

 8        Q.   So you would have no reason to run any

 9   testing on any evidence once DNA testing has been

10   requested, correct?

11             MR. KAMIONSKI:  Objection to the form of the

12   question, foundation.

13             THE WITNESS:  In this case, you know, I just

14   did the samples.

15   BY MS. GREEN:

16        Q.   Okay.  And, again, I'm not talking about

17   this case, I'm talking about --

18        A.   In general?

19        Q.   Yes, generally.  I know you don't remember

20   this case.  So just generally, although if you got a

21   request for DNA testing, you were not required to do
```



1  any testing on the item, any serology testing on the

2  item, you'd simply swab the nails and send the swab

3  out for DNA testing, right?

4          MR. KAMIONSKI:  Objection, mischaracterizes

5  his testimony, foundation.

6          THE WITNESS:  Well, that's not entirely

7  true, what you're saying.  It partially true.

8  BY MS. GREEN:

9      Q.   Okay.

10     A.   We would -- if it was a rape kit and if they

11  did the swabbings of, you know, the swabs would be

12  sent to the lab if they were doing a rape kit.  I

13  believe we had to count the -- count the sperm on the

14  -- and make a slide, and then it would be -- if there

15  was enough to get something, somebody would get my

16  report and they would go out.

17     Q.   Got you.  Let's stick with fingernails then.

18  I'm not talking about this case, but just generally.

19          If you got a request for testing on a victim

20  -- DNA testing on a victim's fingernails and the

21  investigator tells you they have a suspect and they're



1    looking to include, see if -- you know, the suspect's

2    DNA is under the fingernails.  They want DNA testing.

3          What do you do in that instance?

4          A.   If they did, I would have to talk to my

5    supervisor, you know.

6          Q.   Okay.  If your supervisor approved the DNA

7    testing request, then what?

8          A.   I'd write out a request to send it to the

9    MSP Lab.

10         Q.   Okay.  And then you'd send it out, right?

11         A.   Yes.  But it first would have to be looked

12   at by my supervisor so see if everything was done

13   correctly, and then it could go out.

14         Q.   All right.

15         So, if your supervisor approves DNA testing,

16   there is no need for you to conduct any leucomalachite

17   green testing on fingernails if the investigator is

18   telling you they want testing done, right?

19         MR. KAMIONSKI:  Objection to the form of the

20   question, calls for speculation, foundation.

21         THE WITNESS:  Is that in this case or just



1   any case?

2   BY MS. GREEN:

3       Q.   This case.

4       A.   I don't recollect how it -- exactly how it

5   would work but I would think that -- I don't want to

6   even think.

7       Q.   Can you think of any reason why you would

8   need to conduct leucomalachite green testing on

9   fingernails when DNA testing is what was requested?

10      A.   I wouldn't.

11      Q.   Okay.  Now, and that's because -- so you

12  understood if you got a request for DNA testing, there

13  was no reason for you to conduct leucomalachite green

14  testing, correct?

15           MR. KAMIONSKI:  Objection, mischaracterizes

16  his testimony and form.

17           THE WITNESS:  Yeah, I don't know.  I don't

18  know how to answer that question.

19  BY MS. GREEN

20      Q.   What's confusing about the question?

21      A.   Well, it's kind of like doing a residue



1   test.  You know, you can wash something out and it can

2   still have -- you can wash it out the best you can on

3   a vile and you still might have stuff in the vial that

4   still could test positive later on.

5          So you're saying that though I used it all

6   up, when in fact you don't know I used it all up.

7   You're just taking a sample out of the vial.

8          Same thing with the fingernails.  I'm

9   swabbing the fingernail.  I don't know if I got

10  everything off the fingernails.  I'm just testing the

11  samples that I took from the fingernails to test, you

12  know, to do a presumptive test.

13      Q.   Sure.  But if someone requested that you do

14  DNA testing on fingernails, there is no reason for you

15  to do a presumptive test for the presence of blood,

16  correct?

17      A.   I don't know that.  Somebody would have to,

18  you know, I would have to be directed, you know, see

19  what's on the form.

20          I would have to ask somebody.  I don't

21  remember, you know, how that would work.



```
1         Q.   Can you think of any reason as you sit here

2    today why if someone asked you for DNA testing on

3    nails to match -- compare to a suspect why you would

4    then go and perform leucomalachite green testing on

5    it?

6              MS. AMATO:  Objection to the form of the

7    question, incomplete hypothetical.

8              MR. KAMIONSKI:  Join.

9              THE WITNESS:  I can't tell you that.

10   BY MS. GREEN:

11        Q.   But specifically you understand that

12   leucomalachite green testing can either include or

13   exclude a suspect, correct?

14             MR. KAMIONSKI:  Objection to the form of the

15   question.

16             THE WITNESS:  That's correct.  Your sample

17   is gone, consumed.

18   BY MS. GREEN:

19        Q.   And so if someone is looking for DNA testing

20   to include or exclude a suspect, there would be no

21   reason to perform leucomalachite green testing,
```



 1   correct?

 2        A.   I don't -- I can't answer that question.  I

 3   don't know.

 4        Q.   You can't think of a reason as you sit here

 5   right now?

 6             MR. KAMIONSKI:  Objection to the form of the

 7   question.

 8             MS. AMATO:  Objection to the form of the

 9   question.  Sorry, Avi.  Join.

10             THE WITNESS:  I'm not there, so I couldn't

11   tell you.

12   BY MS. GREEN:

13        Q.   So, Detective Ritz testified at his

14   deposition that he did request that DNA testing be

15   conducted on the nails in this case and Detective

16   Mabrey -- I mean, I'm sorry, Prosecutor Mabrey, the

17   prosecutor also testified that he would have had a

18   conversation with you about conducting DNA testing on

19   the nails is in this case.  Okay?

20        A.   Okay.  But I do not recollect the

21   conversation.



1    Q.   Fine.  Do you have any explanation for --

2    although I know you don't remember it, do you have any

3    explanation for why you would conduct leucomalachite

4    green testing in this case when Detective Ritz and the

5    prosecutor both said they would have told you to

6    conduct DNA testing or testing that could include or

7    exclude the suspect?

8    A.   Like I said, if the samples, if I took some

9    of the sample and consumed the sample, it doesn't mean

10   that the rest of the fingernail had something on them.

11   Q.   Okay.  So just taking that to its logical

12   conclusion, why didn't you send the rest of the

13   fingernails out for DNA testing?

14   A.   That was not my -- I don't have -- I don't

15   have that authority to do that.

16   Q.   Who has that authority to do that?

17   A.   That would be up to the detective and to my

18   supervisor.

19   Q.   Okay.  So did you -- now, again, if you got

20   a request for DNA testing, what is the reason, why

21   would you conduct leucomalachite green testing?  I



1  understand it's your position that there may be

2  something left to test later but like, what is the

3  purpose of conducting leucomalachite green testing?

4       A.   The purpose is to find out if it -- what if

5  it's paint?  You know, if you do a leucomalachite test

6  and it was just like red fingernail polish or red

7  paint, what would be the sense of spending a lot of

8  money sending it out to the Maryland State Police Lab?

9       Q.   Well --

10      A.   It has to do -- it has to do with -- I

11 understand what you're saying.  Yes, a homicide was

12 committed here but if you don't find out whether it's

13 for -- you know in our lab, if you don't find out what

14 it is whether it could be blood, then it's all for

15 not.

16      Q.   But you already know that you can test --

17 you know, epithelial cells -- do DNA testing on

18 epithelial cells.  It doesn't have to be blood to do

19 DNA testing on it.  You understand that, right?

20      A.   No, I'm not familiar with anything of how to

21 get DNA off of anything.



```
1              I am just a -- what I did there, I did

2    serology and now I analyze drugs.

3         Q.   But you understand that DNA can come from

4    skin --

5         A.   Yes.

6         Q.   -- under the fingernails?

7         A.   Yes.

8         Q.   You can understand a perpetrator's DNA can

9    be underneath the fingernails, even if there is no

10   blood there, correct?

11        A.   Yes.

12        Q.   Okay.  So what is the purpose of testing for

13   the presence of blood which you know is destructive

14   and not discriminatory testing?  What's the purpose of

15   that?

16        A.   Well, the purpose was that you could find

17   out what the right stain was, if it was blood.

18   Possibly it's blood.

19        Q.   Why didn't you preserve any of the red

20   stains on the fingernails for subsequent testing?

21        A.   I don't know if it -- all I'm saying is what
```



1   I tested was consumed.  I don't know that.

2       Q.   You already told me earlier today, we went

3   through it in excruciating detail, that you consumed

4   all the red stains you could visualize.

5            MR. KAMIONSKI:  Objection, that

6   mischaracterizes his testimony.

7   BY MS. GREEN:

8       Q.   Do you want to change that testimony now?

9       A.   No.

10           MR. KAMIONSKI:  Objection, that

11  mischaracterizes his testimony.

12           THE WITNESS:  I'm saying I consumed all the

13  samples that I took -- that I got from the underneath

14  the fingernails.  Whether it was all of it, I can't

15  tell you.

16  BY MS. GREEN:

17      Q.   And why did you decide to sample every

18  fingernail that had a red stain on the the it?

19      A.   To see if it was -- if it was blood.

20      Q.   Wouldn't it make sense to save some of it

21  once you've gotten some of the fingernails



1    presumptively positive for blood to save the other

2    stains for subsequent DNA testing?

3         A.   At that time my job was to do a preliminary

4    test for blood.  That's what I did.

5              I consumed the samples that I took from the

6    fingernails.  Like I said I didn't know if any -- if

7    there was anything left on the fingernails.

8         Q.   Well, you told -- you testified at trial

9    that there was nothing left to test.

10        A.   Of my sample.

11        Q.   Right.  So following your testimony to its

12   logical conclusion --

13        A.   Right.  I'm talking --

14        Q.   Why not send the rest out for DNA then, if

15   you don't use it all?

16        A.   I was only talking about the samples that I

17   took from my preliminary test that were consumed.

18   Nothing about any other -- epithelial cells, if there

19   were any under the nails.

20        Q.   When you scraped the nails, you understand

21   that you're also picking up epithelial cells in



1  addition to blood, correct?

2       A.   I wasn't scraping the nails.  I was just

3  taking like a swab or something with a wet swab.

4       Q.   And that's what you do when you're testing

5  nails for DNA, you swab the nail to try to get

6  epithelial cells.  That's what you just told me,

7  right?

8            MS. AMATO:  Objection to the

9  mischaracterization of the evidence.  He didn't say

10  that's how you test for DNA.

11            MR. KAMIONSKI:  Join.

12            THE WITNESS:  I don't recollect how -- I

13  just don't know how they extract DNA from stuff.  So,

14  I wouldn't know that.  All I know is how to do that

15  preliminary stuff, and I did it to the best of my

16  knowledge.

17  BY MS. GREEN:

18       Q.   Why did you not save any of the red stains

19  for testing if you had a request for DNA testing?

20  What would be the rationale for that?

21       A.   They weren't large enough to -- just wasn't



1   enough there.

2        Q.   All right.  But you tested six different

3   nails, right?

4        A.   Yes, according to my report.  Yes, I did.

5        Q.   Why didn't you just test one nail and then

6   send the rest of the stains out for DNA testing?

7        A.   Because that's the way I did my job.  I did

8   a preliminary test and I was looking for human blood,

9   the possibility of human blood -- the possibility of

10  any blood.

11       Q.   All right.  You have the notebook in front

12  of you, but I'd now like to mark another exhibit.

13  What number are we on?

14            MS. BROWN:  I have 88.

15  BY MS. GREEN:

16       Q.   You should have there a card copy exhibit

17  that is a February 8th, 1999 report that Mr. Kamionski

18  might be able to hand you I think.

19            MR. KAMIONSKI:  I have it right here

20  (indicates).

21            MS. GREEN:  I'm marking that Exhibit 88.



```
 1              (Verger Exhibit No. 88 was marked for

 2      identification.)

 3      BY MS. GREEN:

 4          Q.   And you still have the notebook in front of

 5      you, right?

 6          A.   Yes.

 7          Q.   And you're at 1091?

 8          A.   Yes.

 9          Q.   Okay.  So, keep 1091 in front of you and

10      then look at 88, which is just a two-paged document.

11      I'm not sure if it was printed double sided.  Let me

12      know when you're there.

13              MR. KAMIONSKI:  We're here.  Do you want to

14      read the Bates number for the record?

15              MS. GREEN:  Yes, it's for -- I've marked as

16      Exhibit 88 a Trace Analysis Unit report Bates

17      stamped -- it's actually not in Bates order, but the

18      first page is NKDF 1107 and the second page is NKDF

19      000651.  Page 1 of a two-paged report.

20      BY MS. GREEN:

21          Q.   Now, looking at the homicide notebook,
```



1    Exhibit 23, NKDF 1091, you saw that there's a December

2    4th, 1991 request for testing at -- by Detective Ritz,

3    right?

4         A.   Yes.

5         Q.   Okay.

6              Now, so at that point you should be moving

7    forward with testing, right?

8         A.   Yes.

9         Q.   And according to Detective Ritz at that

10   time, he told you to do DNA testing, or he was seeking

11   DNA testing, according to him.  I know you don't

12   remember it.  Okay?

13             MR. KAMIONSKI:  It doesn't say that on the

14   form here.

15             THE WITNESS:  Yeah, it doesn't say that.

16   Where do you see that?

17             MS. GREEN:  It's his sworn testimony from

18   his deposition, when we talked to him about this form.

19             THE WITNESS:  I don't recollect him saying

20   it.  So, I don't -- and it's not on his form, so I

21   can't say that for a fact.



Case 1:19-cv-00384-ELH   Document 186-1   Filed 05/12/21   Page 221 of 388
BARRY SCOTT VERGER                                     April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police          220

1   BY MS. GREEN:

2       Q.   That's fine.  I'm just representing it to

3   you.  I have his deposition testimony.  If I'm wrong

4   it's on me.  But I'm just -- keep that in your head.

5   Okay?  Detective Ritz testified that in December he

6   was seeking DNA testing on the nails.  Okay?

7       A.   Okay.

8       Q.   Now, if you look at Exhibit 88, the second

9   page, this is a report signed by you, right?

10      A.   Yes.

11      Q.   February 8th, 1999?

12      A.   Yes, that's it.

13      Q.   Okay.

14           That has your signature, correct?

15      A.   Yes.  It's an old signature, but it's mine.

16      Q.   And it's dated February 8th, 1999?

17      A.   Yes.

18      Q.   In the comments you write to Detective Ritz,

19  "Fingernail clippings were retained in the Evidence

20  Control Section for possible future analysis,"

21  correct?



1       A.    That's correct.

2       Q.    Do you have any explanation for why in

3  February of 1999, you did not test the clippings but

4  rather retained them in Evidence Control Section for

5  possible future analysis?

6       A.    I don't recollect what had happened.

7       Q.    Can you think of any reason why you wouldn't

8  have tested the fingernail clippings after you got the

9  request but rather simply just retained them?

10      A.    Was that before I examined them or this is

11  after I examined them?

12      Q.    This is before you examined.  Just to

13  explain to you a little bit.

14            The crime took place in November 1998.  You

15  got the first request in December 1998.  This is your

16  report from February 8th, 1999.  You actually did the

17  leucomalachite green testing in May 1999.

18            I'm going to keep walking you through the

19  chronology here.

20            And then that was it for the nails.

21      A.    Okay.



1    Q.   Okay.  So, can you think of any reason why

2  if you got a request for doing DNA testing on nails

3  from Detective Ritz in December 1999 -- 1998, why you

4  would not have sent them out for testing but instead

5  retained them in the Evidence Control Section for

6  possible future analysis.

7    A.   I don't recollect.  I can't tell you.

8    Q.   Okay.  Fair to say that if you didn't

9  ultimately end up doing the testing, it's because the

10 investigator or your supervisor told you not to do any

11 testing?

12       MR. KAMIONSKI:  Objection to the form of the

13 question, calls for speculation.

14       THE WITNESS:  I don't recollect that.

15       MS. AMATO:  Well, join.

16 BY MS. GREEN:

17   Q.   As you sit here today -- I know you don't

18 remember the specific case -- but can you think of a

19 reason in any case why after getting a request for

20 doing testing, you wouldn't do the testing but instead

21 you would simply just retain the evidence?





```
 1                MR. KAMIONSKI:  Objection to the form of the

 2     question, calls for speculation, incomplete

 3     hypothetical.

 4                MS. AMATO:  Join.

 5                THE WITNESS:  Yeah.  I don't recollect that.

 6     I can't tell you.

 7     BY MS. GREEN:

 8        Q.   You can't think of any scenario when you

 9     would behave this way?

10        A.   No.

11                MR. KAMIONSKI:  Asked and answered.

12                MS. AMATO:  Join.

13     BY MS. GREEN:

14        Q.   Would you say that then since you can't

15     think of any scenario when you would behave this way,

16     that in fact this would be unusual to get a request

17     for testing from a detective in a homicide case and

18     then to end up doing no testing at all?

19                MR. KAMIONSKI:  Objection to the form of the

20     question.

21                THE WITNESS:  I can't answer that.
```



```
 1  BY MS. GREEN:

 2      Q.   Why not?

 3      A.   I don't recollect.  I can't -- I can't think

 4  of any scenarios that would, you know, like you said.

 5      Q.   And so in other words, it would be unusual?

 6      A.   I've --

 7           MR. KAMIONSKI:  Objection to the form of the

 8  question, calls for speculation, incomplete

 9  hypothetical.

10           THE WITNESS:  I can't tell you that.

11  BY MS. GREEN:

12      Q.   You can't think of a single time in your

13  career where you gotten a request for testing and then

14  you didn't do the testing, correct?

15           MR. KAMIONSKI:  Mischaracterization of his

16  testimony, calls for speculation.

17           THE WITNESS:  That happens sometimes in the

18  Drug Analysis Unit.

19  BY MS. GREEN:

20      Q.   Okay.  What's the scenario there that that

21  happens?
```



1      A.   That the evidence was thrown out.

2      Q.   Okay.  You know --

3      A.   Not in the sense that it was destroyed, that

4  the State's attorney didn't want to prosecute the

5  case.  So it wasn't needed for court.

6      Q.   Okay.  So one scenario where you might get a

7  request for testing but not end up testing is that the

8  prosecution is having some concerns about the case,

9  correct?

10      A.   Yes.  That would be in the Drug Analysis

11  Unit.  I can't recollect anything that happened in

12  1999.

13      Q.   Okay.  But that's -- as you sit here today,

14  that's the only scenario you can think of about cases

15  where you've gotten a request for testing and you

16  didn't ultimately end up doing the testing, correct?

17      A.   That's correct.  It's present.  What's

18  happening presently.

19      Q.   Okay.

20          In any event, from looking at this document

21  it seems like Detective Ritz first asked for testing



1   on the nails, right, in December of 1998, correct?

2        A.   Yes.  I'm reading the sheet, yes.

3        Q.   But by February 8th, 1999, someone -- either

4   an investigator or the prosecutor, changed their mind

5   and decided they actually didn't want the testing

6   after all, correct?

7        A.   I --

8             MR. KAMIONSKI:  Objection to the form.

9             MS. AMATO:  Objection, mischaracterizes

10  testimony.

11  BY MS. GREEN:

12       Q.   That's what these documents suggest to you,

13  correct?

14            MR. KAMIONSKI:  Calls for speculation.

15            THE WITNESS:  Yeah, I don't recollect -- you

16  know, why or, you know, why the evidence was like

17  that.

18  BY MS. GREEN:

19       Q.   But someone gave you an instruction,

20  although I have asked you to test this, don't test it,

21  just retain it, right?



Case 1:19-cv-00384-ELH   Document 186-1   Filed 05/12/21   Page 228 of 388
BARRY SCOTT VERGER                                    April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police            227

```
1              MR. KAMIONSKI:  Objection, calls for
2    speculation.
3    BY MS. GREEN:
4        Q.   That's the best you can glean from putting
5    these documents together?
6        A.   I don't recollect any of this stuff.
7        Q.   Don't the documents suggest that you were
8    requested to do some testing?
9        A.   Like I told you before, the only thing I
10   remember is, you know, getting the evidence and doing
11   a preliminary test on it.
12       Q.   Does Document 1091 -- NKDF 1091, the
13   December 4th request for testing suggest someone asked
14   you to do testing?
15       A.   Like I said, I don't remember how it worked,
16   whether this document was one in evidence when I
17   picked it up.
18            I don't recollect talking to anybody about
19   it.
20       Q.   Okay.
21       A.   I just knew I had to do it.  And then I had
```



1   to do it -- and what I did was I did the preliminary

2   test.

3        Q.   Okay.  But you didn't do the preliminary

4   test on May '99, right?

5        A.   No, I did it on -- whenever my sheet said.

6        Q.   Yeah, that's May '99.  So we're in December

7   and February.  Okay?

8        A.   Okay.

9        Q.   Let's take your February report.

10       A.   Which one, now?

11       Q.   Exhibit 88.

12       A.   This one (indicates)?

13       Q.   Yes, sir.

14       A.   I was looking at the other one, the one

15   where I did the actual test.

16            I'm --

17       Q.   Are you on Page NKDF 651?  You want me to

18   put it on the screen for you?

19       A.   Sure.  That would help.

20            MS. GREEN:  Let's put it on the screen,

21   please.  It's Mr. Verger's February 8th, 1999 report,



1    the second page, please.

2    BY MS. GREEN:

3        Q.   All right.  This has been marked as

4    Exhibit 88 and on the second page which is Bates

5    stamped NKDF 651, this is the document I showed you

6    earlier, right?  You confirmed it was your signature?

7        A.   Right.  Okay.

8        Q.   So let's just read together.

9             It says, "Thomas, fingernail clippings were

10   retained in Evidence Control Section for possible

11   future analysis," right?

12       A.   Correct.

13       Q.   Okay.  So this document indicates that

14   although there was a request for testing in

15   December 4, 1998, by February 8th, 1999, you did not

16   actually test the fingernails yet?

17       A.   I thought I tested them before that.

18       Q.   What documents have you seen that indicate

19   to you that you tested the fingernails before February

20   8th, 1999?

21       A.   Where is my -- I have to see that report, my



1   preliminary report.

2        Q.   Can I just represent to you the bench notes

3   we looked at today, they say you tested the nails on

4   May -- in May -- I'll just represent that to you.  You

5   don't need -- just take it as true.  Okay?

6        A.   Okay.

7        Q.   Now, this is the February 8th, 1999 report,

8   right?

9        A.   Right.

10       Q.   You only tested the nails once, right?

11       A.   Not the nails.  Like I said, it's the

12   samples that was under the nails that I took off.

13       Q.   You only did testing in relation to the

14   fingernail clippings on one occasion, correct?

15       A.   Yes, I took the sample that I had had and

16   only tested once, that I can recall.

17       Q.   All right.

18            And I'm representing to you the evidence

19   we've looked at today tells us, the document we've

20   seen says the date of that testing was May 1999.

21   Okay?



1        A.   Yes.

2        Q.   Just take that as a fact.

3             So with respect to the fingernail clippings,

4   this February 8th, 1999, report indicates that you did

5   not do testing on the nails -- you had not done

6   testing on the nails by February?

7        A.   It only says the fingernail clippings were

8   retained in evidence section for possible future

9   analysis.

10       Q.   Right.

11       A.   That's what it says.

12       Q.   So it says -- so you got a request in

13  December that we talked about, right?

14       A.   Okay.

15       Q.   And now, it's February and all it says is

16  you retained the evidence, right?

17       A.   That's what it says on the report.

18       Q.   Okay.

19            So if you take my representation as true,

20  that there's no other report from you between December

21  and February, is it fair that -- to say that you did



 1  not actually test the nails between December and

 2  February because if you had, there would be a report?

 3      A.   I don't recollect it.  But if there's no

 4  report, then I don't think I did it.

 5      Q.   Okay.

 6          And so in terms of the that, what must have

 7  happened is someone told you between December 4th,

 8  1998 and February 8th, 1999 not to test the nails

 9  after all.

10          MR. KAMIONSKI:  Objection, calls for

11  speculation.

12          THE WITNESS:  But I just know from the form

13  it says fingernail clippings were retained in the

14  Evidence Control Section for possible future analysis.

15  BY MS. GREEN:

16      Q.   And you do that when you pause testing on a

17  case or when it's possible the case might be thrown

18  out, correct?

19      A.   I believe -- well, I shouldn't say I

20  believe.  I can't really answer that as a -- we take

21  evidence that's not, you know, we take evidence and



```
 1   bring it back downstairs or store it in a -- a

 2   refrigerator or freezer after it's been analyzed

 3   routinely.

 4       Q.   Okay.  Thanks.

 5       A.   So I can't tell you if it was meant to go

 6   somewhere else.

 7       Q.   We can remove it --

 8       A.   I don't know.

 9            MS. GREEN:  We can remove this document from

10   the screen.

11   BY MS. GREEN:

12       Q.   All right.  So let's just keep going.

13            Any other ideas why you may not have tested

14   the nails by February 8th, 1999?

15       A.   Like I said, stuff is routinely returned to

16   -- in a storage area, and just that's the only thing I

17   can think of.

18       Q.   Why would you return it to a storage area

19   without testing them?

20       A.   Weren't there examinations already done to

21   them?
```



1            I'm lost on your timetable.

2      Q.    No, they're -- it's okay.  We'll move on.

3            Let's now turn in your notebook, Exhibit 23,

4  which is the homicide file notebook --

5      A.    Okay.

6      Q.    -- to page NKDEF 1116.

7      A.    I got it.

8      Q.    All right.  This is another communication

9  from Detective Ritz to you in this case, correct, the

10  Toni Bullock homicide?

11      A.    Correct.

12      Q.    And this time he is submitting -- Detective

13  Ritz is submitting an altered stain blood card, right?

14      A.    Correct.

15      Q.    And we have the defendant's name as Malcolm

16  Jabar Bryant; do you see that at the top?

17            MR. KAMIONSKI:  Why do you think it's him,

18  the communication?  Where does it say that?

19            MS. GREEN:  He is the person who did the

20  testing.

21  BY MS. GREEN:



1        Q.   But it's submitting -- Defendant's name is

2   Malcolm Jabar Bryant, correct?

3            MR. KAMIONSKI:  -- for the record there's

4   nothing on NK1116 that mentions Mr. Verger's name for

5   the record.  Objection, foundation.

6   BY MS. GREEN:

7        Q.   Mr. Verger, are you the analyst that

8   conducted testing in this case?

9        A.   Yes, I did.

10       Q.   Are you aware of anyone else conducting

11  testing in this case?

12       A.   I'm not.

13       Q.   I've just shown you a February 8th, 1999

14  report that you authored in this case, right?

15  Exhibit 88?

16       A.   February 8th, 1999.  Yes, got it.

17       Q.   I also showed you earlier your bench note

18  from May 21, 1999 testing, right?

19       A.   Yes, yes.

20       Q.   You also testified as an expert at trial in

21  this case, right?



1      A.   Yes.

2      Q.   You're the only one from the BPD Trace

3    Analysis Unit who testified at the trial in this case,

4    correct?

5      A.   As far as -- I can't recollect, I can't tell

6    you that.  My name's on a lot of this stuff.

7      Q.   Okay.  Is there any doubt in your mind that

8    you were the analyst assigned to this case?

9           MR. KAMIONSKI:  You're throwing in Trace

10   Analysis and there's nothing on these documents that

11   says trace analysis.

12          MS. GREEN:  I'm not talking about trace

13   analysis.

14          MR. KAMIONSKI:  Why you just said trace

15   analysis.

16   BY MS. GREEN:

17     Q.   Mr. Verger, you were the analyst assigned to

18   this case?

19          MS. GREEN:  That's literally my question.

20   If you don't like the question object to the form, but

21   please don't make any speaking objection.  You're



1  adding words into a question that literally weren't

2  there.

3          THE WITNESS:  Well, why are you looking at

4  me when you're saying that?  I didn't say a word.

5          MR. KAMIONSKI:  She's just looking at the

6  camera.

7          MS. GREEN:  Sorry, I'm just looking at the

8  screen.

9  BY MS. GREEN:

10      Q.  You can just --

11          MR. KAMIONSKI:  You're looking at everybody.

12          MS. GREEN:  So in any event, first, Mr.

13  Kamionski can you just please just make your form

14  objections and not make speaking objections?

15          MR. KAMIONSKI:  Objection to the form and

16  mischaracterization of the document and foundation.

17  BY MS. GREEN:

18      Q.  Is there any doubt in your mind, Mr. Verger,

19  that you were the analyst assigned to this case?

20      A.  Yeah, I was assigned to this case for sure.

21  But I'm not sure, you know, I did everything in the



```
 1   case.
 2        Q.   As an analyst assigned to the case, would
 3   you review the laboratory request before conducting
 4   testing?
 5        A.   I can't recollect whether I did everything
 6   or maybe somebody else did something else in the case.
 7   That's all.
 8        Q.   Well, we know you tested the fingernails,
 9   right?
10        A.   That's correct.
11        Q.   You know you tested a brown paper bag,
12   right?
13        A.   That's correct.
14        Q.   When you did that testing, would you have
15   reviewed the laboratory request for testing before
16   doing it?
17        A.   I don't -- whatever had -- if I took the
18   evidence out of the vault and it had some -- one of
19   these forms on it, yes, I'd examine it.
20        Q.   Although' I know you can't remember this
21   case, and even as you sit here today, you can't tell
```



1   me with any certainty that it would have been your

2   practice before conducting testing to review the

3   laboratory request for the testing?

4        A.   I would only -- I was only doing what the

5   form told me to do.

6        Q.   Okay.  That's fine.  So would you review a

7   laboratory request before you test?

8        A.   Well, again, I'd look at the -- this form

9   here?

10       Q.   Yes.

11       A.   Yes, I have to look at it.  Sure, if it was

12  attached to the case -- I don't remember if it was

13  attached to the case.  I would have to look at, like,

14  56 forms and stuff like that.

15            Yeah.  If this was attached, yes, I would

16  have reviewed it and looked at what needed to be done.

17       Q.   All right.

18            So this is from Detective William Ritz,

19  right?

20       A.   It is.

21       Q.   It's sending an UltraStain blood card,



1    Property Number:  99-024825.  Okay?

2         A.   Yes.

3         Q.   I'll represent to you that that is a --

4    well, from the form you can see it indicates that that

5    is a blood sample recovered from the suspect, Malcolm

6    Bryant, correct?

7         A.   Yes.

8         Q.   So he's submitting to you for the laboratory

9    a blood sample from the suspect, right?

10        A.   Yes, he wants a blood sample sent -- a blood

11   card sent with the evidence.

12        Q.   And he's making clear in the request he

13   wants DNA testing analysis to be conducted with the

14   above mentioned evidence?

15        A.   That's correct.

16        Q.   And evidence under property numbers 98060329

17   and 98060417, right?

18        A.   Right.

19        Q.   Okay.

20        A.   Correct.  But you know, I just -- did I -- I

21   don't know if I sent these out or not, suspected blood



1  samples recovered from the crime scene.

2           I know I didn't -- I wasn't there at the

3  crime scene.  Blood sample recovered from the victim.

4  I don't know if that's -- I didn't collect the blood

5  sample from the victim.

6      Q.   It's being sent to the lab.  Ritz collected

7  it.  I'm telling you.

8           Ritz collected the blood sample from the

9  suspect.  He's sending the UltraStain blood card to

10 the lab.

11          That's what detectives do, right, they send

12 evidence to the lab that they want tested, right?

13     A.   Right.  But he wouldn't have had this

14 suspected blood sample recovered from the crime scene,

15 would he have?

16     Q.   You don't think the lead detective could --

17     A.   He could ask for it, I would think but he

18 doesn't have it.

19     Q.   So he's not even saying he has it.  He's

20 just requesting DNA testing analysis on these property

21 numbers?



1       A.   Okay.

2       Q.   Isn't that is prerogative as a detective?

3            MR. KAMIONSKI:  Objection to the form of the

4   question.

5            You can answer.

6            THE WITNESS:  Yeah, but my name's not on

7   this form.  I don't know what it has to do with me.

8   BY MS. GREEN:

9       Q.   All right.  As far as you're concerned,

10  although you conducted testing on items in this

11  case -- I'll represent to you you conducted testing on

12  the item, Property Numbers 98060329 and 98060417.

13  I'll just represent to you --

14      A.   Okay.  Okay.

15      Q.   But even if that representation is true,

16  this form has no concern to you, right?

17           MS. AMATO:  Objection to the form of the

18  question.

19           THE WITNESS:  Like I said, I don't recollect

20  seeing this form before.  So I don't know.

21  BY MS. GREEN:



1    Q.   Right.  But from what you've seen looking at

2  it right now, this is not a form that you feel

3  comfortable saying you might have seen?

4    A.   That's correct.

5    Q.   And there is no information on this form

6  right now, that you can see that you think would have

7  been pertinent for you to have reviewed before

8  conducting testing on these property items?

9    A.   That's correct.

10        MS. AMATO:   Objection to the form of the

11  question.

12        THE WITNESS:   That's correct.  Looks like

13  suspected blood samples recovered from the crime

14  scene.  But I don't know which ones -- which blood

15  samples were recovered from the crime scene.

16  BY MS. GREEN:

17    Q.   It literally says it.  It says, blood sample

18  recovered from victim Toni Bullock.  But even though

19  it says that, you still can't interpret this form with

20  where the blood sample -- what blood samples were

21  recovered from the crime scene?



Case 1:19-cv-00384-ELH   Document 186-1   Filed 05/12/21   Page 245 of 388
BARRY SCOTT VERGER                                          April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police                   244

```
 1        A.    Right.  I don't know if I analyzed that.

 2              MS. AMATO:  Objection, mischaracterization

 3   of the document.

 4              MR. KAMIONSKI:  And his testimony.

 5              Go ahead.

 6   BY MS. GREEN:

 7        Q.    You're saying you don't know -- you're

 8   having trouble answering this question because you

 9   don't know the property numbers and what they

10   correspond to.  Is that right?

11        A.    That's correct.

12        Q.    All right.  Why don't you turn --

13              MS. GREEN:  Avi, do you mind -- Mr.

14   Kamionski, do you have mind putting in front of Mr.

15   Verger previously marked Exhibit 71?

16              MR. KAMIONSKI:  Where is it?

17              MS. GREEN:  It's his June 1st report, like

18   official laboratory report.

19              MR. KAMIONSKI:  He's got it.

20   BY MS. GREEN:

21        Q.    Just hold that up and keep it in front of
```



1   you on the notebook -- the Exhibit 23 notebook, NKDF

2   1116.  Do you see it?

3        A.   Yeah.  Hold on a second.

4        Q.   Okay.

5        A.   The last one we were talking about, right?

6        Q.   Yeah, so you see at the top of Exhibit 71

7   item description submitted under property number

8   98060329?

9        A.   Yes, I see that.  Let me see if I can see it

10  on this paper.

11       Q.   Under number -- the first number in the main

12  paragraph, request for DNA testing.  Evidence was

13  under -- suspected blood samples recovered from the

14  crime scene:  98060329?

15       A.   Yeah, it's at the bottom, you mean?

16       Q.   Okay.  So it looks like he's asking for DNA

17  testing, Detective Ritz, on the items under property

18  number 98060329, correct?

19       A.   That's correct.

20       Q.   And the items are two brown leaves, right?

21       A.   Well --



BARRY SCOTT VERGER                                                April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police                          246

1       Q.    Look at the top.  Item number one, brown

2   leaf, right?

3       A.    Yeah, brown leaf.  Item number two, brown

4   leaf folded, soiled brown paper bag and a black

5   umbrella.

6       Q.    Okay.  So, he is -- Detective Ritz is

7   submitting for DNA testing those four items; two brown

8   leaves, a brown paper bag and a black umbrella,

9   correct?

10      A.    Correct.

11      Q.    And evidence under property number 9806417,

12  right?

13      A.    Right.  417, where's that?

14      Q.    It's not -- it's not there because it's the

15  blood sample recovered from the victim.  The

16  description's on the document.

17      A.    Okay.

18      Q.    Okay?  And he's asking for DNA testing on

19  these items, correct?

20      A.    Okay.

21      Q.    Based on this request for DNA testing, he's



1  not asking for DNA testing on the fingernail

2  clippings, right?

3       A.   It doesn't say he is.

4       Q.   Okay.  In any event, if you tested these

5  items, you would have seen this report, right?

6       A.   What, on my report?  Which report are you

7  talking -- pertaining to?

8       Q.   I'm talking about the laboratory request for

9  Detective Ritz.

10      A.   Okay.

11      Q.   You would have reviewed this document?

12      A.   I don't know if I -- I don't recollect if I

13  would or if I wouldn't have.

14      Q.   Okay.  I'd like to show you another document

15  that you have a hard copy.  It's marked Plaintiff's

16  Exhibit 24, it's compilation exhibit.

17           MR. KAMIONSKI:  Exhibit 24?

18           MS. GREEN:  Previously marked.

19           MR. KAMIONSKI:  I don't have it.  Do I have

20  it here?

21           MS. GREEN:  I sent it but I may have messed



```
 1   that up.

 2            Can we please put that on the screen?

 3            MS. BROWN:  What page?

 4            MS. GREEN:  Exhibit Number 24, BCFA 2755.

 5            MR. KAMIONSKI:  Hold on a second.

 6            MS. GREEN:  Might be easier --

 7            MR. KAMIONSKI:  I'm giving him the

 8   compilation with the page.

 9            MS. GREEN:  Okay.  Thank you.

10   BY MS. GREEN:

11      Q.   Are you in front -- do you have Bates page

12   BCFA 2755?  Do you want to hold it up?

13            MR. KAMIONSKI:  No, I just want to clean

14   this up a little bit.  Can I move the other stuff out

15   of the way here?

16            MS. GREEN:  Sure.

17            THE WITNESS:  This is it, right?

18            MS. GREEN:  Yes.

19            MR. KAMIONSKI:  Hold on a second.

20            THE WITNESS:  Okay.

21   BY MS. GREEN:
```



1      Q.   Now, this is a handwritten note from the

2  prosecutor Dave Mabrey?

3      A.   Okay.

4      Q.   And it's a note, you can just see from the

5  face of it dated May 18th, 1999?

6      A.   I see it.

7      Q.   And he's saying he spoke to you, and you

8  told him you didn't have a request for the nails,

9  right?

10      A.   That's what it says.

11      Q.   But you would do it based on -- you would

12  test the nails based on your conversation with him,

13  correct?

14      A.   That's what it says.

15      Q.   All right.

16          This note is inconsistent with the

17  December 4th, 1998 report we've seen in asking for the

18  nails to be tested, correct?

19          MR. KAMIONSKI:  Objection to the form of the

20  question.

21          THE WITNESS:  I don't know.



1   BY MS. GREEN:

2        Q.   Well, the December 4th, 1998 report that I

3   showed you is a request from Detective Ritz for trace

4   analysis on the nails, right?

5        A.   I would like to see like a timetable, so I

6   know what I'm looking at.

7        Q.   All right.

8             You don't get to see a timetable.  You just

9   have to take my representations as true.  So -- and if

10  I'm wrong, I'm wrong.

11            So you looked at the December 1998 report,

12  right?

13       A.   Yes, I did the fingernails -- examined the

14  fingernails in 1998?

15       Q.   No.

16       A.   Okay.  So I'm getting mixed up now.

17       Q.   Why don't we put -- you know what?  Let's

18  take a break -- or actually I'm sorry, let's go -- let

19  me just finish this line of questioning, then we'll

20  take a break.

21            Do you recall earlier in the deposition I



BARRY SCOTT VERGER                                            April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police                     251

1   showed you an Exhibit 23, a request for trace analysis

2   testing on the nails written by Ritz, right?

3       A.   Yes.  I have to see it but yes.  Okay.  I

4   believe you.

5       Q.   This is notes of a conversation with you in

6   1999, right?

7       A.   Yes.

8       Q.   And the notes indicate that you told Dave

9   Mabrey that you didn't have a request for the nails,

10  right?

11      A.   Yeah.  It's written on the note, but I

12  didn't write it.

13      Q.   So that's different than the December 1998

14  report that I showed you.

15      A.   Okay.

16      Q.   You're telling according to Dave Mabrey's

17  note, you're telling him there was no testing --no

18  request for testing on the nails, right?

19      A.   I --

20           MR. KAMIONSKI:  Objection to form of the

21  question.



```
 1    BY MS. GREEN:
 2         Q.   According to the notes.  I know you don't
 3    remember the conversation?
 4         A.   Yeah, I don't recollect seeing the notes and
 5    putting everything together like you're trying to do.
 6         Q.   I know you don't remember it -- this
 7    conversation.  What is in front of you right now is
 8    the note indicating that Dave Mabrey had a
 9    conversation with you on May 18, 1999, correct?
10         A.   That's what the note says.
11         Q.   And although you don't remember it, the note
12    indicates that you told Dave Mabrey in May 1999 that
13    you don't have -- you did not have a request for
14    testing on the nails, correct?
15         A.   That is correct.
16         Q.   And although you don't remember it, I showed
17    you earlier in this deposition a December 1998 request
18    for testing on the nails, correct?
19         A.   Correct.
20         Q.   Okay.  Do you have any explanation for why
21    you would tell Dave Mabrey that there was no request
```



1   for testing on the nails when in fact you saw today

2   there was?

3          MR. KAMIONSKI:  Object to form of the

4   question, calls for speculation, foundation.

5          THE WITNESS:  I can't tell you that because

6   I can't turn back the clock to 1999 and tell you what

7   had happened in the sequence, if it was attached or --

8   it may not have been attached to it and it may have

9   been found later.

10  BY MS. GREEN:

11     Q.   You must not have known that Detective Ritz

12  had in fact requested DNA testing on fingernails,

13  right?

14     A.   I don't recollect.  It could have been found

15  later.

16     Q.   What could have been found later?

17     A.   The request for him saying that, that I

18  couldn't find.

19     Q.   You think the request was lost?

20     A.   It could have been misplaced.

21     Q.   Any other explanations?



1    A.   No, I don't.  I'm not -- I don't have any

2  recollection of 1999 to tell you.  I couldn't remember

3  to save my life what happened back in 1999.

4    Q.   Okay.  Fair enough.

5         So although you don't remember it, this note

6  indicates that -- after this conversation with Dave

7  Mabrey, you agreed to test the nails, right?

8    A.   Yes.

9    Q.   And so you had a conversation with the

10  prosecutor in this case according to this note?

11    A.   Yes.

12    Q.   This note, do you think it's fabricated?

13    A.   I really couldn't tell you anything about

14  this note.  Like I said, I can't remember anything

15  back in 1999 that pertains to this stuff.

16    Q.   Do you have any reason to believe this note

17  might have been fabricated?

18    A.   As I said, I don't know.

19    Q.   Okay.  Let's take 10 minutes.

20         THE VIDEOGRAPHER:  Going off the record.

21         The time is 3:13.



```
 1              (Whereupon, a recess ensued.)

 2              THE VIDEOGRAPHER:  We're back on the record

 3    at 3:32 p.m.

 4    BY MS. GREEN

 5         Q.   Mr. Verger, we talked a little bit today

 6    about how you would coordinate sending samples out for

 7    DNA testing, correct?

 8         A.   Yes, that's correct.

 9         Q.   When you were in the Trace Analysis Unit

10    back in 1999, correct?

11         A.   That's correct.

12         Q.   And there was no requirement that you

13    conduct leucomalachite testing before sending samples

14    out for DNA testing, correct?

15         A.   That's a recollection.  I don't remember.

16         Q.   Okay.

17              As you sit here right now, you do not recall

18    there being any requirement that you conduct

19    leucomalachite testing before sending samples to MSP

20    for DNA testing, correct?

21         A.   Well, those samples that I would take would
```



Case 1:19-cv-00384-ELH   Document 186-1   Filed 05/12/21   Page 257 of 388
BARRY SCOTT VERGER                                          April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police              256

1    be destroyed.  So those samples wouldn't be any good

2    anymore.

3         Q.   Exactly.  So if you are doing leucomalachite

4    testing, you can't -- you can't test them for DNA.  So

5    if the goal is to test for DNA, there was no

6    requirement for you to do leucomalachite testing,

7    correct?

8              MR. KAMIONSKI:  Objection, calls for

9    speculation, misstates his testimony.

10   BY MS. GREEN:

11        Q.   You can answer.

12        A.   One more time?  After all the objections and

13   stuff.

14        Q.   No problem.

15             There was no requirement for you to conduct

16   leucomalachite testing on samples before sending them

17   out for DNA testing to the best of your recollection?

18        A.   Yes, I don't recollect whether that happened

19   or not.

20        Q.   And in fact as you just suggested, such a

21   requirement would not make sense because



Case 1:19-cv-00384-ELH   Document 186-1   Filed 05/12/21   Page 258 of 388
BARRY SCOTT VERGER                                               April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police                      257

1   leucomalachite testing is destructive.  So anything

2   that you do -- any sample that goes through

3   leucomalachite testing necessarily cannot be DNA

4   tested, correct?

5       A.   As far and I know, yes.

6       Q.   Okay.  And so --

7       A.   You have to remember this is -- that was

8   1999.  I don't know if it's possible now.

9       Q.   Sure.  Sure.

10           And, in fact, on -- why don't you turn to

11   Exhibit 85, your expert testimony?

12           And just so I'm clear before we turn to your

13   testimony -- sorry.

14           Just so I'm clear, so in 1999 you don't

15   recall there being any MSP policies requiring

16   leucomalachite testing?

17       A.   I don't recollect knowing that.

18       Q.   And you don't think there were because that

19   wouldn't make any sense because the leucomalachite

20   test was a destructive test?

21           MR. KAMIONSKI:  Objection to the form of the



1    question, calls for speculation.  He says he doesn't

2    recollect either way.

3    BY MS. GREEN:

4         Q.    You can answer.

5         A.    I don't know.

6         Q.    All right.  Why don't we turn to page -- why

7    don't we turn to Page 183 at the top of your

8    testimony?

9              183, Line 22 and I'll just read it out loud.

10   Or actually, read Line 22 on Page 183 to yourself, all

11   the way through 184, Line 3.

12        A.    How far down did you say?

13        Q.    Line 3.

14             What you just read is, you're testifying

15   that even in 1999, you did not believe that there was

16   a protocol requiring you to do leucomalachite testing

17   before DNA testing, correct?

18        A.    That's what's in my testimony.

19        Q.    That's consistent with your recollection

20   today, there was no MSP protocol requiring you to do

21   leucomalachite testing, correct?



Case 1:19-cv-00384-ELH   Document 186-1   Filed 05/12/21   Page 260 of 388
BARRY SCOTT VERGER                                          April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police                    259

```
 1              MR. KAMIONSKI:  Objection, calls for

 2   speculation.

 3              THE WITNESS:  Yeah, I don't recollect that

 4   being the case.  It could have been something I didn't

 5   know.

 6   BY MS. GREEN:

 7       Q.   And in any event, so because it wasn't

 8   required whether or not to do leucomalachite testing

 9   on items that had been requested to go out for DNA

10   testing, that was something that was in your

11   discretion, correct?

12              MR. KAMIONSKI:  Objection, asked and

13   answered, form.

14              THE WITNESS:  Could you restate that one?

15   BY MS. GREEN:

16       Q.   Okay.

17              Whether or not to do leucomalachite testing

18   on items for which there was a request for DNA

19   testing, was something that was in your discretion,

20   correct?

21       A.   I don't recollect if it was in my discretion
```



```
 1   or not.

 2        Q.   Well, it's either required or it's in your

 3   discretion?

 4        A.   Right.  And I don't recollect what it was.

 5        Q.   Well, you just saw your testimony that it

 6   wasn't required, right?

 7        A.   I said I thought it wasn't required.

 8        Q.   And at trial you testified that there was no

 9   protocol requirement, correct?  I just showed you

10   that?

11        A.   You did.  I'm telling you straight I don't

12   recollect what that -- what all that meant when I was

13   testifying.

14        Q.   But you know you would have been truthful at

15   trial, right?

16        A.   That is correct.  I want to be truthful --

17   the best truthful witness you could find.  I just

18   don't remember what I was thinking when I said those

19   words.

20        Q.   Okay.

21             And so but in any event, if you testified at
```



Case 1:19-cv-00384-ELH   Document 186-1   Filed 05/12/21   Page 262 of 388
BARRY SCOTT VERGER                                            April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police                     261

1   trial as I just showed you that there was no MSP

2   protocol requiring leucomalachite testing, you know

3   that's true because you wouldn't have said it if you

4   didn't know it to be true, correct?

5        A.   That could have been the case, yes.

6             MR. KAMIONSKI:  It also misrepresents his

7   testimony.  He told you that but you're

8   misrepresenting it.

9             MS. GREEN:  Why don't you make your form

10  objections, Mr. Kamionski?

11            MR. KAMIONSKI:  Objection, misrepresenting

12  the testimony that you wanted him to read verbatim.

13            MS. GREEN:  Clean up anything you want after

14  my questioning.

15            MR. KAMIONSKI:  Objection, misrepresenting

16  his testimony and asking questions based on

17  misrepresented testimony.

18  BY MS. GREEN:

19       Q.   Then let's go to Page 185 of your testimony.

20            MR. KAMIONSKI 185.  Listen to her question.

21            THE WITNESS:  Go ahead.



BARRY SCOTT VERGER                                    April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police           262

```
 1              MR. KAMIONSKI:  Listen to her question.

 2   BY MS. GREEN:

 3        Q.   Are you with me Page 185, Line 20?

 4        A.   Yes.  Line 20.

 5        Q.   Just read Line 20 to yourself, 185 to 186,

 6   Line 4.

 7              Let me know when you're done.

 8        A.   Okay.  Go ahead.

 9              MR. KAMIONSKI:  Hold on.  She said the next

10   page.

11   BY MS. GREEN:

12        Q.   186, Line 4, please.

13        A.   Is that number five?

14        Q.   Yes, just up to number five.

15              So this is the line of questioning that I

16   just had you read about leucomalachite green testing,

17   the Court's -- right?

18        A.   Right.

19              MR. KAMIONSKI:  She didn't -- leucomalachite

20   testing.  Listen to what she's asking you.

21              THE WITNESS:  I'm tired.
```



1           MS. GREEN:  Do you want to go back on

2    camera, Avi?  Because I have some concerns that you're

3    coaching the witness right now.

4           MR. KAMIONSKI:  You're hearing everything

5    I'm saying.

6           MS. GREEN:  I don't see what you're pointing

7    at though.

8           MR. KAMIONSKI:  I'm holding the paper right

9    here.  He's going through the testimony.  And I'm

10   wanting him to read the second page because you asked

11   him to read the first page and he said he was done.

12   BY MS. GREEN:

13       Q.   All right.  So, sir, have you had an

14   opportunity to read Line 85?  Would you like a break?

15           You said you're tired.  Would it be helpful?

16       A.   Yes, I do want a break.

17       Q.   Okay.  Can I first -- before you get the

18   break, I told you I want you to answer my pending

19   question before we take a break.  Is that okay?

20           MR. KAMIONSKI:  He answered the pending

21   question.  We're going to take a break.



1              MS. GREEN:  Okay.  How long do you want?

2              MR. KAMIONSKI:  Ten minutes.

3              MS. GREEN:  All right.

4              THE VIDEOGRAPHER:  We're going off the

5    record.

6              The time is 3:44.

7              (Whereupon, a recess ensued.)

8              THE VIDEOGRAPHER:  We are back on the

9    record.

10             The time is 3:52.

11   BY MS. GREEN:

12        Q.   Mr. Verger, I want to pick back up.  Before

13   our break I was asking some questions about

14   Exhibit 85, your trial testimony in this case?

15        A.   Okay.

16        Q.   Do you still have that exhibit in front of

17   you?  It's just an excerpt?

18        A.   Yes.

19        Q.   Okay.

20             When we -- before we went on the break I had

21   asked you to read some portions of Page 185 and 186?



1        A.   Yes, I do.

2        Q.   Okay.

3             Can you turn with me to Page 185, please?

4        A.   I'm at 185 now.

5        Q.   Okay.  At 185, you are being examined

6    regarding the leucomalachite green test, correct?

7        A.   That's correct.

8        Q.   Okay.  And it's a series of questions first

9    put to you by Mr. Mabrey and then the Court started

10   asking you some questions, right?

11       A.   That's correct.

12       Q.   Okay.

13            Then -- and I asked you to read to Page 185,

14   Line 20 to 186, Line 4, right?

15       A.   That's correct.

16       Q.   And you've now have had an opportunity to do

17   that, sir?

18       A.   Yes, I have.

19       Q.   Okay.  Now, why don't you turn with me to

20   Page 186, please?

21       A.   Okay.



1    Q.   And at Page 186, Line 2 you say, "It really

2    belongs up to the person who's doing the test.  It's

3    to use your discrepancy whether or not to do it."  Did

4    I read that correctly?

5    A.   Yes, you did.

6    Q.   I have said discrepancy, but I assume you

7    probably meant to say "discretion" there, correct?

8         MR. KAMIONSKI:  Objection to the form of the

9    question.

10         THE WITNESS:  I just said discrepancy.  I

11    don't know what I meant by it.

12    BY MS. GREEN:

13    Q.   Okay.  Fair enough.  So but here again, you

14    are making it clear that it's up to you, the person

15    performing the test whether or not to perform the

16    leucomalachite green test, correct?

17    A.   No, I --

18         MR. KAMIONSKI:  Question to the form of the

19    question, incomplete recitation of the transcript.

20         You can answer.

21         THE WITNESS:  If it's -- if you're talking



1  about it going to the State Police, they require

2  whether it's human blood or not before it goes there.

3  So we have to do a test on it to find out if it's

4  human blood.  Then it could be -- then it can go to

5  the State Police.

6  BY MS. GREEN:

7       Q.   And you remember before the break I asked

8  you if there was a requirement to test for the

9  presence of blood before it could go out for DNA

10  testing?

11      A.   Yes.  Well, I don't but go on.

12      Q.   You do not recall me asking you before the

13  break whether -- that you would perform any

14  leucomalachite green testing before --

15      A.   There's been a lot of questions.

16      Q.   That's okay.

17      A.   And I don't remember all of them.

18      Q.   Well, I just wanted to ask you this:  Do you

19  recall before the break me asking you whether or not

20  there was a requirement that you do leucomalachite

21  green testing on items before they get sent out for



BARRY SCOTT VERGER                                              April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police                     268

```
 1    DNA testing?
 2         A.   I believe I answered that -- one of those
 3    types of questions earlier in my testimony saying that
 4    the Maryland State Police does require, you know, to
 5    get human blood -- fingernails out to them.  And
 6    that's why we do a test for it.
 7         Q.   You know, when I asked you before the break
 8    and before you talked to your lawyer and your lawyer
 9    insisted on taking a 10-minute break you said
10    something different.  You actually said that you had
11    no recollection of there being such a requirement and
12    you said -- you also agreed with me that it would make
13    no sense because the leucomalachite test is a
14    destructive test and there would be nothing to test
15    from the sample for DNA.  You told me that before the
16    break, sir.  Do you remember that?
17         A.   You are correct when I said the samples were
18    destroyed, the samples from the -- the samples that I
19    took under the fingernails were destroyed.
20              Now, the fingernails themselves if they were
21    swabbed and otherwise if they were found to have human
```



 1   blood on them, they would be sent out to the, you

 2   know, the MSP Lab.

 3        Q.   During the break in this deposition, did you

 4   discuss the testimony that you were supposed to give

 5   with your lawyer?

 6             MR. KAMIONSKI:  Objection to answering any

 7   questions about discussion that we had during the

 8   break.

 9             MS. GREEN:  Avi, do you agree that in the

10   midst of a deposition, it's improper to coach the

11   witness on the substance of their testimony?

12             MR. KAMIONSKI:  I'm not being deposed here.

13   You're misrepresenting a record where he's asked the

14   question on Page 185, "Mr. Verger, would it be

15   possible to send the fingernails directly to the State

16   Police without doing the leucomalachite test.  Please

17   know the pertinent part is to find out if they asked

18   us to find out if it's human blood or not but it is

19   possible."

20             MS. GREEN:  Avi --

21             MR. KAMIONSKI:  You're misrepresenting a



1    record.

2            MS. GREEN:  Not at all.

3            Would you like to do -- do you agree with

4    me, Avi, that's it's improper to coach a witness in

5    the midst of testimony about what testimony they

6    should give, to take a break and tell them what

7    testimony to give?

8            MR. KAMIONSKI:  Do you have questions for

9    the witness or are you finished?

10           MS. GREEN:  I'm asking you because I intend

11   to go to the Court on this.

12           MR. KAMIONSKI:  Go to the Court.  Go to the

13   Court.

14           MR. BRUSTIN:  Before we do, Amelia --

15   Amelia, before we do, I just ask you to make sure we

16   have the transcript from the answers he gave just

17   before the break and the answers he's given after the

18   break so we can show the Court.

19           What we want to do, I think, is we want to

20   get the Court to -- before this witness leaves the

21   room -- to inquire about whether or not there was



1    those conversations.

2              So what I would recommend -- it's up to you

3    but if we have it on the transcript, that you might

4    want to call the Court and have the Court ask Avi and

5    the witness whether they discussed this testimony and

6    that's the reason why it changed.

7              MS. GREEN:  Mr. Court Reporter, do you have

8    a draft transcript that you're able to send us?

9              MR. BRUSTIN:  Or just where we can read it.

10   I think it was right before the break when you asked

11   it, right, Amelia.

12             MS. GREEN:  Yeah, it was several questions

13   on this, of his recollection of the requirements.

14             MR. BRUSTIN:  So we want to make sure his

15   testimony had changed directly after having a break

16   with counsel.

17             Let me talk for a second.

18             MS. GREEN:  But before we go off the

19   record -- let's go off the record.

20             THE VIDEOGRAPHER:  Off the record.

21             The time is 3:59.



1          (Whereupon, a recess ensued.)

2          THE VIDEOGRAPHER:  We are back on the

3   record.

4          The time is 4:55.

5   BY MS. GREEN:

6       Q.    Mr. Verger, we just called the Court.  Were

7   you present for that conversation with the Court?

8       A.    No, I wasn't.

9       Q.    Did you hear anything the judge said?

10      A.    No, I did not.

11      Q.    Did you hear anything your counsel said?

12      A.    Just small words.

13      Q.    Did you leave the room for the Court

14  conversation?  I'm trying to get a sense if you

15  understand or if you left the room?

16          MR. KAMIONSKI:  I was in a different room on

17  the call.

18          MS. GREEN:  Okay.  Thank you, Avi.

19  BY MS. GREEN:

20      Q.    All right.  Mr. Verger, before our last

21  break we were talking about whether there was a



1   requirement for you to conduct leucomalachite green

2   testing on testing that was set for DNA -- evidence

3   that was supposed to be sent out for DNA testing or

4   where there had been a request for DNA testing on

5   evidence.

6        A.   Okay.

7        Q.   Do you recall that?

8        A.   I do.

9        Q.   Okay.

10            And you recall telling me earlier in the

11  deposition that you had no recollection of such a

12  requirement, correct?

13            MR. KAMIONSKI:  Objection to the form of the

14  question, misstates the prior testimony.

15            MS. GREEN:  I'm asking if he recalls telling

16  me that.

17            THE WITNESS:  I don't even remember telling

18  you that.

19  BY MS. GREEN:

20       Q.   Okay.

21            Do you recall telling me earlier in the



 1  deposition that it wouldn't make any sense for there

 2  to be a requirement to test evidence with the

 3  leucomalachite green test before sending it out for

 4  DNA testing because the test is destructive?

 5      A.   But those were your words and I just was

 6  saying I was agreeing with you.

 7      Q.   Okay.

 8      A.   That the test, that the sample was -- since

 9  the sample was destroyed when testing it, it wouldn't

10  be any good.

11      Q.   And you have a lot of experience testifying

12  in court, right?

13      A.   Yes.

14      Q.   Okay.  You understand what a leading

15  question is, right?

16      A.   You could testify all day in court and still

17  not get the same question twice.

18      Q.   So a leading question is a question where

19  I'm suggesting the answer to you.

20      A.   Okay.

21      Q.   So you understand that if I ask you a



1  question and you say yes, you're giving -- that's your

2  testimony.  You've agreed with what I just said and

3  that's your sworn testimony.  Do you understand that?

4       A.   Now, I do.

5       Q.   And you didn't understand before, that when

6  you were saying yes to my questions, you were agreeing

7  with me and that was sworn testimony?

8       A.   I was just trying to get to the bottom of

9  the, you know, get the answers, so telling you what

10 you wanted to hear.

11      Q.   You've been cross examined hundres of times,

12 correct?

13      A.   That's correct.

14      Q.   And you understand when you say yes to a

15 question that you're asked under oath, that is your

16 testimony?

17      A.   Yes.

18      Q.   You understand that this is testimony that

19 -- you took an oath at the beginning of this

20 deposition, right?

21      A.   I did.



1    Q.   You agreed to give truthful testimony?

2    A.   I did.

3    Q.   You understand that by saying yes in answer

4 to a question, that's your testimony and you've sworn

5 to tell the truth, correct?

6    A.   That's correct.

7    Q.   And is it now, your testimony that when you

8 were saying yes to my questions throughout this

9 deposition, you were just making it up as we went

10 along?

11   A.   That is incorrect.

12   Q.   All right.  That's what I figured.

13       So, when you agreed with me that it would

14 make no sense for there to be a requirement for

15 leucomalachite testing earlier in the deposition,

16 before sending items out for DNA testing, that was

17 your truthful testimony, correct?

18   A.   Yes.  At the time, you know, I wasn't, you

19 know, wasn't thinking very clearly on the subject.

20   Q.   All right.

21   A.   And it came to my light that they do require



1   that you do some testing before it -- they test for

2   DNA.

3        Q.   All right.  So earlier in the deposition

4   when we talked about it, you didn't remember there

5   being a requirement, right?

6        A.   Yes.  I don't think it's like a written

7   requirement, but I can't say for sure.

8        Q.   You don't remember -- earlier in the

9   deposition you didn't remember any requirement, right?

10       A.   Right.  I don't recollect anything that

11  happened in that case.  You're trying to remember

12  stuff that happened 20 years ago and some stuff is

13  like fractured in your brain and some stuff, I lost.

14       Q.   I'm just trying to nail it down.

15            Earlier in the deposition when we talked

16  about it, you didn't remember a requirement to conduct

17  leucomalachite testing in any format, correct?

18       A.   Oh, I tested -- I definitely tested for

19  leucomalachite on a sample.  That's all I remember.

20       Q.   Sir, listen to my question.

21       A.   All right.



1    Q.    Earlier in the deposition when I asked you

2    questions about whether or not the Maryland State

3    Police required leucomalachite testing, you did not

4    remember any requirement, correct?

5            MR. KAMIONSKI:  Objection to the form of the

6    question, asked and answered.

7            THE WITNESS:  At that time I probably said

8    yes, and now, I'm saying no.  Because I remember.

9            You have to --

10   BY MS. GREEN:

11   Q.    Fair enough.  And I'm just trying to nail

12   that down.  So then we took a break, right?

13   A.    Right.

14   Q.    You had some time to converse with your

15   counsel, correct?

16           MR. KAMIONSKI:  Objection to the form and

17   the implication.  We covered this issue already.

18           MS. GREEN:  Fine.

19   BY MS. GREEN:

20   Q.    We took a break?

21   A.    We took a break.



1      Q.   You were in the presence of your counsel

2   during that break?

3      A.   He didn't leave the room.

4      Q.   Okay.

5           And we went back on the record, right?

6      A.   That's correct.

7      Q.   And after that break, you remember a

8   requirement, right?

9      A.   I read above the pages that you wanted me to

10   read.

11      Q.   Sure.  So -- but again, after the break you

12   remembered your requirement --

13           MR. KAMIONSKI:  Objection, asked and

14   answered.

15   BY MS. GREEN:

16      Q.   Okay.

17      A.   Restate it again.  I was listening to both

18   sides here.

19      Q.   Sure.

20           After the break you remember now, that there

21   in fact is a requirement for you to -- there was a



1  requirement for you to conduct leucomalachite green

2  testing on items that -- for which there had been a

3  request for DNA testing?

4       A.   See, I don't recollect it being anything

5  written down or anything like that.  I do recognize

6  that we should -- that we did do it.

7       Q.   Okay.  So, now, my question is, now that you

8  said you refreshed your recollection with your

9  testimony, right?

10       A.   That's correct.

11       Q.   That's how you came to remember the

12  requirements that you didn't remember before the

13  break, right?

14       A.   Right.

15       Q.   And also before this deposition, we already

16  talked, you took the time to read your testimony,

17  right?

18       A.   I just went through it, just glanced at it.

19       Q.   Okay.

20            So you just glanced at your testimony in

21  preparation for the deposition today?



```
 1        A.    Yes.

 2        Q.    So when you told me earlier that you read it

 3   carefully, that was a lie, right?

 4              MR. KAMIONSKI:  Objection to the form of the

 5   question, argumentative.

 6              You can answer.

 7              MS. AMATO:  Mischaracterizes the testimony.

 8              MR. KAMIONSKI:  And it mischaracterizes his

 9   testimony.

10              You can answer.

11              THE WITNESS:  I read it.

12   BY MS. GREEN:

13        Q.    Before the deposition?

14        A.    Yes.

15        Q.    Did you read all 18 Pages of it?

16        A.    I glanced at 18 pages of it.

17        Q.    Okay.

18              Is glancing the same as reading in your

19   book?

20              MR. KAMIONSKI:  Objection to the form of the

21   question.
```



1                THE WITNESS:  I don't have a book.

2     BY MS. GREEN:

3          Q.   Is glancing the same as reading?

4          A.   It depends on the person.

5          Q.   This is a very simple question.  Before the

6     deposition today in preparation for the deposition,

7     did you read your 18 pages of testimony you gave in

8     the trial?

9          A.   I read it, but I didn't, you know, read it

10    all, you know, I didn't take it all in.

11         Q.   You read it but you didn't understand it,

12    right?

13         A.   Yes.  It's old testimony, something I did

14    20 years ago.

15              You know, I'm not going to remember

16    everything about it.

17         Q.   Fair enough.  But on that break you took the

18    time to read your testimony again, right?

19         A.   Above it, yes, above the thing that you --

20    that you picked out.

21         Q.   You read a portion of testimony and for the



1  first time during the break, you understood it, right?

2       A.   It just reminded me of something.

3       Q.   It reminded you of something that you hadn't

4  been reminded of before when you read your testimony

5  before the deposition, right?

6       A.   That's correct.

7       Q.   Okay.  So when you read that testimony

8  during the break and you reminded yourself of a new

9  answer --

10      A.   Well, you read my answer, too.

11      Q.   Sir, when you reminded yourself of your

12 testimony -- so you read your testimony, a portion of

13 your testimony during the break, right?

14      A.   Yes.

15           MR. KAMIONSKI:  Objection, asked and

16 answered.

17 BY MS. GREEN:

18      Q.   Did your counsel -- did you decide to read

19 that testimony on your own or did your counsel give it

20 to you to read during the break?

21           MR. KAMIONSKI:  Objection, instruct the



1  witness not to talk about anything that we talked

2  about during the break.

3          And we've gone over this already and we

4  reviewed before the Court with this.

5  BY MS. GREEN:

6      Q.   I didn't say what you talked about.  I'm

7  just asking if your counsel gave it to you.

8          I can ask about any documents he's been

9  given at any time.  It's not privileged.

10         During the break, did your counsel give you

11  the testimony to read?

12     A.   It was right in front of me, yes.

13     Q.   Did he point you to the pages you should

14  read during the break?

15     A.   He said read the pages.  Don't left her put

16  words in your mouth.

17     Q.   Okay.  You did your best to comply with your

18  counsel's instructions?

19     A.   Yes.

20     Q.   All right.  And that's when for first time

21  you read that there was, in fact, was a requirement



Case 1:19-cv-00384-ELH   Document 186-1   Filed 05/12/21   Page 286 of 388
BARRY SCOTT VERGER                                    April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police          285

1   for you to conduct leucomalachite green testing before

2   sending things out for DNA testing to MSP, right?

3        A.   That's the reason why I'm saying that I did

4   that leucomalachite test, yes.

5        Q.   All right.  Now, so just to be clear, you

6   are changing your testimony from what you gave

7   earlier?

8             MR. KAMIONSKI:  Objection, mischaracterizes

9   his testimony, asked and answered.

10            THE WITNESS:  I believe I answered that

11  question.

12  BY MS. GREEN:

13       Q.   Right.  You're refusing to answer the

14  question as to whether you changed your testimony.

15  That's what's happening now?

16       A.   I'm telling you what I -- what we do, and

17  you're telling me what you think I do.

18       Q.   I want --

19       A.   I'm just telling you right here, right now,

20  that the reason why we can't submit stuff to MSP is

21  they have to -- they have rules whether we do certain



1    tests.  We can't just send stuff off to MSP without

2    knowing, you know, that it's -- you know, if it could

3    be blood or not.

4        Q.   Well, so now, we've gotten down to the

5    bottom of it.

6             So there was a request for DNA testing in

7    this case.  Do you remember that now, on the

8    fingernails?

9        A.   No, I don't recollect anything about DNA

10   being on the fingernails.  No request.  I don't

11   recollect any request.

12       Q.   Aren't you saying the reason you were doing

13   leucomalachite testing is because MSP required it

14   before you send items out for DNA testing?

15       A.   I did the leucomalachite test but I don't

16   recollect hearing anything about it being sent out to

17   the Maryland State Police.

18       Q.   Fair enough.

19            So tell me about those rules that required

20   you to do a leucomalachite testing, the MSP rules on

21   that?



1          A.    Well, not the MSP rules, per se.   But it's

2     in conjunction with Baltimore City.

3          Q.    Okay.

4          A.    And there is -- I don't know if it's written

5     anywhere but there is a -- there's a reason why you

6     send stuff to the MSP to get a certain test, you got

7     make sure it's human blood.

8               They don't want dog blood or something else

9     sent out.

10         Q.    So there was a rule that you needed to test

11    the fingernails were blood?  That's what you're

12    telling me right now?  I just want to make sure I

13    understand it.

14               MR. KAMIONSKI:   Objection, mischaracterizes

15    his testimony.

16               You can answer, if you understand it.

17               THE WITNESS:   The way it was presented to me

18    is you -- if you find human blood, you can send it --

19    and you have sampled that, you can send it to the MSP.

20               If you don't have human blood and you just

21    write that in your report, that the leucomalachite



1  green was positive, but the sample was consumed.

2  BY MS. GREEN:

3       Q.   Okay.

4       A.   So if I had a stain and like in some of the

5  other articles that you were showing, those items

6  could be -- since the blood's still good, you can

7  still send it to get a DNA test.

8       Q.   But these items couldn't be sent for DNA

9  testing, right?

10           MR. KAMIONSKI:  Objection, foundation.

11           THE WITNESS:  Yes.  It depends on like, the

12  leucomalachite test destroys the sample.

13  BY MS. GREEN:

14       Q.   Okay.

15       A.   The other sample still existed, only a small

16  portion of it.  So they could be taken.

17       Q.   All right.  So let me get this straight.

18           I'm just talking about the fingernails here.

19  On the fingernails, you did leucomalachite testing,

20  right?

21       A.   On the samples taken from the fingernails,



Case 1:19-cv-00384-ELH  Document 186-1  Filed 05/12/21  Page 290 of 388
BARRY SCOTT VERGER                                          April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police              289

1  yes.

2        Q.    Okay.

3              And you're telling me that there was

4  something left that could be tested after you did that

5  testing?

6        A.    No.  I don't know if there was anything

7  else.  I said that the samples were destroyed that I

8  took, that I did the leucomalachite test.  I don't

9  know what else was left under the nails.

10       Q.    And why did you do -- you said something

11  about there being a rule or a requirement.  I just

12  want to go back after this and pin it down a little

13  bit.

14             So, before sending items to DNA testing --

15  for DNA testing to MSP?

16       A.    Yes, what I believed.  That was one of the

17  functions we did back then.

18       Q.    Before sending items for DNA testing to MSP,

19  there was a -- I'm just going to ask you straight:

20  Was there a requirement for you to do leucomalachite

21  testing?  Were you required to do that?



1     A.   Yes, we were required to do a leucomalachite

2   test on -- on items that they felt could be blood.

3   And if it could be blood, if there was a sample left

4   over, to do a human test.  And if we did a human test

5   and it was human, yes, they would take it.

6     Q.   Okay.  So it was -- whose requirement was

7   it?

8     A.   I'm not sure whose requirement it was.

9     Q.   Okay.

10    A.   I'm not sure if the MSP required it or we

11  required it, but I just know that's the way it was --

12  that's how it functioned back then.

13    Q.   Well, we're talking about the MSP rule?

14    A.   Right.  I'm not familiar with the MSP rule.

15  I don't -- you know, you're asking me something that

16  I'm -- I'm not part of.  I just know when we send

17  samples out to MSP, it's usually the sample's got to

18  be DNA worthy.

19    Q.   All right.  So when I depose Mr. Profili,

20  you anticipate that he's going to tell me that you

21  were trained before you could submit any evidence out



```
 1   for DNA testing to MSP, you had to conduct destructive

 2   leucomalachite green testing on it before you could do

 3   that?

 4            MS. AMATO:  Objection to the form of the

 5   question.

 6            MR. KAMIONSKI:  Join.

 7            THE WITNESS:  I don't know what Mr. Profili

 8   would say.  I'm not him.  I don't know what he would

 9   say.

10   BY MS. GREEN:

11       Q.   Well, he was your supervisor, right?

12       A.   Yes, he was.

13       Q.   A friend of your's right?

14       A.   Yes, a long time ago.

15       Q.   So what you're saying, if you're telling the

16   truth, should be consistent with what he's going to

17   have to say when he's under oath, right?

18            MS. AMATO:  Objection to form of the

19   question, argumentative.

20            MR. KAMIONSKI:  Join.

21   BY MS. GREEN:
```



BARRY SCOTT VERGER                                        April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police                 292

1        Q.   You can answer.

2        A.   I don't know.  I don't know what he would

3   say.

4        Q.   Okay.  In any event, initially this morning

5   you told me -- I started the deposition with this, I

6   went through it really clearly because I really wanted

7   to make sure I understood your testimony and what was

8   left.

9             You told me that all of the red stains on

10  all six of the red stains and brown stained nails, you

11  destroyed all the stains, they were all consumed?

12       A.   Consumed in analysis.

13       Q.   Okay.

14       A.   The ones I could see, yes.

15       Q.   All right.

16            Then after the break you changed your

17  testimony and said, in fact, you're not sure, maybe

18  there were some red stains left, right?

19       A.   There were red stains that I could see.

20       Q.   So were there red stains that you could see

21  left; yes or no?



1        A.    I didn't see any red stains left.

2        Q.    Okay.

3              So you consumed all the red stains on the

4   fingernails, right?

5        A.    Right, we're talking about a minute amount

6   of red substance.

7        Q.    Okay.  And you went on every nail?

8        A.    On every nail?  Just the ones where I saw

9   red.

10       Q.    Okay.  That makes sense and that's

11  consistent with what you told me this morning.  So I'm

12  glad we're still on the same page about that.

13             And so, just thinking through this

14  logically -- first of all, can you accept the premise

15  there was a request for DNA testing on the nails?

16             MR. KAMIONSKI:  Objection, foundation.

17  BY MS. GREEN:

18       Q.    I just want you to assume that there was a

19  request for DNA testing on the nails.  Okay?

20       A.    Okay.

21       Q.    That's what Detective Ritz said.  Okay?  So



1    I'm just going to ask you to assume it even if you

2    don't remember it?

3              MR. KAMIONSKI:   Objection to the extent it

4    mischaracterizes his prior testimony.

5    BY MS. GREEN:

6         Q.   Okay?

7         A.   Okay.

8         Q.   Before you tested the fingernails, you knew

9    there was a request for DNA testing.  Why would there

10   be a requirement for you to conduct consumptive

11   testing on all the red stains?  Because then you're

12   not --

13        A.   I can't tell you that.  I don't know that.

14        Q.   It doesn't make any sense, right?

15        A.   Like I said, you know, I did it and I can

16   only tell you what I did.  I can't tell you, you know,

17   what I don't know.

18        Q.   And you did it, you made the decision to do

19   it.  That was in your discretion, sir, correct?

20        A.   I did it, yes.  I did the fingernails.  I

21   looked for red stains and I found stains.  I swabbed



1  them and I tested the samples and they were destroyed.

2      Q.   And that's the decision you made, right?

3      A.   That's what I did.  I'm sticking to that,

4  yes.

5      Q.   All right.

6           And there was no rule or requirement telling

7  you you had to destroy -- conduct leucomalachite green

8  testing on every single red stain on the nails.  There

9  is no requirement, correct?

10          MR. KAMIONSKI:  Objection, mischaracterizes

11 his testimony.

12          THE WITNESS:  I don't recollect anything

13 like that.  It was on the paperwork.

14 BY MS. GREEN:

15     Q.   All right.  If -- okay.  Now, as an analyst

16 as a forensic expert, you have to make a number of

17 discretionary decisions, correct, similar to that one?

18     A.   Yes, I got to follow a certain protocol.

19     Q.   Deciding what to test and how much to test,

20 that's in your discretion?

21     A.   Yes.



1      Q.   Okay.  Fair enough.

2           So, for example, you could have -- just

3  assuming there was some rule -- I've never seen one.

4  I'll tell you I've subpoenaed MSP, I've send requests

5  to BPD, but even assuming there is some rule that you

6  were supposed to do the leucomalachite green test

7  before sending it out, there's no rule requiring you

8  to do -- consume every single stain on every single

9  nail, right?

10     A.   I don't know.  I don't recollect how big the

11  stains were.  We could be talking about a stain of a

12  pinhead.  I don't know how big the stain was.  You're

13  asking me to remember something that I can't remember.

14  If you were -- you know, if there was some kind of

15  pictures of the -- you could say oh, that's a really

16  big stain, or oh, wow, did you see that?

17     Q.   Did you take pictures before you did the

18  test?

19     A.   No, I did not.

20     Q.   Why not?

21     A.   I don't believe it was required at the time.



1      Q.   Okay.  Why not test -- why test more than

2   one nail for the presence of blood?  Why not stop

3   after you got the presumptive of what you got -- when

4   you got the positive result on the first nail?

5           MR. KAMIONSKI:  Objection, asked and

6   answered.

7           THE WITNESS:  I couldn't tell you that,

8   answer that question.

9   BY MS. GREEN:

10     Q.   You have no explanation for why you made the

11  decision --

12     A.   That was a decision that was made 20 years

13  ago.  And I don't believe, you know, the technology

14  that we have today -- maybe it would have been

15  different.

16  BY MS. GREEN:

17     Q.   But as you sit here right now today, you

18  can't think of a legitimate scientific explanation for

19  why you did not stop after you got the positive

20  presumptive result on the first nail?

21     A.   No.



1    Q.   Now, we asked Dave Mabrey the prosecutor in

2    the case -- do you remember Dave Mabrey?

3    A.   No, I don't.

4    Q.   Well, he's the prosecutor in this case.   He

5    agreed his notes reflected that he talked to you.   And

6    apparently he put you on at trial.   And by the way,

7    when you testify at trial you typically, although you

8    don't remember it in this case, when you testify as an

9    expert on behalf of the prosecution, you typically

10   meet with the prosecutor before you testify to talk

11   about your testimony.

12        So you know what questions to expect and if

13   you could explain the procedures to him, right?

14   A.   I don't remember meeting with him, as I told

15   you.

16   Q.   I know you don't remember it but I'm asking

17   you about the practice?

18   A.   Yeah, if the practice is that.   Yes.

19        Sometimes it is, sometimes it doesn't

20   happen.

21   Q.   Okay.   Well, Mabrey told us that he would



 1  never put an expert like you on the stand without

 2  talking to you before trial to get an understanding of

 3  the testing.

 4          Do you have any reason to question that

 5  statement?

 6          MR. KAMIONSKI:  Objection to the form of the

 7  question, mischaracterizes Mabrey's testimony.

 8          THE WITNESS:  I couldn't tell you that

 9  because I don't remember the conversation we had.

10  BY MS. GREEN:

11      Q.  Do most prosecutors know what leucomalachite

12  green testing is all about?

13      A.  I couldn't tell you.

14      Q.  Well, in any event, you can't dispute

15  Mabrey's testimony that he would have talked to you.

16  He said he didn't know much about this test, so he

17  would have -- he said he would have been relying on

18  Verger to explain the testing that was done.

19      A.  Okay.

20      Q.  That's common, prosecutors rely on experts

21  such as yourself to explain what you did, right?



Case 1:19-cv-00384-ELH   Document 186-1   Filed 05/12/21   Page 301 of 388
BARRY SCOTT VERGER                                          April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police                    300

1            MR. KAMIONSKI:  Objection to the form of the

2    question, it calls for speculation.

3            You can answer.

4            THE WITNESS:  I don't know.

5    BY MS. GREEN:

6       Q.   You're not aware of prosecutors relying on

7    you to explain --

8       A.   I don't remember him talking to me.  You're

9    asking me about testimony with him.  I don't -- I

10   don't remember any of my conversations with any of the

11   prosecutors about that.

12      Q.   You don't remember ever having a private

13   conversation with a prosecutor where they're relying

14   on you to explain scientific testing that you

15   conducted, right?

16      A.   Yes, I remember having conversations with

17   them.  I just don't remember the content of the

18   conversations.

19      Q.   Okay.  But that's something that you did

20   typically?  You typically would, as part of your job

21   as an expert, to talk and explain the testing that you



Case 1:19-cv-00384-ELH   Document 186-1   Filed 05/12/21   Page 302 of 388
BARRY SCOTT VERGER                                              April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police                      301

1   did before -- to the prosecutor?  So that they can

2   determine whether they want to call you as a witness

3   at trial, right?

4        A.   Yes.

5        Q.   And if Mabrey reached out to you for such an

6   explanation about your testing, you would have made

7   yourself available, right?

8        A.   Yes.

9        Q.   In fact Mr. Mabrey testified that it was

10  important when he has a witness like yourself who's

11  testifying about forensics that's outside his area of

12  expertise, to speak with the witness before putting

13  them on the stand at a homicide trial to understand

14  the substance of their testimony.

15       A.   If that's what he said, I don't know.

16       Q.   Okay.

17            But if he wanted to talk to you about the

18  substance of your testimony, you would have made

19  yourself available, right?

20       A.   That's correct.

21       Q.   You do not deny that you had a conversation



1   with him before trial about the substance of your

2   testimony?

3           MR. KAMIONSKI:  Objection, mischaracterizes

4   his testimony, asked and answered.

5           THE WITNESS:  I don't recollect.

6   BY MS. GREEN:

7      Q.   All right.

8           Now, Mr. Mabrey also testified that there's

9   no question you told him before trial that the State

10  Police required that you do the test for the presence

11  of blood before sending the nails for DNA testing?

12     A.   I don't remember saying that.

13     Q.   All right.

14     A.   And in fact it's contradictory to the

15  testimony you've given today that you're not aware of

16  any such requirement, right?

17          MR. KAMIONSKI:  Objection, it misstates his

18  testimony.

19          THE WITNESS:  I didn't say that.  I just

20  told you before that, that the procedures of

21  substances going to the Maryland State Police.



BARRY SCOTT VERGER                                    April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police              303

```
 1   BY MS. GREEN:

 2       Q.   You told me you weren't aware of it being a

 3   requirement and it was in your discretion.  That's

 4   what you just --

 5       A.   I told you that -- I told you that I didn't

 6   know whether it was a requirement or not.

 7       Q.   Okay.

 8       A.   And I don't know what the MSP required.

 9       Q.   All right.

10            So now, that I've confronted you with Mr.

11   Mabrey's testimony, you're now taking the position you

12   have no idea one way or the other whether MSP had a

13   requirement?

14            MR. KAMIONSKI:  Objection, it

15   mischaracterizes his testimony.

16            THE WITNESS:  I don't recollect what the

17   Maryland State Police said.

18   BY MS. GREEN:

19       Q.   Okay.  So now, it's your testimony there

20   could be a requirement requiring you to test -- do the

21   leucomalachite testing or it could completely be in
```



1   your discretion, you do not know?

2          MR. KAMIONSKI:  Objection, mischaracterizes

3   his testimony.

4          You can answer.

5          THE WITNESS:  I don't put in the request for

6   the DNA, no.

7   BY MS. GREEN:

8       Q.   Actually you did in this case.  I showed it

9   to you.

10      A.   Not -- not making that decision to make it.

11  Yeah, I still have the form but it's not my decision

12  to whether it goes to the Maryland State Police,

13  that's what I was saying.

14      Q.   All right.  Whose decision is that?

15      A.   Well, under my testimony from before I said

16  it was under my supervisor, Bill Ritz.

17      Q.   All right.  Do you want me to change that --

18  take the opportunity to change that testimony now?

19      A.   That wasn't a change, that was what I said.

20      Q.   I'm asking, is it still true now that we're

21  at the end of the deposition or you want to change it?



1        A.    No, I'm sticking with that.

2        Q.    You're sticking with your supervisor and

3    Ritz who are the people who decide what gets DNA

4    tested and what doesn't?

5        A.    Yes, right.  I don't have --

6        Q.    All right.

7        A.    I don't decide.

8        Q.    All right.  So, you did not make the

9    decision -- but you understand that the reason DNA

10   testing was not done in this case was because you told

11   Mabrey it could not be done?

12       A.    I don't remember saying that.

13       Q.    Well, that's Mabrey's position?

14       A.    That's fine if he said it.  But I didn't say

15   it.  I don't recollect him saying it, I don't remember

16   the conversation.  Remember this is 1999.

17       Q.    Okay.  Mr. Mabrey testified that he had no

18   reason to anticipate that the samples would be

19   consumed in your analysis, that you were consuming the

20   blood sample?

21       A.    I don't know what was in front of him.  I



 1   can't tell you, I didn't talk to him.  I don't

 2   remember.  Even today, I don't remember talking to

 3   him.

 4        Q.   You never told Mabrey that you were going to

 5   be doing sample -- consumptive testing on the nails?

 6        A.   I don't recollect what I said to Mabrey, if

 7   I talked to him.

 8        Q.   You didn't give him advanced notice of that?

 9        A.   I don't recollect the conversation.

10        Q.   Do you deny telling Mr. Mabrey that -- do

11   you deny telling Mr. Mabrey that the Maryland State

12   Police required that you do testing for the presence

13   of blood before sending the nails for DNA testing?

14        A.   I don't recollect that conversation.  Are

15   you talking about my court testimony or are you

16   talking about something -- a phone call?

17        Q.   I'm asking -- Mr. Mabrey said the reason the

18   nails weren't -- first of all, let's back up a little

19   bit.  Back to what you wanted to talk about earlier in

20   the deposition.

21             It's your position that you only consumed



1   the blood stains on the nails, correct?

2        A.   The samples, yes, the stains that I removed

3   from the nails.

4        Q.   Okay.  And you removed it all, right?  You

5   removed all the stains you could see, right?

6        A.   Right.

7             MR. KAMIONSKI:  Objection, mischaracterizes

8   his testimony.

9   BY MS. GREEN:

10       Q.   And then you -- and then you consumed it?

11       A.   I consumed it?  It was consumed in the test.

12       Q.   And you conducted the test?

13       A.   That's correct.

14       Q.   Okay.

15       A.   The samples were consumed.

16       Q.   So all the blood stain samples that you

17  could see were consumed in the testing conducted,

18  right?

19            MR. KAMIONSKI:  Objection, mischaracterizes

20  his testimony.

21            THE WITNESS:  All the stuff that I pulled



1   off the fingernails was destroyed.

2   BY MS. GREEN:

3        Q.   Okay.  And you pulled off everything you

4   could see?

5             MR. KAMIONSKI:  Objection, misstates his

6   testimony.

7             THE WITNESS:  I don't recollect whether I

8   pulled it all off, but what I pulled off, I -- it was

9   consumed.

10  BY MS. GREEN:

11       Q.   Fair enough.  Now, we talked to Mr. Mabrey a

12  little bit about this consumption issue because he

13  said the reason that these nails were never sent out

14  for DNA testing is because you told him that the nails

15  were completely consumed, such that no testing could

16  be done.

17            MR. KAMIONSKI:  Objection to form of the

18  question.

19  BY MS. GREEN:

20       Q.   Now, do you deny telling him that --

21       A.   It would have been -- whenever I was



Case 1:19-cv-00384-ELH   Document 186-1   Filed 05/12/21   Page 310 of 388
BARRY SCOTT VERGER                                          April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police                    309

1   talking, it would have been about the samples that I

2   took would have been destroyed --

3        Q.   Okay.

4        A.   -- or consumed.

5        Q.   I know you don't remember the conversation.

6   You're certain today, you told Mabrey the samples you

7   took were consumed, you didn't tell him the nails were

8   consumed?

9        A.   I don't recollect what I said to Mabrey.

10       Q.   Well, so -- so here we go again.  Do you

11  deny telling Mr. Mabrey that the fingernails were

12  consumed such that DNA testing couldn't be done?

13       A.   I don't recollect what I said.  What I was

14  referring to when I said the samples -- only the

15  samples were -- were consumed that I took off the

16  nails.

17       Q.   All right.  So in your conversation with

18  Mabrey, you would have made it clear that the nails

19  were still there?  It's just the samples you took off

20  the nails that were gone?

21       A.   Right.  Whatever I consumed was the sample.



1    Q.   And so if he asked you about after your

2  testing, if we could do some DNA testing on the nails,

3  you would have told him well, the nails are right

4  there.  You can try it, right?

5    A.   I don't recollect saying anything to him

6  after I consumed the samples.

7    Q.   All right.  Well, I'm telling you he had a

8  conversation with you about it.  That's what he said.

9    A.   All right.

10   Q.   Because he needs to find out what the heck

11 was going on with his evidence in this case.  Okay?

12   A.   Okay.

13   Q.   And I'll also tell you -- you don't have a

14 reason, I know you didn't talk to defense counsel in

15 this case but Malcolm Bryant was requesting DNA

16 testing on the nails because he believed it would

17 exonerate him.  And his defense was requesting DNA

18 testing of the nails.

19        So although you don't remember it, this was

20 something that both the defense and the prosecution

21 were very interested in finding out, if these DNA --



1    if this DNA testing could be done.  Okay?

2        A.   Okay.

3        Q.   And so when we asked Mr. Mabrey about that

4    and what was going on with that, he said he -- he said

5    that you told him that you couldn't send the nails for

6    DNA testing because they were consumed.  Okay?  That's

7    what he said?  You got that?

8        A.   I don't recollect what he said, but if you

9    say so.

10       Q.   I'm reading from Page 268.  I'm trying to

11   move through and I don't have to waste a lot of time.

12   But Line 3, 268 Line 3.

13           QUESTION:  "Verger told you that he couldn't

14   send the nails for DNA testing because there were

15   consumed, correct?"

16           ANSWER:  "Correct."

17           QUESTION, THE COURT:  "Did you rely on that

18   representation as being made in good faith to you,

19   correct?"

20           ANSWER:  "Correct."

21           QUESTION:  "That was your understanding as



1    to why the nails were not DNA tested, correct?"

2            ANSWER:  "Based on what we've reviewed now,

3    yes."

4            This is Mr. Mabrey's sworn testimony from

5    February 2021.  Okay?

6       A.   Okay.

7       Q.   So he is saying you, Mr. Verger, told him

8    that you could not send the fingernails for DNA

9    testing because they were consumed, correct?

10           MR. KAMIONSKI:  Objection.

11           THE WITNESS:  I don't --

12   BY MS. GREEN:

13      Q.   I'm sorry.  I'm just reading the transcript.

14   You don't need to answer.  I don't have a question.

15   There's no question pending.  But you've got that in

16   your head, that testimony, right?

17      A.   Sure.

18      Q.   Okay.  Now, as you sit here right now,

19   regardless of whether you said it, you know that's not

20   true.  You know that there were nails that were not

21   consumed in the testing, right?



 1      A.   Right, the nails --

 2           MS. AMATO:   Objection to the form of the

 3   question, compound question.

 4   BY MS. GREEN:

 5      Q.   You can answer.

 6      A.   The nails were not destroyed.  The samples

 7   were destroyed.

 8      Q.   Okay.

 9           So the nails could still be sent out for DNA

10   testing even after you did your testing, right?

11           MR. KAMIONSKI:   Objection to foundation,

12   calls for speculation.

13           THE WITNESS:   I don't know -- I don't know

14   that to be a fact.

15   BY MS. GREEN:

16      Q.   Okay.  Now, would you have known that to be

17   a fact -- would you have known the answer to that in

18   1999?

19           MR. KAMIONSKI:   Objection to foundation,

20   calls for speculation.

21           MS. AMATO:   Join.



1          THE WITNESS:  I can't remember -- I don't

2    remember back in 1999 to tell you that.

3    BY MS. GREEN:

4        Q.   Okay.  So do you deny -- so what would have

5    prevented you from trying to send the nails out to MSP

6    just to see if they could test it, right, because

7    you're not a DNA analyst?

8          MR. KAMIONSKI:  Objection, asked and

9    answered.

10         THE WITNESS:  I don't understand the

11    question.

12    BY MS. GREEN:

13       Q.   So is there anything that would have

14    prevented you from sending those fingernail clippings,

15    the ones that you said you put back in the bag after

16    you scraped blood stains off of them and destroyed the

17    blood stains, those fingernail clippings, after you

18    did your leucomalachite green testing and destroyed

19    everything, all the stains, right -- you with me?

20       A.   Yes.

21       Q.   Did your testing, you still got your nails,



1    right?

2        A.    That's correct.

3            MR. KAMIONSKI:   Objection to the form of the

4    question, compound.

5    BY MS. GREEN:

6        Q.    Now, could -- there was nothing preventing

7    you from sending those nails out for DNA testing,

8    right?

9            MR. KAMIONSKI:   Objection to the form of the

10   question, foundation, calls for speculation.

11           THE WITNESS:   I'm not responsible for

12   sending stuff out for DNA.   They just tell me what to

13   do.

14   BY MS. GREEN:

15       Q.    Okay.   So the reason the nails still didn't

16   get sent out for DNA is because Detective Ritz told

17   you not to send them out, right?

18           MR. KAMIONSKI:   Objection, misstates his

19   testimony.

20           THE WITNESS:   I don't recollect.

21           MS. AMATO:   Join.



1  BY MS. GREEN:

2      Q.   What other explanation do you have if you

3  had a request for DNA testing, you still have nails.

4  What other explanation is there for not sending the

5  nails out with the rest of the items for DNA testing?

6      A.   I can't answer that question.

7      Q.   Okay.

8      A.   I don't know the answer.

9      Q.   If Ritz asked you if you could send the

10  nails out for DNA testing, you would have told him

11  just to try and see.  You would have told him yes,

12  right?

13     A.   No.

14          MR. KAMIONSKI:  Objection to the form of the

15  question.

16          You can answer.

17          THE WITNESS:  No, I would not.  I would have

18  asked -- he would have to talk to my supervisor.

19  BY MS. GREEN:

20     Q.   Okay.  You would tell him talk to your

21  supervisor?



Case 1:19-cv-00384-ELH   Document 186-1   Filed 05/12/21   Page 318 of 388
BARRY SCOTT VERGER                                        April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police                 317

1        A.    That'd correct.  They -- that's a decision

2    they've got to make.

3        Q.    All right.  So, the reason these nails --

4    assuming there was a request for DNA testing from the

5    prosecutor, the reason these fingernails never got

6    sent out for DNA testing after you did your

7    leucomalachite green testing, is either because Ritz

8    told you not to send them or your supervisor told you

9    not to send them, right?

10            MR. KAMIONSKI:  Objection to the form of the

11   question, it calls for speculation.

12            THE WITNESS:  I don't recollect that ever

13   coming up, about the nails for DNA.

14   BY MS. GREEN:

15       Q.    Well, Mabrey said it came up.  He said that

16   you told him you could not send the nails for DNA

17   testing because they were consumed and he said that he

18   relied on you for making that representation in good

19   faith?

20       A.    I was telling him about the samples being

21   destroyed.



```
 1        Q.   Okay.  So as --

 2        A.   In good faith.

 3        Q.   It's your sworn testimony that when you told

 4   him that the nails were -- couldn't be sent out for

 5   DNA testing, you were really just talking about the

 6   blood samples, right?

 7        A.   The samples.  That's correct.  They were

 8   consumed.

 9        Q.   Now, why do you think Mabrey took away from

10   your conversation with him that the nails were

11   consumed?

12             MR. KAMIONSKI:  Objection, calls for

13   speculation.

14             MS. AMATO:  Join.

15             THE WITNESS:  I don't know.

16   BY MS. GREEN:

17        Q.   Do you have any explanation for that?

18        A.   No, I don't.  I said I don't know.

19        Q.   Is it possible that you actually told Mabrey

20   the nails were consumed?

21        A.   I don't know.
```



```
 1        Q.   So you can't deny that you told Mabrey the

 2   nails were consumed?

 3        A.   I don't --

 4             MS. AMATO:  Objection, mischaracterizes his

 5   testimony.

 6             MR. KAMIONSKI:  Join.

 7             THE WITNESS:  I was talking about the

 8   samples being consumed.

 9   BY MS. GREEN:

10        Q.   You can't deny that you told Mabrey the

11   nails were consumed?

12             MR. KAMIONSKI:  Objection, asked and

13   answered.

14             MS. AMATO:  Join.

15             THE WITNESS:  I can't answer that question.

16   BY MS. GREEN:

17        Q.   Okay.  Go back to Page 85 your testing

18   here -- I mean, your testimony in this case.

19             MR. KAMIONSKI:  What page did you want to go

20   to?

21   BY MS. GREEN:
```



1      Q.   Do you have Exhibit 85 in front of you, sir?

2      A.   Is this it?

3           MR. KAMIONSKI:  That's your Exhibit 10.

4           THE WITNESS:  Okay.  Go ahead.  What page?

5  BY MS. GREEN:

6      Q.   Page 179, please.

7      A.   All right.

8      Q.   All right.  Fifteen through 19.

9           MR. KAMIONSKI:  Hold on.  Fifteen to 19 on

10  179?

11  BY MS. GREEN:

12     Q.   Yes, and I'll read it out loud.

13          So this is Mr. Mabrey asking you questions.

14          QUESTION:  "Now, these same nail testings

15  that you've done that you said were consumed in

16  analysis, can those same nails be tested for DNA, or

17  once they're consumed, that's it?"

18          ANSWER:  "Once they're consumed, that's it."

19          So here again, you're testifying that the

20  nails are consumed.

21     A.   The sample was consumed.



Case 1:19-cv-00384-ELH   Document 186-1   Filed 05/12/21   Page 322 of 388
BARRY SCOTT VERGER                                             April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police                      321

1        Q.    But you didn't say sample, did you?

2        A.    It said nail testing, testings of nails.

3   That's a test.

4        Q.    Did you say --- did you say sample, sir?

5        A.    It doesn't say -- but it doesn't say nail.

6   It says nail testing.

7        Q.    All right.  You're not willing to answer the

8   question as to whether or not this transcript says

9   sample?

10            MR. KAMIONSKI:  Objection to the form of the

11   question, argumentative.  The transcript says what it

12   says.

13            MS. AMATO:  Join.

14   BY MS. GREEN:

15        Q.    You don't feel comfortable answering that

16   question right now?

17            MR. KAMIONSKI:  Objection to form of the

18   question.

19            THE WITNESS:  I was referring to the sample.

20   BY MS. GREEN:

21        Q.    Okay.  And so -- and similarly when Mabrey



Case 1:19-cv-00384-ELH  Document 186-1  Filed 05/12/21  Page 323 of 388
BARRY SCOTT VERGER                                              April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police                      322

1    said you told him the nails were consumed in your

2    conversation before trial, you were also referring to

3    the sample then even though he used the word "nails,"

4    right?

5         A.   I don't recollect that.

6              MR. KAMIONSKI:  Objection to form of the

7    question as well.

8    BY MS. GREEN:

9         Q.   Do you deny -- do you deny telling Mabrey

10   that?

11        A.   I don't recollect the conversation with

12   Mabrey.

13        Q.   Okay.  Let see.

14             Either way, whatever consumption you did,

15   you didn't tell Mabrey before you did it, right?

16             MR. KAMIONSKI:  Objection to the form of the

17   question, foundation, form.

18             THE WITNESS:  I don't recollect whether I

19   said anything about it or not.

20   BY MS. GREEN:

21        Q.   Well, if you ever talked to Ritz about the



1  testing you were going to do in this case, you

2  certainly would have told him that the leucomalachite

3  green testing was consumptive, right?

4          MR. KAMIONSKI:  Objection to the form of the

5  question, calls for speculation, foundation.

6          MS. AMATO:  Join and incomplete

7  hypothetical.

8  BY MS. GREEN:

9      Q.   You can answer.

10     A.   I don't know.

11     Q.   If Detective Ritz talked to you -- I

12  understand you don't remember the conversation.  But

13  if Detective Ritz talked to you before you did your

14  testing for the presence of blood and asked you like

15  what the test was, what the point of the test was,

16  surely you would have explained to him that it is

17  destructive testing, right?

18          MR. KAMIONSKI:  Objection to the form of the

19  question, calls for speculation, incomplete

20  hypothetical, assumes facts.

21          You can answer, if you understand the



1  question.

2             THE WITNESS:  I don't know.

3  BY MS. GREEN:

4      Q.   All right.  I know it's getting late.  I

5  think I have approximately 30 more minutes.  Can we

6  take a five-minute break?

7             THE VIDEOGRAPHER:  Off the record.

8             The time is 5:46.

9             MR. BRUSTIN:  Just before we go off, can we

10  go back on for a minute?

11             THE VIDEOGRAPHER:  Back on the record.

12             The time is 5:46.

13             MR. BRUSTIN:  In light of what just happened

14  on the record -- so we're not going to be closing this

15  deposition, we're going to be keeping it open.  So

16  that means for you, Avi, that you are -- the same

17  rules when a deposition is open apply, you can't be

18  talking about the substance, because we intend to make

19  a motion that not only did you coach the witness, but

20  you misrepresented what happened to the judge.

21             So this deposition will remain open so that



1  we can file that motion.

2           MS. GREEN:  All right.  We can go off

3  record.  We'll be back in five minutes.

4           THE VIDEOGRAPHER:  Okay.  Off the record.

5           The time is 5:47.

6           (Whereupon, a recess ensued.)

7           THE VIDEOGRAPHER:  We're back on the record.

8           The time is 5:58.

9  BY MS. GREEN:

10      Q.   Mr. Verger, did you have an opportunity to

11  converse with your counsel during the break?

12      A.   Didn't talk to him at all during the break.

13      Q.   Okay.

14           In terms of -- now, you -- now, at trial you

15  testified that you received the blood sample from

16  Mabrey, right?

17      A.   I'd have to see it.

18      Q.   Do you remember that from reading your

19  testimony?

20      A.   I just remember that -- I don't remember

21  from the testimony.  I just remember the sheet that



1   you showed me that had it on it.

2        Q.   Okay.

3             And you testified on Page 185 that you

4   received Mr. Bryant's -- of your testimony -- that you

5   received Mr. Bryant's blood sample for comparison

6   purposes only?

7        A.   Page 185?  I'm looking.  Hold on.

8        Q.   Yes, sir.

9        A.   Okay.

10       Q.   If you want to read it, just read at the

11  bottom of 184, Line 20.  That's where you say, "I

12  received a blood sample from Malcolm Bryant."

13       A.   What number did you say?

14       Q.   Page 184.

15       A.   Oh.

16       Q.   I received a blood sample from Malcolm

17  Bryant, do you see that, Line 20, 21?

18       A.   No, not on 185.

19       Q.   184, sir?

20       A.   You said -- all right.

21       Q.   I'm just trying to orient you.



```
 1        A.    Yes.   Thank you.

 2        Q.    184, Line 20?

 3        A.    184, Line 20.

 4        Q.    Mr. Verger, "Hold on a second.  I received a

 5   blood sample from Malcolm Bryant."

 6        A.    Yes.   Who said that?

 7        Q.    You did.  It says, "MR. VERGER:  Hold on a

 8   second.  I received a blood sample for Malcolm

 9   Bryant."

10        A.    Okay.  I said that.  Yes, I read it.  I read

11   it.

12        Q.    Now, take a look at 185, please?

13        A.    Okay.  185.  Okay.

14        Q.    Top of 185.

15              QUESTION:  "And to your knowledge, that was

16   for comparison purposes only.  Is that right?"

17              ANSWER:  "Yes, sir."

18              Did I read that correctly?

19        A.    Yes, you read that correctly.

20        Q.    All I want to establish is that you received

21   a blood sample from Malcolm Bryant for comparison
```



1   purposes only, correct?

2        A.   That's correct.

3        Q.   Okay.  And that's not uncommon when you're

4   sending items out for DNA testing, you need the

5   suspect's DNA to compare, right?

6        A.   That's correct.

7        Q.   Okay.

8        A.   You would need a sample.

9        Q.   You understood that as part of the testing

10  in this case, the goal was to compare the biological

11  material to biological material from Malcolm Bryant,

12  correct?

13       A.   That's correct.

14       Q.   Okay.  And either to see if Malcolm Bryant

15  is excluded, right?

16       A.   Yes, I believe that's how it's done.

17       Q.   Or included, correct?

18       A.   I believe that's how it's done.

19       Q.   The whole purpose of doing any testing on

20  the nails in this case was to either -- was to compare

21  to Malcolm Bryant, right?



1      A.   I can't answer that question.

2      Q.   That was the end goal. He was the suspect?

3      A.   I don't know.  He was the only suspect, you

4  know.  I don't know.

5      Q.   That's okay.  Fair enough.

6      A.   Yes.

7      Q.   I'm telling you there's no other suspect's

8  blood you received.  There was no other suspect's

9  blood collected in the case.  I'm just representing

10  that to you.

11          So taking my representation as true, the end

12  goal was to compare the biological material under the

13  fingernails to the biological material, the known

14  biological material of the suspect, right?

15      A.   Yes, if there was substance to be looked at.

16  If there was enough there.

17      Q.   And when you did the testing in this case,

18  you knew that the prosecution had that goal in mind,

19  right?

20          MS. AMATO:  Objection --

21          MR. KAMIONSKI:  Objection to the form of the



Case 1:19-cv-00384-ELH   Document 186-1   Filed 05/12/21   Page 331 of 388
BARRY SCOTT VERGER                                                    April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police                           330

1  question, calls for speculation.

2          MS. AMATO:  Join.

3          THE WITNESS:  I couldn't tell you that.

4  BY MS. GREEN:

5      Q.   When you did the testing you understood that

6  the goal was to compare the biological material from

7  test -- from the fingernails to Malcolm Bryant's?

8      A.   When I -- when I examined the fingernails,

9  the sample, I took samples from it and that was

10 through my leucomalachite test.

11         I don't know anything else about it.

12     Q.   What other possible goal could there have

13 been -- end goal for trial for testing the fingernails

14 other than to compare them to the suspect?

15     A.   I don't know.

16         MS. AMATO:  Objection, calls for

17 speculation.

18 BY MS. GREEN:

19     Q.   Can you think of any -- any other goal for

20 analyzing the fingernails in a homicide case other

21 than to see if you can identify the biological



1  material and compare it to the suspect's?

2       A.   I can't answer that question.

3       Q.   In any event, leucomalachite green testing

4  is not a discriminatory test as it relates to

5  comparing to other biological material, correct?

6       A.   Yes.  It just tells you the possibility it

7  could be blood.

8       Q.   Right.  It doesn't tell whose blood it could

9  be, right?

10      A.   That's correct.

11      Q.   If you wanted to find out whose blood it is,

12  you'd have to save some of the blood sample and do a

13  different test on that, right?

14      A.   I don't know if there was enough blood

15  sample to be saved.  If I did what I did, I took the

16  sample and it was consumed in analysis.  If there was

17  anything left, I don't know, I don't have that -- I

18  don't have that type of expertise to know that.

19      Q.   All right.

20           But in any event, you knew that the

21  leucomalachite green test was not a test that could



1 | say if the blood was Malcolm Bryant's or not?

2 |     A.   That's correct.

3 |     Q.   Okay.

4 |         And nevertheless, you consumed all the

5 | stains you visualized on the fingernails during the

6 | leucomalachite green testing, correct?

7 |         MR. KAMIONSKI:  Objection, that misstates

8 | his testimony.

9 |         THE WITNESS:  I performed a leucomalachite

10 | on the same -- from the samples that I took.

11 | BY MS. GREEN:

12 |     Q.   Okay.

13 |         And the samples you took were all the red

14 | stains you saw on the nails, right?

15 |         MR. KAMIONSKI:  Objection, misstates his

16 | testimony.

17 |         THE WITNESS:  All the red -- all the red I

18 | could see.

19 | BY MS. GREEN:

20 |     Q.   Okay.  In any event, you didn't save any red

21 | for a different test that might be used that was more



1   discriminatory, that could be compared to Malcolm

2   Bryant?

3        A.   Like I was telling you, I don't know what

4   the size of the red stains were.

5        Q.   You did not attempt to save any stains for

6   subsequent tests that were discriminatory in nature,

7   correct?

8             MR. KAMIONSKI:  Objection to the form of the

9   question, misstates the testimony.

10            THE WITNESS:  I can't answer that question.

11   BY MS. GREEN:

12        Q.   Why can't you answer that question?

13        A.   That question, it's -- you're assuming

14   stuff.  Like you're assuming how much sample I had

15   underneath the fingernail.

16        Q.   I'm asking if you attempted to preserve some

17   of the red stains for discriminatory testing

18   comparison to Malcolm Bryant?

19        A.   I'm telling you I don't know the size of the

20   stains that I had to use to do my leucomalachite.

21        Q.   It doesn't matters.  You had six different



```
 1   stains, right?

 2        A.   It does matter.

 3             What if they were the size of a pinhead?

 4        Q.   You still did the testing on -- six

 5   different times on six different stains.

 6             You did not attempt to preserve any

 7   stains --

 8        A.   Alls I can tell you is they were consumed in

 9   analysis.  I can't tell you anything else.

10        Q.   And you did not try and save them?

11        A.   The nails were saved.

12        Q.   You didn't try and save the stains?

13        A.   The stains were consumed.  The samples were

14   consumed.

15        Q.   All right.  Wouldn't you have been permitted

16   pursuant to BPD training and policy to not test all

17   six of the fingernails that had stains on them?

18        A.   One more time?  Can you say one more time?

19        Q.   Would was there a BPD policy, was it --

20        A.   Not that I know of.

21        Q.   There was no policy requiring you to test
```



1   all six of the nails?

2        A.   I couldn't tell you.

3             MR. KAMIONSKI:  Objection.

4   BY MS. GREEN:

5        Q.   You could have tested one -- just one nail

6   from each hand, right?

7        A.   I couldn't tell you what the protocol was

8   then.  This was 1999, it was a long time ago.

9        Q.   In 1999 would you have known the protocol?

10       A.   That's what I'm saying.

11            MR. KAMIONSKI:  Objection.

12            MS. AMATO:  Join.

13            MR. KAMIONSKI:  You can answer.

14            THE WITNESS:  I have no idea.

15  BY MS. GREEN:

16       Q.   Are you aware of any BPD protocol that

17  required you to test all six nail stains, red-brown

18  stains?

19            MR. KAMIONSKI:  Objection, asked and

20  answered.

21            You can answer again.



```
 1              THE WITNESS:  I don't recollect.

 2   BY MS. GREEN:

 3      Q.   Okay.  So you do not deny as you sit here

 4   today, you could have just tested one nail from each

 5   hand?

 6              MR. KAMIONSKI:  Objection to the form of the

 7   question, asked and answered, calls for speculation,

 8   foundation.

 9              THE WITNESS:  I don't recollect.

10   BY MS. GREEN:

11      Q.   When you did testing on a regular basis back

12   when you were in the Trace Analysis Unit, you would

13   have known the protocol back then, right?

14              MS. AMATO:  Objection to the form of the

15   question.

16              THE WITNESS:  I can't answer that because I

17   would have to go back to 1999 to tell you.

18   BY MS. GREEN:

19      Q.   Remember earlier in the deposition you told

20   me at the time you were doing the testing in fact it

21   was your duty to know the protocols and make sure you
```



Case 1:19-cv-00384-ELH   Document 186-1   Filed 05/12/21   Page 338 of 388
BARRY SCOTT VERGER                                    April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police            337

1   were following them?

2        A.   Duties back then, but not now.  I don't -- I

3   would be telling you something I didn't know.  I don't

4   remember.

5        Q.   Okay.  So in 1999, although you don't

6   remember the protocol, you know you would have known

7   them, otherwise you wouldn't have been performing this

8   testing, right?

9        A.   I can't -- I can't answer that.

10       Q.   Would it be -- wouldn't it be a dereliction

11   of duty to perform scientific testing on homicide

12   evidence if you don't know the BPD's protocols?

13            MS. AMATO:   Objection.

14            MR. KAMIONSKI:   Objection, argumentative.

15            THE WITNESS:   I can't tell you that.

16   BY MS. GREEN:

17       Q.   As you sit here today, you think it's

18   possible you did perform testing on homicide evidence

19   without having any idea what the protocol was?

20            MS. AMATO:   Objection, mischaracterizes the

21   testimony.



1              MR. KAMIONSKI:  Join and asked and answered

2     lots of times.

3              You can answer again.

4              THE WITNESS:  I can't tell you.

5     BY MS. GREEN:

6         Q.   Do you know the protocols in the Drug

7     Analysis Unit now?

8         A.   Yes.

9         Q.   Are there any protocols regarding

10    destructive testing in the Drug Analysis Unit?

11             MR. KAMIONSKI:  Object to the form of

12    question.

13             You can answer.

14             THE WITNESS:  I don't understand the

15    question.

16    BY MS. GREEN:

17        Q.   You told me earlier today that sometimes you

18    do consumptive testing in the Drug Analysis Unit,

19    right?

20        A.   Yes, you're talking about when we wash out a

21    vial.  When we do a wash.



1        You do a wash, you take some sample out with

2    the wash, but you don't test it.  You don't retest it,

3    so you don't know whether you got all of it out.

4        Q.   All right.  Let's move on.

5        Whether you were in the Mobile Unit, Trace

6    Analysis Unit or even the Drug Analysis Unit, you knew

7    the case work you were doing related to criminal

8    investigations, right?

9        A.   Correct.

10        Q.   And one of the basic principles for

11    scientists and analysts like yourself is that you have

12    to take every precaution to avoid destroying or

13    impairing the value of evidence, correct?

14            MR. KAMIONSKI:  Objection to the form of the

15    question.

16            THE WITNESS:  In the Drug Analysis Unit we

17    just --

18    BY MS. GREEN:

19        Q.   Any --

20        A.   Well, you're asking me -- again, you're

21    asking me to try to remember stuff that happened like



1   years ago.

2       Q.   So I'm reading everything right now from the

3   Mobile Crime Unit Operating Procedures from 1993, the

4   standard operating procedures regarding evidence

5   handling.

6            Were you in the Mobile Unit in 1993?

7       A.   Yes, in 1989 I got there.

8       Q.   Okay.

9            That sounds familiar and something you would

10  have been aware of.

11           "Each technician shall exercise every

12  precaution to avoid destroying or impairing the value

13  of evidence.  Avoiding particularly destruction of

14  fingerprints by improper handling of the objects

15  involved."

16           Does that ring any bells?

17      A.   Yeah, it does ring a little bit.  I do

18  understand it.

19      Q.   Okay.

20           What about this, another cite from the 1993

21  Mobile Unit procedures on evidence handling.  "When



1  evidence pertinent to a crime scene is found and

2  recovered, certain rules must be followed in its

3  handling and preservation so that its admissibility as

4  evidence in court and its value for laboratory

5  examination will not be affected."

6        A.   I understand that, too.

7        Q.   So as early as when you were in the Mobile

8  Crime Unit in the 1990s -- early 1990s, you were

9  learning about how to preserve evidence and ensure

10  you're not impairing the value of evidence that might

11  be used in court, right?

12        A.   That's correct.

13        Q.   And that's a basic principle, as basic as it

14  gets for scientists like yourself, correct?

15             MS. AMATO:  Objection.

16             THE WITNESS:  I'm not sure what you're

17  asking me.

18  BY MS. GREEN:

19        Q.   You have a duty to preserve evidence?

20        A.   Yes.

21        Q.   Okay.  That was your duty.



1          Now, when you do testing, sometimes you do

2    consumptive testing, right?

3          A.   That's correct.  We did the leucomalachite

4    while I was in the Mobile Unit.

5          Q.   And there were procedures in place that one

6    basic principle of consumptive testing is you only use

7    what you need to do the test and you preserve the rest

8    for further testing, right?

9          A.   That's a -- it depends on the person doing

10   it, of course.

11         Q.   All right.  It was your discretion to use --

12   when you were conducting destructive testing like a

13   leucomalachite green test, you're telling me it was

14   your discretion, whether to only use what you need to

15   do the test or whether to use it all -- use all the

16   biological material up?

17         A.   I can only tell you, I don't know how much

18   sample there was that I took.

19         Q.   You never learned when you became a

20   scientist that the basic principle that makes you

21   attest for the presence of blood, you save part of the



Case 1:19-cv-00384-ELH   Document 186-1   Filed 05/12/21   Page 344 of 388
BARRY SCOTT VERGER                                       April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police                  343

1   sample for further discriminatory testing?

2       A.   You do the best you can.  But if there's

3   very little there, you can only take what's there to

4   get your test done.

5       Q.   When you became a forensic analyst, you were

6   trained that when you're doing a testing on a sample,

7   you only take a representative sample to run the test

8   and save the rest for subsequent testing, right?

9       A.   Yes, it depends on how much sample you're

10  using and how much is there, how much is present.  If

11  there's not very much present, you're not going to

12  save a whole lot because there's not much there.

13      Q.   Okay.  But in principle, forgetting the

14  amount of the sample, say you have a -- let's talk

15  about something easy.

16          Say you got a rape kit, right?

17      A.   Okay.  Why don't you talk about something

18  present, like drugs?

19      Q.   Because --

20      A.   Rape kit doesn't -- that's the same thing.

21      Q.   All right.  Well, I'm not going to talk



1   about drugs because you -- you weren't analyzing drugs

2   in the Trace Analysis Unit.

3           I want to talk about bodily fluids.

4       A.   Okay.

5       Q.   So that can be connected to another human

6   being.

7       A.   That's fine.

8       Q.   So --

9       A.   Fair.

10      Q.   -- let's use blood, right?

11          So say you're testing a shirt for -- you see

12  a red stain on a white T-shirt.  Okay?

13      A.   Okay.

14      Q.   Instead of -- say it's a big red stain.  All

15  right?  You with me?

16      A.   Yes.

17      Q.   And you wanted to run a leucomalachite green

18  test to see if that stain is blood, right?

19      A.   That's correct.

20      Q.   So you would take a cutting, just a

21  representative sample of the stain?



1        A.    That is correct.

2        Q.    And you'd run the test to see if it's blood,

3    right?

4        A.    That's correct.  Take a sample from the

5    stain.

6        Q.    And you were trained only to take a small

7    representative sample so you could identify if it's

8    blood and save the rest for discriminatory testing,

9    right?

10        A.    That's correct.

11        Q.    Okay.

12              And so for example, you wouldn't take six

13    cuttings from the stain once you already took one

14    cutting and determined it was blood?

15        A.    I would just do the leucomalachite test.  I

16    would need two, wouldn't I?

17              I'd have do a test for human blood, too.

18        Q.    Okay.

19              Have you ever heard of the concept of

20    representative sampling?

21        A.    Yes, I have.



1      Q.   The idea that you take what you need to do

2   the test but you leave the rest behind for further

3   testing?

4      A.   Yes.

5      Q.   You were trained on that?

6      A.   Yes, I understand that concept.

7      Q.   In fact as a forensic analyst, you were

8   trained on -- trained on that concept, right?

9      A.   Yes.  I used that in the Drug Unit.

10     Q.   All right.  And so you'd agree that as a

11  basic principle when you're doing presumptive testing

12  you only -- for the presence of blood, you are only

13  supposed to take just what you need to do the

14  presumptive test and you save the rest for

15  discriminatory testing and comparison to the suspect,

16  correct?

17          MR. KAMIONSKI:  Objection to the form of the

18  question.

19          THE WITNESS:  Yes.  It depends on how -- how

20  much of the stain you have to get a positive result.

21  BY MS. GREEN:



1          Q.    Your duty is to try and preserve as much of

2     the evidence as possible for actual discriminatory

3     testing, correct?

4          A.    Yes.  They're trying to take a sample from

5     the big stain you're talking about and do a -- you're

6     saying a leucomalachite test, yes.  Leave the rest of

7     the stain behind.

8          Q.    For discriminatory testing, right?

9          A.    Yes, for further testing.

10         Q.    Now, the leucomalachite green test, you

11    would agree is an incredibly sensitive test, correct?

12              MR. KAMIONSKI:  Objection to the form of the

13    question.

14              MS. AMATO:  Join.

15              THE WITNESS:  I don't recollect how

16    sensitive it is.

17    BY MS. GREEN:

18         Q.    Well, I'll tell you based on the reading

19    I've been doing, you only need a tiny little stain,

20    just a tiny little bit to run the test. You don't need

21    a lot of blood.



1        A.    Okay.

2        Q.    Okay?

3        A.    Okay.

4        Q.    You don't have any reason to dispute that,

5    right?

6              MR. KAMIONSKI:   Objection to the form of the

7    question, foundation.

8              MS. AMATO:   Join.

9              THE WITNESS:   I'm only going by what you

10   say.

11   BY MS. GREEN:

12       Q.    All right.  Well, if you don't agree with

13   me, let me know.  Okay?

14       A.    I just don't -- I don't know where you got

15   that information from.

16       Q.    Do you have any recollection of the

17   leucomalachite green test being a sensitive test as

18   you sit here today?

19       A.    I don't -- I don't recall.

20       Q.    Would you have known -- learned about its

21   sensitivity at the time you were performing the test



1  when you were trained on it?

2      A.   Like I said, I don't recollect how much you

3  need to get a positive result, and it's a presumptive

4  test.

5      Q.   Fair to say over the course of your career

6  you did this test hundreds of the times?

7          MR. KAMIONSKI:  Objection to the form of the

8  question.

9  BY MS. GREEN:

10     Q.   Between the Mobile Unit and the Trace

11  Analysis Unit, you did this presumptive test hundreds

12  of times?

13     A.   That's incorrect.  I don't believe I've done

14  it hundreds of times.

15     Q.   Dozens of times?

16     A.   Pardon?

17     Q.   Dozens of times?

18     A.   I couldn't tell you how many times I did it.

19  I know it wasn't a hundred times.

20     Q.   You'd agree it's a pretty basic test, a

21  standard test that's been around a long time, right?



1          MR. KAMIONSKI:  Objection to the form of the

2    question.

3          THE WITNESS:  I'd have to look up the test.

4    Well, it's certainly been around since 1990, right,

5    when you joined the Mobile Unit?

6          MR. KAMIONSKI:  Objection to the form of the

7    question, foundation, calls for speculation.

8          THE WITNESS:  Yeah, it was around when I got

9    into the Mobile Unit.

10   BY MS. GREEN:

11      Q.   All right.  In any event, given that you

12   were trained that you're supposed to take the smallest

13   amount possible and leave the rest and preserve as

14   much evidence as possible for actual discriminatory

15   testing, can you explain why in this case you tested

16   all six -- nails on all -- withdrawn.

17          Given that you were trained that you had a

18   duty to try and preserve as much evidence as possible

19   for actual discriminatory testing, can you explain why

20   in this case you made the decision to test all the red

21   stains on six different nails?



1        A.    I couldn't tell you that.

2              MS. AMATO:  Asked and answered.

3              MR. KAMIONSKI:  Join.

4    BY MS. GREEN:

5        Q.    You'd agree your decision to test the stains

6    on six different nails is inconsistent with your

7    training that you have a duty to try and preserve as

8    much of the evidence as possible for actual

9    discriminatory testing?

10             MR. KAMIONSKI:  Objection to form.

11             THE WITNESS:  I can't answer that.

12             MR. KAMIONSKI:  Misstates his testimony.

13   BY MS. GREEN:

14       Q.    Why can't you answer that?

15       A.    Because there's -- it's different than what

16   I did in the Mobile Unit, you're talking about

17   fingernails.

18             The sample size of the fingernails is

19   different than, you know -- you just, you don't know

20   how large a piece of evidence is.

21       Q.    All right.



1          You would agree that you've got six nails

2     with stains on them, right?

3          A.   That's what my report said.

4          Q.   You tested all six, right?

5          A.   Yes.

6          Q.   Now, you could have tested just one and

7     preserved the rest of the stains for actual

8     discriminatory testing, right?

9               MR. KAMIONSKI:  Objection to the form of the

10    question, asked and answered, calls for speculation.

11              THE WITNESS:  I couldn't tell you what was

12    going through my mind when I did this.

13    BY MS. GREEN:

14         Q.   But you know you could have tested just one

15    of the stains and preserved the other five stains for

16    discriminatory testing, correct?

17              MS. AMATO:  Objection, the form of the

18    question and foundation, calls for speculation.

19              MR. KAMIONSKI:  Join.

20              THE WITNESS:  When you're talking about

21    possibilities, there's always possibilities.



1   BY MS. GREEN:

2       Q.   Okay.  And you would agree that's something

3   that was possible for you to do, correct?

4           MR. KAMIONSKI:  Same objection.

5           THE WITNESS:  I just don't know what the

6   protocols back then were.  You know, I don't recollect

7   what any -- how we did things back then.

8   BY MS. GREEN:

9       Q.   You do recall that there was a duty and

10  protocol to try and preserve as much of the evidence

11  as possible for actual discriminatory testing,

12  correct?

13          MR. KAMIONSKI:  Objection, asked and

14  answered.

15          MS. AMATO:  Join.

16          THE WITNESS:  Don't know how much sample was

17  underneath the fingernails to tell you, you know, if

18  it was there enough there to preserve it.

19  BY MS. GREEN:

20      Q.   But there are six nails.  So forget how much

21  was under one nail.  There's six different nails with



 1  sample on it, right?

 2          MR. KAMIONSKI:  Objection, asked and

 3  answered.

 4          THE WITNESS:  I just couldn't tell you how

 5  much was underneath.  It could be -- I'd be guessing

 6  -- I'd be guessing to tell you, you know, one

 7  fingernail had a certain amount and another one had --

 8  it might not have been -- it possibly couldn't be

 9  human blood.

10  BY MS. GREEN:

11      Q.   There are six nails with stains on them,

12  right, six different nails?

13      A.   Right.

14      Q.   Six separate items with stains?

15      A.   Right.

16      Q.   You could have tested one item and saved the

17  other five items, right?

18          MR. KAMIONSKI:  Objection to the form of the

19  question, calls for speculation.

20          MS. AMATO:  Join.

21          THE WITNESS:  I can only tell you what I



Case 1:19-cv-00384-ELH   Document 186-1   Filed 05/12/21   Page 356 of 388
BARRY SCOTT VERGER                                        April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police           355

 1   did.  I consumed the sample when I did the testing.

 2           That's all I can tell you.

 3   BY MS. GREEN:

 4       Q.   You refuse to answer the question right --

 5       A.   Not --

 6       Q.   -- now --

 7       A.   Not refusing to answer the question.  I just

 8   don't -- that's what I did.  I'm just telling you if

 9   you read the -- I'm not back in 1999.  I can't tell

10   you what I was thinking in 1999.  I can only tell you

11   what I did.

12   BY MS. GREEN:

13       Q.   I'm not asking what you were thinking.  I'm

14   asking in 1999, you could have tested a single nail

15   and saved the other five nails with stains on them for

16   discriminatory testing --

17           MR. KAMIONSKI:  Objection.

18   BY MS. GREEN:

19       Q.   -- that's something you could have done,

20   correct?

21           MR. KAMIONSKI:  Objection asked and



 1 | answered, calls for speculation.

 2 |           MS. AMATO:  Join.

 3 |           THE WITNESS:  It's only a possibility.

 4 | BY MS. GREEN:

 5 |     Q.   Okay.

 6 |     A.   I couldn't tell you that.

 7 |     Q.   It's a possibility.  Fair enough.

 8 |           But you didn't do that.  You did all six,

 9 | right, that's what happened?

10 |           MS. AMATO:  Objection, calls for

11 | speculation.

12 | BY MS. GREEN:

13 |     Q.   Did anybody at any time say why did you

14 | destroy the stains on all six of the nails?  Did

15 | anyone ever ask you that question and then --

16 |           MS. AMATO:  Objection, asked and answered.

17 |           THE WITNESS:  That, I did not -- you're

18 | asking me destroyed evidence.  I said I only consumed

19 | the -- you know, doing the test -- consumed the

20 | samples when I did the tests.

21 | BY MS. GREEN:



1      Q.   Did anybody at any time in the BPD --

2      A.   You said -- you said destroyed.

3      Q.   I'm changing it.

4           Di anybody at any time say, why did you

5   consume samples from all six of the nails?

6      A.   I don't recollect anybody saying that.

7      Q.   Did anybody ever raise this to you as a

8   problem?

9      A.   I don't recollect anybody saying that's a

10   problem.

11      Q.   What was the supervision -- and in fact,

12   that's the type of thing, if someone says you had a

13   problem with your work, you'd remember it, right?

14      A.   I don't know.  As far as I know, I was doing

15   everything right.

16      Q.   That's what your supervisors were telling

17   you, right?

18      A.   As far as I know, yes.  I thought I was

19   doing everything right.

20      Q.   And what was that supervision like in the

21   BPD lab?



Case 1:19-cv-00384-ELH   Document 186-1   Filed 05/12/21   Page 359 of 388
BARRY SCOTT VERGER                                          April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police                    358

1            MR. KAMIONSKI:  Objection to the form of the

2    question.

3            MS. AMATO:  Join.

4            THE WITNESS:  In what context?

5    BY MS. GREEN:

6        Q.   In the context of when you were working as a

7    forensic analyst in the Trace Analysis Unit, tell me

8    about the supervision you received?

9        A.   That's a very broad question you're asking.

10   I mean, that is like was he like hanging over my back

11   looking at everything I do?  No, he with not.

12           Did he check my reports?  Yes, he did.  Did

13   he have some hands on?  Yes, he did.

14   BY MS. GREEN:

15       Q.   Was your -- your BPD supervisor in the Trace

16   Analysis Unit supervising at such a level to, you

17   know, the procedures you were following when you were

18   conducting testing on biological evidence?

19           MS. AMATO:  Objection to the form of the

20   question, vague.

21           MR. KAMIONSKI:  Join.



Case 1:19-cv-00384-ELH   Document 186-1   Filed 05/12/21   Page 360 of 388
BARRY SCOTT VERGER                                              April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police                       359

1            MS. AMATO:  Calls for speculation, lacks

2    foundation.

3            MR. KAMIONSKI:  Join.

4            THE WITNESS:  He only read my report and

5    also he came in and if he had any questions, he would

6    ask.  He was always there to answer any questions you

7    had.

8    BY MS. GREEN:

9        Q.   In a typical case, how much communication

10   would you have with your supervisor over the course of

11   running the forensic testing both before, during and

12   after the testing in the Trace Analysis Unit?

13       A.   Just could you ask that question one more

14   time?

15       Q.   Of course.

16            So I want to talk about like when you were

17   in the Trace Analysis Unit you were doing testing in

18   relation to different cases, different criminal

19   investigations, correct?

20       A.   That's correct.

21       Q.   And in the context of one criminal



Case 1:19-cv-00384-ELH   Document 186-1   Filed 05/12/21   Page 361 of 388
BARRY SCOTT VERGER                                    April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police               360

1  investigation where you would be doing testing, can

2  you walk me through how often you'd be communicating

3  with your supervisor about that testing?

4       A.   That's also vague because you would ask them

5  a lot of questions if you don't have any, you know,

6  clue what you were doing and you'd have to ask him.

7            If you thought you were doing -- you knew

8  what you were doing, then you would just do it.  You

9  wouldn't have to ask him.

10      Q.   What about when you -- cases where you were

11 doing a leucomalachite green test in the Trace

12 Analysis Unit, how much -- what level of supervision

13 -- what level of communication would you have with

14 your supervisor in any given case?

15      A.   I don't recollect that, having any talk

16 about it -- with the leucomalachite test.

17      Q.   So when you were running the leucomalachite

18 green test, you wouldn't have any conversations with

19 your supervisor before you did the test, right?

20      A.   I didn't say that.  I said I don't remember

21 if I did or not.



1      Q.    You have no recollection of the level of

2   communication you would have with your supervisors

3   when you were in the Trace Analysis Unit?

4      A.    That's correct.

5      Q.    Do you remember Mark Profili?

6      A.    Yes.  He was my supervisor.

7      Q.    Did you-all have a good working

8   relationship?

9      A.    I believe so.

10     Q.    Are you still in touch with him?

11     A.    He is not working at the police department

12  anymore.  I don't talk to him.

13     Q.    Do you have any reason to question his

14  honesty and integrity?

15     A.    No, I don't.

16     Q.    Do you feel he provided you with an

17  acceptable level of supervision when you were in the

18  Trace Analysis Unit?

19     A.    Yes.  It was him and there was other people

20  around me, too.

21     Q.    But he was the only direct supervisor you



1   recall, right?

2         A.   Yes.  He was the supervisor of the whole

3   unit.  But there was a lot of people there with more

4   experience than I, there.

5         Q.   And as far as you understand it, the other

6   people with more experience than you were following

7   the same procedures for leucomalachite testing of

8   fingernails as you were, right?

9              MS. AMATO:  Objection, foundation.

10             MR. KAMIONSKI:  Join.

11             THE WITNESS:  I can't answer what they were

12   doing.

13   BY MS. GREEN:

14        Q.   You have no basis -- you have no reason to

15   believe what you were doing was out of step with what

16   your colleagues were doing?

17        A.   That's correct.

18        Q.   Okay.  Let's take a break.  I think I might

19   be about done for the day.  Give me five minutes to go

20   through my notes here.

21        A.   My dogs thank you.



```
 1              THE VIDEOGRAPHER:  We're going off the

 2   record.

 3              The time it 6:36.

 4              (Whereupon, a recess ensued.)

 5              THE VIDEOGRAPHER:  We are back on the

 6   record.

 7              The time is 6:39.

 8   BY MS. GREEN:

 9       Q.   Mr. Verger, you have reviewed today your

10   handwritten notes from the leucomalachite green

11   testing you did in this case, correct?

12       A.   That's correct.

13       Q.   You also have reviewed your typed report

14   from that testing, correct?

15       A.   I --

16       Q.   I think it's Exhibit 71.

17              MS. GREEN:  Avi, do you Exhibit 71 you can

18   hand him?  The June '99 typed report?

19              THE WITNESS:  I have it right here.  Is that

20   what you're talking about?

21   BY MS. GREEN:
```



1    Q.   Yes, that's it.  So this is your -- I just

2    want to confirm the documents and what they are.  I'm

3    almost done.

4    A.   Okay.

5    Q.   Is this typed report -- is your report on

6    the leucomalachite green testing you conducted in this

7    case, correct?

8         MS. GREEN:  And while we're waiting for him

9    to review that, can you please put the bench notes on

10   the screen?  I just want to show him.

11   BY MS. GREEN:

12   Q.   Mr. Verger, are you able to confirm that's

13   your -- the typed -- the final report you did on the

14   testing you conducted in this case?

15   A.   I believe it is.

16   Q.   Okay.  And just take a look on the screen

17   here, please.

18   A.   Sure.

19   Q.   Do you remember we talked about -- I put on

20   the screen, what's this number?  If anybody knows it?

21   A.   LD 101.



```
 1              MS. BROWN:  It's 86.

 2    BY MS. GREEN:

 3        Q.   Exhibit 86, I'm now showing on the screen.

 4    Okay?

 5        A.   Okay.

 6        Q.   These are your handwritten notes from when

 7    you did the testing in this case, correct?

 8        A.   That's correct.

 9        Q.   All right.  Do you have any reason to

10    believe there would have been any other documentation

11    of the testing you did in this case other than these

12    handwritten notes and your report?

13        A.   I don't recollect.  I said I believe so.

14        Q.   Okay.  You believe this is the sum total of

15    the documentation regarding the testing you conducted

16    in this case?

17        A.   Although, you know, it's been a long time

18    but I believe it's so.

19        Q.   Okay.  And you don't have any reason to

20    believe any other -- all your notes should be -- if

21    you had additional notes, they should be together in
```



1  the file with the other notes, correct?

2       A.   Right.  But I don't see anything -- I see

3  one section of notes but I don't see anything with the

4  brown leaf --

5       Q.   Yes.

6       A.   -- or the soiled brown paper bag.

7            It's got to be on a separate report.

8       Q.   No, it's on the next page.  Scroll down,

9  please, to Page 2.

10           Do you see the black umbrella?

11      A.   Okay.  Yes.  Yes.

12      Q.   Okay?  So this two-page document and the one

13  exhibit, the bench notes you've seen today -- the two

14  pages of bench notes you've seen today and the June

15  1st, 1999 report are -- as far as you know, as you sit

16  here today, are the sum total of the documentation of

17  the testing you did in this case?

18      A.   I believe so.

19      Q.   Okay.  I do not have any other further

20  questions.

21           I'm not sure if anyone else intends to ask



1  you any questions.

2          THE WITNESS:  Was there a report with a

3  brown leaf on it also?  I just saw the umbrella.

4  BY MS. GREEN:

5      Q.   It said -- it had the word "brown?"

6      A.   No, huh-uh.  Brown leaf.  It said brown

7  leaf, they have a folded brown paper bag, soiled.

8  Black umbrella.  It had four items.  I only saw the

9  fingernails on the first page and the two items on the

10  second page.  You follow me?

11      Q.   I hear you.  Have you seen any different

12  documents in preparation for testifying today?

13      A.   I did not.  I did not see the report, the

14  notes that I took for the brown leaf, for item -- for

15  number one and for number two.  I saw the folded brown

16  -- I think -- I saw the black umbrella for sure.

17      Q.   Okay.  Do you believe that there are any

18  other reports, just focusing on the fingernails --

19      A.   Uh-huh.

20      Q.   -- that exist from that --

21      A.   I -- again, I don't believe there was.



Case 1:19-cv-00384-ELH   Document 186-1   Filed 05/12/21   Page 369 of 388
BARRY SCOTT VERGER                                                    April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police                            368

1         Q.   Okay.  Fair enough.

2              MS. GREEN:  So I'm done with my questioning.

3              I'm not sure if any other counsel intend to

4    ask you any questions.

5              MR. KAMIONSKI:  I have some brief questions.

6    And just to be clear, I know the plaintiff is taking

7    the position that he wants this deposition open.  It's

8    our position the deposition's over for the plaintiff's

9    questioning.  If that changes for some reason, that

10   changes.  But today is the day to ask all the

11   questions.

12                       EXAMINATION:

13   BY MR. KAMIONSKI:

14        Q.   Here's -- I just want to go through --

15             MR. KAMIONSKI:  What was the exhibit at

16   trial testimony?  What did you call that exhibit

17   number?

18             MS. GREEN:  Exhibit 85.

19   BY MS. KAMIONSKI:

20        Q.   Okay.  Barry, I'm showing you what's

21   proffered Exhibit 85.  Okay?



1        MR. KAMIONSKI:  Just to give you

2   perspective, I'm literally sitting right next to him.

3   Okay?

4        MS. GREEN:  Okay.

5   BY MR. KAMIONSKI:

6     Q.   And I'm showing -- and you were asked

7   questions, many questions -- we've been here for many

8   hours today, right, Barry?

9     A.   Yes.

10    Q.   Are you tired?

11    A.   Yes, I am.

12    Q.   Okay.  And -- but I just wanted to clear

13  something up before we end up today.

14       You were answered a lot of questions -- back

15  and forth questions about what the protocols were and

16  the requirements were before sending items to the

17  state police.  Do you remember going through those

18  types of questions all day today?

19    A.   Yes.

20    Q.   Okay.

21       And I take it when you gave your testimony



Case 1:19-cv-00384-ELH   Document 186-1   Filed 05/12/21   Page 371 of 388
BARRY SCOTT VERGER                                          April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police                    370

1   back in 1999, it was -- you were actually working at

2   the time in the trace lab, is that fair?

3       A.   Yes, sir.

4       Q.   And the item -- and your test -- the things

5   that you said back then in 1999 were more fresh in

6   your mind in 1999 than they are today in 2021?

7       A.   Yes.

8       Q.   Okay.  And you haven't dealt with trace

9   analysis for how long now?

10      A.   For -- since probably -- since 2000.

11      Q.   Okay.

12      A.   Before 2000.

13      Q.   Okay.  So I want to direct your attention to

14  Page 185 of your testimony.  And you were asked this

15  direct question:  "Mr. Verger, would it be possible to

16  send the fingernails directly to the state police

17  without doing the leucomalachite test?"

18          Right, you were asked that question by Mr.

19  Mabrey, correct?

20      A.   That's correct.

21      Q.   Okay.  And your answer was, ANSWER:  "Pretty



1  much their protocol is to find out if -- they asked us

2  to find out if it's human blood or not, but it is

3  possible."

4          Does that testimony refresh your

5  recollection that back in 1999, it was the protocol

6  for you to first conduct any sort of human testing

7  before any items were sent to the Maryland State

8  Police?

9      A.   Right.

10         MS. GREEN:  Objection to form, asked and

11  answered.

12         You can answer.

13  BY MR. KAMIONSKI:

14     Q.   You can answer.

15     A.   Yes, that was -- that was the protocol

16  pretty much that they were asking, for like any --

17  they wanted us to find out if it was human blood or

18  not, whether it went to the -- for DNA testing.

19     Q.   And that's what you told the prosecutor and

20  the Court and everybody else when you testified back

21  then, correct?



 1              MS. GREEN:  Objection to form, asked and

 2     answered, misstates prior testimony.

 3              THE WITNESS:  That's correct.

 4              MR. KAMIONSKI:  I have no further questions.

 5              MS. GREEN:  Natalie, do you have any

 6     questions?

 7              MS. AMATO:  No, we're bifurcated.

 8              MS. GREEN:  Okay.  I have a few more

 9     questions just on that.

10                       EXAMINATION:

11     BY MS. GREEN:

12         Q.   Now, when I asked you about what you told

13     the prosecutor, you told me you didn't remember,

14     correct?

15         A.   That's correct.

16         Q.   You just confirmed to Mr. Kamionski that you

17     told the prosecutor that there was a protocol that --

18     from the Maryland State Police that required you to

19     test for human blood before you could send things

20     there for DNA testing.  That's right, right?

21         A.   Yes, that was on my testimony when I



1  testified way back when.

2       Q.   I'm not talking about your testimony.

3  You --

4       A.   Well, you're talking about -- you can talk

5  about that today, and I told you I don't recollect

6  what all the protocols were.  And the testimony went

7  over it.

8       Q.   You just told Mr. Kamionski that you told

9  the prosecutor there was a protocol, correct?

10      A.   I told that that's what -- that's what the

11 -- I believe that's how the state police took evidence

12 to see -- check for DNA.

13      Q.   When I asked you questions about what you

14 told the prosecutors, you said you didn't remember it,

15 right?

16      A.   I didn't remember it.

17      Q.   All right.

18           Now, you -- now, under oath you're saying

19 you do remember your conversations with the

20 prosecutor.  Is that right?

21      A.   I don't remember --



```
 1              MS. AMATO:  Objection, mischaracterization

 2   of his testimony.  He was read to right -- directly

 3   from the transcript.

 4              MS. GREEN:  That's not what happened.

 5              MS. AMATO:  That is literally what just

 6   happened when Avi asked him questions.

 7              MS. GREEN:  You've answered your question.

 8              It's not even worth getting into.

 9              Make your objections, fine.

10   BY MS. GREEN:

11       Q.   You have no memory of what you told the

12   prosecutor in this case, right?

13       A.   I didn't.

14       Q.   Okay.  But there was -- but tell me more

15   about this protocol that you just remembered on

16   questioning from your counsel.

17              MR. KAMIONSKI:  Objection.

18              MS. AMATO:  Objection, mischaracterization

19   of the testimony.

20              THE WITNESS:  I believe I said that in the

21   beginning of the -- when you first asked me about the
```



Case 1:19-cv-00384-ELH   Document 186-1   Filed 05/12/21   Page 376 of 388
BARRY SCOTT VERGER                                        April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police                  375

1  blood, the leucomalachite test, what was it for.

2  BY MS. GREEN:

3      Q.   All right.  Tell me about the protocol. What

4  was the protocol?

5      A.   It was a protocol if -- this was for human

6  blood.

7      Q.   Yes.

8      A.   This wasn't just for leucomalachite.  It had

9  to be human blood before it goes to get tested for

10  DNA.

11     Q.   Okay.  And that was a Maryland State Police

12  protocol, correct?

13     A.   That's what I'm saying.  I'm saying I'm not

14  sure if that was their protocol or our protocol.

15          I don't know whose decision that was, who

16  made that decision.

17     Q.   Well, you just told your counsel that was

18  the Maryland State Police's protocol, right?

19          MS. AMATO:  Objection, mischaracterization

20  of his testimony.

21  BY MS. GREEN:



Case 1:19-cv-00384-ELH   Document 186-1   Filed 05/12/21   Page 377 of 388
BARRY SCOTT VERGER                                        April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police                    376

1      Q.    All right.  You're tired right now, right?

2      A.    Yes, I am.

3      Q.    You were most awake this morning and alert

4    for the first few hours of your deposition, correct?

5      A.    I hope so.

6      Q.    You were much more awake and alert than you

7    are right now, right?

8      A.    Yes.  I was much more -- more attentive but

9    that's -- you know, when you're asked questions,

10   you're thinking -- you're trying to answer the

11   question as correctly as you can, but sometimes in

12   your mind you're thinking of something and it might

13   come out, you know, differently than you said.

14     Q.    Your most reliable testimony this morning

15   was before lunch, correct?

16           MS. AMATO:  Objection as to the form --

17           MR. KAMIONSKI:  Objection.

18           MS. AMATO: -- of the question.

19   BY MS. GREEN:

20     Q.    You were most alert and awake before lunch,

21   right?



1        A.    I couldn't tell you that.

2        Q.    You can't tell me if you were more alert and

3   awake before lunch than you are right now?

4        A.    I'm tired.  This is the end of the day.  I'm

5   tired but I'm alert.  I can understand what you're

6   saying.

7        Q.    You understand you've been asked many, many

8   times questions about the Maryland State Police

9   protocol, correct?

10       A.    Right.  And I said I don't remember -- I

11  don't recall who -- whether they -- whether they asked

12  upon us to -- see I'm babbling now.

13             I want to say --

14       Q.    Your testimony about this protocol has been

15  all over the map today, right?

16             MR. KAMIONSKI:  Objection to the form of the

17  question --

18             MS. AMATO:  Objection.

19             MR. KAMIONSKI:  -- misstates his testimony.

20             MS. AMATO:  Join.

21             THE WITNESS:  I -- from what I understand,



1  I'm not sure if it's -- whose protocol it is, but I

2  believe when I was telling you that the Maryland State

3  Police only take samples to be tested for DNA if it's

4  human.

5  BY MS. GREEN:

6       Q.   You agree you gave different testimony --

7       A.   I'm telling you right now, I'm of sound mind

8  right now.  I'm telling you that's what happens.  I

9  can't tell you what -- what I said before.

10      Q.   You agree earlier today you gave me

11  different testimony than you gave your lawyer just

12  now?

13           MS. AMATO:  Objection to the form of the

14  question.

15           MR. KAMIONSKI:  Join, misstates his

16  testimony.

17           THE WITNESS:  I'm telling you again, that I

18  don't know whose protocol that is but I know that we

19  -- on a norm, that we sent blood that was tested and

20  it tested positive for human blood, that could be sent

21  over -- not all of it, just, you know, what someone



 1  requested for to be sent to the Maryland State Police.

 2  BY MS. GREEN:

 3      Q.   Do you stand by your testimony today?

 4      A.   Yes.

 5      Q.   Did you lie during your testimony today?

 6      A.   No, I did not.

 7      Q.   Did you intentionally lie during your

 8  testimony today to cover up your misconduct in this

 9  case?

10      A.   No, I did not.

11      Q.   You would never do that, right?

12      A.   I'm as honest as you can get.

13      Q.   You never said you couldn't remember

14  something when in fact you really did today?

15      A.   I told you if I remembered.  If I don't

16  recollect, I don't recollect.

17           I don't remember this case at all.  It's

18  from 1999.

19      Q.   You didn't -- you never once said I don't

20  remember to avoid answering one of my questions?

21      A.   I answered it as honestly as I could.



Case 1:19-cv-00384-ELH   Document 186-1   Filed 05/12/21   Page 381 of 388
BARRY SCOTT VERGER                                      April 21, 2021
The Estate of Malcolm J. Bryant vs Baltimore Police            380

1      Q.   You never once said I don't remember to

2    avoid answering the question posed to you in the

3    deposition today?

4           MR. KAMIONSKI:  Objection, this is

5    harassing.

6           MS. AMATO:  And asked and answered.

7    BY MS. GREEN:

8      Q.   You can answer.

9      A.   I told you what I know.  I'm being honest

10   with you.  You've asked the question like 50 different

11   times.  And haven't you?  You've rephrased the

12   question 50 different times and I've tried to answer

13   it as honest at I could.

14     Q.   And the reason I continue asking similar

15   questions is because your answers keep changing, sir.

16          Do you understand that?

17          MS. AMATO:  Objection.

18          MR. KAMIONSKI:  Objection to the form of the

19   question and it mischaracterizes his testimony.

20          THE WITNESS:  I don't believe -- I don't

21   believe that.



```
 1   BY MS. GREEN:

 2       Q.   You believe you've given consistent

 3   testimony here today?

 4       A.   I think I have.

 5       Q.   You never changed your answer because you

 6   thought it would advance your position in this

 7   litigation if you did?

 8       A.   Listen, this is the first time I've ever had

 9   a deposition handed to me.  I -- I'm as honest as I

10   can be with you.  I don't, you know -- when you say

11   something, sometimes you'll clear a cobweb once in a

12   while and I tell you that.  But for the most part, you

13   know, I'm telling you the truth.

14       Q.   What is the other part where you're not

15   telling the truth?

16            MR. KAMIONSKI:  Objection.

17            THE WITNESS:  It's not a -- it's not lying.

18   I'm telling you the truth.

19   BY MS. GREEN:

20       Q.   You said for the most part you're telling me

21   the truth.  What else --
```



1       A.   That was a figure of speech.

2            I'm sorry I said that that way.  That was a

3   figure of speech.  I just was saying I tell the truth

4   and I'm being honest with you, and sometimes when --

5   when a -- a memory will come out and I try to tell you

6   the truth.

7       Q.   Have you had any drugs or alcohol today?

8       A.   Oh, my God.

9            MR. KAMIONSKI:  Objection.

10           THE WITNESS:  No.

11  BY MS. GREEN:

12      Q.   Have you ever been treated for drug or

13  alcohol abuse?

14      A.   No.

15      Q.   Have you taken any medication over the

16  course of the deposition today that might affect your

17  memory or ability to testify?

18      A.   No.

19      Q.   All right.  I do not have any further

20  questions.

21           MS. GREEN:  I understand Mr. Kamionski is



1    not consenting to leaving the deposition open, but we

2    are asking to leave it open to continue to address

3    issues regarding counsel speaking with the witness

4    about the substance of his testimony over breaks.

5              THE VIDEOGRAPHER:  Off the record.

6              The time is 6:57.

7              MS. AMATO:  Can we go back on the record for

8    just a minute?

9              THE VIDEOGRAPHER:  I'm going to have to go

10   back on.  Just a quick pause.  One moment.

11             Back on the record.

12             The time is 6:57.

13             MS. AMATO:  I'm objecting to leaving the

14   deposition open.  That's it.

15             MR. BRUSTIN:  Before we go off the record,

16   though, I know you're objecting to keeping the

17   deposition open which is fine.  I just want to make

18   sure, though, for purposes of speaking to the witness,

19   after the deposition, you're going to treat this as if

20   the deposition is open while that issue is being

21   decided by the Court?



1            MR. KAMIONSKI:  I don't intend to talk to

2      the witness about his testimony.

3            MR. BRUSTIN:  Great.

4            THE VIDEOGRAPHER:  Okay.  This is George at

5      this time.  We ask that all participants give your

6      transcript and/or video orders to the court reporter.

7            MS. GREEN:  We're going to order the

8      transcript and also the video for the Plaintiff.

9            THE VIDEOGRAPHER:  Any other transcript or

10     video orders?

11           MS. ENGLAND-CASAR:  The Defendants will also

12     order a copy of the transcript.

13           THE VIDEOGRAPHER:  I don't know who is

14     speaking.

15           MS. ENGLAND-CASAR:  I'm sorry.  This is

16     Jasmine England-Casar.

17           THE VIDEOGRAPHER:  For which firm?

18           MS. ENGLAND-CASAR:  Nathan & Kamionski.

19           THE VIDEOGRAPHER:  Okay.  And you said a

20     copy of the video as well?

21           MS. ENGLAND-CASAR:  Yes.



1              THE VIDEOGRAPHER:  Okay.  Standard?

2              MS. ENGLAND-CASAR:  Standard.

3              THE VIDEOGRAPHER:  We're now going off the

4    record.  The time is 6:58 p.m. on April 21s1, 2021.

5    Have a great day.

6              (Whereupon the deposition concluded at 6:58

7    p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21



800.211.DEPO (3376)
EsquireSolutions.com

```
 1                 REPORTER'S CERTIFICATE

 2                 State of Maryland

 3                 County of Baltimore, to wit:

 4                      I, KENNETH NORRIS, a Notary Public of

 5      the State of Maryland, County of Baltimore, do hereby

 6      certify that the within named witness personally

 7      appeared before me at the time and place herein set

 8      out, and after having been duly sworn by me, according

 9      to law, was examined.

10                      I further certify the examination was

11      recorded stenographically by me and this transcript is

12      a true record of the proceedings.

13                      I further certify that I am not of

14      counsel to any of the parties, nor in any way

15      interested in the outcome of this action.

16                      As witness my hand and notarial seal

17      this 21st day of April, 2021.

18                                   _____

19                                        KENNETH NORRIS

20                                        Notary Public

21      My Commission Expires:  7-07-22
```



```
 1                  CERTIFICATE OF DEPONENT

 2

 3           I hereby certify that I have read and

 4   examined the foregoing transcript, and the same is a

 5   true and accurate record of the testimony given by me.

 6

 7              Any additions or corrections that I

 8   feel are necessary,  I will attach on a separate sheet

 9   of paper to the original transcript.

10

11              _____

12              Barry Scott Verger

13

14

15

16

17

18

19

20

21
```



800.211.DEPO (3376)
EsquireSolutions.com