

# Neufeld Scheck & Brustin, LLP

Tel: [212] 965-9081  
Fax: [212] 965-9084  

99 Hudson Street, 8th Floor  
New York, New York 10013  
nsbcivilrights.com

May 14, 2021

Hon. Deborah L. Boardman  
United States District Court  
101 West Lombard Street, 3C  
Baltimore, Maryland 21201

Re: *Estate of Malcolm J. Bryant v. Baltimore City Police Dep't, et al.*, No. 1:19-cv-00384

Dear Judge Boardman:

Pursuant to the Court's Order, ECF No. 175, Plaintiff submits this letter explaining why the crime-fraud exception to the attorney-client or work-product privilege is wholly inapplicable.

"[T]he party asserting the crime/fraud exception…must make a prima facie showing that the privileged communications fall within the exception. [The party] must *prove* that (1) the client was engaged in or planning a criminal or fraudulent scheme when he sought the advice of counsel to further the scheme and (2) the documents containing the privileged materials bear a close relationship to the client's existing or future scheme to commit a crime or fraud." *Chaudhry v. Gallerizzo*, 174 F.3d 394, 403 (4th Cir. 1999) (cleaned up, internal citations and quotation marks omitted) (emphasis added).

This prima-facie showing is the equivalent of the evidence needed to defeat a motion for summary judgment: "evidence that, if believed by a trier of fact, would establish the elements of some violation that was ongoing or about to be committed." *In re Grand Jury Proc. #5 Empanelled Jan. 28, 2004*, 401 F.3d 247, 251 (4th Cir. 2005). Another way to describe Defendants' burden is they must present sufficient evidence suggesting crime or fraud "to require [the opposing party] to come forward with an explanation"; however, "[i]f the court finds the explanation satisfactory, the privilege remains." *Glaxo, Inc. v. Novopharm Ltd.*, 148 F.R.D. 535, 544 (E.D.N.C. 1993) (cleaned up, internal quotation marks and citation omitted); *see also In re Grand Jury Proc., Thursday Special Grand Jury Sept. Term, 1991*, 33 F.3d 342, 352 (4th Cir. 1994).

Defendants have not—and cannot—present evidence of any crime or fraud to meet this burden. Rather, after substantial discovery into this issue, it is abundantly clear there is no crime and no fraud. It is undisputed the "bald sketch" composite was never used as part of post-conviction proceedings and was not a basis for Mr. Bryant's exoneration. Rather, Mr. Bryant was exonerated by a post-conviction reinvestigation by the Baltimore City State's Attorney, which included review of exonerating DNA. *See* ECF No. 147-1, press release, at 3. It is also beyond reasonable dispute that this sketch was in the UB Law files for years before Mr. Bryant's exoneration. Ms. Nethercott testified to the best of her knowledge that the "bald sketch" was produced by the BPD in response to a 2006 MPIA request, Ex. 1, Nethercott Dep. at 142:3–13, and that she has a specific memory of reviewing the documents in the MPIA response at least as early as 2010, Ex. 2, Nethercott 30(b)(6) Dep. 129:16–131:13*; see also* Ex. 3, 2006 MPIA request. Contemporaneous records corroborate that testimony. *See, e.g.*, P.'s Annotated Privilege

Log,[1] at 15, 22 (highlighting entries for student transfer memos related to the "bald sketch" from 2009 and 2010). While Ms. Nethercott admitted the possibility that documents within what were her working files became inadvertently commingled over the years that she worked on the case, or that she has misremembered the source of a document over a decade later, she was adamant that she never intentionally manufactured any document in her file. Ex. 2 at 101:4–102:19, 112:11–114:11, 134:5–20, 137:10–138:12. Nor is there any evidence providing a good-faith basis for Defendants to lodge such an accusation against a member of the bar.

      Ms. Nethercott also testified she is certain the "bald sketch" did not come from Mr. Bryant. Ex. 1 at 142:3–22. Mr. Bryant never had access to the UB Law files at any time after his exoneration, Ex. 2 at 58:10–15, and he was incarcerated continuously from December 1998 until his exoneration in May 2016—well after contemporaneous records demonstrate the "bald sketch" was in the UB Law files. And Plaintiff's current counsel did not become involved in this case until after the 2016 exoneration—again, years after the "bald sketch" was documented in the UB Law files.

      Defendants' allegation apparently is that someone (it has never been clear who Defendants are accusing, likely because there is no evidence of wrongdoing by anyone) created what they characterize as an "inherently suspicious" document at some point between 2006 and 2009, while having a nefarious plan to defraud someone (the intended victim is also unclear)—but then never used it. That is not remotely plausible. Nor does it come close to the prima-facie showing Defendants must make to pierce privilege in the multitude of ways they have sought.

      None of the evidence Defendants rely on supports their allegations. For example, Defendants take as a given that the "bald sketch" was not produced by the BPD, because BPD denies it. But there are no contemporaneous records from the BPD of what it produced in response to the 2006 MPIA request (such as a cover letter or bates stamping), and no indication anyone from BPD has personal knowledge of what was in the file or produced 15 years ago. The only person to testify with personal knowledge is Ms. Nethercott—who swore to the best of her recollection the bald sketch was produced by the BPD in its MPIA response, which she kept segregated in binders within the UB Law file. Ex. 1 at 74:16–75:17, 142:9–13; *see also* Ex. 4, 3.15.21 email from T. Concepcion (describing two binders counsel inspected). Defendants point to evidence that the bald sketch was not created solely by the sketch computer program—which is apparent on its face (as it is clearly a copy of the composite flyer), but in no way answers *who* created it or *who* produced it to UB Law.[2] Defendants cite evidence suggesting the bald sketch was produced from copies of an underlined flyer—but it is entirely unclear where that underlined flyer first came from. Defendants assume the file as scanned in 2016 (in which the composite flyer included in the trial file has highlighting and underlining) is accurate, and that the version of the file inspected in 2021 was "manipulated." But Ms. Nethercott testified to the best of her recollection that the version of the composite flyer in the trial file produced to her did not have the underlining shown in the scan, and so while she does not have a specific memory of

---

[1] On April 23, 2021, Plaintiff submitted an annotated privilege log to Defendants and the Court highlighting entries that relate to the "bald sketch." Given concerns expressed by the University of Baltimore regarding the public disclosure of student names, we are not filing the annotated privilege log on the public docket.

[2] Defendants had a document examiner personally examine every version of the composite in the UB Law file, including the "bald sketch." *See* Ex. 4. They have never produced any report from this examiner—presumably because the examination did not support their claims of fabrication.

replacing the copy in the trial file, it is quite possible she would have because she believed it had been inadvertently commingled with other parts of the file. Ex. 2 at 73:7–81:14. For his part, Mr. Bryant's trial lawyer Larry Rogers testified that while he only received one composite from the State's Attorney's Office, he could not remember, 22 years later, whether the version in his possession had underlining and highlighting or not. Ex. 5, Rogers Dep., 233:18–236:5.[3]

At most, Defendants' evidence creates uncertainty regarding the accuracy of Ms. Nethercott's memory as to where the "bald sketch" came from and when she received it, as well as uncertainty as to which version of the composite flyer (underlined and highlighted or not) was originally in the trial file. But there is a universe of space between that premise and any surmise that *anyone* intentionally manipulated the sketch, let alone that it was manipulated as part of a planned (but concededly never executed) fraud or crime. Simply put, despite the wide-ranging discovery Defendants have pursued on this issue, they do not come close to meeting their burden of establishing a crime or fraud. *See, e.g., Billings v. Stonewall Jackson Hosp.*, 635 F. Supp. 2d 442, 446–47 (W.D. Va. 2009) (holding party's unsubstantiated speculation that document produced in discovery was fabricated provides "no basis whatsoever for…[application of] the crime-fraud exception"); *see also Johnson v. Ford Motor Co.*, No. 3:13-CV-06529, 2016 WL 1241538, at *14 (S.D.W. Va. Mar. 28, 2016). Rather, the alleged "evidence" Defendants point to "amounts to nothing more than rank speculation and conjecture." *Hinkle v. City of Clarksburg*, 81 F.3d 416, 422 (4th Cir. 1996).

Defendants' irrational fixation on this issue is not without cost. There is the burden on counsel of responding to an endless stream of unreasonable discovery requests, each more speculative and attenuated than the last. There is the cost of unwarranted disclosure of any privileged material. *See, e.g., Saint Annes Dev. Co., LLC v. Trabich*, No. CIV WDQ-07-1056, 2009 WL 324054, at *8 (D. Md. Feb. 9, 2009) (denying request to pierce privilege on assertion crime-fraud exception applies, noting "circumstances counsel modesty and caution because once the privilege is ruled invalid, any damage from compelled disclosure cannot be undone").[4] And there is the cost of repeatedly having false and baseless accusations of misconduct against counsel lodged indiscriminately in the public record.

After countless hours of discovery into Defendants' baseless suspicions, it is abundantly clear that there is neither crime nor fraud here. Defendants' single-minded focus on this issue is a distraction from the very real and consequential claims of police misconduct in this case. Defendants' request to pierce privilege should be denied, and any further requests for discovery into the "bald sketch" rejected.

---

[3] Defendants also consistently misconstrue the record. For example, Defendants assert a 2016 affidavit from Ms. Nethercott regarding BPD *Brady* violations suspiciously "makes no mention of the 'bald sketch.'" *See* ECF No. 184 at 3. In actuality, the affidavit describes that it "came to light via a MPIA request" that "the witness had generated *more than one composite*." ECF 184-4 at ¶ 12 (emphasis added).

[4] Because Defendants fail at the first step, there is no basis to disclose *any* privileged material. However, the law is clear that opinion work product "enjoys a nearly absolute immunity" and may not be disclosed absent an even higher showing, including "attorney knowledge of or participation in" the demonstrated crime or fraud. *In re Grand Jury Subpoena*, 870 F.3d 312, 316 (4th Cir. 2017) (internal citations and quotation marks omitted).

Respectfully,

_____/s/_____

Nick Brustin (Pro hac vice)
Anna Benvenutti Hoffmann (Pro hac vice)
Amelia Green (Pro hac vice)
Yasmin Dagne (Pro hac vice)
Neufeld Scheck & Brustin, LLP
99 Hudson Street, 8th Floor
New York, NY 10013
nick@nsbcivilrights.com
anna@nsbcivilrights.com
amelia@nsbcivilrights.com
yasmin@nsbcivilrights.com
T: (212) 965-9081/ F: (212) 965-9084

Jean Zachariasiewicz (Bar No. 19734)
Chelsea J. Crawford (Bar No. 19155)
Anisha Queen (Bar No. 20766)
Brown, Goldstein & Levy, LLP
120 E. Baltimore Street, Suite 1700
Baltimore, Maryland 21201
jmz@browngold.com
ccrawford@browngold.com
aqueen@browngold.com
T: (410) 962-1030/ F: (410) 385-0869

*Attorneys for Plaintiff*