```
               IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MARYLAND
                       NORTHERN DIVISION


- - - - - - - - - - - - - - - - - x
                                   :
THE ESTATE OF MALCOLM J. BRYANT,   :
                                   :     Case No. 19-00384-ELH
        Plaintiff,                 :
                                   :
    v.                             :
                                   :
BALTIMORE CITY POLICE              :
DEPARTMENT, et al.,                :
                                   :
        Defendants.                :     May 19, 2021
                                   :
- - - - - - - - - - - - - - - - - x     Baltimore, Maryland
```

### TELEPHONIC DISCOVERY CONFERENCE


```
BEFORE:          MAGISTRATE JUDGE DEBORAH L. BOARDMAN


APPEARANCES:               ANNA BENVENUTTI HOFFMAN, ESQ.
                           NICK BRUSTIN, ESQ.
                           AMELIA GREEN, ESQ.
                           YASMIN DAGNE, ESQ.
                           Neufeld Scheck and Brustin, LLP
                           99 Hudson Street, 8th Floor
                           New York, NY  10013
                             On Behalf of the Plaintiff

                           JEAN MARY ZACHARIASIEWICZ, ESQ.
                           ANISHA S. QUEEN, ESQ.
                           Brown Goldstein & Levy, LLP
                           120 E. Baltimore Street, Suite 170
                           Baltimore, MD  21202
                             On Behalf of the Plaintiff
```

Proceeding recorded by electronic sound recording, transcript produced by transcription service.

*CompuScribe*
*301-577-5882*

```
APPEARANCES (Cont.)        AVI KAMIONSKI, ESQ.
                           SHNEUR ZALMAN NATHAN, ESQ.
                           Nathan & Kamionski, LLP
                           33 W. Monroe, Suite 1830
                           Chicago, IL  60603
                             On Behalf of the Individual
                             Defendants

                           MICHAEL JEFFRY ELLIKER, ESQ.
                           JASMINE ROSE ENGLAND-CAESAR, ESQ.
                           THERESA CONCEPCION, ESQ.
                           Nathan & Kamionski, LLP
                           575 S. Charles Street, Suite 402
                           Baltimore, MD  21201
                             On Behalf of the Individual
                             Defendants

                           NATALIE ROSE AMATO, ESQ.
                           Baltimore City Law Department
                           100 N. Holliday Street, Suite 101
                           Baltimore, MD  21202
                             On Behalf of the Baltimore City
                             Police Department

                           CHRISTOHPER BOWIE LORD, ESQ.
                           Office of the Attorney General
                           Educational Affairs Division
                           200 St. Paul Place, 17th Floor
                           Baltimore, MD  21202
                             On Behalf of the University
                             of Baltimore


Audio Operator:            Keisha-Ann Carter

Transcription Company:     CompuScribe
                           P.O. Box 789
                           Cheltenham, Maryland   20623-9998
                           (301) 577-5882
```

fb                                                                        3

I N D E X

                                                                       Page

Discussion Re: Damages Witnesses                                          6

Discussion Re: Bald Sketch Issue                                        28

Ruling - Judge Boardman                                                 72

KEYNOTE:   "---" indicates inaudible in transcript.
           "*"  indicates phonetically spelled in transcript.

1                    P R O C E E D I N G S

2          (Whereupon, at 2:19 p.m., the hearing began.)

3              THE CLERK:  The United States District Court for the

4     District of Maryland is now in session, with the Honorable

5     Deborah L. Boardman presiding.

6              THE COURT:  Okay.  Good afternoon everyone.  First

7     off, I just want to apologize for being late.  I had some

8     serious technical difficulties today, and --- well.  But I am

9     really finished with virtual court.

10             So anyway, we are here today for an on the record

11    discovery conference, and I wanted it to be on the record

12    because we are nearing the end of discovery and there are a

13    number of issues that we need to address.  And I see that Mr.

14    Lord is here from the State Attorney General's Office and a

15    number of people are here to discuss a number of different

16    issues.

17             So I think what would be useful is, for the record,

18    if we could start with Counsel for the Plaintiff, the Malcom

19    Bryant representatives.  Identify yourselves, please.  And

20    then we will move to the individual Defendants and then BPD

21    and then third parties.

22             MS. HOFFMANN:  Good afternoon, Your Honor. This is

23    Anna Benvenutti Hoffman, for the Plaintiff.

24             MR. BRUSTIN:  Good afternoon, Your Honor.  Nick

25    Brustin, also for the Plaintiff.

 1              MS. GREEN:  Good afternoon.  Amelia Green, also for

 2     the Plaintiff.

 3              MS. DAGNE:  Yasmin Dagne, also for the Plaintiff.

 4              MS. ZACHARIASIEWICZ:  Good afternoon, Your Honor.

 5     Jean Zachariasiewicz, for the Plaintiff.

 6              MS. QUEEN:  Good afternoon.  Anisha Queen, for the

 7     Plaintiff.

 8              MR. KAMIONSKI:  Good morning, Your Honor.  Avi

 9     Kamionski, Shneur Nathan, Michael Elliker, Jasmine

10     England-Caesar and Theresa Concepcion, on behalf of the

11     individual Defendants.

12              MS. AMATO:  Good afternoon, Your Honor.  Natalie

13     Amato, on behalf of the Baltimore Police Department.

14              MR. LORD:  Good afternoon, Your Honor.  Christopher

15     Lord, from the Attorney General's Office, on behalf of the

16     University of Baltimore.

17              THE COURT:  Okay.  Very good.  Well, thank you all

18     for being here, as I said.

19              Let me just tell you what I have reviewed in

20     preparation for this hearing.  I have reviewed Filings No.

21     176, 177, 178, 179, 180, 181, 183, 184, 185, 186 and 187 and

22     188.  I don't know what 182 -- oh, and 182.  I have reviewed

23     that.  So those are all the filings that have not been -- it

24     raises issues but have not been ruled on yet.

25              What I would like to do first is to start with the

1    issues that do not relate to the bald sketch.  Okay?  So I

2    would like to start first with the damages witnesses.

3           This is something that the individual Defendants

4    raised previously and asked for leave of Court in order to

5    depose damages witnesses.  I granted leave with certain

6    limitations.  I asked the Plaintiff to specify a little more

7    or elaborate a little bit on what the people know.  They did

8    that.  The Defendant thinks that more specificity is required.

9    I don't.

10          I will hear from Mr. Kamionski, but at this point I

11   am inclined to go with my original instinct, which was you get

12   two damages witnesses.  Mr. Kamionski.

13          MR. KAMIONSKI:  Ms. England-Caesar is actually going

14   to be doing this argument for us.

15          THE COURT:  Okay.  Thank you very much.

16          Ms. England-Caesar.

17          MS. ENGLAND-CAESAR:  Thank you, Your Honor.  So the

18   individual Defendants' position is that --- information that

19   the Plaintiff has provided --- about the testimony --- and

20   what he said regarding any damages.  --- the Plaintiff ---

21   provided us information regarding --- of each witness --- and

22   --- what type of damages or what type of information they

23   would be providing regarding those damages.

24          Additionally, --- we got additional information that

25   it was --- in addition to --- relationship that they would

1   also have some --- regarding --- don't have any specific

2   information on what those penalties are and how we can

3   evaluate the differences of what each witness --- the damages.

4           So in order for us to determine which witness has

5   information or which --- information that is cumulative, we

6   need to know specifically what --- what the nature of that

7   testimony is.

8           THE COURT:  Okay.  I understand your position.  Let

9   me pull up the --

10      (Pause)

11          THE COURT:  Okay.  I am looking at Document 185,

12  which is Defendants' submission, and attached to it was the

13  email from Plaintiff's Counsel describing the relationship

14  between --- six damages witnesses that have yet to be deposed,

15  or who haven't been deposed, and their relationship.

16          I think that what they have provided you is

17  sufficient for you to decide whom to depose of those.  So

18  based on that, you can decide on two of the six witnesses that

19  you will depose for damages.

20          Okay.  Let's go on to the Barry Berger* deposition.

21  Let me ask you this.  Did any party submit the Berger

22  transcripts?

23          MR.      :  We did, Your Honor.  It should be

24  attached to Document No. 183.

25          MS.      :  Judge, you only have it on screen.  It

 1   is about -- between the two exhibits it was about 1,000 pages.

 2   So it is not printed out.

 3          MR.        :  We also submitted it, Your Honor.

 4          THE COURT:  Right.  Okay.  All right.  We will look.

 5   I am not sure I am going to be able to rule on that, but I

 6   know what the issues are generally.  Allow me to explain what

 7   I think they are, and then I will first hear from the

 8   Plaintiff, because I think they are the one that raised the

 9   issue.

10          So last week I believe, and maybe it was a week and

11   a half ago, the parties contacted me during Barry Berger's

12   deposition.  The Plaintiff was questioning him and believed

13   that during an eight-minute Mr. Kamionski, who was defended

14   his client, Mr. Berger, talked to the witness about the

15   testimony, and the testimony seemed to be important or is

16   important in this case.

17          And it is whether or not the Maryland State Police

18   or any other agency required certain testing that would result

19   in the destruction of DNA evidence.  Mr. Berger has given a

20   variety different answers, I think, on that particular topic,

21   and the individual -- excuse me.  The Plaintiffs claim during

22   the deposition -- excuse me.  During breaks, that

23   Mr. Kamionski talked to the witness about the testimony ---

24   the witness.

25          During that conversation with counsel on the record

1    I asked Mr. Kamionski if he talked to the witness about his

2    testimony, and he said no.  So now Plaintiffs have brought the

3    issue again before me and asked me to look more closely at the

4    deposition transcript, which I certainly will after this.

5              But, Mr. Brustin, I am happy to hear from you on

6    this.

7              MR. BRUSTIN:  Thank you, Your Honor.  Just to put it

8    in perspective, this deposition, it was -- it was, from our

9    perspective, a very important deposition and from our

10   perspective an extraordinarily successful deposition.

11   Mr. Berger admitted, in the clearest way possible, that he

12   intentionally and repeatedly destroyed DNA evidence in this

13   case.  He also admitted that it was contrary to policy and

14   training.

15             And it was also an extraordinarily difficult

16   deposition.  Mr. Berger, who is a professional witness; is an

17   expert that has testified hundreds of time, refused to answer

18   the simplest policy questions, pretended not to remember

19   anything about his training and experience, even though he is

20   still working at the BDP, would change answers mid-sentence.

21   It was an extraordinarily difficult deposition that was

22   extraordinarily well handled by my partner --- .

23             I have sat through, personally, lots and lots of

24   depositions and done lots of depositions, and I don't --- with

25   the Court lightly when I think somebody is being coached.  But

1   I continually believed that as I watched the deposition, and I

2   raised it to Your Honor and I brought it to Your Honor's

3   attention.  I thought it was important enough to do that.

4          Your Honor very specifically asked Mr. Kamionski

5   whether or not there had been any coaching of the witness.  He

6   said, no, there had not been in no uncertain terms.  You said

7   because you -- and I asked if you would inquire of the

8   witness.  He said because he was an officer of the Court, he

9   would take him at his word.

10         Well, it turns out that if he had answered your

11  question truthfully, what he would have said to you is what

12  the witness told us a few minutes later, which was during the

13  break, as I suspected, he put the testimony in front of the

14  witness, he directed the witness to a certain part of the

15  testimony, he said read it and don't let her put words in your

16  mouth.  That is as much as he was able to tell us.

17         So if he had answered your question honestly, that

18  is what he would have told you.  That is what happened.  Not

19  that there was no coaching.  Now maybe he could have explained

20  it somehow, but the truthful answer to your question would

21  have been that.

22         When he responded to our -- and so when we saw that,

23  I realized that we needed to make this motion, both because he

24  had made a misrepresentation to the Court and also because of

25  the extraordinary importance of this testimony.  We want to

1   make sure that we are preserving our right to make any

2   appropriate sanctions motions necessary down the road so we

3   can properly utilize this witness and utilize the coaching and

4   the instruction that occurred.

5           In response to our motion, Mr. Kamionski decided

6   that it was appropriate to simply *ad hominem* attacks on my

7   partner for absolutely no reason and not even to address what

8   he said to the Court.  We find it quite extraordinary.

9           So all we are asking now -- we are not asking to

10  sanction him.  What we are asking at this point is to simply

11  question this witness, either in court or -- where I will also

12  question the witness, about other coaching that may have

13  occurred, which clearly violates local rules.

14          And I will just add that after the Berger deposition

15  we took the deposition of his supervisor, who is now a

16  professor at Towson State, and he was shocked by the testimony

17  of Berger.  He acknowledged that it was contrary to any policy

18  or any training to BPD or any policy or training he is aware

19  of anywhere.  So this is -- you don't have to rely on us for

20  that.  You can look at what he said afterwards.

21          But our only request now is that we or the courts be

22  able to question Mr. Berger about other conversations, other

23  potential coaching that he had with Mr. Kamionski.

24          THE COURT:  Let me ask you, Mr. Brustin, on that

25  point.  To what extent does any client privilege here apply?

1   I mean, really educate me.  You want to ask him, or you want

2   someone, me or you, to ask him what their conversations were

3   about?  Did they talk about his testimony?  What are the

4   questions you propose?

5          MR. BRUSTIN:  That is a fair question, and if you

6   require more briefing on it, we can do it.  All we are

7   suggesting is that he should only be questioned about

8   instructions that he received during the deposition about

9   information that we were asking about during the deposition.

10  Conversations he had with Counsel about the question, whether

11  it was during the deposition or after the deposition.

12         We were very careful at the end of the deposition to

13  suggest to Mr. Kamionski that we were keeping the deposition

14  open for just this purpose and that he was not to speak to the

15  witness about any substantive answers.  That is all we are

16  looking to do.

17         And given that, if there was any coaching, it would

18  violate local rules.  We think that that is very fair

19  questioning; limited but fair questioning of this witness.

20         THE COURT:  Just work with me here.  Assuming we do

21  that, assuming -- and I have no idea if that will happen or

22  what the witness would say.  But assuming he says, yup, my

23  lawyer pointed me to areas in my prior testimony that, you

24  know, reminded me that what I was saying was wrong and that I

25  needed to, you know, basically go back to what I said before,

1   what is the remedy?

2              MR. BRUSTIN:  There are a number of potential

3   remedies.  One remedy would be to strike some of his

4   testimony, and we would have to evaluate -- once we learned

5   what happened, we would have to evaluate what remedy we would

6   seek.  But it could be striking portions of his testimony, it

7   could be sanctions against the attorney; it could be a number

8   of remedies.  But our primary goal here is to preserve his

9   testimony and to address the changing testimony during his

10  deposition.  So that is what these sanctions would be going

11  towards.

12             I also just want to -- my colleague just pointed out

13  to me that we did cite a case on the --- if there was improper

14  conduct.

15             THE COURT:  Okay.  All right.  I will hear from --

16  anyone from the Defense?  Mr. --- Nathan.

17             MR. NATHAN:  Yes.  I am going to speak to that.

18             THE COURT:  Very good.

19             MR. NATHAN:  So surprisingly, in the Plaintiff's

20  letter I didn't see anywhere where they actually quoted the

21  relevant part of the testimony, which Mr. Brustin just quoted,

22  which happened after the break, and it was at page 284.

23             If I may just quote it.  Line 6 --- question.

24  "Question:  I --- what you talked about.  I am just asking if

25  your Counsel gave it to you."  It is asking about --- gave the

1    transcript.

2            "I can ask about any documents you have been given

3    at any time.  It is not privileged.  During the break did your

4    Counsel give you testimony to read?"

5            "Answer:  It was right in front of me.  Yes."

6            "Question:  Did he point to you the pages you should

7    read during the break?"

8            "Answer:  He said read the pages.  Don't let her

9    words in your mouth."

10           The transcript says left, but it is -- Mr. Brustin

11   said let.  I mean, that is what I am sure it said.  "Don't let

12   her put words in your mouth."

13           And the response that we filed in relation to that,

14   it wasn't *ad hominem* attacks.  It is giving the Court context.

15   That is why we attached the entire transcript, so the Court

16   can see the context of what was happening here.

17           It was a question that was raised with this witness

18   as far back as the criminal trial.  The witness plainly

19   testified when the events were fresh in his mind about what

20   the protocol was.  --- tested certain evidence, it was

21   consumed and he did that because that was the protocol that he

22   believed he had to follow in order for him to send evidence to

23   the Maryland State Police.

24           The Plaintiff in this deposition, which took over

25   eight hours, asked that question, received that answer and

1   then proceeded to ask -- basically badger the witness for

2   another, and we cite it in our footnote one in our letter, 30

3   separate times.  That was harassing, it was disrespectful and

4   we are happy to provide Your Honor with the complete video of

5   the testimony.

6          And it will be apparent to Your Honor the

7   characterization that here we are dealing with some

8   professional witness.  It is a joke of an allegation.  It is a

9   joke of a statement.  He is a crime lab analyst that is

10   uncomfortable testifying, and he was being harassed by

11   Plaintiff's Counsel.

12          And you will see at the very end of the deposition a

13   completely disrespectful question to him, just to give an

14   example, asking him about any --- whatsoever.  "Are you on

15   drugs or have you ever been treated for alcohol or drug

16   abuse?"  There was no basis for that question, and it was

17   because they were having fun making fun of a witness who is

18   not experienced at testifying and simply is not good at

19   testifying.

20          And Mr. Kamionski, during a break -- they asked this

21   witness exactly what happened during a break, and the witness,

22   again showing his inexperience, testified and blurted out

23   exactly what happened.  So there is nothing --

24          THE COURT:  Mr. Nathan, let me ask you this.  Do you

25   think it was appropriate to do what Mr. Kamionski did during

1   the break, given the local rule?

2              MR. NATHAN:  And I am going to read the local rule.

3              THE COURT:  Okay.

4              MR. NATHAN:  The local rule -- first of all, I was

5   -- there is a local rule, and I think these two local rules

6   need to be read together because they are part of -- they are

7   both of guideline 6.  Discovery guideline 6(c) talks about

8   that an attorney is not asking the same question over and

9   over, because that is improper.

10             And then guideline 6(g) says during breaks --- in a

11  deposition no one should discuss with the deponent "the

12  substance of the prior testimony given by the deponent during

13  the deposition."

14             Telling a witness who is being badgered over and

15  over again about -- being badgered over and over again with

16  the same question until they hope to get a jumbled record,

17  which is what they successfully achieved and they improperly,

18  in our view, received a -- procured a jumbled record.  It is

19  fully appropriate, and it is not coaching.  It is not -- to

20  use the language of the guideline, it is not discussing the

21  substance of the testimony to say don't let her put words in

22  your mouth.

23             That is what one would expect from the

24  attorney/client relationship.

25             THE COURT:  What about pointing to the transcript?

1          MR. NATHAN:  I think the testimony was that there

2     was a transcript there.  It is perfectly appropriate, and I

3     would expect an attorney behaving as such to protect the

4     record and avoid a jumbled record that is being

5     mischaracterized by an abusive examiner, and that is what

6     happened here.

7          There was no conduct that was against the guideline.

8     There certainly is no -- there is no federal rule that that

9     prohibits that conduct, and it doesn't violate the guideline.

10         THE COURT:  All right.  Look, I really -- I prepared

11    for this hearing, but clearly I didn't prepare by reading the

12    transcript and I will do that.  But this is helpful for me.

13         I will say I --

14         MS.       :  Your Honor, if I -- I am sorry to jump

15    in.  I just wanted to make one very small additional point.

16         But the reason in the transcript, when the witness

17    said that the transcript was in front of him, the transcript

18    was in front of him because Ms. Green presented it to him;

19    asked to put it in front of him and said this is your prior

20    testimony.  Please review page -- you know, I don't remember

21    the exact pages.  But please review page this to that.

22         And the witness had to turn the page, as instructed

23    by Ms. Green.  So Mr. Kamionski was only asking the witness to

24    finish reading the testimony that Ms. Green had initially

25    pointed out.  I think that is an important point because it is

1  not that Mr. Kamionski came and presented something out of

2  left field.  He had the exhibit in front of him, a break was

3  taken and while the break was going on, Mr. Kamionski was

4  noting.

5          And he also noted on the record that what he was

6  trying to explain to the client was that he hadn't fully

7  complied with Ms. Green's expectation to read the entirety of

8  his previous testimony.

9          THE COURT:  Okay.  What page and line number am I on

10  the record?  I am going to look at it right now because I

11  remember what I asked.  But I want to make sure I -- I was on

12  the record, right?

13          MR.     :  It is 284.  No, you are not on the

14  record.

15          MS.     :  We called you on the telephone.  You

16  were not on the record, Your Honor.  So it is just --

17          THE COURT:  Oh.  I thought you had the court

18  reporter there.

19          MS.     :  Unfortunately, because it was a Zoom

20  --- calling you on the phone, the whole thing was a little bit

21  of a mess.  And also, we had stopped the deposition for such a

22  long time trying to make sure we could talk to you.  So we

23  don't have you on the record.

24          THE COURT:  I recall asking did you speak about the

25  testimony or approach the witness?  I can't remember which

1    one.  I thought in my mind I was trying to cover both.

2              MR.       :  Your Honor --

3              MS.       :   I think if Your Honor looks at the

4    transcript --

5              MR. BRUSTIN:  Can I speak?  I am sorry.  I was

6    speaking.  Can I address it?

7              THE COURT:  Hold on.  Okay.  Let me just --

8    Mr. Brustin, I will hear from you in a moment.

9    Ms. Concepcion, I will hear from you first.  Go ahead.

10             MS. CONCEPCION:  I think if Your Honor reviews the

11   transcript what you will see is that before the break there is

12   that exhibit number that Ms. Green presented to the witness,

13   and then there is a point where Mr. Kamionski states, no, she

14   said, you know, to read --- this page.  And then you will see

15   in the deposition transcript that Ms. Green said, Avi, you are

16   off screen, I don't know what you are showing him.

17             And Avi said you can hear everything I am saying.

18   And he held up the paper to the computer and said I am just

19   telling him to read, to turn the page and finish reading the

20   lines that you directed him to read.  And then the paper was

21   placed down and the break was taken.

22             So that is the exhibit that the witness -- when the

23   witness says it was already in front of me, it is because it

24   was in front of him because of Ms. Green's questioning.

25             THE COURT:  I understand.

fb                                                                      20

1            MS. CONCEPCION:  And because the witness on the

2    record had already stated that he hadn't read the complete

3    portion that Ms. Green pointed him to, I think the proper

4    characterization of Mr. Kamionski's action was to say read

5    what she is telling you to read, because he hadn't previously

6    done that.

7            THE COURT:  Okay.  Thank you for that clarification.

8            Mr. Brustin.

9            MR. BRUSTIN:  I don't want to be labor this, Your

10   Honor, but the reason that I did not push any harder with the

11   Court when you were on the phone is because you were very

12   clear to Mr. Kamionski.  Was there any coaching at all here?

13   Anything like that?

14           And whether or not what he did would constitute

15   coaching over the rules is beside the point.  What is

16   important is that he misrepresented to you, and we now have a

17   right to determine what else happened as a result of that.

18   And all of this nonsense about Ms. Green badgering this

19   witness, this is a professional witness.  He still works for

20   the BPD.  He has testified hundreds of times.

21           The only thing he reviewed in preparation for the

22   deposition was the testimony she was asking him about, and

23   they specifically took a break; demanded a break, when she was

24   questioning him about this.  That is when this happened.

25           THE COURT:  Okay.  I understand the issues.  Is

1    there anything else from --- perspective on this?  I need to

2    take this under advisement and review the transcript.

3           MR.      :  Not at this time, Your Honor.

4           THE COURT:  All right.  Thank you very much.

5           MS. ZACHARIASIEWICZ:  Your Honor, I apologize.  When

6    we discussed the damages witnesses --

7           THE COURT:  It would be useful, I am sorry, if you

8    could just identify yourself for the record.

9           MS. ZACHARIASIEWICZ:  Jean Zachariasiewicz, for the

10   Plaintiff.

11          When we discussed the damages witnesses, we didn't

12   discuss the documents subpoenas to them that were also part of

13   that were also part of --- and I didn't know if you want to

14   come back to that or if you --- I just didn't want to get too

15   far away from that issue.

16          THE COURT:  Thank you.  That is a good point.

17   Let's talk about that now.  So as I understand it, the

18   individual Defendants had issued subpoenas to all of the -- I

19   think the -- I don't know how many, but all of the potential

20   damages witnesses for not only handwritten letters between

21   them and Malcom Bryant, but the attacks on social media.

22          I will hear from the individual Defendants on that,

23   as to why that is not burdensome and disproportionate --- to

24   the case.

25          MS.      :  Yes, Your Honor.  So, first of all, we

 1   didn't feel that Plaintiffs --- to argue that since there is

 2   no privilege for a proprietor --- that they can claim over

 3   those documents.

 4          It is proportional because it goes to, again, ---

 5   with Mr. Bryant.  It goes to specifically how he might have

 6   been feeling in the text messages.  How are you today and what

 7   is going on?  Those types of things.

 8          So honestly, Your Honor, if we had that information,

 9   again in conjunction with --- about the scope of --- to

10   testify, it would help us more --- and be able to choose which

11   witnesses have the most information regarding damages.  So it

12   is really in conjunction with more testimony and what we know

13   about damages, and about how they interacted with Mr. Bryant

14   while --- .  Up to the point of both the depositions and then

15   the --- .

16          THE COURT:  So let me understand,

17   Ms. England-Caesar, what exactly you are seeking and from whom

18   and for what periods?

19          MS. ENGLAND-CAESAR:  So the period that we were

20   seeking was --- his incarceration and then an effort for him

21   to get out of jail through the time of his --- because

22   obviously that --- communication --- .

23          I am sorry.  What was your --- question?

24          THE COURT:  Okay.  So the time period.  Okay.  That

25   is helpful.  1998.  He got arrested at the end of 1998,

1  correct?  And he was released in 2016, and he sadly died in

2  2017.  So your request goes from 1998 to 2017, correct?

3         MS. ENGLAND-CAESAR:  Yes.

4         THE COURT:  Okay.  And what are the nature of the

5  communications you are seeking?

6         MS. ENGLAND-CEASAR:  We are seeking letters, which

7  we already --- from --- witnesses --- .  We are seeking any

8  text messages or messages --- because we did learn that

9  Mr. Bryant had been active on social media for some time after

10 his release.  And just any other electronic communications

11 that would --- still have relating to those conversations and

12 possible information that we requested --- .

13        THE COURT:  Okay.  And what is the nature of the

14 communications?  I heard something about efforts to get out.

15 Is this related to his mental health?  What exactly is it?  Is

16 it, hey, you know, can you run to the store and get me some

17 milk?  What are you looking for?

18        MS. ENGLAND-CAESAR:  We are looking for, yes,

19 information for his mental health, his relationship with those

20 witnesses.  Yes, information regarding the efforts that were

21 taken to secure Mr. Bryant's release because that lends to the

22 damages and how he was thinking about those things, how he was

23 talking about those things, and we feel that it is all

24 connected to and related to the damages that Plaintiffs claim.

25        THE COURT:  Okay.  I understand your request.

1             Who will be arguing this for the Plaintiffs?

2             MS. ZACHARIASIEWICZ:  I will, Your Honor.  Jean

3    Zachariasiewicz.  Thank you.

4             So I think -- remember when there was no date range

5    on the actual subpoena rider sent.  But understanding that it

6    is nearly 20 years, I think it -- because these witnesses

7    don't have letters at this point, it really focuses on

8    electronic communications.

9             The subpoena rider itself is not related to damages.

10   --- to damages witnesses, but the actual wording is any and

11   all communications, and then it makes clear that it is

12   electronic and otherwise.  --- other persons or entities.  If

13   Your Honor was to say this is fair, it is not just searching

14   for Facebook messages from Malcolm Bryant, it is for any

15   Facebook message from anybody about Malcolm Bryant.

16            So if Mr. Bryant's sister received a lot of

17   condolences from friends and acquaintances when Mr. Bryant

18   passed away, that could ostensibly be responsive because they

19   are documents concerning and relating to Malcolm Bryant's 1999

20   --- post-conviction efforts, subsequent exoneration and

21   efforts --- exoneration and civil lawsuits.  Damages aren't

22   actually mentioned in there at all.

23            And I think this is actually trying to get more

24   information --- to prove that Mr. --- wasn't innocent.  But

25   that is not what these witnesses are.  They are damages

1  witnesses, and they shouldn't have to produce every electronic

2  communication they have about a family member who tragically

3  passed away, nor should they have to retain counsel to object

4  to these subpoenas.

5         I think Your Honor has the ability, under Rule 45,

6  to quash them for being overly burdensome, whether we raise it

7  or another person does.

8         MS. ENGLAND-CAESAR:  Your Honor, if I may add to

9  that?

10         THE COURT:  Sure.

11         MS. ENGLAND-CAESAR:  So the subpoena that we have

12  wasn't officially delivered to these witnesses.  We were

13  conferring with Plaintiff's counsel for the --- and the

14  wording to avoid their objection.  So the subpoena, as

15  Ms. Zachariasiewicz read, that was one of the drafts we were

16  working trying to narrow down the language --- that we had.

17  Plaintiffs indicated that we were still requesting electronic

18  communications, that they were still going to object no matter

19  what the subpoena said.

20         More importantly, if they have relevant information,

21  then we should get the information that we requested as it

22  relates to his post-conviction efforts to -- you know, all the

23  exoneration efforts.  Because again, it does lend to

24  Mr. Bryant's understanding and his mental --- about this case.

25         So with that said, the scope of the rider isn't as

1  broad as --- .  We offered to narrow it.  We are still

2  offering to narrow it.  So just with that understanding --- .

3          THE COURT:  Okay.  Well, let me tell you some of my

4  thoughts on this particular issue.  You know, I think

5  Defendants make a legally salient point because I am not sure

6  Plaintiffs actually have standing.  You know, I don't know the

7  inherent powers of the Court, but I am looking at Rule 45.

8          You know, to the extent you have standing ---

9  personal rider privilege.  Maybe you can point me to some

10  other basis why you have standing.

11          But setting aside that for now, because this issue

12  could --- they fight it pro se or with counsel, I don't think

13  it makes sense for them to come forward with a handwritten

14  letter objecting when we can clearly ferret out the issues

15  now.  It seems more efficient to do that.

16          What I think makes no sense is for the Defendants to

17  depose the two damages witnesses.  Ask them whether they ever

18  communicated with Mr. Bryant on social media, whether they

19  ever text messaged with him, whether they ever emailed with

20  him, and if so, do any of those documents really exist.  So I

21  think that they can find that information that way.

22          Were the subpoenas directed to all six of these

23  proposed damages witnesses that were identified in one of the

24  submissions?

25          MS.       :  Yes, Your Honor.

1          MS.        :  I think it was only four.

2          THE COURT:  Four?

3          MS.        :  I believe so.

4          THE COURT:  Who were the four?

5          MS.        :  Just a moment, Your Honor.  They were

6  Dana Bryant, Mr. Bryant's sister; Debria Hendrix, his niece;

7  Malvena Melvin, his cousin; and then Anne Bryant, his mother,

8  who has already been deposed and confirmed she had a few

9  physical letters that had been produced that were still in her

10  possession.  And we have confirmed with the others that they

11  don't have physical letters at this point.

12          THE COURT:  Have you asked them whether or not they

13  have any social medica communications with Mr. Bryant after he

14  was released?

15          MS.        :  Your Honor, I didn't ask specifically

16  about social media.  My understanding is they don't have text

17  messages at this point --- I could double check that.  I did

18  not to ask specifically about social media.  So I don't know

19  the answer to that.

20          THE COURT:  All right.  Well, have you asked them

21  about text messages and emails?

22          MS.        :  Yes.  And my understanding -- well,

23  nobody has gone through and done a full search, but I believe

24  they don't think they have much left.  But I can't -- I don't

25  want to represent to the Court that nobody has anything

1    because I am not positive about that.

2              THE COURT:  Well, can you look into that, please?

3              MS.      :  Yes.

4              THE COURT:  All right.

5              MS.      :  And, Your Honor, can I just clarify?

6    Is this limited to communications with Mr. Bryant himself and

7    not others about Mr. Bryant?

8              THE COURT:  Yes.  I mean, I don't see any reason --

9    any relevance to their communications with someone else about

10   Mr. Bryant.  We are trying to measure the impact that this

11   wrongful conviction had on Mr. Bryant himself.

12             MS.      :  Okay.  Thank you.

13             THE COURT:  Okay.  Let's move on to the bald sketch

14   issue.  I just want to tee this up and step back for a moment.

15   This has been an issue that has been brewing probably since

16   February.  Maybe before that.  I am not sure.  I heard bits

17   and pieces of it.  I see a chat from --- .

18             It started to develop in February.  It was brought

19   to my attention shortly after that.  I allowed for -- I asked

20   Plaintiff to submit a more detailed privilege log that

21   identified documents they withheld that were related to the

22   bald sketch.  They did that.  I reviewed all of those

23   documents in-camera, and I reviewed them very carefully.

24             Since then a number of issues have developed that

25   the parties have brought to my attention, and I will just go

1   through what the issues are.

2           The individual Defendants seek the deposition and

3   documents from Josh Green, a former counsel of record in this

4   case; the deposition of former University of Baltimore

5   students and paralegals who worked on the case; they request a

6   search of University of Baltimore emails.  And then, under the

7   client fraud exception, they are seeking documents that were

8   withheld that were based on privilege or work product that I

9   reviewed.

10          What I would like to do is just to confirm some

11  basics that we discussed before, but I just need to frame the

12  issues for myself.  Rule 26 says you are entitled to ---

13  relevant evidence relating to a claim or defense.  Right now,

14  and I would like to confirm it from the Plaintiff, are in the

15  current operative complaint there are allegations relating to

16  the bald sketch, and I have identified the exact paragraph.

17          And just for the record, they are paragraphs 334, 53

18  and 87.  And in the complaint it doesn't say bald sketch.  It

19  says a composite sketch that more closely resembled --- and

20  Mr. Bryant.  So that is how it was characterized in the

21  complaint.  But it is paragraphs 334, 53 and 87.

22          What I have heard from Plaintiffs in a number of

23  prior conferences is that they are no longer pursuing any of

24  their claims based on this bald sketch.  Who will be speaking

25  for the Plaintiffs on this?

1            MS. HOFFMAN:  That is me.  Anna Hoffman --- .

2            THE COURT:  Okay.  Ms. Benvenutti Hoffman.  Can you

3   tell me -- can you confirm for us on the record that you and

4   your client will not be pursuing any claims based on the bald

5   sketch?  Is that true or not true?

6            MS. HOFFMAN:  It is true that we are not seeking to

7   use that document or make any claims that that was a piece

8   of --- .

9            THE COURT:  Well, what would you be seeking to do

10  with respect to the bald sketch, if anything?

11           MS. HOFFMAN:  We are not seeking to introduce that

12  or use that document at all.  The reason that I am speaking

13  carefully about this is because that was only one piece of

14  several pieces of evidence suggesting misconduct or suppressed

15  exculpatory evidence.

16           But we have several --- one of which is entirely

17  separate from --- this issue, which is about the withheld

18  evidence about the other suspect, inculpating the other

19  suspect, Rich.  There is also other evidence that suggests

20  misconduct or suppressed exculpatory evidence with respect to

21  the identification of the witness, Paige Chapelle*, which

22  relates to the creation of the composite.

23           It has nothing to do with this document, the bald

24  sketch document, but I just want to make it clear.  What we

25  are disclaiming is any use of this document.  We had a claim

1   that this document was produced in 2006 as part of an MCIA

2   request that was a part of our --- claim when we initially

3   brought this case.  We are not advancing that claim and we are

4   not seeking to introduce this document that was -- that our

5   understanding was produced in 2006 --- .

6           THE COURT:  Okay.  All right.  That is what my

7   understanding was.

8           So if we move from whether it is relevant to a

9   claim, it is not.  Then we go to whether it is relevant to a

10  defense.  The first question is, is it relevant in defense of

11  this claim?  And since the claim is no longer being pursued,

12  it doesn't seem relevant.

13          What I heard last time, and on that basis I granted

14  the request to supplement or to elaborate on the privilege

15  log, was that it is relevant to a defense that the entire case

16  should be dismissed along the lines of what happened in the

17  Dewitt case before Judge Chasnow.  So if I could hear from the

18  Defendants as to that specific issue, is what is this

19  information relevant to?

20          MR. KAMIONSKI:  Sure.  And I am going to be speaking

21  to that, Your Honor.

22          THE COURT:  Okay.  Good afternoon, Mr. Kamionski.

23          MR. KAMIONSKI:  Good afternoon, Your Honor.

24          The first part is that the Plaintiffs are not

25  disclaiming their claim that there were multiple composite

fb                                                                        32

1    sketches created.  Okay?  They are sticking with that claim.

2    So that is still a claim in the case.

3          So the fact that a sketch was created to mimic this

4    potential second composite sketch is still -- we think it is

5    still relevant evidence to rebut that issue.  But hold on.  I

6    am going to explain some more.

7          The Plaintiffs have represented that they received a

8    stack of documents from the police department in response to

9    an MPIA request.  That stack of documents includes this bald

10   sketch.  That is their representation that they have made on

11   the record and --- and that Ms. Nethercott* made, and that has

12   been used in multiple depositions.

13         There are other documents within that stack of

14   documents that Plaintiff claims are Brady material violations.

15   Like a note from this individual or another 911 call.  We are

16   attacking the voracity.  We are going to claim that the

17   Plaintiff cannot rely on materials that they claim were

18   submitted as a collection of materials that they never had

19   before that they weren't aware of, because the files have been

20   tampered with and nobody can verify, with accuracy, what the

21   criminal defense people and -- knew at the time and what was

22   not known at the time because the file has been manipulated

23   and changed, including the submission of this false bald

24   sketch.

25         In addition -- so that is to the legal point.  So as

 1  to the legal claim about the <u>Brady</u> material, we say it is all

 2  one package.  You say you received all this information from

 3  the Baltimore Police Department.  We are saying that is not

 4  true because this document is a fraud and --

 5          THE COURT:  Isn't their claim not necessarily that

 6  we received it, but it was never disclosed to Mr. Rogers?

 7          MR. KAMIONSKI:  Correct.  They are claiming that

 8  certain materials were not disclosed to Rogers, and here we

 9  have Rogers' file, which shows that the documents were not

10  there.  But we know, based on discovery so far, that the

11  Rogers file has been tampered with.  That is one aspect.

12          The second aspect is they also claim that other

13  materials came from the Baltimore Police Department that were

14  never disclosed, and they are relying on the fact that

15  Ms. Nethercott testified that she received certain documents

16  in response to an MPIA request that she never had before.  And

17  included in those documents is the bald sketch.  So we are

18  saying in --

19          THE COURT:  I thought -- the last time we went over

20  this the documents you are claiming were also in the MPIA

21  file, setting aside the bald sketch that the Plaintiffs now

22  claim they got and were never disclosed, I thought you told me

23  those documents were also in the BDP file and that the only

24  curious and sort of what is going on here is the presence of

25  the bald sketch in the MPIA file.

 1            MR. KAMIONSKI:  Correct.

 2            THE COURT:  Okay.

 3            MR. KAMIONSKI:  But I am saying that it is not --

 4    they cannot -- we would argue that it is not reliable to say

 5    that they didn't know about it just because they got it in a

 6    response later on.  We don't know what the criminal

 7    defendants' file was like because it has been tampered with.

 8    We don't know what the State's Attorney's file was like

 9    because the State's Attorney has made representations that

10    they cannot vouch to the validity that their entire file is

11    complete.

12            So we don't know -- just because something doesn't

13    exist in one file or doesn't exist in another file doesn't

14    necessarily mean it was withheld and never known to the

15    Plaintiffs during the criminal case.  And we are saying it is

16    all -- the fact that there is a fraudulent document in there

17    taints the validity of that argument to say that certain

18    documents were disclosed and certain documents weren't

19    disclosed because the entire file was tainted.  That goes to

20    the Brady claim.

21            And then the final -- and then the important issue

22    is the fraud, the general Dewitt fraud, which I am prepared

23    to, you know, marshal through that evidence.  I even prepared

24    a PowerPoint to marshal through it.  But our point is that

25    evidence is indicative of the fraud --- the bald sketch.

1             THE COURT:  I re-read Dewitt this morning.  In

2    Dewitt Mr. Dewitt was caught basically red-handed on recorded

3    telephone calls fabricating evidence, paying for witnesses to

4    testify on -- asking witnesses to create documents or document

5    examiners to testify that the statements were manufactured,

6    and that happened during a state proceeding and it was that

7    evidence that resulted in his exoneration.  Or his release I

8    should say.

9             You don't have that here.  I mean, I even read ---

10   deposition.  She said I have no idea what this bald sketch is.

11   That had nothing to do with why he was released.  So help me

12   understand why this is such an important issue.

13        MR. KAMIONSKI:  Sure.  In Dewitt there was two

14   components to Dewitt.  First there was the phone call of him

15   paying off witnesses.  There is also the evidence of the

16   fraudulent document that existed in Dewitt, which we

17   introduced document examiners in that case to prove that the

18   document was fraudulent as well.

19             Here, the fact that it wasn't used in the criminal

20   case is not really -- it is not critical for purposes of this

21   case.  It was attempted to be used in this case.  The fact

22   that we stopped them now and we called them on it doesn't mean

23   that it wasn't tried to be used in this case until this point.

24   And if we didn't say anything, this would have been introduced

25   again to our clients at trial.

fb                                                                              36

1           We have had to spend the time to play -- to catch

2   them on this fraud because --

3           THE COURT:  Well, then why isn't your sanction

4   attorneys' fees or something like that?  I am just not

5   understanding the nexus between -- even if you can prove that

6   Malcolm Bryant or his attorneys fabricated the bald sketch, if

7   that is not the basis of the exoneration and they are not

8   pursuing that claim, why is the relief or the remedy you are

9   seeking appropriate and why doesn't that diminish the

10  importance of the issues?

11          MR. KAMIONSKI:  I am not understanding.  I think it

12  -- I mean, I think that it is -- if the Plaintiff or its agent

13  committed a fraud and used it in the civil litigation, that is

14  exactly a litigation misconduct that the law does not want to

15  allow and that is why the case should not be proceeding under

16  that respect, and that is why we are doing further discovery

17  into it?

18          MR.      :  May I?  judge, may I just pipe in to

19  try to answer that question?

20          THE COURT:  Sure.

21          MR.      :  So the Plaintiff here is saying that --

22  I mean, he was released because they portrayed the DNA

23  evidence as definitive exculpatory evidence.  You know we

24  dispute how to characterize that, but that is why he was

25  released.  He was released because of the DNA evidence.

1              That is not an actionable claim against anyone.

2    That is not a civil claim case.  The remedy there was for him

3    to be released.

4              At that point, in order to get a civil claim, in our

5    view they had to concoct some kind of police misconduct, and

6    the focus of -- I mean, the reason that Plaintiff was

7    convicted was always Taisha Powell.  There was a single

8    eyewitness identification that happened here.  That was the

9    basis for the conviction.

10             So they put as the centerpiece of their -- of the

11   lawsuit really -- this is not like some side issue, the bald

12   sketch.  It is Taisha Powell; the reason that he was

13   convicted.  They said, well, what Brady evidence do we have

14   that is going to be actionable to create liability by the

15   Baltimore Police Department?

16             And in our view -- and Avi is prepared to marshal

17   through the evidence of this.  But in our view they concocted

18   this bald sketch to show that Taisha Powell, the critical

19   witness, made an exculpatory statement to Detective Ritz and

20   said really there was a bald -- described the person as being

21   bald.

22             So Taisha Powell described at trial and during the

23   record in the police reports that suspect had this bushy hair.

24   If in fact Taisha Powell described this suspect as being bald,

25   that is Brady evidence because it is severely impeaching to

1   the single eyewitness case.

2          Now in order to create that civil claim they are

3   talking about a bald sketch that is completely fabricated.

4   Any other <u>Brady</u> issue that they are talking about here is all

5   related to that.  That is the case.  That is the whole civil

6   case here, and they are going to try to maybe pivot to try to

7   put together some kind of other <u>Brady</u> evidence.  There isn't

8   any.  That is the case.

9          So to say how does this relate to the claims in

10  their case or why is this litigation misconduct, the reason is

11  because under the law if you fabricate a legal claim and it is

12  shown that you have fabricated the entire basis for your

13  lawsuit, it is against the administration of justice to permit

14  a lawsuit like that to proceed.  The legal system can't be

15  infected in that kind of way, and the legal system can't -- it

16  is not, frankly, equipped to deal with flat out lies like

17  that.

18         And when they are caught in a lie like that that is

19  about the centerpiece of the civil claim, there is case law,

20  as Your Honor read <u>Dewitt</u>, to support the dismissal of the

21  case.  Simply backing out of -- saying we are not going to now

22  try to introduce the fabricated document into evidence doesn't

23  avoid the fact that they have done this; they have built the

24  case on fraudulent evidence.

25         It is also relevant -- I don't want to rehash what

 1   Avi said, but as long as I am talking, I just want to, if I

 2   may, just speak for one more second.

 3          Whatever they now try to pivot to in terms of their

 4   Brady claim, they are going to say, well, no, we have some

 5   other Brady claim.  However they characterize it, and I am not

 6   -- you know, I don't want to be arguing against a mutant

 7   target.  But however they characterize it, it was withheld

 8   from Larry Rogers at trial.

 9          In order to make that argument they have to say the

10   document -- this is Larry Rogers' file, this is the box of the

11   file, it is not there.  So us establishing that it is

12   completely unreliable when they say what was or was not in the

13   Larry Rogers file is going to be critical to the defense of

14   any Brady claim, no matter how they seek to pivot that claim.

15          THE COURT:  Okay.  Thank you, Mr. Nathan.

16          Mr. Kamionski, did you have some follow up point you

17   wanted to --

18          MR. KAMIONSKI:  Yes, yes.  Can I just --

19          THE COURT:  Can I just ask you?  I am not -- I just

20   want to know.  Is there anything in there that we haven't

21   already talked about?  I am not a big PowerPoint person, and

22   it is actually not -- you know, I just -- I prefer argument.

23   But is there anything in there that you haven't shared?

24          MR. KAMIONSKI:  Well, I wanted to show -- I mean, is

25   Your Honor accepting the fact that the bald sketch is fraud?

fb                                                                40

 1              THE COURT:  I can't accept that fact.

 2              MR. KAMIONSKI:  I know that.  I understand that.  So

 3    we have like -- so I will tell you.  The PowerPoint shows ways

 4    that the bald sketch was fraud, and the second part of the

 5    PowerPoint shows -- I mean, it marshals through the support

 6    for why the bald sketch was fabricated.

 7              THE COURT:  Well, I have read your paper and you

 8    have gone through that with the various -- you know, how this

 9    margin is smaller and the underline.  I mean, I have gone

10    through all your submissions.

11              MR. KAMIONSKI:  Okay.  That is the -- those are the

12    -- you know, the major points.

13              THE COURT:  Okay.

14              MR. KAMIONSKI:  Is showing how certain documents --

15    and then the stuff that we talked about in the latest

16    crime/fraud submission is a little confusing.  Just try to

17    understand all the various margins that we are talking about.

18    But the point is that the file that was submitted -- I will

19    through some of the points just real quick so we can go

20    through that.

21              The document that was identified as the bald sketch,

22    that was represented to us that was produced by the Baltimore

23    Police Department, BPD MPIA 20, is -- there is a document in

24    the file that Plaintiff also produced under Bryant 2736 that

25    has wider margins than the BPD MPIA 20, and the point is that

fb                                                                                        41

1    that document -- the extra document could not have been a copy

2    of the thing that was submitted from the Baltimore Police

3    Department.  It was something that came after the fact.  Does

4    that make sense?

5            THE COURT:  I understand what you are arguing.  I

6    mean, I don't know if it the paper got scanned.  I don't know.

7    I understand what you are arguing.

8            MR. KAMIONSKI:  Do you mind if I show you real quick

9    on the --

10           THE COURT:  I will take a look quickly.  I really

11   don't want to go through an entire PowerPoint presentation

12   though.

13           MR. KAMIONSKI:  I will be quick.  I won't --- the

14   whole thing.

15           THE COURT:  Okay.

16           MR. KAMIONSKI:  Here is the point I am making about

17   the margins.  Okay?  The item on your left, which is BPD MPIA

18   20, you see how the 'u' is cut off here, whereas it is

19   complete on the 2736?  So 2736 could not be a copy of MPIA 20.

20   It is the other way around based on the margins that we got.

21           And the other big point about the margins is that

22   all the margins in the 2016 scan were different.  In the 2021

23   scan all the margins have been modified to be the same.  The

24   documents were changed to be the same.  And the BPD MPIA

25   document, which has the full 'w' does not exist in the 2021

1    scan.

2          The point that I am making is that the documents

3    were changed and -- documents were changed from the 2016 scan

4    to the 2021 scan and made to appear that the documents -- that

5    BPD MPIA -- that the bald sketch came from the Baltimore

6    Police Department.

7          There are also documents that are missing.  For

8    example, the actual original one that was in the 2016 scan has

9    actually been destroyed.  I mean, these documents no longer

10   exist in the file.  The 2016 scan and the 2016 scan of the

11   full sketch with the underlining and the highlights no longer

12   exist in the file.  It has been replaced with non-highlighted

13   scans to make it look that the document came from the

14   Baltimore Police Department.

15         We also don't know the date of the creation of the

16   bald sketch either.  There is multiple testimony about

17   multiple dates of when that bald sketch came into existence.

18   You know, Ms. Nethercott testified at one point 2006 and 2007.

19   She testified another time it was 2010.  Your Honor has looked

20   at privilege logs from 2009 that referenced the bald sketch,

21   and there is an -- the key point is there is an affidavit

22   between Mr. -- that Mr. Treem and Ms. Nethercott completed

23   where the bald sketch is completely not mentioned even

24   though --

25         THE COURT:  I read that affidavit and I thought that

1  they did allude to it.  They --- that another composite.  They

2  didn't get into the weeds of calling it a bald sketch.  But

3  when I read it, it didn't seem nefarious or missing to me.

4           MR. KAMIONSKI:  There is another document in the

5  file, and this is what the Plaintiff will reference, even

6  though they are not using the bald sketch; is a letter from

7  the State's Attorney to Detective Ritz asking about multiple

8  sketch, are there multiple sketches, and no mention of you

9  have the bald sketch.

10          And if it is an expert report about Brady material,

11 you would think you would see the actual -- like they would

12 say we received a bald sketch from the Baltimore Police

13 Department.

14          Our position is that we -- I think we have presented

15 a prima facie case that there has been a fraud committed.  The

16 fact that there has been a further tampering of the files with

17 documents taken out and destroyed -- like the argument that

18 the documents were comingled or batched together, those

19 documents are gone.  They are not missing in the file.  They

20 are gone.

21          The bald sketch, the underlying -- the Rogers file

22 118, which is the source of the bald sketch, the creation of

23 the bald sketch, that document is gone.  Not comingled.  It is

24 gone.  Those other versions of the bald sketch are gone as

25 well.  So it is not a function of where things were comingled

1   together.  It was somebody who went in there and actually made

2   changes to the document.

3          And the fact that there is alignment where all the

4   version of the bald sketch with different left hand margins

5   are now, in the new version, completely clean and all have the

6   same margins, indicates that that was -- suggests that there

7   was a calculated move in doing all those changes.

8          MR. NATHAN:  Judge, if I may add --

9          THE COURT:  If you could just identify yourself for

10  the record, that is fine.  I have a question about what

11  exactly you are seeking.  I mean, deposing eight or nine

12  former law students and paralegals from the University of

13  Baltimore, requiring them to go through thousands of emails if

14  not more?  So I would like to hear more on that, Mr. Nathan.

15         MR. NATHAN:  I am going to let Avi deal with that.

16  But I just wanted to address one thing that you started out

17  with to begin with, just to try to understand.  You started

18  this discussion, I believe, trying to say, well, Plaintiff,

19  are you relying on this or not?  I want to just clarify it

20  just so we are all on the same page about what they are

21  relying on.  If I am --

22         THE COURT:  I am certainly going to hear from

23  Ms. Benvenutti Hoffman on that.  I am sure she is dying to

24  speak.  But go ahead.

25         MR. NATHAN:  I am just going to share a document

1   that is the State's Attorney memo that Mr. Kamionski

2   referenced.  I think it is Bates numbered --- 212.  It was

3   marked as Exhibit 3 to her deposition.  I apologize.

4          (Pause)

5          MR. NATHAN:  This here is a document.  It is just a

6   memo from the State's Attorney to Detective Ritz dated January

7   25th, 1999, and at the bottom there is a line.  "Finally, I

8   seem to recall there were two composite sketches made before

9   the final sketch was completed.  Are they available to me?"

10         Now if they intend to make -- if they intend to

11  throw assertions out there that there was a second bald

12  sketch, our answer is, no, there isn't a second bald sketch.

13  But if they are going to try to use this question to imply

14  that there is another sketch beyond what was disclosed and

15  basically bait the Defendants into introduced the bald sketch

16  or the fabrication issue it is not -- if they are going to be

17  relying on this document in any way or referencing and trying

18  to imply that there was a second sketch, then they are relying

19  on the bald sketch.

20         And I just wanted to make that point, that it is not

21  just whether they introduced a document itself about a bald

22  sketch.

23         THE COURT:  Okay.  Thank you.

24         MR. KAMIONSKI:  As to what we are seeking --

25         THE COURT:  Mr. Kamionski?  Sure.

1          MR. KAMIONSKI:  It is actually very simple.  We want

2    to know where the bald sketch came from and what do people

3    know about it.  For the students, for the former law students

4    that actually worked on the case, it could be a half an hour

5    deposition or less about when did you first learn about it,

6    what do you know about it and that is it.

7          THE COURT:  You have already deposed Ms. Nethercott

8    twice.  I mean, she is the best -- isn't she the best evidence

9    of where this came from, and she is the one that told you that

10   she believes it came from the MPIA request?

11         MR. KAMIONSKI:  She has kind of backed off of that

12   already.  She is not sure anymore.

13         THE COURT:  I read her transcript, and she was

14   pressed hard for an absolute commitment.  And, you know, she

15   is an attorney and said that is exactly what I believe.  But,

16   you know, I guess she backed away slightly because she was

17   being pressed.

18         But what we know and what do the students recall?  I

19   mean, they just came in as law students --- in a clinic to try

20   to get --- .

21         MR. KAMIONSKI:  Right.  And because the document is

22   very questionable and in our opinion is fabricated, we want to

23   find out from more people who had their hands on it what

24   happened to it.  And the fact that there has been a post-scan

25   change in the file to make it look like it came from the

1   Baltimore Police Department, we would like to know from

2   anybody who touched the file what they know about this and

3   what happened to the sketch.

4          For example, like the file was taken from

5   Ms. Nethercott's office to Mr. Treem, and it sat in his office

6   for several weeks.  And at some point after that documents

7   were moved from the file and destroyed from the file.  That is

8   not up for dispute.  Those documents are gone and they -- to

9   make it look like that sketch came from the Baltimore Police

10  Department.

11         THE COURT:  I understand.

12         MR. KAMIONSKI:  So from our perspective it is very

13  limited to just this one bald sketch issue.  We are not -- we

14  are not even looking for -- you know, for extended

15  questioning.  They could answer interrogatory questions, you

16  know, if that --- .  Explain what they know.  Or if they know

17  nothing, they know nothing.

18         But I think it is fair.  I think the fact -- like

19  the Plaintiff is accusing up until -- accused the Baltimore

20  Police Department of doing this.  You know, we have developed

21  evidence that suggests that it was fabricated and there is

22  strong evidence, we believe, to support that, and we would

23  like to get to the bottom of finding out what people know

24  about it and who may have been responsible for it.

25         THE COURT:  Okay.  Thank you very much.

fb                                                                      48

1              Ms. Benvenutti Hoffman --- .

2              MS. HOFFMAN:  Thank you.  I think there are two

3    basic issues here.  The first, as the Court was getting at

4    originally, is if any of the discovery that the Defendants

5    proportional to the needs of the case?  Is it permissible

6    under Rule 26?  And I think the answer is quite clearly no.

7              They have already received an extraordinary amount

8    of discovery into an issue that is not directly relevant to

9    any claim or defense.  They had multiple in-person inspections

10   of files.  They had two separate depositions of

11   Ms. Nethercott.  They had a document examiner who has not

12   submitted any evidence in person examine all of the various

13   versions of the composite and the bald sketch.  There have

14   been multiple submissions that --- to the --- .

15             Lots of discovery already.  And at the end of the

16   day none of it supports the allegation that there is

17   intentional misconduct.

18             So the first issue is whether they are entitled to

19   any discovery under the discovery rule, and the answer is no.

20   They have already gotten plenty of discovery on this issue.

21             The second one, which is really troubling, is they

22   continue to lodge false accusations against all of the counsel

23   apparently on this call with absolutely no basis whatsoever to

24   say that we have engaged in fraud, that we have intentionally

25   misrepresented.  There is no basis for them to say that at

 1   all.  We have been completely forthcoming with everything we

 2   have done.

 3        All the discovery they have taken have made clear

 4   that everything that we said in this suit was based on

 5   information that we got from prior counsel, which so far is --

 6   frankly, it is the only personal knowledge information in the

 7   records, the testimony from Ms. Nethercott as to her belief.

 8   There is absolutely no evidence to impute Mr. Bryant, who was

 9   incarcerated at the time that this document -- contemporaneous

10   evidence was in the file.

11        Ms. Nethercott was quite clear Mr. Braynt never had

12   access to the files, that the document did not come from him.

13   The only evidence is -- the only evidence of personal

14   knowledge is Ms. Nethercott's testimony that to the best of

15   her belief and memory she believed this document was produced

16   by the BPD.  That is supported by the contemporaneous records

17   from the file going back at least as early as 2009.  Years and

18   years before anyone on this trial got involved in this case.

19        And yet, we have false accusations of very serious

20   misconduct being lashed against counsel again and again, and

21   it is not appropriate.  You cannot do that.  You cannot just

22   say that members of the bar are engaged in fraud and

23   fabricated evidence without any basis whatsoever to do it, and

24   that is what the record demonstrates here.

25        So there is two separate issues, and I am happy to

1  talk about how this is not relevant in any way to any of the

2  questions on the remaining issues in discovery.  They have

3  already had plenty of discovery into the integrity of the

4  file.  They have testimony from Ms. Nethercott.  They have

5  testimony from Mr. Rogers.  They have multiple depositions.

6          So to the extent that they want to say -- although

7  Mr. Rogers testified as to what it is that he received in

8  discovery and that the issues we are talking about ---

9  material not produced, that is consistent with what the

10  State's Attorney has testified to under oath as to what was or

11  was not produced at the time of this case.

12          Every other piece of material was -- all of the

13  material --- currently talking about in terms of Brady

14  material is that the document -- it is in the BPD file.  So

15  there is no question that the BPD has it.  The only question

16  is whether it was disposed.  We already have a record of

17  evidence as to whether it was or wasn't.

18          It is also -- the Fourth Circuit just issued a

19  decision in the Burgess case.  It came down last week.

20  Another wrongful conviction case against the City of

21  Baltimore.  --- in that case apparently affirmed the trail

22  verdict.  There was no evidence whatsoever, contemporaneous

23  evidence, as to the trial file, the State's Attorney's file or

24  -- for the record, according to the decision, there are other

25  ways to establish what was or what was not disposed.  We have

fb                                                                            51

1    plenty of evidence as to what was or was not disposed from the

2    memory of the -- all parties.  Not just the defense lawyer,

3    but also the State's Attorney.

4            So if they want to talk about what the substance of

5    this case -- we are happy to litigate the substance of this

6    case.  If they don't think we have enough evidence to go

7    forward, bring their motion for summary judgment.  Let's go

8    with discovery.  Let's go forward here.  We are quite happy to

9    litigate the substance.  But it is not appropriate for them to

10   continue to lodge false accusations of misconduct that they do

11   not have any basis to support.

12           MR. BRUSTIN:  Can I add just one point to that,

13   Judge?

14           THE COURT:  Yes, Mr. Brustin.

15           MR. BRUSTIN:  I feel like I have to as co-lead

16   counsel.  I want to be -- I would like to have some clarity on

17   the record today.

18           Are they accusing me and my colleagues of

19   intentional misconduct?  Are they accusing us of what?  I need

20   to know on the record so that I can determine what action I

21   can take ethically and with the Court.  It is a remarkable

22   allegation with absolutely no support.  It certainly

23   contradicts what they have said to us in the past.

24           But on the record today they have intimated that the

25   counsel on this call have engaged in intentional fraud with

 1   absolutely no basis.  Is it an extraordinary, extraordinary

 2   statement, and I would like clarification, if that is what

 3   they are saying, so we can determine what action to take.

 4           THE COURT:  Well, I don't know.  Well,

 5   Mr. Kamionski, you are kind of seeking to depose Mr. Treem.

 6   Where are you and where do you believe the evidence of fraud.

 7   I understand the document you have shown me.  I understand the

 8   margins and the fact that a document couldn't have been a copy

 9   of another one.

10           But who are you claiming did this?  Malcolm Bryant?

11   Michelle Nethercott?

12           MR. KAMIONSKI:  We don't know who did it.  Okay?  I

13   am not accusing Nick Brustin or anybody from the Plaintiff's

14   counsel of creating the bald sketch.  Okay?  We don't know who

15   did it, and I don't think we need to.  I don't think -- just

16   because we don't know who did it, it doesn't mean we are not

17   allowed to try to discover what happened.

18           The bald sketch on its face is fabricated.  Okay?

19   We don't know who fabricated it.  We don't know how it was

20   fabricated it, when it was fabricated.  We don't know.  Okay?

21   And we are not accusing Plaintiff's counsel of fabricating it

22   at all.  We know that in Mr. Rogers' file is the source

23   document for the bald sketch.

24           THE COURT:  Right.  But are you suggesting -- let me

25   just interrupt you.  I am sorry.  It is hard with the Zoom.

fb                                                                          53

1              MR. KAMIONSKI:  Sure.

2              THE COURT:  Are you suggesting that even though you

3    are -- you are not alleging that they created it.  Are you

4    suggesting that Plaintiff's counsel was involved in

5    perpetuating a fraud by manipulating the file?

6              MR. KAMIONSKI:  No.  I have no evidence that the

7    Plaintiff's counsel manipulated the file.  The file was

8    manipulated.  We don't know who did it.  The file was -- I

9    mean, Your Honor, I mean, it is undisputed.  We had a 2016

10   scan of the file and a 2021 scan of the file, and they are

11   different.  So we don't know who did it.

12             I mean, we are trying to figure that out, and we are

13   not -- I mean, we are not saying the plaintiff's counsel did

14   this.  We don't know.  We just know we have a fraudulent -- we

15   have a sketch that we have evidence that suggests it is

16   fabricated, we have a scan that is different and documents

17   moved around.  It didn't happen by itself.  Right?  So we

18   don't know who did it, and we are trying to figure that out.

19             And I think it is a fair and reasonable question to

20   find out how did this happen, and that is all we are trying to

21   find out.  We can't point fingers at anybody because we don't

22   -- we can't know who did it.  We just know it didn't happen on

23   our side of the --- .  It is somebody on the other side on

24   behalf of Mr. Bryant that that did this, and we don't know

25   who.

1            THE COURT:  Aren't you getting away from the issue

2  how does that relate to the claims or the offenses in this

3  case?  I just keep coming back to that particular issue.

4            MR. NATHAN:  Judge, I am going to step in because I

5  already --

6            THE COURT:  Mr. Nathan, please identify yourself.

7            MR. NATHAN:  I apologize.  Shneur Nathan, for the

8  individual Defendants.

9            I tried to make this point before because it is --

10  the entire case from the prosecution, as well as the civil

11  case, relates to Taisha Powell.  Taisha Powell was, again, the

12  sole eyewitness in the case.  She was the basis for the

13  conviction.  If there was critical impeachment information

14  against Ms. Powell, it would have impacted the case about

15  whether Mr. Bryant was convicted.

16            Now he ends up getting released from prison based on

17  DNA evidence that had nothing to do with Detective Ritz.  But

18  the Plaintiff is now asserting civil claims, a <u>Brady</u> claim

19  against the officer, saying they withheld material impeachment

20  evidence that would have impeached the sole eyewitness, Taisha

21  Powell.  So to say --

22            THE COURT:  They are not going to rely on the bald

23  sketch.  They have other evidence that they are going to rely

24  on, and then there is also the Berger issue.

25            MR. NATHAN:  So I have to hear what this other

fb                                                                    55

 1   evidence is because there isn't other evidence.  It all boiled

 2   down to Taisha Powell.  So if they are going to say other

 3   evidence that is going to impeach the credibility of Taisha

 4   Powell's identification, how does that -- are they going to be

 5   referring to that other document that I shared with the Court,

 6   that there is some mysterious sketch?

 7           What is their other claim?  Because they don't seem

 8   to have another claim.

 9           THE COURT:  All right.  Ms. Benvenutti Hoffman, help

10   us clarify what your -- what the claims you will be pursuing

11   going forward if you are not introducing or relying on the

12   bald sketch.

13           MS. HOFFMAN:  So we have a number of claims, and I

14   am not prepared to argue summary judgment.  But in case I

15   missed --

16           THE COURT:  I don't want a summary judgment

17   argument.  I certainly can't do that.  That is for Judge

18   Hollander.

19      (Simultaneous crosstalk.)

20           MS. HOFFMAN:  Sorry.  I didn't mean to interrupt

21   you.

22           THE COURT:  Go ahead.  I just need you to clarify

23   for me the relevant claims in the case.

24           MS. HOFFMAN:  Yes.  So first, we do have the claims

25   against Berger for initially destroying exculpatory evidence,

fb                                                                      56

1    which is entirely separate from anything related to Ritz or

2    the identification.  We also have claims, <u>Brady</u> Claims,

3    against Ritz and there are several different types and, of

4    course, for a Brady claim everything would be considered

5    collectively.  And a lot of this is laid out in our complaint,

6    but then some additional evidence has been developed during

7    discovery.

8            So there are claims about the suppression of

9    exculpatory evidence about the other suspects, which was --

10   there are several documents about that that were withheld and

11   other evidence that was developed during discovery about

12   additional evidence implicating Ritz that was not recorded.

13   There is also other evidence of misconduct or suppressing

14   exculpatory information about the identification procedure

15   with Ms. Powell that was developed during discovery in this

16   case.

17           I know that there is some evidence about -- there is

18   undisputed evidence about violations of policy and procedure

19   with respect to writing down contemporaneous records or the

20   identification.  I believe there is some evidence --- these

21   depositions about how the composite -- the composite --- was

22   created, and this is about the composite that was actually

23   used.  It has nothing to do with this document from

24   Ms. Nethercott's file.

25           There is evidence about -- I believe that there is

1  evidence about case undermining --- identification developed

2  during the post-conviction.  So there are a lot of different

3  things.  Largely circumstantial evidence, but that is not

4  uncommon in these cases, about suppressed information,

5  undermining the liability of Ms. Powell's identification.

6  That is one type of Brady evidence, and there is all kinds of

7  evidence --- different suspects.  That is another type of

8  Brady evidence.  And then there is all the misconduct by

9  Berger.

10          There is absolutely no basis, to extent that we want

11  to rely on other circumstantial evidence, of improprieties in

12  the composite process, like the contemporaneous document from

13  the State's Attorney and testimony from the State's Attorney

14  related to that document, suggesting that they believe there

15  are multiple composites.  That has nothing to do with this

16  other document.  There is no reason that that is not

17  independent evidence that we could use.

18          Now whether -- you know, if the Defendants want to

19  argue that is suspicious, that is too speculative and that is

20  not --- basis for a Brady claim, that is an argument for

21  summary judgment.  We can argue that on the  merits.  But that

22  is not -- there is no -- the document itself we have said that

23  we don't want to rely on.

24          I still believe the evidence in the record, the only

25  evidence in the record suggests it came from the BPD.  ---

fb                                                                                    58

1    admit there is enough questions and there is just enough on

2    the face of the document that we don't -- you know, nobody

3    really knows what the document is; that we didn't rely on it

4    and we wanted to give notice that we are not relying on it,

5    and so we do think it does make all the discovery Defendants

6    are seeking much less relevant than it would otherwise be.

7           But there is no evidence of misconduct by anyone.

8    So anything else they are seeking as a sanction, if it is

9    going to be a sanction, it would have to be a sanction against

10   who?  For what?  What did they do?  We didn't do anything

11   wrong.  Mr. Bryant didn't do anything wrong.  There is no

12   evidence that anyone intentionally did anything wrong.

13          At most what we have is some circumstantial evidence

14   that suggests there might have been confusion about where a

15   document came from.  Again, the only testimony in the record

16   is it came from the BPD.  That is where --- contemporaneous

17   records of UB Law.  But there is some question that maybe

18   there was a mishap or maybe during the many years that

19   students --- department were -- in the law clinic were

20   reviewing this; that somebody got confused and maybe that is

21   not where it came from.  Maybe that is why.

22          I don't have any personal knowledge.  I can't say

23   for sure.  There is nothing, nothing at all that indicates

24   intentional misconduct by anyone, let alone someone that would

25   be attributable to Mr. Bryant or his current counsel or the

 1  people who are litigating this.  So you can't have a sanction

 2  without evidence of misconduct that somebody should be

 3  sanctioned for, and there is no evidence of misconduct.

 4          MR. NATHAN:  Judge -- I am sorry.

 5          THE COURT:  Thank you.

 6          MR. NATHAN:  Shneur Nathan, if I may.

 7          THE COURT:  Yes.  And then I will -- I think I am

 8  finished after you.  Thank you.

 9          MR. NATHAN:  Okay.  Your Honor asked the Plaintiff

10  to identify what other Brady material they are relying on

11  because as I said before, this case is about Taisha Powell.

12  It is all about her identification.  And with all respect to

13  Ms. Hoffman, she mentioned five different ways of saying

14  Taisha Powell.

15          She said there is another suspect, Bo Peek*.  He is

16  the bald sketch guy.  He is bald, and he is the alternative

17  suspect.  She said another suspect.  She mentioned

18  identification procedure, relating to Ms. Powell.  Again, that

19  is the sketch.  Writing down contemporaneous identifications

20  about the composite.  Also the sketch.  And she also said

21  undermining Taisha Powell's identification.

22          Again, it comes down to --

23          THE COURT:  No.  By the composite she is referring

24  to the actual one with the full head of hair.

25          MR. NATHAN:  The allegations, as I understand them,

1   is that Taisha -- and by the way, Taisha Powell testified in

2   this case that she sat down with the sketch artist one time,

3   and she also doesn't remember a bald sketch.  That is an

4   important point.

5         But we are talking about -- the whole bald sketch

6   issue is whether or not Taisha Powell created a bald sketch

7   during that time with the sketch artist.  Sketch artist is a

8   misnomer because it is a computer program.  But the person

9   manipulating the computer program with Taisha Powell.

10        So these are all different ways of releasing the

11  process that -- by which Taisha Powell did her identification

12  through this photo sketch was there is some withheld

13  exculpatory evidence.  Ms. Hoffman again did not say that they

14  are not relying on that other document, implying that there is

15  some other sketch withheld.

16        So here we are handcuffed, according to Plaintiff's

17  argument.  What they are trying to do is, well, there is some

18  bald sketch.  Not bald sketch.  There is some other sketch

19  that we withheld.  We can't point to it.  And it handcuffs us

20  from saying, well, you know what this other bald sketch issue

21  is?  It is a big fraud.  They tried to say it was a bald

22  sketch, and we proved that it is wrong.

23        Now going just to the point about their -- who is

24  going to be sanctioned, we don't have specifically who is

25  going to be sanctioned yet.  Right now there is no motion for

1   sanctions pending.  We don't -- we do take that, these

2   allegations, very seriously, and we don't want to baseless

3   accusations against individuals.  It is serious.  I know I

4   don't want to do that.  None of my colleagues want to do that.

5           What we are asking for is discovery.  What the law

6   requires us to do is establish a prima facie case that there

7   was probably something fraudulent that happened here.

8           Mr. Kamionski did an expedited version of his

9   PowerPoint, but he -- you know, Your Honor has read our

10  submissions.  We have well exceeded a prima facie case that

11  this bald sketch was fabricated.  He is prepared to spend the

12  next hour going through every little detail about how we show

13  that it is fabricated and --- spare you and not do that.

14          THE COURT:  You are.

15          MR. NATHAN:  But I don't think you would let me even

16  if I wanted to.  The point is in response to that whole

17  panoply of items that we -- where we showed this sketch is

18  fraudulent, what we have the Plaintiff saying is who did it?

19  You don't have evidence of who did it.  It is a game of

20  gotcha.

21          In fact, we have an interrogatory that was due today

22  asking, well, when -- identify when Mr. Bryant interacted with

23  the file.  When was he at -- in the same place as the file?

24  And the Plaintiff asked for an extension.  So that is also not

25  fair to say, hey, you haven't proved it yet.  Well, you

1    haven't answered our question.

2            And all we are seeking right now is -- we are not

3    asking for sanctions on the issue.  We are asking for

4    discovery.  We certainly made a prima facie showing.  We are

5    prepared to continue to make that showing, but we think it is

6    well established, and Plaintiffs did not rebut it or even come

7    close to rebutting it.

8            THE COURT:  Let's move to Mr. Lord.  Do you have

9    anything to add here that is not included in your written

10   submission?

11           MR. LORD:  I have so much, Your Honor, but I will

12   try to keep it short.  I would like to just start off -- you

13   know, the person who is -- I share Ms. Hoffman's and

14   Mr. Brustin's concerns about the attacks on the integrity of

15   the attorneys in this case.

16           But from my perspective, and I am really very late

17   to the game in this litigation, the most serious allegations

18   are against the person who is not in the room, which is

19   Ms. Nethercott.  I mean, Mr. Kamionski said, on countless

20   occasions in his initial discussion with you today, that

21   someone tampered with the file, implying that there was some

22   wrongdoing in the University of Baltimore Innocence Project

23   Clinic using its own file.

24           I mean, what happened in this case was in 2016 after

25   at least -- well, almost 10 years or 10 years of

1   Ms. Nethercott, you know, representing Mr. Bryant in

2   post-conviction proceedings.  Originally it started with the

3   Baltimore City Public Defender's Office and then through the

4   Law Clinic.  And successfully advocating for his exoneration

5   through DNA evidence.

6           He then asked if she would cooperate with his -- you

7   know, referring the matter over to Plaintiff's counsel in

8   consummation of the civil suit.  Well, at that point he was a

9   current client.  She cooperated with that.  She made the paper

10  file, as it existed on that single day, available to

11  Mr. Treem's firm.  He had it.  And so there is a snapshot in

12  time where this paper file is scanned.

13          And, quite frankly, the UB Law Clinic had no role in

14  that, other than providing the file to Mr. Treem's office.

15          It then comes in time.  There is no litigation hold.

16  It is not -- it has not been subpoenaed at that point.  It has

17  not been ordered by anybody or even requested by anybody to be

18  rocked in time by the law school.  It is a working paper file

19  which has been developed over 10 years and which moved from

20  the Baltimore City Public Defender's Office, to a temporary

21  office that Ms. Nethercott had, to a clinic office where it

22  was one of hundreds of Innocence Project Clinic files and

23  however many thousands of files amongst, you know, the 11

24  clinics and the law school.

25          And so the file that Mr. Kamionski is referring to

fb                                                                      64

1   was a snapshot in time of a paper file that was scanned in

2   2016.  Five years later -- and at that time -- so it goes back

3   to the law school, and it is the law school's property.  That

4   file continued to be used and accessed, as Ms. Nethercott

5   testified.

6           The State's Attorney's Office asked her to cooperate

7   with a review with an outside consultant on this case.  And

8   once that file -- she reviewed that file.  She discussed that

9   file.  It got moved from an office to sometimes to her home

10  --- .  She also used it for -- reviewed it for other purposes.

11          And so then five years later, in the context of

12  litigation for which the law school is not a party, it is not

13  counsel, it has no role whatsoever other than the initial

14  cooperation with her client, you know, with Plaintiff's

15  counsel, now there is another snapshot in time.

16          As I explained to Mr. Kamionski and the other many

17  lawyers representing the individual Defendants back in my

18  original February 23rd letter, the concept that this has been

19  tampered by the University of its own file, especially when

20  there was no legal hold on it in any way, is -- quite frankly,

21  it is inflammatory.  And if it were not in the context of this

22  legal proceeding, it would be probably defamatory.

23          And so, as strongly as the Plaintiff's counsel feel

24  about -- and I don't think anybody has said, but the rule of

25  evidence connotations of this, it is even more serious for

1   Ms. Nethercott because she is not a party.  She is not in this

2   case.

3              So the concept that Ms. Nethercott would tamper with

4   her own file was -- it legally and commonsensically it doesn't

5   make any sense.  You can't tamper with your own property.  It

6   is the university's property.

7              The whole thing here is based on there is a snapshot

8   in time some five years ago of some huge paper file that has

9   been accumulated, you know, for 10 years, and then five years

10  later there is another snapshot in time.  And, yes, those

11  paper files do not look the same.

12             You can look around my office.  If you looked in my

13  office today, tomorrow or the next day, my paper files would

14  not look the same.  This is five years later.  So I would --

15  you know, I would challenge the very concept and the use of

16  the term tampering because it is completely inappropriate in

17  this case, and it is -- as I said, it is offensive to

18  Ms. Nethercott.  I mean, that is sort of my initial --- .

19             THE COURT:  Okay.

20             MR. LORD:  And I am reading -- you know, in the --

21  you know, actually we did not brief this whole crime/fraud

22  exception.  Our role here is primarily focused on the burden

23  to the university.

24             But I would just point out the concept here was,

25  well, there was tampering in order to correct the file before

1    it was subsequent -- in file review in February of 2021.  But

2    at no point did -- why would that even happen?  The university

3    wasn't even aware there would be a subsequent review in 2021.

4    We have not been involved in this case.

5            After Mr. Bryant was exonerated, other than, you

6    know, the initial cooperation with Plaintiff's counsel, the

7    university's whole -- why would it tamper with its file that

8    it had no idea would even have any bearing on the case?  The

9    file was made available in 2016, and then the parties came

10   back and said if I could take a look at the file again in

11   2021.

12           What exactly would -- why would even know -- why

13   would Ms. Nethercott have even known that might happen three

14   or four or five years ago?  And as Ms. Hoffman pointed out,

15   the questions about multiple sketches or multiple composites,

16   as I understand it were identified by the students in the

17   clinic as early as 2009.  I mean, there is -- in the memos you

18   have reviewed there are references to it.

19           So let me backup here.  What did the university do

20   in this case?  It did exactly what any lawyer is supposed to

21   do.  Ms. Nethercott and her team of student attorneys are

22   representing an individual who is in jail.  And what is their

23   job in that case?  Their job is to go back and pull everything

24   they can from a conviction that happened 10 years -- you know,

25   as a starting point 10 years earlier.

fb                                                                                    67

1            Review the transcripts, review the documents, review

2    the evidence; identify are there grounds here where we can

3    argue that Mr. Bryant was improperly convicted.  That is what

4    lawyers do.  They were advocating.  They were identifying all

5    the documents.

6            That is what Defendants' counsel are doing.  They

7    are saying what can we do to defend our clients in this case?

8    Let's think of all the arguments we can make that might help

9    our Defendants not be found civilly liable in this case.  And

10   they are making a lot of hay out of the fact that one piece of

11   paper existed in 2016 here but didn't exist in the same place

12   in 2021, which is why we are here.

13           But that is what -- that is what Ms. Nethercott and

14   the clinic did, and that is exactly what attorneys are

15   supposed to do.

16           THE COURT:  Okay.  Thank you.

17           MR. LORD:  I know.  Okay.  But I think at some

18   point, if there is going to be a claim that Ms. Nethercott ---

19   Plaintiff and our agent tampered with the file, put it on the

20   record, put it under Rule 11 and we will come and defend that.

21           THE COURT:  Understood.  All right.

22           MR. LORD:  If you want to hear -- you know, so that

23   I guess is my preference on -- you know, I was trying to jump

24   in when he kept referring to tampering.  You can't -- she

25   didn't tamper with her own file.

fb                                                                          68

1          As it relates to the burden on the university, we

2   have articulated it.  This has been a moving target with the

3   individual Defendants as to what they are evening seeking.

4   But the most recent request, which they reiterated the day

5   before our letters to you were due, was that we want to search

6   of over 13,000 email accounts for -- you know, as a series of

7   search terms.

8          We had objected to that.  At the meet and confer

9   there was no request that we -- that wasn't even raised.  At

10  the meet and confer conference we were requested to review and

11  produce Michele Nethercott's personal emails, which we had

12  already advised there were none.

13         Later that day Mr. Kamionski called and said, no,

14  no, we really want Michele Nethercott's work email and offered

15  a compromise.  So this is sort of round two of what the

16  discussion was.  So we never even searched to identify what

17  the scope of the request of all UV email accounts because we

18  timely objected.  We are not searching through 2000 email

19  accounts.

20         It didn't even come up again until the day before

21  our letters were due.  So I can't even tell you what the scale

22  is, but I can represent -- I am sure you know from ESI.  If

23  you are going to search 13,000 email accounts, if you get 5

24  hits per account, just random picks, we are now going to have

25  65,000 emails.

1              I think I have articulated for you the extraordinary

2     measures the university would have to go through to review

3     both for privileges issues as relates to the clinic work, but

4     FERPA issues as it relates to student issues.  Every single

5     student who is mentioned in one of those emails would have to

6     get a FERPA notice, would have a right to -- given a right to

7     object.

8              But the burden on the university is we would have to

9     go through every single one of them to identify who those

10    students are.

11             There is absolutely no recognition of this burden in

12    the response, and I am looking at that email, the February --

13    excuse me.  The May 12th letter in which we -- the Defendants'

14    response was, well, for the same reason that -- discussed

15    above, the Court should order UB to produce all responsive

16    emails for an in-camera inspection.

17             Well, our objection, as we articulated twice, was

18    not based on the merits of the case.  It was based on the

19    burden to the third party, which is UV, and that is the

20    analysis under Rule 45.  That wasn't even -- this hasn't even

21    been proffered by the Defendants, that this would not be

22    burdensome.

23             The issue about deposing former students, I can't

24    impress enough upon you how serious university officials take

25    this.  I mean, this case has caused more work on the

fb                                                                    70

1    university and more time, and the specter of deposing former

2    students about work they did as part of their clinical program

3    is of the utmost seriousness to them, both because of the

4    FERPA issues that are implicated and the integrity of the

5    academic program and the confidentiality of the academic

6    program.  But because of the nature of the law clinic.

7              And so by going and -- you know, a law clinic is a

8    hybrid.  It is both an educational program and a law firm.

9    And so by going and asking the law students what they did in

10   -- as you saw from their memos, you know, thinking through

11   what are potential arguments we have?  What is the evidence?

12   What arguments can we make?

13             You know, asking about that is obviously going to be

14   privilege under the attorney work product privilege.  It might

15   be attorney/client communication privilege.  And to the extent

16   they are talking about it, it is an educational record.  So it

17   is confidential under federal law under FERPA.

18             And the chilling effect.  The university is

19   terrified of the chilling effect.  If law students are told

20   that a year or two or five or ten years after a clinic they

21   can be hauled into a deposition and forced to discuss the work

22   they did in the clinical program and perhaps have to engage

23   counsel at their own expense to defend their rights about the

24   confidentiality of their own personal education records, these

25   are serious concerns of the university.

1              You know, I am sure the parties here can discuss

2    whether it goes beyond the number of allowed depositions or it

3    is disproportionate to the case.  That is not our issue.  My

4    issue, on behalf of UV, is we have spent countless hours.

5              You know, I --- AED.  I don't track my time this

6    way.  But I can tell you I represent -- my office represents

7    all the public universities in all litigation.  We probably

8    have 75 active litigation cases, not including pre-litigation

9    claims and third party -- you know, assisting our clients and

10   third parties.

11             As a rule, we assist and we cooperate when we get

12   third party subpoenas.  It happens to the universities all the

13   time.  And if the requests are voluminous, we try to work with

14   the parties to scale back the request or say, look, this is

15   going to be so voluminous that we are going to have to ask you

16   to pay our expenses.  And normally what we do is we say we

17   will treat like an MPIA request; pay us for our time.

18             This one case of all -- and I oversee all the

19   litigation.  I am the deputy counsel for litigation.  This one

20   case has taken up as much time in the last two months for me

21   and my clients as any other case I am working on or I oversee.

22             THE COURT:  Are they paying you extra for it?

23             MR. LORD:  No.  Of course not.

24             THE COURT:  I understand your argument.  Is there

25   anything else that you want to add?

fb                                                                      72

         1          MR. LORD:  No.  I mean, at this point my point was

         2   the university has produced Mr. Nethercott as a corporate

         3   designee.  She testified in her personal capacity.  We moved

         4   the entire Bryant file over.  We brought additional

         5   information about, you know, public appearances or something.

         6          The scale of the email request is not even -- there

         7   is not even an attempt to be reasonable.  When you say --

         8          THE COURT:  I understand, Mr. Lord.

         9          MR. LORD:  UV would like to be done.  And if there

        10   are charges of -- as it relates to Ms. Nethercott, if there

        11   are going to be allegations that she acted fraudulently, then

        12   at some point they need to be made in a formal way, pursuant

        13   to Rule 11, and she needs to have the opportunity to defend

        14   herself and not be sort of the -- pointing to the empty chair,

        15   which is really what is happening now the way these arguments

        16   are going now.

        17          THE COURT:  Okay.  Thank you very much.

        18          MR. LORD:  Thank you.

        19          THE COURT:  Just give me one moment, please.

        20      (Long pause.)

        21          THE COURT:  Okay folks.  This is where I come out

        22   with this.  My mouth, first and foremost, is anchored in Rule

        23   26.  Of course, the individual Defendants may obtain discovery

        24   regarding any non-public matter that is relevant in the

        25   parties' claim or defense and proportional to the needs to the

1    case.

2         We talked extensively about whether the bald sketch

3    information that is sought in a variety of manners, including

4    --- depositions and documents, UV law student and paralegal

5    depositions and documents and the information withheld by the

6    Plaintiff's case on work product and attorney/client

7    privilege.  So my ruling addresses all of those issues.

8         Of the things I have to consider, of course, when I

9    am considering relevance and proportionality, I have to

10   consider that if severability is limited by the requirement of

11   proportionality, which requires me to weigh whether the burden

12   or extent of the proposed discovery outweighs the ---

13   benefits.  I have to consider, among other factors, the

14   importance of the issues at stake in the action and the

15   importance of the discovery in resolving the action.

16        Here there is considerable debate between the

17   parties about whether or not or the bald sketch information is

18   relevant to a pending claim or defense.  Plaintiff claims it

19   is relevant.  Neither Defendant claims it is relevant to a

20   pending claim, which is the Brady claim, and I understand the

21   Plaintiff's argument that the Brady claim cannot be separated

22   from the evidence of the bald sketch, in that to the extent

23   that there is any reference to Taisha Powell, the bald sketch

24   makes it relevant.

25        I don't see it that way.  I see that the Plaintiff's

1    pending claims, or the ones they are pursuing, which will not

2    include evidence or reference to a bald sketch, are

3    independent of those.  Nonetheless, for the purposes of my

4    analysis, I will accept that there may be some relevance to a

5    pending claim of the bald sketch.

6         The other issue is whether or not this is relevant

7    to any defense, and I previously found that for purposes of

8    obtaining more information regarding the privilege log entries

9    and the documents that were withheld relating to the bald

10   sketch, that it was relevant to defenses.  Defendants told me

11   that they wanted to try to get the information in order to

12   ultimately file a claim to dismiss the entire lawsuit along

13   the lines of the way the defendants did in Dewitt.  And based

14   on that, I allowed the supplementation of the discovery, of

15   the privilege logs, and then I reviewed the documents

16   in-camera.

17        You know, I looked at -- as I considered that

18   defense and how it sits contextually with Rule 26 and request

19   here, as I need to do, I looked at Dewitt, as I said, and

20   Dewitt is a pretty extraordinary opinion under extraordinary

21   circumstances.  And Judge Chasnow in that emphasized how it is

22   the culpability of the plaintiff that drives the extent and

23   nature of the sanctions.

24        And in that case the culpability of Mr. Dewitt was

25   pretty clear, and Judge Chasnow found, by clear and convincing

fb                                                                                75

1    evidence, that he engaged in witness tampering and the

2    alteration of evidence and did that in order to defraud a

3    state court and it was based on that fraud that he was

4    released.  And it was also based on that fraud that he was

5    seeking damages in a federal lawsuit.

6         So Judge Chasnow, in the Dewitt case, he, of course,

7    did talk about the Court's inherent powers to preserve the

8    integrity of the judicial process and the resources needed to

9    resolve any disputes in an orderly and expeditious manner.

10   She also talked about the --- public policy --- the cases she

11   decided on the merits and dismissal without reciting the

12   merits is the most extreme sanction.

13        Let me be clear.  To the extent that issue is ever

14   posed in this case, it will not be me deciding that.  That is

15   Judge Hollander.  But there is an interplay between this

16   asserted defense and the discovery that Defendants are -- kind

17   of seek in order to assert that defense, and I think that I

18   have to consider the nature of the defense and how important

19   the issues are relating to the defense.

20        And I just note that this case --- completely

21   different from Dewitt.  This is a case in which Mr. Bryant was

22   exonerated based on DNA evidence and not based on the bald

23   sketch.  So in my mind that diminishes, probably dramatically,

24   the importance of the bald sketch and the need for discovery

25   regarding the asserted defense.

1          Where that leads me to next is even assuming that

2     the bald sketch information is relevant to a pending claim or

3     defense, the Defendants, of course, and they are appropriate

4     to focus on this issue, they need to pierce the privilege,

5     because almost all of the information that they are seeking in

6     this regarding the bald sketch would be privileged.

7          Certainly with regard to Mr. Treem, the former

8     counsel of record.  Certainly any documents that the Plaintiff

9     withheld based on attorney/client privilege or work product.

10    Anything that the law students who were acting as lawyers at

11    the time might have done on this case or how they interacted

12    with Mr. Bryant and any communications they had regarding the

13    case.  I would assume the logs would be privileged, if not

14    entirely be privileged.

15         So for that reason, the parties have correctly

16    identified that the crime/fraud exception, really I think, in

17    this case governs whether or not, assuming relevance, that the

18    discovery is appropriate.  And I reviewed the Fourth Circuit

19    opinion that all parties had cited in Chaudhry vs. Gallerizzo,

20    174 F 3rd 394 403.

21         "The party asserting the crime/fraud exception must

22    make a prima facie showing that the privileged communications

23    fall within the exception."

24         While a showing must -- they justify a favor of the

25    offering party.  It does not necessarily compel such a

1  finding.  There are two things that a party must show in order

2  to make that a prima facie case to invoke the crime/fraud

3  exception.

4         The first, number one, "The client was engaged in or

5  planning a criminal or fraudulent scheme when he sought the

6  advice of counsel to further the scheme," and two, "the

7  documents containing the privileged material bear a close

8  relationship to the client's existing or future scheme to

9  commit or defraud."

10         I would like to focus on the first prong, which

11  again, is that the client wasn't engaged in or planning a

12  criminal or fraudulent scheme when he sought the advice of

13  counsel to further the scheme.  In that regard, the Fourth

14  Circuit, in In Re: Grand Jury Proceeding, 102 F 3rd 748 at

15  751, a 1996 Fourth Circuit opinion said, "When applying the

16  crime/fraud exception to the attorney/client privilege, it is

17  held that it is the client's knowledge and intention that are

18  of paramount concern because the client is the holder of the

19  privilege."

20         So my analysis here focuses on the evidence that the

21  client, here Malcolm Bryant -- there has been no suggestion

22  that his personal representatives were involved in any

23  wrongdoing or knew anything about this.  So I am focusing

24  solely on Malcolm Bryant as the client, and he is certainly

25  the holder of the privilege with respect to the vast majority

1   if not all of the information at issue here.

2           With regard to what we know, I have got the sworn

3   testimony of Michele Nethercott, who was his lawyer at the

4   Innocence Project at the University of Baltimore Law School

5   for a long period of time.  She testified at least twice in

6   her deposition that Mr. Bryant did not send her the bald

7   sketch.  She was certain about that.  She may have ---

8   elsewhere, but on that she was certain.

9           In addition to that, I reviewed the in-camera

10  documents that were provided to me, including a number of

11  letters that Mr. Bryant wrote.  And while he was aware of the

12  bald sketch, I see no evidence in the documents that were

13  produced to me that he engaged in or planned a criminal or

14  fraudulent scheme when he sought the advice of counsel.

15          So for those reason I find that the Defendants have

16  not made a prima facie to invoke the crime/fraud exception in

17  order to obtain any discovery regarding the bald sketch.

18          In addition, I want to make some specific findings

19  with respect to the specific requests for information.  So the

20  request to Josh Treem for documents in his deposition --

21  Mr. Treem, of course, was --- counsel.  I think his former

22  counsel of record in this case.  But was counsel of Mr. Bryant

23  and, according to Ms. Nethercott, received the file from the

24  University of Baltimore and at some point returned it to UB.

25          It is at this point, in my view, speculation that

1   Mr. Treem would have any non-privileged information regarding

2   it.  There is no evidence that Mr. Treem committed any fraud.

3   I see that they have noted that he is under indictment.  He is

4   presumed innocent.  That is completely irrelevant to me.

5        There is only speculation that he might know what

6   had happened -- what might have happened to the assortment or

7   the composition of the file between the time that he received

8   it from Ms. Nethercott and the time it was returned to UB.

9   Certainly every document I see in-camera tells me that the

10  bald sketch was in the UB file as early as 2009.

11       In addition, I find deposing Mr. Treem would be

12  burdensome because it would require extensive assertions of

13  privilege and certainly going through the documents would be

14  burdensome because of all the privilege issues there, and I

15  don't find there is a basis to pierce the privilege.

16       With respect to the University of Baltimore law

17  students, their legal depositions, for the same reasons that I

18  think that it would be inappropriate to depose Mr. Treem, it

19  is certainly inappropriate to depose the former law students

20  and paralegals.  It is clear from the review of the in-camera

21  documents that the bald sketch appeared in the file as early

22  as 2009 and that these law students knew it was there.  There

23  has been no evidence before me to indicate that they

24  fabricated it or that they were aware of a fabrication.

25       Of course, anything that they would offer would be

1   protected by the attorney/client privilege and work product

2   doctrine.  And for the reason that Mr. Lord cited as well,

3   they would have privacy concerns and would have to address

4   those before deposing them, and that would be extremely

5   burdensome.

6            For the same reasons I find that searching through

7   13,000 email accounts to see -- even with --- word searches of

8   UB Law School is incredibly burdensome and outweighs -- is

9   disproportionate to me in this case and outweighs any likely

10  benefit, which I find to be minimal.

11           I think there were a lot of issues raised today, but

12  what I focused on is --- 26 and the crime/fraud exception.

13  There other issues raised.  You know, did lawyer ---

14  appropriately?  You know, people were in a very heated

15  discussion today.

16           And I think that -- I think that I haven't seen any

17  evidence right now of wrongdoing by a lawyer.  The Defendants

18  have deposed Ms. Nethercott twice.  She seems to be the best

19  person to know about the contents and integrity of the file,

20  and I think that the Defendants have made a valiant effort to

21  prove -- or to make a prima facie case for the crime/fraud

22  exception.  But I don't find it here, and I won't pierce the

23  privilege.

24           Is there anything else that we can address from the

25  Plaintiff's perspective?

1          MS.        :  No, Your Honor.  Thank you.

2          THE COURT:  From the individual Defendants?

3          MR.        :  No, Your Honor.

4          THE COURT:  Okay.  Ms. --- I haven't heard from you

5    much today.  Anything else?

6          MS.        :  No, Your Honor.  Thank you.

7          THE COURT:  Okay.  Mr. Lord, anything?

8          MR. LORD:  No.  Thank you, Your Honor.

9          THE COURT:  All right.  Discovery closes on June

10   2nd.  Is that right?  No.

11         MS.        :  I believe it is June 4th.

12         THE COURT:  Okay.  All right.  If there isn't

13   anything else, thank you very much for your time today.  I

14   appreciated your arguments, and have a good evening.

15      (Chorus of "Thank you, Your Honor.")

16         THE CLERK:  This Honorable Court is --- .

17      (Whereupon, at 4:18 p.m., the hearing concluded.)

18

19

20

21

22

23

24

25

C E R T I F I C A T E

I hereby certify that the foregoing is a correct
transcript from the duplicated electronic sound recording of
the proceedings in the above-entitled matter.


_____*Fabiana Barham*___07-29-21_____
Fabiana Barham                        Date
Certified Transcriber, CompuScribe
Certification No. CET-1214